## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEVINCCI SALAH HOURANI )<br>6901 Winners Circle )<br>Fairfax, VA 22039 )<br> )<br>and )<br> )<br>ISSAM SALAH HOURANI )<br>c/o Crowell & Moring LLP )<br>11 Pilgrim Street )<br>London EC4V 6RN )<br>United Kingdom )<br> )<br>     Plaintiffs, )<br> )<br>v. )<br> )<br>ALEXANDER V. MIRTCHEV )<br>2201 N Street, N.W., Apt 2 )<br>Washington, D.C. 20037 )<br> )<br>KRULL CORPORATION )<br>1825 Eye Street N.W., Suite 400 )<br>Washington, D.C. 20006 )<br> )<br>GLOBALOPTIONS, INC. )<br>1501 M Street Northwest )<br>Washington, D.C. 20005 )<br> )<br>GLOBALOPTIONS )<br>MANAGEMENT, INC. )<br>1615 L Street Northwest )<br>Washington, D.C. 20036 )<br> )<br>     Defendants. )<br> ) | CIVIL ACTION NO._____ |

## COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES

Plaintiffs Devincci Hourani and Issam Hourani (collectively hereafter referred to as "Plaintiffs") for their complaint in this matter allege as follows:

## NATURE OF THE CASE

Plaintiffs hereby bring claims against Defendants Alexander V. Mirtchev, Krull Corporation ("Krull Corp." or "Krull"), GlobalOptions Inc., and GlobalOptions Management, Inc. for compensatory and punitive damages arising from Defendants' Washington-based conspiracy with the Government of Kazakhstan and its autocratic ruler, President Nursultan Nazarbayev, to steal Plaintiffs' multi-billion dollar businesses and investments in Kazakhstan.

For a number of years, the strong men of the former Soviet states of Central Asia have engaged in the predatory practice of stealing the assets of so-called "Oligarchs" in order to eliminate potential political rivals and centralize their own authoritarian and anti-democratic power. In President Nazarbayev's case, he sought outside help. Nazarbayev retained "consultants" such as Alexander Mirtchev and other Washington-based companies, including Krull Corp., GlobalOptions Inc., and GlobalOptions Management, Inc. (collectively, the "Corporate Defendants").

Alexander Mirtchev is a secretive consultant and strategist who works on behalf of the dictator President Nazarbayev to achieve various aims, not the least of which is to influence the corridors of power in Washington and alter the perception amongst Washington insiders that his boss is a despot. For this considerable task, Mirtchev and his cluster of companies are paid vast sums of money. What is more, Mirtchev is good at his job. So helpful has been his advice that President Nazarbayev has awarded Mirtchev, a Bulgarian-born U.S. citizen, a prominent leadership role as a director of the Kazakhstan's sovereign wealth fund. However, even that sovereign wealth fund was

born of Mirtchev's scheming imagination and his plan for Kazakhstan's "Central Asian Tiger," President Nazarbayev.

In late 2007, Defendant Mirtchev and the Corporate Defendants presented Nazarbayev with a detailed plan for consolidating power and enriching himself at the expense of some of Kazakhstan's most successful businessmen, including the Plaintiffs. After Nazarbayev authorized the plan, the Defendants fully supported and assisted in its execution, and in the process, made millions of dollars in profits, much of it based on their patron President Nazarbayev's seizure of the Plaintiffs' investments and businesses.

**JURISDICTION AND VENUE**

1.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the Plaintiffs are citizens of a state and foreign state different from each of the Defendants, and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

2.     Plaintiff Devincci Hourani is a citizen of the United States residing in the state of Virginia and Plaintiff Issam Hourani is a citizen of the United Kingdom residing in London.

3.     Defendant Alexander Mirtchev is a citizen of the United States who resides in the District of Columbia at 2201 N Street, N.W., Washington, D.C. 20037. Defendant Krull Corp. is a Delaware corporation that maintains its headquarters at 1825 Eye Street N.W., Suite 400, Washington, D.C. 20006, and systematically and regularly conducts business in the District of Columbia. Defendant GlobalOptions Inc. maintains an office at 1501 M Street N.W., Washington, D.C., 20005, and systematically and regularly conducts business in the District of Columbia. Finally, Defendant

GlobalOptions Management, Inc. maintains an office at 1615 L Street Northwest, Washington, D.C. 20036 and systematically and regularly conducts business in the District of Columbia.

4.     This Court also has jurisdiction over violations of federal law pursuant to 28 U.S.C. § 1331.  To the extent necessary, this Court has supplemental jurisdiction over the subject matter of all other claims pursuant to 28 U.S.C. § 1367(a).

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the defendants reside in the District of Columbia and a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia.

## THE PARTIES

6.     Plaintiff Devincci Hourani is a United States citizen who resides in the state of Virginia.  Devincci Hourani is the 92% owner of Caratube International Oil Company ("Caratube"), an oil exploration and production company based in Kazakhstan. In addition to owning Caratube and its concession for the exploration and production of oil worth well over a billion dollars, Devincci Hourani had significant other business interests in Kazakhstan, including a 50% interest in Pharma Industry Corporation LLP, a pharmaceutical company, and a 34% interest in KTK Television, a broadcasting corporation worth tens of millions of dollars.

7.     Plaintiff Issam Hourani (also sometimes spelled Khorani) is a citizen of the United Kingdom currently residing in London and is the brother of Devincci Hourani. The Hourani family began investing in Kazakhstan in the early 1990's after the collapse of the Soviet Union.  Since that time, several members of the Hourani family, including Devincci and Issam, started or acquired a wide array of profitable businesses in

Kazakhstan. Importantly, as it relates to the allegations set out in this Complaint, Issam Hourani's wife, Gulshat, is the sister of Rakhat Aliyev, the former son-in-law of President Nazarbayev.

8.    As explained in greater detail below, Aliyev was serving as Kazakhstan's Ambassador to Austria in 2007 when he had a "falling-out" with President Nazarbayev, arising largely from Aliyev's stated intent to run for President of Kazakhstan in 2012. In response, President Nazarbayev undertook a number of actions against Aliyev, including having him criminally tried *in absentia* on various charges. President Nazarbayev also utilized a number of mechanisms of the government, as well as hired third parties, to strike out at various relatives and friends of Aliyev, including the Houranis who, as noted, are related to Aliyev only by marriage.

9.    Eventually, Kazakhstan: (1) expropriated all of Devincci and Issam Hourani's business interests; (2) physically threatened and harassed them and their families; (3) forced them both to leave Kazakhstan in order to escape the government's threats and harassment; and (4) commenced, and prompted other agencies (including INTERPOL) to commence, frivolous criminal and other investigations into their personal and business affairs.

10.    Critically, INTERPOL notices and red bulletins were issued against the Houranis and their family members based upon false allegations. Furthermore, libelous accusations were made and published regarding Issam Hourani including, among other things, allegations that he was a member of and/or supported terrorist groups including Hezbollah, Hamas, and Al Qaeda. At least one of these false reports was published on the webpage of the Embassy of Kazakhstan in Washington, D.C.

11.     To facilitate his multi-faceted campaign against Devincci and Issam Hourani and their families, President Nazarbayev enlisted, conspired with, and utilized the services of various third parties as agents, including, in particular, Defendants Alexander Mirtchev, Krull Corp., GlobalOptions, Inc., and GlobalOptions Management, Inc. Acting on the directives of President Nazarbayev, the Defendants undertook various actions, as set forth in more detail below, that culminated in the unlawful expropriation of the Plaintiffs' business interests, which caused them losses and damages in excess of several billion dollars.

12.     Defendant Alexander Mirtchev was born in Sofia, Bulgaria, in 1954 and subsequently became a United States citizen. He is the founder and president of Krull Corp., a "global strategic solutions provider, with a focus on new economic trends and emerging policy challenges."[1] In addition to his position as the president of Krull Corp., Mirtchev is (or was) the Co-Chairman of GlobalOptions, Inc.[2] Further, Mirtchev is also the Chairman of GlobalOptions Management, Inc., a joint venture between Krull and GlobalOptions.

13.     Mirtchev is, and for several years has been, a senior advisor to President Nazarbayev of Kazakhstan. From 2007 to 2008, Mirtchev served as the Chairman of the Board of Directors of the Kazyna Sustainable Development Fund of Kazakhstan, one of the predecessor funds to the Samruk Kazyna sovereign wealth fund.[3] The Government of

---

[1] *See* Dr. Alexander Mirtchev, http://krullcorp.com/en/dr-alexander-mirtchev.html (last visited Sept. 22, 2010).

[2] *See id.*; *see also* Alexander Mirtchev, ATLANTIC COUNSEL, http://www.acus.org/users/alexander-mirtchev (last visited Sept. 22, 2010).

[3] *See* http://www.samruk-kazyna.kz/page.php?page_id=2741&lang=3&parent_id=2731.

Kazakhstan appointed Mirtchev as an Independent Director of the combined Samruk Kazyna sovereign wealth fund by Presidential Decree in 2008, a role that he currently maintains. As set forth in more detail below, Mirtchev's influential role in Kazakhstan's economic and political activities is far more expansive than these titles suggest. In reality, Mirtchev is "the point man" – a modern day Rasputin if you will – for President Nazarbayev in his efforts to manage a fortune, consolidate the country's political power, destroy potential political adversaries, and discredit such adversaries internationally. Further, Mirtchev has extensive connections to elected politicians and powerful appointees in the United States Government and relies upon those connections in acting as an axle of influence between Washington, D.C. and Kazakhstan's new capital, Astana.

14.     As detailed herein, the concerted efforts of Mirtchev, personally and through his corporate affiliates Krull Corp., GlobalOptions, Inc., and GlobalOptions Management, Inc., in formulating, advising, and affecting the agenda of President Nazarbayev have been directed at destroying the Plaintiffs, financially and otherwise, by expropriating their businesses and property, besmirching their reputations, and threatening their safety, as well as that of their families.

15.     Defendant Krull Corp. ("Krull") is a Delaware Corporation having its headquarters in Washington, D.C., with a registered agent located at 1220 N. Market Street, Suite 804, Wilmington, Delaware, 19801. According to the District of Columbia Regulatory Authority, the registration for Krull has been revoked.[4] Upon information

---

[4] *See* Krull Corp.,
http://mblr.dc.gov/corp/lookup/results.asp?algorithm=mtphn1&rec_limit=50&clp_mod=2&keywords=krull&search_type=1&submit=Continue+to+Step+2+%3E%3E (last visited Sept. 22, 2010).

and belief, Krull leases Mirtchev's private residence for him. Mirtchev founded Krull in 1992 and its mission is "to address new economic trends, relevant business strategies, and economic and political risk mitigation."[5] Put simply, Krull appears to be an international consulting firm providing a variety of economic and investigatory services to multinational corporations and foreign sovereigns. Krull has a United Kingdom affiliate, Krull Corp. UK, that, upon information and belief, Alexander Mirtchev uses, among other things, as a conduit for transferring the financial assets of President Nazarbayev's family to accounts and shell companies around the world – for the purpose of avoiding detection as to ownership, size, and purpose of those assets. Upon information and belief, Krull also has financial interests in oil fields in Kazakhstan and Uzbekistan. Krull and Mirtchev have conspired with President Nazarbayev to expropriate illegally the Plaintiffs' assets, launder the proceeds of those expropriations through a series of international banking transactions, and publish libelous untruths about the Plaintiffs in the international media in order to discredit them and hopefully to get them detained and arrested.

16.     Defendant GlobalOptions, Inc. ("GlobalOptions") is a subsidiary of GlobalOptions Group, Inc., which is based in New York. A Dunn and Bradstreet Report reflects that GlobalOptions, which is currently located at 1501 M Street, N.W., Number 5, was previously located at 1615 L Street, N.W., the same address that Alexander Mirtchev has listed on business cards for Defendant GlobalOptions Management, Inc. GlobalOptions was founded in 1999, registered as a corporation in 2005, and has 434 total employees. GlobalOptions is considered, among other things, one of the strongest

---

[5] Krull Corp., http://krullcorp.com/en/about.html (last visited Sept. 22, 2010).

"teams" in providing consultation services to international leaders on economic, political, and public relations issues. It has also long been associated with doing work for the Government of Kazakhstan, and in particular with the Presidential family. For instance, a May 12, 2008, *Wall Street Journal* article reported that, in connection with the well-publicized criminal prosecution of New York businessman James Giffen for allegedly accepting bribes from U.S. companies to gain access to the Kazakhstan oil market, President Nazarbayev's daughter Dariga (Rakhat Aliyev's ex-wife) hired GlobalOptions to monitor the bribery case and provide her and her family with regular detailed reports about the events in the New York prosecution.[6]

17.      Defendant GlobalOptions Management, Inc. is a joint venture of Krull and GlobalOptions Group and is located at 1615 L Street, N.W., in Washington, D.C. According to business cards, Alexander Mirtchev is the Chairman of GlobalOptions Management, Inc. Mirtchev also identifies himself as the Chairman of GlobalOptions Management, Inc.'s London branch, which lists its address as "care of Krull Corporation (UK) Ltd."

## FACTS

### A.      Alexander Mirtchev and the Corporate Defendants Work as Agents of Kazakhstan

18.      The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 17 of the Complaint as if fully set forth herein.

---

[6] *See* Glenn R. Simpson, Susan Schmidt, and Mary Jacoby, *Kazakh Leader's Daughter Monitored in U.S. Bribe Probe*, WALL STREET JOURNAL, May 12, 2008.

### 1.   Alexander Mirtchev's Background

19.   Alexander Vasilyevich Mirtchev was born in 1954 in Sofia, Bulgaria.

20.   Mirtchev claims to have obtained an L.L.M. degree in International and Comparative Law at the National Law Center of the George Washington University, and a Ph.D. from the St. Kliment Ohridski University, Bulgaria.[7] He also claims to have studied economics and finance at the London School of Economics, Boston University, and Harvard Business School.[8]

21.   Upon information and belief, Mirtchev worked as a legal assistant in the Bulgarian Parliament in the 1970's and later worked as a senior official in the National Intelligence Service of Bulgaria, during which time he was posted to Washington, D.C., on three occasions.

22.   Upon information and belief, Mirtchev later headed the communist party in Bulgaria in the lead up to, and in the period following, that country's transition to democracy.  Some reports indicate that Mirtchev has been invited on two occasions to serve as Bulgaria's prime minister.

23.   Mirtchev subsequently became a citizen of the United States.

24.   Mirtchev founded Krull in 1992.  Upon information and belief, Krull was originally created in order to lobby on behalf of the Bulgarian government.  Further, upon information and belief, Krull is heavily involved in the Ukrainian oil market.

---

[7] *See* <u>Dr. Alexander Mirtchev, http://www.krullcorp.com/en/dr-alexander-mirtchev.html</u> (last visited Sept. 22, 2010).

[8] *Id.*

25.     Over the past 20 years, Mirtchev has forged vital connections to established members of the Washington political and bureaucratic elite.

26.     For instance, upon information and belief, former Secretary of State James G. Baker has had Mirtchev present lectures at the United States State Department.

27.     Amongst Mirtchev's powerful friends in Washington, D.C., are top-ranking American Diplomat Richard Holbrooke, former Secretary of State and National Security Advisor Henry Kissinger, former Director of the Federal Bureau of Investigation William Sessions, former Director of the Central Intelligence Agency James Woolsey, former U.S. Senator Bob Dole, former Mayor of New York City Rudolph Giuliani, and former Chairman of the Defense Policy Board Advisory Committee, Richard Perle.

28.     Upon information and belief, Mirtchev has also provided public relations and other services to Zeromax, the company owned by Gulnara Karimova, the daughter of Uzbekistan's dictator, Islam Karimov.

### 2.     Alexander Mirtchev is a Prominent and Committed Advisor and Agent of President Nazarbayev and the Government of Kazakhstan.

29.     Over the course of the last several years, Alexander Mirtchev has evolved into one of President Nazarbayev's closest political and business advisors, and his top behind-the-scenes public relations man.

30.     In a Wall Street Journal article published on July 23, 2008, Mirtchev is described by Rakhat Aliyev "as the point man for President Nazarbayev, not only in seeking to resolve his legal problems but in helping to manage some of the fortune that he

has accumulated in [his] 19 years in power."[9]  The article explains that Mirtchev is both a

political and financial advisor to the Presidential family, and that he has assisted them in

covertly moving hundreds of millions of dollars into hidden accounts by means of Krull's

United Kingdom affiliate, Krull UK.

31.     Further, Mirtchev is the "Senior Economic Advisor" to Kazakhstan's

Prime Minister, Karim Massimov, who is also the Chairman of the Board of the Samruk

Kazyna sovereign wealth fund, a multi-billion dollar fund purportedly established in

Kazakhstan to assist the government in dealing with the global economic crisis.[10]  The

Samruk Kazyna Fund is discussed in more detail, *infra*.

32.     Mirtchev himself was the former Chairman of the Board of the Kazyna

Sustainable Development Fund and he now sits as an Independent Director of Samruk

Kazyna, which was formed as a result of the merger of two state-controlled holding

companies, Kazyna Sustainable Development Fund and Kazakhstan Holding for the

Management of State Assets ("SAMRUK").[11]

33.     Mirtchev is one of the masterminds – if not *the* mastermind – behind

President Nazarbayev's efforts to consolidate political and economic power in himself

and his family by stripping Kazakhstan's so-called Oligarchs of their assets, and initiating

bogus criminal investigations and prosecutions against such individuals as part of a larger

plan to promote President Nazarbayev as the "Superkhan" in the eyes of the world.

---

[9] *See* Glenn R. Simpson and Susan Schmidt, *Kazakhstan Corruption: Exile Alleges New Details*, WALL STREET JOURNAL, July 23, 2008.

[10] *See* Alexandr Vasilyevich Mirchev, SAMRUK KAZYNA, http://www.samruk-kazyna.kz/page.php?page_id=2741&lang=3&parent_id=2731 (last visited September, 22, 2010).

[11] *See id.*

### 3. The Giffen Affair and Alexander Mirtchev's Rise to Senior Advisor and Agent of President Nazarbayev.

34.     Mirtchev's rise to such an influential position within President Nazarbayev's inner circle began with an arranged meeting in or around 2003.

35.     Mirtchev initially met with President Nazarbayev's daughter, Dariga, in or around May 2003 in Pezaro, Italy.  At that introduction, Dariga was so dazzled by Mirtchev's presentation that they soon boarded a chartered aircraft to fly to Kazakhstan's capital, Astana, to meet her father.

36.     Upon information and belief, Mirtchev, Dariga Nazarbayev, and President Nazarbayev discussed the difficulties Nazarbayev's regime had recently encountered vis-à-vis the so-called "Kazakhgate" scandal, which involved the prosecution of American businessmen James Giffen under the Foreign Corrupt Practices Act ("FCPA").

37.     Giffen's prosecution, the largest ever under the FCPA, centered on Giffen's routing of approximately $1.2 billion in payments by international oil companies looking to commence operations in Kazakhstan into Swiss bank accounts belonging to President Nazarbayev and other high-level Kazakh officials.[12]  Giffen kept between $78-84 million for his own account and the remainder was kept by President Nazarbayev in his own name at the Swiss Banks.  President Nazarbayev was named as an unindicted co-conspirator in Giffen's prosecution.[13]

---

[12] *See* Terry Macalister, *Swiss Join Oil Bribery Inquiry*, THE GUARDIAN (May 7, 2003), http://www.guardian.co.uk/business/2003/may/07/oilandpetrol.news.

[13] *See* Peter Maass, *The Fuel Fixers*, THE N.Y. TIMES (December 23, 2007), http://www.nytimes.com/2007/12/23/magazine/23wwln-phenomenon-t.html; *see also*, Richard Orange, *Oil, Bribery, and the CIA*, THE NATIONAL (August 29, 2010),

(continued...)

38.     Giffen's prosecution stemmed from President Nazarbayev's long-running tradition of discrediting political rivals by implicating them in illegal financial activities. The Kazakh Government had Swiss authorities commence a survey of bank accounts in an effort to prove that former prime minister Akezhan Kazhegeldin siphoned money from public coffers for personal use.[14] On this occasion, however, the plan backfired as the inquiry revealed a Kazakh Government account holding approximately $85 million in oil company money.[15] The U.S. Department of Justice eventually traced this amount back to Giffen, and Swiss authorities later froze the accounts.[16] In 2007, however, the United States reached a deal with officials in Kazakhstan and Switzerland to release approximately $84 million in the frozen accounts.[17] Recently, Giffen reached a plea bargain attempting to end the Kazakhgate bribery scandal. Giffen and his company pled guilty to misdemeanor tax charges and a single count of bribery.[18]

39.     Upon information and belief, Mirtchev formulated Kazakhstan's legal and public relations strategy in dealing with the Kazakhgate scandal and personally

---

(continued)
http://www.thenational.ae/apps/pbcs.dll/article?AID=/20100829/BUSINESS/708299966/1005.

[14] Richard Orange, *Oil, Bribery, and the CIA*, THE NATIONAL (August 29, 2010), http://www.thenational.ae/apps/pbcs.dll/article?AID=/20100829/BUSINESS/708299966/1005.

[15] *Id.*

[16] *Id.*; *see also* Robert Winnet, *Oilman Who Inspired Clooney film, Cops to One Charge After 10-year Probe*, EDMONTON JOURNAL, (August 14, 2010), http://www.edmontonjournal.com/news/Oilman+inspired+Clooney+film+cops+charge+after+year+probe/3398254/story.html.

[17] *Id.*

[18] *Id.*

developed a successful plan to lobby the U.S. and Swiss governments to unfreeze the accounts holding President Nazarbayev's bribery proceeds. This strategy included discrediting Kazakhstan opposition leaders and economic elites such as Kazhegeldin and others that Nazarbayev felt were responsible for the Kazakhgate scandal.

40.    In 2003, Mirtchev and GlobalOptions Management, Inc. prepared several briefing documents for President Nazarbayev on how to cope with the Kazakhgate crisis including, but not limited to: (1) a 239-page GlobalOptions Management, Inc. document entitled "KG & ST in the Western Media" summarizing the Western Media's attitudes towards Nazarbayev's regime and how to change the overall negative perception; (2) "'KG' Crisis Management and ST's Strategic International Repositioning" which provides a schedule of major actions that Mirtchev and GlobalOptions Management, Inc. would take to ameliorate the bad press revolving around Kazakhgate and unfreeze the Swiss bank accounts; (3) "KG and ST in the Western Law Enforcement Inquiries: Project ST-Stage I" which provides a 360-degree view of the Kazakhgate crisis and specifically states that Issam Hourani's brother-in-law, Rakhat Aliyev, had played an active role in creating the Kazakhgate crisis; and (4) "Instruments of Mobilization of Political Influence on the Part of Official Authorities of the U.S.A." which instructs Nazarbayev that it is necessary to lobby the State Department, and various members of the Senate, to obtain an "Expression of Interest" letter to the federal judge and Department of Justice prosecutors overseeing the Giffen case asking them to cease the prosecution. Upon information and belief, at all relevant times "ST" referred to "Central Asian Tiger" or "Super Tiger," a reference to President Nazarbayev, and "KG" referred to Kazakhgate.

41.     President Nazarbayev was encouraged by Mirtchev's scheme to unfreeze the Swiss bank accounts, which, upon information and belief, Mirtchev engineered by convincing U.S. and Swiss authorities, as well as the World Bank, that the funds would be spent on computers for schools in Kazakhstan. However, this money was actually diverted to a Singaporean company that was controlled by Nazarbayev. No computers were actually delivered to Kazakh schools.

42.     Upon information and belief, Mirtchev received $26 million for his assistance with the Kazakhgate scandal, $20 million of which was paid in cash and $6 million of which was transferred through banks to a UK-based affiliate of Krull. Upon information and belief, Mirtchev has not reported this income to the Internal Revenue Service.

43.     The success of Mirtchev and the Corporate Defendants in aiding President Nazarbayev through the Kazakhgate crisis led him to rely heavily on Mirtchev in formulating economic and political policy and in dealing with those he felt were a threat to his regime going forward.

    **4.     Alexander Mirtchev and the Corporate Defendants Worked in Concert with President Nazarbayev and the Government of Kazakhstan to Develop the "Superkhan" Project.**

44.     Upon information and belief, sometime in October 2007, Mirtchev formulated and presented the so-called "Superkhan" project to President Nazarbayev and his inner circle.

45.     The ambition of the 30-year Superkhan project is to consolidate all economic and political power in the hands of President Nazarbayev, as well as within his inner circle through: (1) the complete elimination of political, economic, and societal

rivals including the Oligarchs and other leaders of finance and industry; (2) the seizure of

major economic assets and industries held by Kazakhstan's Oligarchs; (3) the

discrediting of the Oligarchs through strategically placed articles in the Kazakh and

Western press and the Internet; (4) the nationalization of independent media critical of

Nazarbayev's regime; and (5) the softening of Kazakhstan's image in the West through

the promotion of Nazarbayev as the benevolent ruler of the steppe or the "Superkhan."

46.     Mirtchev and GlobalOptions Management, Inc. drafted and presented this

plan to President Nazarbayev and his inner circle in or around October 2007 in the form

of a detailed strategic memorandum.

47.     Mirtchev and GlobalOptions Management Inc.'s memorandum states that

the goal of the Superkhan project[19] is a long term political mandate for President

Nazarbayev, who is referred to as "ST", short for "Central Asian Tiger." Further, the

memorandum states that "neutralizing" the growing political ambitions of the Oligarchs

and "Financial and Industrial Groups" ("FIGs") is necessary to ensuring that long-term

political mandate.

48.     The memorandum goes on to state that the Oligarchs' access to mass

media increases their threat to President Nazarbayev's power base.  Moreover, the

memorandum explains that the neutralization of the Oligarchs and the FIGs, and, thus,

the stabilization of Kazakh society, require that President Nazarbayev and his proxies

take direct and personal control of all of the assets and finances of the Oligarchs and the

FIGs.  Further, neutralizing the Oligarchs and assuming control of their vast assets will

---

[19] This memorandum does not actually use the expression "Superkhan."  However, upon
information and belief, that is how the document was routinely referenced by those
involved in its creation.

enable President Nazarbayev to strengthen his position as the indisputable leader of Kazakhstan and bolster his image abroad.

49.     The memorandum instructs that the Oligarchs must be warned that they are not to engage in any political activity or support political opposition groups, and that doing so would lead to adverse consequences for them, their businesses, and the well-being of their families.

50.     In addition, the memorandum specifically identifies Rakhat Aliyev and his financial and industrial group, as a target for the actions described above.

51.     The reference in the memorandum to Aliyev's financial and industrial group includes the Hourani family, although Aliyev's business holdings and the Houranis' business holdings were completely separate from one another.

52.     This memorandum suggests that, in order to achieve the goal of ensuring a long-term political mandate for President Nazarbayev, the Kazakh Government would have to first place the assets of the Oligarchs and FIGs under state control using some form of legitimate pretext.  The memorandum explains that this can be done through the use of investigations into tax improprieties, violations in regulations on the operation of oil fields, administrative violations committed during the privatization of industries, and the commission of purportedly "heinous" crimes.  The memorandum suggests that the use of such tactics would force the Oligarchs to transfer assets to the state – that is, to Nazarbayev himself.  These tactics were later employed against the Plaintiffs.

53.     Mirtchev and GlobalOptions Management, Inc.'s memorandum also suggests that President Nazarbayev create a sovereign wealth fund to control the assets taken from the Oligarchs and FIGs.  The memorandum suggests that the fund be

controlled by reliable local and foreign experts and that it be fully independent of other preexisting Kazakh ministries so as to be directly controlled by the President. This fund became the Samruk Kazyna sovereign wealth fund described in greater detail below.

54. Mirtchev and GlobalOptions Management, Inc.'s memorandum further suggests that President Nazarbayev should next take action to discredit the Oligarchs in the eyes of Western governments so as to deny them potential political refuge. This part of the project would include: (1) a dialogue with senior officials in Western law enforcement agencies to discredit the Oligarchs and FIGs as having committed financial and administrative offenses; (2) the development of news articles in the Kazakh and international media identifying certain Oligarchs as corrupt; and (3) establishing trusted contacts with the most influential media outlets and think tanks in the West to provide them with evidence of the illegal activities of the Oligarchs and FIGs. Of course, as listed above, Alexander Mirtchev has many of the necessary connections to officials in Western law enforcement agencies.

55. Further, Mirtchev and GlobalOptions Management, Inc.'s memorandum instructs that, as a part of his efforts to consolidate power, President Nazarbayev commence a large scale public relations campaign in the West to bolster his image. These efforts have included, upon information and belief, a series of bus-stop poster advertisements in Washington, D.C., in advance of the 2010 international nuclear security summit.[20] Further, Mirtchev has relied upon his host of Washington political

---

[20] *See* Richard Solash, *Waiting for the Bus with the President of Kazakhstan*, RADIOFREEEUROPE/RADIOLIBERTY (April 13, 2010), http://www.rferl.org/content/Waiting_for_the_Bus_with_the_President_of_Kazakhstan/2 011420.html.

connections to paint a more favorable image of Kazakhstan's ruler and make U.S. policy friendlier towards the country.

56.    To that end, Mirtchev has harnessed his political connections to arrange meetings between Nazarbayev and important figures such as Dick Cheney, Bill Clinton, and Tony Blair.  Additionally, Nazarbayev has visited both the White House and 10 Downing Street in recent years.

57.    Also, as specifically called for by the memorandum presenting the Superkhan plan, Mirtchev has assisted the Nazarbayev clan in engaging high-priced Washington, D.C., lobbying and public relations firms to improve President Nazarbayev and Kazakhstan's image in the West.

58.    Upon information and belief, Mirtchev has been instrumental in Kazakhstan's decision to engage BGR Group, a Washington, D.C., lobbying firm with an office in London that does significant work for Kazakhstan.  Upon information and belief, BGR Group has a long term contract with Kazakhstan, the aim of which is to improve Kazakhstan's reputation in the eyes of Washington powerbrokers and the Western media and to gain further access to influential decision makers who could tilt U.S. policy in favor of Nazarbayev's despotic, but oil-rich, regime.

59.    Similarly, Mirtchev and the Corporate Defendants have, upon information and belief, advised Kazakhstan to engage a similar lobbying and public relations firm, Policy Impact Communications ("PIC"), to burnish its image here and abroad through the manipulation of the Western media.  According to an April 15, 2010, article that was posted on the website www.mainjustice.com about the long-running Giffen prosecution

entitled, "SDNY Shakes Up Team on Long-Stalled Kazakh Bribe Case,"[21] Kazakhstan

signed a $1.5 million lobbying contract with PIC to, among other things, "place op-ed

pieces in 'prestige' media" and "monitor 'writers known to be critical' of the country."

60.     According to a document titled "PIC Agenda, Objectives and Deliverables

May 1, 2009 – May 1, 2010," PIC named a number of "Key Deliverables" that it would

provide to Kazakhstan under that contract, including, (1) conducting an audit "of

Kazakhstan's presence on the global Internet;" (2) improving or establishing a new

website for Kazakhstan in the United States; and (3) obtaining "a legitimate blogger [to]

build the content, reputation, and influence of a pro-Kazakhstan site."

61.     Upon information and belief, Mirtchev and the Corporate Defendants have

helped Kazakhstan select these lobbyist and public relations companies to promote

Nazarbayev's image as the "Superkhan" in the West and to assist in placing media and

website articles attacking the reputations of those who run afoul of the Nazarbayev clan,

including Rakhat Aliyev and the Houranis.

62.     The Republic of Kazakhstan, with the assistance of Mirtchev and the

Corporate Defendants, employed the very procedures described above against the

Houranis both in retaliation for their affiliation with Rakhat Aliyev and as part of the

Superkhan Project.

---

[21] This article no longer appears on the www.mainjustice.com website.  However, copies
can be furnished to this Court upon request.

     **5.**    **Alexander Mirtchev and the Corporate Defendants'**
            **Operations as Agents of President Nazarbayev and the**
            **Government of Kazakhstan.**

     63.    Upon information and belief, Mirtchev and the Corporate Defendants

work extensively with Erlan Idrissov, the Kazakh Ambassador to the United States, on a

number of matters, including but not limited to, public relations, political strategy, and

the transfer of assets belonging to President Nazarbayev and his family around the globe.

     64.    Upon information and belief, the Government of Kazakhstan provided

Mirtchev with a diplomatic passport under the name Anton G. Nikolov, with Mirtchev

using his own photograph on Nikolov's passport.  Nikolov is an actual National Security

Committee ("KNB") security officer whose passport was and is falsely and unlawfully

used by Mirtchev.

     65.    Upon information and belief, Mirtchev uses this diplomatic passport to

enter and exit Kazakhstan so that no immigration logs in the United States or Kazakhstan

connect Mirtchev to Kazakhstan.

     66.    Upon information and belief, Ambassador Idrissov's personnel at the

Kazakh Embassy in Washington, D.C., pay Mirtchev in cash twice a year, with each

payment totaling approximately $1 million.  Upon information and belief, these cash

payments are not reported to the Internal Revenue Service.

     67.    Upon information and belief, this cash is sent to the Kazakh Embassy in

Washington, D.C., via diplomatic pouch and is earmarked for payment to Mirtchev.

     68.    Similarly, upon information and belief, Krull is also paid in cash through

the Kazakh Embassy in Washington, D.C., for its services.

69.     Upon information and belief, Mirtchev often travels to Kazakhstan to receive instructions in hardcopy, which he then types into his laptop so that the inadvertent discovery of said instructions will not be attributable to Kazakhstan.

70.     Upon information and belief, Mirtchev is very cautious and prefers to conduct "delicate" conversations outdoors to avoid the possibility of being taped or otherwise overheard.

71.     Mirtchev relies heavily on an employee and/or owner of Krull UK named Kaloyan Dimitrov, also known as "Kal."

72.     Dimitrov is a citizen of the United Kingdom and a native and citizen of Bulgaria.

73.     Dimitrov resides at 1 Grampian Gardens, London, NW21JH, United Kingdom.

74.     Dimitrov acts as Mirtchev's "right hand man," handling his phone calls, booking his travel, monitoring his finances, and managing financial transactions on behalf Krull Corp., Krull UK, and other entities with connections to Mirtchev.

75.     Dimitrov registered the website for Krull Corp.

76.     Upon information and belief, Dimitrov also assists Mirtchev and the Corporate Defendants in opening shell companies in foreign countries in which to place transferred funds, including those of President Nazarbayev and his family.

77.     Additionally, Dimitrov assisted Mirtchev and the Corporate Defendants in monitoring the Giffen case for President Nazarbayev and his family.

78.     Mirtchev and the Corporate Defendants work extensively on public relations matters with Ambassador Idrissov of the Kazakh Embassy in Washington, D.C.

79.     Upon information and belief, Mirtchev has provided luxurious vacations and trips to high-priced retreats and spas to political elites in Washington, D.C., and other Western capitals in order to influence policy favorable to Kazakhstan and improve its public image.

80.     Mirtchev and the Corporate Defendants, upon information and belief, work in concert with the Government of Kazakhstan to publish information promoting President Nazarbayev and the Republic of Kazakhstan while simultaneously attacking President Nazarbayev's economic and political rivals.

81.     As discussed in more detail, *infra*, Mirtchev and the Corporate Defendants influence other publications and commentators to print similar materials promoting President Nazarbayev and the Government of Kazakhstan while simultaneously attacking President Nazarbayev's economic and political rivals.

82.     Mirtchev and Krull utilize several information technology firms, including one in Israel, to publish false and unflattering information about political and economic adversaries of President Nazarbayev on the Internet.

83.     Specifically, such published materials have included various false and libelous claims that Issam Hourani is a member or supporter of such diverse and dissimilar terrorist organizations as Hezbollah, Hamas, Al Qaeda, and the Muslim Brotherhood.[22]

---

[22] *See* Dmitry Sidorov, *Justice in Kazakhstan*, FORBES (Feb. 9, 2009), http://www.forbes.com/2009/02/09/rakhat-aliyev-kazakhstan-opinions-contributors_0209_dmitry_sidorov.html; *see also* Axis Information and Analysis, *Eurasian Secret Services Daily Review* (Dec. 8, 2008), http://www.axisglobe.com/article.asp?article=1710 (stating that Issam Hourani is an active member of Hamas).

84.     Additionally, Mirtchev and the Corporate Defendants funnel President Nazarbayev's accounts through a series of international transactions and shell companies designed to mask their ownership and illegally launder their contents.

85.     Upon information and belief, Mirtchev and the Corporate Defendants worked with a woman named Aigul Nurieva to register Krull's aforementioned Krull UK branch in the United Kingdom.

86.     Upon information and belief, Nurieva once worked or currently works in the Kazakh Embassy in Singapore and was formerly a banker in Kazakhstan

87.     Mirtchev uses the Corporate Defendants, Aigul Nurieva, and Krull UK owner/employee Kal Dimitrov to facilitate the movement of President Nazarbayev and his family's capital to offshore and onshore accounts and shell companies around the globe to conceal its existence.

88.     Dimitrov uses the identity of a number of nominees to facilitate the transfer of monies through these offshore and onshore accounts and shell companies.

89.     The funds moved by Mirtchev, Nurieva, Dimitrov, and the Corporate Defendants include assets formerly belonging to private businesses that have been unlawfully appropriated or expropriated by the Government of Kazakhstan, including those of the Houranis.

90.     Upon information and belief, Mirtchev receives "commissions" relating to these transfers under the false identity of Anton Nikolov. Nurieva determines the amount of these commissions based on the amount of cash that Mirtchev helps move offshore.

91.     Upon information and belief, Mirtchev, using the identity of Nikolov, transfers these commissions from a bank account in Kazakhstan to Citibank and BB&T accounts in Washington, D.C., and a HSBC account in London.

92.     Upon information and belief, Mirtchev, using the false identity of Nikolov, received approximately $4.5 million in commissions from 2007 to 2009 for aiding the Nazarbayev clan in transferring assets around the globe.  Upon information and belief, these commissions are not reported to the Internal Revenue Service.

93.     Finally, upon information and belief, Mirtchev and the Corporate Defendants have financial interests and/or investments in oil fields in Kazakhstan and Uzbekistan.  Upon information and belief, money paid by the Republic of Kazakhstan to Mirtchev and Krull as fees for their assistance in the expropriation of the Houranis' businesses and the development and implementation of the Superkhan project may have been used to invest in these oil interests.

**B.      Alexander Mirtchev and the Corporate Defendants Worked in Concert with President Nazarbayev and the Government of Kazakhstan to Deprive the Houranis of their Assets.**

**1.      The Houranis Owned Substantial Investments and Assets in Kazakhstan for Several Years.**

94.     In the early 1990's, Devincci and Issam Hourani's brother Hussam went to Kazakhstan to obtain a master's degree in petroleum engineering.  Issam Hourani visited Hussam several times and began to build business ties to Kazakhstan as a result of his visits.  Issam Hourani then began to encourage his brother, Devincci Hourani, his father Salah Hourani, and his brother-in-law, Kassem Omar, to invest in Kazakhstan. Eventually, Devincci and Issam Hourani became the key distributor of medical devices in the newly-liberalized Kazakh market.

95.     Through his sales of medical devices, Issam Hourani met Professor

Mukhtar Aliyev, a well-known surgeon, former Minster of Health in Kazakhstan, and a

former member of the Kazakh Parliament. Professor Aliyev introduced Issam Hourani to

his son Rakhat Aliyev and his daughter, Gulshat, whom Issam married in 1996.

96.     Notably, Issam Hourani acquired Kazakh nationality in 1998 after his

marriage to Gulshat. However, subsequent to the falling out between President

Nazarbayev and Rakhat Aliyev beginning in May 2007, his Kazakh nationality was

"frozen" pending a revocation decision. It was then unilaterally revoked by the Kazakh

Government – at the direction of Nazarbayev – because of purported "false statements"

regarding certain "medical reports" that Issam Hourani had allegedly provided during the

citizenship application process which took place a decade prior. Despite the fact that

Issam Hourani had made no such false statements, he was informed that he had been

stripped of Kazakh nationality in a notice dated January 8, 2008.

97.     Since Issam Hourani was the eldest of the Hourani siblings, he was

typically considered the "face" of the Hourani family in Kazakhstan. This was

particularly the case because he was one of the first investors in the country after its

independence and because he had married the sister of Rakhat Aliyev, who was the

President's eldest son-in-law through his marriage to Dariga Nazarbayeva. As such, he

was often viewed by the government as the "representative" of the family's various

business interests.

98.     As the 1990's began to draw to a close, the Hourani family began to

diversify their business interests as the medical device market became more competitive.

Devincci Hourani and his then-in-laws invested in the Kulandy Energy Company in

2002. Kulandy's assets were later transferred to KazMunaiGaz, a company wholly owned by the Samruk Kazyna sovereign wealth fund and which is partially directed by Alexander Mirtchev.

99.     Further, in or around 2004, Devincci Hourani obtained a 34% interest in a media and broadcasting company called KTK Television that was majority owned by Issam Hourani's wife Gulshat. As will be explained below, KTK Television was effectively confiscated by the Kazakh Government in 2007.

100.     Further, Devincci Hourani was also heavily involved in the operations in Ruby Roz Agricol, a multi-million dollar poultry processing company wholly owned by the Houranis' brother-in-law, Kassem Omar. Omar is married to the Houranis' sister Hiam. As will be explained further below, Ruby Roz Agricol was also effectively expropriated by the Kazakh Government during 2007 and 2008.

101.     Further, Mr. Omar was the 24% owner of a sugar trading company called Sugar Centre Kazakhstan. This business, which was worth tens of millions of dollars, was also expropriated by the Kazakh Government during 2007 and 2008.

102.     Devincci Hourani also advised Kassem Omar on the management of his holding company called Universal Oil Field Supply, which invested in an airport in the city of Kokshetau and in Kokshetau Airlines. As explained further below, Universal Oil Field Supply and Kokshetau Airlines would later be confiscated by the Kazakh Government.

103.     Devincci Hourani was also the 92% owner of Caratube Oil International Company, which held a contract for a significant oil concession at a Kazakh oil field that, by all accounts, had proven deep reserves of oil. As explained in more detail below,

Caratube was expropriated after the Kazakh Government unlawfully cancelled its oil concession in 2008 for alleged breaches of contract. Caratube's assets also were transferred to KazMunaiGaz, a company wholly owned by the Samruk Kazyna sovereign wealth fund which is partially directed by Alexander Mirtchev. Caratube has brought an arbitration claim pursuant to the United States – Kazakhstan Bilateral Investment Treaty ("BIT") which is currently before the World Bank's International Centre for the Settlement of Investment Disputes ("ICSID"), *Caratube International Oil Co. v. The Republic of Kazakhstan*, ICSID Case No. ARB/08/12.

104.    Additionally, Issam Hourani owned a 50% share in Alma Media, a major independent media conglomerate worth hundreds of millions of dollars and comprising television, radio, internet, magazines, books, various publishing entities, and prominent real estate holdings. Alma Media provided an independent news source to the Kazakh public and, thus, was a significant contributor to that country's nascent civil society and an important participant in the effort to create a free press. This presented a considerable threat to President Nazarbayev because successful businessmen – such as Issam Hourani –with access to mass media have amplified powers of persuasion over the Kazakh citizenry.

105.    Additionally, Devincci Hourani and Issam Hourani jointly owned Pharma Industry Corporation LLP, a pharmaceutical and medical training company worth tens of millions of dollars that they acquired in 2005 and 2006.

106.    As of May 2007, the Hourani family had the following business interests in Kazakhstan:

| Owner(s) (Percentage) | Company Name | Sector | Year founded or first purchased/approximate worth (US$) in May 2007 | Current Status |
|---|---|---|---|---|
| Issam Hourani (50%) | Alma Media | Media and real estate | 2003-04/hundreds of millions | Expropriated by Kazakh Government in 2007-08 |
| Issam Hourani (50%) / Devincci Hourani (50%) | Pharma Industry Corporation LLP | Pharmaceutical, medical training and land | 2005-06/tens of millions | Expropriated by Kazakh Government in 2007-08 |
| Devincci Hourani (92%) / Kassem Omar (8%) | Caratube International Oil Company | Oil | 2004/billions | Expropriated by Kazakh Government in 2007-08 |
| Devincci Hourani (34%) / Gulshat Hourani (56%) | KTK Television | Media | 2004/tens of millions | Expropriated by Kazakh Government in 2007-08 |
| Kassem Omar (24%) | Sugar Centre Kazakhstan | Sugar | 2005/tens of millions | Expropriated by Kazakh Government in 2007-08 |
| Kassem Omar (100%) | Ruby Roz Agricol | Poultry | 2004/hundreds of millions | Expropriated by Kazakh Government in 2007-08 |
| Kassem Omar (100%) | Universal Oil Field Supply (Kokshetau Airlines) | Aviation | 2005/tens of millions | Expropriated by Kazakh Government in 2007-08 |

107.    Within a few months of the schism between President Nazarbayev and his

son-in-law, Rakhat Aliyev, each and every one of these business interests owned by the

Houranis and their family members was effectively expropriated or outright seized by the

Kazakh Government.  While some of these assets and businesses are the subject of

pending or future international arbitration claims, it is not possible to pursue such claims

on behalf of others under international law or in international venues outside of

Kazakhstan.  It is well-documented that the domestic courts of Kazakhstan are controlled

directly by, and for the benefit of, President Nazarbayev, and thus there are no available

judicial remedies for the Houranis and their family to pursue inside Kazakhstan.

> 2.   **Rakhat Aliyev's Decision to Run for President of Kazakhstan Led President Nazarbayev and the Defendants to Target the Houranis and their Assets for Expropriation.**

108.   Mirtchev and the Corporate Defendants assisted President Nazarbayev in

determining that, in the wake of Rakhat Aliyev's decision to run for President of

Kazakhstan, he and all of his potential political supporters, including the wealthy family

of his brother-in-law, Issam Hourani, should be stripped of their assets, persecuted, and

neutralized politically.

109.   In the case of the Houranis, this included: (1) the expropriation of each

and every one of their business interests, including those listed above; (2) the harassment

of Devincci and Issam Hourani and their immediate family members through physical

violence, threats, and the initiation of spurious criminal and civil investigations and

prosecutions; (3) their ultimate forced expulsion from Kazakhstan; and (4) the publishing

of libelous and defamatory statements about Issam Hourani in an attempt to discredit the

Houranis.

110.   The theft of the Houranis' assets stems directly from a meeting between

Rakhat Aliyev and President Nazarbayev in late 2006 during which Aliyev disapproved

of President Nazarbayev's introduction of a constitutional amendment that would make

him President of Kazakhstan for life, as well as Aliyev's subsequent announcement that he intended to run for president of Kazakhstan in 2012.

111.    Thereafter, President Nazarbayev identified Rakhat Aliyev – and all those associated with him, even by marriage – as a threat to his power base.  President Nazarbayev stripped Aliyev of his diplomatic post as Ambassador to Austria and began a plan to "investigate" Aliyev's alleged involvement in various undefined criminal schemes.

112.    Beginning in May 2007, the Houranis began to hear rumors that they were considered by the Government of Kazakhstan to be "business associates" of Rakhat Aliyev, and thus faced a considerable risk of being investigated for potential crimes and financial irregularities.

113.    The Kazakh Government then shut down KARAVAN newspaper, part of Issam Hourani's Alma Media holdings, and the KTK television channel, which was owned by Devincci Hourani and Issam's wife, Gulshat.  The government shut down these media organs for a planned three-month period (in the end, the ban lasted two weeks) and replaced the senior management with government shills.  These actions were undertaken to ensure that Rakhat Aliyev was unable to find a way to connect with the Kazakh people through an independent media source.

114.    During that two week media blackout, Issam Hourani was approached by representatives of the Kazakh Government who "required" him to: (1) sign over Alma Media to the government; (2) divorce his wife, Gulshat, merely because she is the sister of Aliyev; and (3) denounce Aliyev publicly.  Issam Hourani refused.  His partner in Alma Media was similarly approached and also refused to cooperate.  Kazakh officials as

well as businessmen from the Middle East with contacts to Kazakhstan would later repeat these demands to Issam Hourani.

115.    Only days after Issam Hourani refused to turn over his shares in Alma Media, the Government of Kazakhstan sent a sent an Interpol notice to Luxembourg, Cyprus, Lebanon, and Austria labeled "VERY URGENT." In that notice, the Kazakh Government falsely stated that Issam Hourani and his business partner in Alma Media were "suspected in criminal connection with criminal organization group which committed . . . kidnapping . . . creating a criminal organization group . . . extortion . . . theft . . . and . . . counterfeiting . . . ." and requested these countries to check through their "population data base" to establish if they had "nationalities of [their] respective countries."

116.    Thereafter, each of the Hourani family businesses described above was raided and investigated, and individual members of the family were systematically interrogated, harassed, and intimidated on a regular basis in Kazakhstan. Specifically, Caratube's offices were arbitrarily searched numerous times; its business was incessantly "investigated" by the various bureaucracies for fabricated reasons; and its employees and officers were harassed and questioned without counsel under threats of criminal prosecution if they did not "cooperate" and say what the authorities wanted them to say in order for them to "build" a case against Rakhat Aliyev and Issam Hourani.

117.    During a June 27, 2007, raid on the offices of Caratube armed police officers (1) forced their way into the building in which Caratube was located; (2) closed off all the entrances, exits, and floors of the building so that no one could come in or go out; (3) ordered each person not to move and to stand with their faces directed at the wall;

(4) confiscated most of the property in the offices; and (5) detained Devincci Hourani, Hussam Hourani, and others, and demanded that they turn over their passports.

118.    In July 2007, Devincci Hourani met with President Nazarbayev's daughter, Dariga Nazarbayeva, who informed him that the Hourani family companies' problems were a direct result of the dispute between President Nazarbayev and her former husband, Rakhat Aliyev.  Dariga Nazarbayeva told Devincci Hourani that that if he could influence Rakhat Aliyev to "calm down," the family's troubles would disappear. At that point, Devincci Hourani was also informed that the various security forces of Kazakhstan were putting together a case against his brother Issam based upon allegations of "terrorism."  In September 2007, Dariga Nazarbayeva called Issam Hourani from a Swiss telephone number and confirmed the same information to him.

119.    During the second week of July 2007, Devincci Hourani spoke to a Lebanese official who told him that an arrest warrant was issued through Interpol Astana and sent to Interpol Lebanon, for Rakhat Aliyev as well as 15 of his "known associates," including Issam Hourani, based on allegations of organized crime.   Apart from Issam Hourani's familial relationship with Mr. Aliyev, he had no connection whatsoever with any of the other people listed.  Moreover, the Kazakh Government soon accused Rakhat Aliyev of unlawfully detaining, drugging, and eventually murdering his alleged lover, an Uzbek national named Anastasia Novikova, in Issam Hourani's apartment in Lebanon. Interpol Astana issued a notice regarding this matter on June 9, 2007.  These allegations are false.  The Lebanese Interpol office informed Interpol headquarters that the death had been ruled a suicide.  Despite this, Interpol Astana reissued Interpol Red Notices on December 22, 2008, and September 2009.

120.   Also, on July 20, 2007, members of the Almaty Department of Interior Affairs interrogated an employee of Ruby Roz in an effort to coerce a false statement from him that Issam Hourani had beaten him years prior

121.   On the night of September 1, 2007, members of the KNB dragged Devincci Hourani out of the Hourani family home (which housed numerous children) and forced his head down between his knees during a car ride to a "secret" location where he was interrogated until the morning.

122.   Further, on October 9, 2007, the Interpol Astana office issued a "Red Notice" to an Interpol office in Beirut, Lebanon, requesting Issam Hourani's arrest pending extradition back to Kazakhstan on the unfounded and false charge, that two years earlier, he had assaulted a Syrian poultry machine engineer who worked for Ruby Roz Agricol. The engineer later admitted to Issam Hourani's brother-in-law, Kassem Omar, that he only made the allegation under pressure from the Kazakh Government and requested $200,000 so that he would recant his allegations against Issam Hourani and he could return safely to Syria.

123.   This kind of harassment lasted throughout 2007, 2008, and 2009 and even continued during the pending ICSID arbitration between Caratube and Kazakhstan. For instance, in April 2009, during the course of the ICSID arbitration, seven KNB officials visited the Caratube oilfield at issue in the proceedings and attempted to coerce several Caratube employees to sign false statements that Devincci Hourani wrongfully acquired the rights to the oilfield from a Kazakh national in 2004. When these employees refused to sign such a statement, they were put under house arrest. KNB officials threatened one

employee's life, beat him over the head and shoulders, and deprived him of food and water during the course of a day-long interrogation.

124.    Additionally, upon information and belief, KNB officials began to monitor Devincci Hourani's every move and monitor his phone calls.

125.    In May 2008, the Government of Kazakhstan began investigating Issam Hourani for supposedly obtaining shares in Ruby Roz Agricol by unlawful means.  These allegations were completely untrue given that Ruby Roz Agricol was owned entirely by Issam Hourani's brother in law, Kassem Omar, and Issam Hourani had no ownership or management relationship with the company at all.  Nevertheless, a police colonel in Kazakhstan's ministry of internal affairs ordered the seizure of all of Ruby Roz Agricol's property on January 11, 2010, on the false grounds that Issam Hourani had obtained the company illegally.

126.    Ultimately, the Kazakh Government expropriated each and every one of the Hourani family businesses and their assets.  In July 2007, Devincci Hourani met with Dariga Nazarbayeva in an attempt to stop the political and economic persecution of his family.  Nazarbayeva told Devincci Hourani in no uncertain terms that the persecution would stop if he signed over his family's interests in KTK Television and Alma Media to the "First Presidential Fund."  The First Presidential Fund was, similarly to Samruk Kazyna, set up by President Nazarbayev to develop his image domestically and abroad. When he protested that he did not have power of attorney to sign over his sister-in-law's interest in KTK Television or his brother Issam's interest in Alma Media, Nazarbayeva produced powers of attorney allegedly signed by Issam and Gulshat Hourani.  Dariga Nazarbayeva then warned Devincci Hourani that the government would take more drastic

actions against his family if he did not sign KTK Television and Alma Media over to this government fund. Under duress, Devincci Hourani signed the necessary documents, and with the stroke of a pen, the Government of Kazakhstan expropriated two of the country's remaining independent media outlets, which were worth hundreds of millions of dollars.

127.    Dariga Nazarbayeva had a similar interaction with the Hourani's brother-in-law, Kassem Omar. She warned him that he must sign over his interests in Ruby Roz Agricol and Universal Oil Field Supply, owner of Kokshetau Airlines, to her so that she could "protect" them from President Nazarbayev's vendetta against Rakhat Aliyev. Omar, who was the sole owner of both of these companies, did so under duress. Dariga Nazarbayeva then allowed government entities to expropriate all of the companies' assets. When she returned the companies to him, there was nothing left but corporate shells. Dariga Nazarbayeva also coerced Kassem Omar to turn over his 24% interest in Sugar Centre using similar threats. Again, Mr. Omar complied under duress. He was left with little choice given the potential threat to his safety and that of his family.

128.    Further, the Kazakh Government forced Pharma Industry Corporation LLP, which Devincci and Issam Hourani owned jointly, into an unjustified "bankruptcy," thereby rendering their shares worthless.

129.    So was it also the case with Caratube. At the end of September 2007, the Ministry of Energy and Mineral Resources ("MEMR") sent Caratube a notice of breach of contract – allegedly dated March 2007 but never produced to Caratube at that time – stating that it was in default of its oil exploration and production contract with the Ministry. This notice was delivered despite the fact that the MEMR had freely amended

the contract in July 2007, confirming compliance to that date, and permitting a two-year extension of the operation of the concession.  Kazakh Government officials then proceeded over the following months to engage in a series of confusing and contradictory actions, many of which were clearly motivated by the political vendetta being waged against the Houranis.  These actions in some cases confirmed compliance with the contract and in other cases involved allegations of non-performance that were legally impossible.  Finally, on February 1, 2008, MEMR unjustifiably and unlawfully terminated the contract with Caratube based on a series of pretextual allegations that Caratube had not performed the contract, when, in fact, Caratube was in full compliance with the contract and on the verge of the commercial production of highly valuable, proven oil reserves to supply the international oil market.

130.    Issam Hourani left Kazakhstan in April 2007 unaware that he would not be able to return to the country.  However, after the dispute between Rakhat Aliyev and President Nazarbayev, he determined that it would not be safe for him and his family to re-enter Kazakhstan.  Similarly, Devincci Hourani left Kazakhstan in September 2007 out of fear for his safety.  He reentered the country briefly in March 2008, to see his infant daughter and to hold meetings with high level officials of MEMR that did not ultimately materialize.  He has not been allowed to visit his daughter since then, and recently all contacts with her have been terminated by the government.

3. **Mirtchev and the Corporate Defendants Have Worked in Concert with President Nazarbayev and the Kazakh Government to Convert the Houranis' Assets Into Those of President Nazarbayev as Part of the Superkhan Project.**

131. The expropriation of the Houranis' various business interests was facilitated by Mirtchev and the Corporate Defendants and was part of their larger designs contemplated by the Superkhan project.

132. Mirtchev and the Corporate Defendants have acted in concert with President Nazarbayev and the Government of Kazakhstan to fold the expropriated assets of foes of the regime into the Samruk-Kazyna sovereign wealth fund and other state-run businesses held by the Nazarbayev family.

133. A March 15, 2010, Memorandum sent to President Nazarbayev's Chief of Staff prepared by Kazakhstan's Prosecutor General, A. Daulbayev, supports the conclusion that once the Houranis were identified as affiliates and potential supporters of Rakhat Aliyev, their assets, especially those that were part of an independent media, were targeted for expropriation as part of the objectives of the Superkhan project.

134. In the memorandum, Prosecutor General A. Daulbayev explains that he headed an investigation by an "inter-agency investigative-operational task force consisting of members of the Foreign Intelligence Service 'Sarbar' [KNB], and ministry of internal affairs" with the goal of locating Rakhat Aliyev and initiating new criminal matters in connection with Aliyev's "accomplices," which the document later reveals to be the Hourani brothers. As a result, in a section titled, "[f]reezing and confiscation of monetary sources in Kazakh banks of private assets as well as assets of private companies registered with Kazakh Authorities in the names of Issam and Devincci Hourani" the Prosecutor General identifies names of each of the Hourani family businesses listed

above, including, Ruby Roz Agricol, Kokshetau Airlines, Kulandy Energy Corporation, Caratube, Universal Oilfield Supply Company, and Pharma Industry Corporation LLP as targets for freezing and confiscation.

135.    The Prosecutor General then states that examinations of these companies revealed "serious breaches of currency, tax, customs, ecological and fire prevention laws" that enabled his organization to confiscate the companies' bank accounts and all of their "movable and immovable property" totaling over $500 million.  The Prosecutor General also recounts that, in conjunction with the KNB, his task force confiscated and transferred the proceeds of the Houranis' personal cars, apartments, villas, office buildings, and land to its own seized accounts.  Further, the Prosecutor General states that his task force stripped Issam Hourani of his citizenship in June 2007 and initiated two criminal cases against Devincci and Issam Hourani.

136.    Further, the memorandum states that the task force transferred the property belonging to the oil companies (Kulandy Energy Company and Caratube) to the oil and gas company KazMunaiGaz, at the behest of its CEO, President Nazarbayev's other son-in-law, Timur Kulibayev.  Crucially, KazMunaiGaz is part of the Samruk Kazyna sovereign wealth fund portfolio of state-owned companies, which is partially directed by Mirtchev.[23]

137.    Notably, upon information and belief, Mirtchev's "double", Anton Nikolov, has drawn a salary from KazMunaiGaz since March 2007.

---

[23] *See* Subsidiary Companies, SAMRUK KAZYNA, http://www.samruk-kazyna.kz/page.php?page_id=2741&lang=3&parent_id=2731 (last visited Sept. 22, 2010). (stating that KazMunaiGaz is wholly owned by Samruk Kazyna).

138.    Moreover, the memorandum states that "[t]he sale of assets belonging to legal as well as natural persons obtained through criminal means, with the goal of financing independent sources of mass media and the destabilization of the socio-political situation in the country was prevented." This sentence, in effect, states that not only were the so-called criminal prosecutions against the Plaintiffs mere pretexts for persecuting those associated with Rakhat Aliyev, but they were also undertaken in accordance with the objectives and procedures as laid out in the above-mentioned memorandum on the Superkhan program, as prepared by the Defendants.

139.    Finally, the Prosecutor General emphasized the true purpose of harassing the Houranis when he states that, "[t]his is being reported in compliance with fulfillment of the directives of the **Head of State**." (emphasis added). In other words, the entire trumped-up and pretextual persecution of the Houranis was personally approved by President Nazarbayev and his advisors, including Mirtchev and the Corporate Defendants.

140.    Notably, as stated *supra*, Mirtchev was the former Chairman of the Board of the Samruk-Kazyna fund and now sits as an Independent Director.[24] Upon information and belief, Mirtchev is paid $70,000 annually in this role. Mirtchev takes a leading role in Samruk Kazyna's activities. For example, upon information and belief, Mirtchev hand-picked the members of the fund's audit committee._Additionally, the fund's current Chairman is Prime Minster Karim Massimov, while President Nazarbayev's other son-in-law and potential successor, Timur Kuliabayev, serves as the

---

[24] *See* Composition of the Board of Directors, SAMRUK KAZYNA, http://www.samruk-kazyna.kz/page.php?page_id=2741&lang=3&parent_id=2731 (last visited Sept. 22, 2010).

fund's Deputy CEO.[25]  The Samruk-Kazyna sovereign wealth fund is nothing more than President Nazarbayev's holding company for the assets he has expropriated from the Houranis and those who dare to oppose him politically.

141.    Upon information and belief, Mirtchev has been compensated from the proceeds of the expropriation of the Houranis assets.

142.    Upon information and belief, Mirtchev and the Corporate Defendants have worked in concert with the President of Kazakhstan to create numerous private investment funds in Singapore, the United Arab Emirates, and other countries to purchase the state-owned assets of Samruk Kazyna.  These private investment funds are, or ultimately will be, controlled by President Nazarbayev.

> **4.     Having Expropriated the Houranis' Investments and Assets, President Nazarbayev and the Defendants Commenced an International Media Campaign to Discredit and Defame Them.**

143.    On or about November 15, 2007, President Nazarbayev personally ordered the KNB to work with the Kazakh Embassy in Washington, D.C., Alexander Mirtchev, and GlobalOptions Management, Inc. to commence gathering information in the United States *to discredit* Devincci Hourani and Issam Hourani.

144.    The aforementioned Colonel Daulbayev of the "inter-agency investigative-operational task force" issued a "top secret" letter to Ambassador Idrissov in Washington, D.C., informing him of President Nazarbayev's order.  The memorandum states that the KNB, Mirtchev, and the Embassy are to gather "discrediting" financial and bank information about the Houranis and submit the KNB's reports on the Houranis to

---

[25] *See id.*

U.S. law enforcement organizations. Further, Colonel Daulbayev states in the letter that it is necessary to use Mirtchev's "lobbyist connections" to foreclose the Houranis from escaping to the United States and persuading U.S. law enforcement agencies to bring charges against them.

145.    The letter also states falsely that Devincci Hourani obtained his U.S. citizenship through a sham marriage.

146.    Colonel Daulbayev's letter goes on to state that, under President Nazarbayev's order, the Kazakh Embassy is to be allocated additional funds to work with GlobalOptions Management, Inc. to spread negative and discrediting information about the Houranis to Non-Governmental Organizations and the mass media.

147.    Finally, Colonel Daulbayev's letter attaches a copy of the memorandum prepared by Mirtchev and GlobalOptions Management, Inc. detailing the Superkhan plan described above, as well as a copy of Devincci Hourani's U.S. passport.

148.    Mirtchev and the Corporate Defendants have since published or assisted in the publishing of libelous and defaming articles about both the Houranis in order to discredit and silence them.

149.    Such publications include, upon information and belief, numerous comments, articles, and websites claiming that Issam Hourani has ties to a wide range of dissimilar Islamic terrorist groups, specifically, Hamas, Hezbollah, Al Qaeda, and the Muslim Brotherhood.

150.    On December 18, 2008, Mirtchev and the Corporate Defendants worked in concert with the Government of Kazakhstan and Ambassador Idrissov, in accordance with the letter's instructions, to publish defamatory statements in an article posted on the

website for the Kazakh Embassy in Washington, D.C., stating that Issam Hourani was

"an active member of HAMAS."[26]  Further, the article makes the defamatory statement

that Issam Hourani imported workers into Kazakhstan who had connections to Hezbollah,

Islamic Jihad, and the Muslim Brotherhood and that these workers were forging

connections with other Islamist groups in Central Asia.

   151.   Also, Mirtchev and the Corporate Defendants worked in concert with the

Government of Kazakhstan to publish a February 18, 2009, article on the same Kazakh

Embassy website claiming falsely that Issam Hourani was a "known supporter of

Hammas [sic]."[27].

   152.   Likewise, Mirtchev and the Corporate Defendants worked in concert with

the Government of Kazakhstan to transmit defamatory information to various online

publications that Issam Hourani is a member and/or supporter of Hamas.[28]

   153.   Moreover, after Rakhat Aliyev published a book entitled, "The Godfather-

in-Law" attacking President Nazarbayev and his regime, a group in Bonn, Germany,

---

[26] *See* Axis Information and Analysis, *The Former Kazakh FBI Apprentice from Jack the Ripper To a Democrat*, *available at*
http://www.kazakhembus.com/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=
161&cntnt01origid=90&cntnt01returnid=90 (last visited Sept. 22, 2010).

[27] *See Rakhat Aliyev: Racketeer or Reformer?*, CASPIAN INFORMATION CENTER (Dec. 18, 2008), *available at*
http://www.kazakhembus.com/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=
161&cntnt01origid=90&cntnt01returnid=90; *or*
http://www.eurasiantransition.org/files/cba213d54c7e169efd4b14f7351615fb-93.php
(last visited Sept. 22, 2010) (same article).

[28] *See* Dmitry Sidorov, *Justice in Kazakhstan*, FORBES (Feb. 9, 2009),
http://www.forbes.com/2009/02/09/rakhat-aliyev-kazakhstan-opinions-
contributors_0209_dmitry_sidorov.html; *see also* AXIS INFORMATION AND ANALYSIS,
*Eurasian Secret Services Daily Review* (December 8, 2008),
http://www.axisglobe.com/article.asp?article=1710 (last visited Sept. 22, 2010) (stating
that Issam Hourani is an active member of Hamas).

calling themselves the "Eurasian Transition Group ("ETG") published a report called,

"The Aliyev Dossier," which makes the false and defamatory statements that Issam

Hourani (referred to as Khorani) is a citizen of Lebanon and that he imported illegally

into Kazakhstan Arab workers and that "[t]wo dozens [sic] of those employees had direct

links to terroristic [sic] movements, some of them with Al Qaida. All of them were

trained by terror cells in special camps." Issam Hourani is not a citizen of Lebanon and

at no point employed workers in Kazakhstan that were trained by terrorist organizations.

These statements are false and defamatory as a matter of law.

154.    Later, someone from ETG emailed a message regarding "The Aliyev

Dossier" to Mirtchev and Krull on July 15, 2009, using the e-mail addresses

krull_ceo@attglobal.net and KrullEurope@aol.com, the same addresses that are listed on

Mirtchev's various business cards. ETG's email states, "[a]fter the publication of

R.Aliyev's book and recent tensions in Austria and Western Europe regarding the whole

case, ETG decided to publish a dossier on R. Aliyev, Issam and Devinchi [sic] Horani

[sic]. It covers his alleged connection with drug traffic, illegal weapons import, Islamic

terrorists, and the responsibility of Western authorities." Each of these claims is false.

155.    Upon information and belief, Mirtchev and the Corporate Defendants

supplied ETG with the defamatory information contained in the "The Aliyev Dossier" or

exercise control over ETG itself such that they caused the defamatory statements about

the Plaintiffs to be published.

156.    Upon information and belief, Mirtchev and the Corporate Defendants have

engaged in numerous other activities designed to ruin the Houranis' finances and

reputation.

**Plaintiffs Have Been Injured by the Defendants' Conduct**

157.   The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 156 of the Complaint as if fully set forth herein.

158.   As a result of the foregoing actions of Alexander Mirtchev, Krull, GlobalOptions, and GlobalOptions Management, Inc., Plaintiffs Devincci Hourani and Issam Hourani have suffered serious financial injuries and injuries to their reputations

## FIRST CLAIM FOR RELIEF

### *Civil Conspiracy*

159.   The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 158 of the Complaint as if fully set forth herein.

160.   Under District of Columbia law, a civil conspiracy exists where there is (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

161.   Importantly, the overt act element of a conspiracy claim is satisfied whenever an injury caused by an unlawful overt act is performed by *one* of the parties to the agreement, pursuant to and in furtherance of the agreement.

162.   In the case at bar, Alexander Mirtchev, the Corporate Defendants, Kaloyan Dimitrov, Aigul Nurieva, President Nazarbayev, and other members of the Kazakh Government conspired to convert the Plaintiffs' property, tortiously interfere with various contracts to which the Plaintiffs were parties, tortiously interfere with

Plaintiffs' economic advantages, and publish defamatory and libelous information about them in various publications and on the Internet.

163.    President Nazarbayev, Alexander Mirtchev, and the Corporate Defendants entered into an overarching agreement to strip Devincci and Issam Hourani of all of their assets in an effort to consolidate power in President Nazarbayev.  As a part of this agreement, and as set forth in detail above, the Defendants agreed to participate, advise, and assist President Nazarbayev and the Government of Kazakhstan in committing a number of torts, including, but not limited to: (1) tortiously converting the Houranis' respective business interests into assets held by President Nazarbayev and the Kazakh Government; (2) tortiously interfering with the Caratube's contract with MEMR; (2) tortiously interfering with the Houranis' respective business relationships, and, thus, interfering with their economic advantage; and (3) defaming Issam Hourani by publishing or causing others to publish false statements that he supports and/or is a member of various terrorist organizations and was involved in criminal conduct.

164.    President Nazarbayev and/or the Government of Kazakhstan paid the Defendants to advise, assist, and carry out this conspiracy and the independent torts upon which it was predicated.

165.    Further, Alexander Mirtchev and the Corporate Defendants, along with the above-mentioned members of the conspiracy, actually committed the independent torts of conversion, tortious interference with contract, tortious interference with economic advantage, defamation, and libel by undertaking the actions described above against Plaintiffs Devincci and Issam Hourani.

166. Finally, as described above, Plaintiffs Devincci and Issam Hourani have suffered significant economic and pecuniary injury through the overt acts of several members of the conspiracy in converting their interests in several businesses in Kazakhstan, and tortiously interfering with their contracts and business relationships. Indeed, years of hard work and effort as well as millions of dollars of investment, not to mention a considerably valuable contract for an oil concession, were converted and interfered with through the machinations of the Defendants and their co-conspirators in the Kazakh Government.

167. Moreover, Issam Hourani has suffered a great injury to his reputation and societal status on account of the overt acts of members of the conspiracy in publishing libelous and defamatory statements about him.

168. Accordingly, Defendants Mirtchev, Krull Corp., GlobalOptions, and GlobalOptions Management, Inc. are liable to Plaintiffs for compensatory damages in the amount of not less than TWO BILLION DOLLARS ($2.0 Billion) and reasonable attorneys' fees, expenses, and costs in amounts to be determined at trial, and all other available relief.

## SECOND CLAIM FOR RELIEF

### *Conversion*

169. The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 168 of the Complaint as if fully set forth herein.

170. Under D.C. law, an action for conversion is recognized when a defendant has unlawfully exercised ownership, dominion or control over the personal property of

another in denial or repudiation of his rights thereto. Further, a plaintiff need only aver title or ownership in himself to support a cause of action for conversion.

171.    As noted above, Devincci Hourani was the lawful owner of a 92% share in the Caratube International Oil Company and a 34% owner of KTK Television. Caratube was worth over a billion dollars while KTK Television was worth tens of millions of dollars. Further, Issam Hourani was the lawful owner of 50% of Alma Media, which was worth hundreds of millions of dollars.

172.    As explained in further detail above, Alexander Mirtchev worked in concert with the Kazakh Government to take unlawful ownership, dominion, or control over Caratube through the termination of its oil concession. The Government of Kazakhstan then absorbed the assets of Caratube into KazMunaiGaz, an oil company that is wholly-owned by the Samruk Kazyna sovereign wealth fund which is partially directed by Alexander Mirtchev. In doing so, Mirtchev and the Corporate Defendants converted Devincci Hourani's 92% interest in that valuable property.

173.    As explained in further detail above, Alexander Mirtchev worked in concert with the Kazakh Government to take unlawful ownership, dominion, or control over Devincci Hourani's interest in KTK Television when Dariga Nazarbayeva demanded that he sign over his interest in the company to the Kazakh Government's First Presidential Fund under threats of reprisal. In doing so, Mirtchev and the Corporate Defendants converted Devincci Hourani's 34% interest in that valuable property.

174.    As explained in further detail above, Alexander Mirtchev worked in concert with the Kazakh Government to take unlawful ownership, dominion, or control over Issam Hourani's interest in Alma Media when Dariga Nazarbayeva demanded that

Devincci Hourani sign over Issam Hourani's interest in the company to the Government of Kazakhstan's First Presidential Fund under threats of reprisal. In doing so, Mirtchev and the Corporate Defendants converted Issam Hourani's 50% interest in that valuable property.

175.    Upon information and be lief, Mirtchev and the Corporate Defendants exercised control over KTK Television and Alma Media as part of the overarching goals of the Superkhan plan, i.e., to place control of all major industry – and specifically, the mass media – in the hands of President Nazarbayev.

176.    Accordingly, Defendants Mirtchev, Krull Corp., GlobalOptions, and GlobalOptions Management, Inc. are liable to Plaintiffs for compensatory damages in an amount not less than TWO BILLION DOLLARS ($2.0 Billion) and reasonable attorney's fees, expenses, and costs in amounts to be determined at trial, and all other available relief.

### THIRD CLAIM FOR RELIEF

#### *Tortious Interference with Contract*

177.    The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 176 of the Complaint as if fully set forth herein.

178.    Under D.C. law, a *prima facie* case of tortious interference with contract requires a showing of (1) the existence of a contract; (2) knowledge of the contract by the defendant; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach.

179.    As explained in greater detail above, Devincci Hourani owned a 92% interest in the Caratube International Oil Company, which, in turn, held a lucrative oil

concession contract with MEMR.

180.    Upon information and belief, Mirtchev and the Corporate Defendants knew of that contract in their relative positions as advisors and agents of President Nazarbayev and the Republic of Kazakhstan.  More specifically, upon information and belief, the Defendants knew about that lucrative contract (1) in advising President Nazarbayev and the Kazakh Government on the implementation of the above-described Superkhan plan; (2) in advising President Nazarbayev and the Kazakh Government on how to respond to the rift with Rakhat Aliyev; and (3) as part of Alexander Mirtchev's role as a director of the Samruk Kazyna fund.

181.    Upon information and belief, Alexander Mirtchev and the Corporate Defendants advised and assisted President Nazarbayev and the Government of Kazakhstan in their efforts to unlawfully terminate and breach the Caratube oil concession contract under Kazakh and international law.  Additionally, as explained in more detail above, Caratube's assets were eventually transferred to the Samruk Kazyna fund, which is partially directed by Defendant Mirtchev.  Upon information and belief, the Defendants intentionally advised that the MEMR breach its contract with Caratube on pretextual and illegal grounds.

182.    Finally, Devincci Hourani suffered pecuniary and financial damages as a result of this breach.  Mr. Hourani had invested millions of dollars into Caratube's operations pursuant to the contract and had reasonable expectations that those operations would yield substantial profits.  The actions of the Defendants ensured that he would never realize those profits.

183.    Accordingly, Defendants Mirtchev, Krull Corp., GlobalOptions, and

GlobalOptions Management, Inc. are liable to Plaintiffs for compensatory damages in an amount of not less than TWO BILLION DOLLARS ($2.0 Billion) and reasonable attorneys' fees, expenses, and costs in amounts to be determined at trial, and all other available relief.

### FOURTH CLAIM FOR RELIEF

#### *Tortious Interference with Economic Advantage*

184.    The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 183 of the Complaint as if fully set forth herein.

185.    Under D.C. law, a plaintiff establishes a claim for tortious interference with economic advantage by demonstrating (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.

186.    As explained above, Plaintiff Issam Hourani held a 50% interest in Alma Media, a media and real estate conglomerate that provided a free and independent source of news and media to Kazakhstan. Alma Media was quite profitable and provided Issam Hourani with a regular return in relation to his 50% share of the company.

187.    Defendant Mirtchev and the Corporate Defendants knew of Issam Hourani's business relationship with Alma Media as part of their designs to strip Issam Hourani of his assets, and, in particular, media holdings.

188.    Upon information and belief, the Defendants intentionally aided and advised President Nazarbayev, Dariga Nazarbayeva, and the Government of Kazakhstan in forcing Devincci Hourani to sign over Issam Hourani's interest in Alma Media to the

First Presidential Fund as a means of retribution for his relationship with Rakhat Aliyev and as part of the greater ambitions for the Superkhan project.  As a result, Issam Hourani no longer realizes the profits that his substantial investment in Alma Media once brought him and, thus, has suffered damages.

189.    Similarly, Plaintiffs Issam Hourani and Devincci Hourani had a profitable business relationship with their pharmaceutical and medical training corporation, Pharma Industry Corporation LLP.  The Plaintiffs each held a 50% share in this business.

190.    Defendant Mirtchev and the Corporate Defendants knew of Issam and Devincci Hourani's business relationship with Pharma Industry Corporation LLP as part of their designs to strip economic elites such as the Houranis of their assets.

191.    The Defendants intentionally aided and advised President Nazarbayev and the Government of Kazakhstan in unjustifiably forcing Pharma Industry Corporation LLP into bankruptcy as a means of retribution for the Houranis' relationship with Rakhat Aliyev and as part of the greater ambitions of the Superkhan project.  As a result, the Plaintiffs no longer realize the profits that their substantial investments in Pharma Industry Corporation LLP once brought them and, thus, have suffered damages.

192.    Additionally, as explained above, Plaintiff Devincci Hourani held a 34% interest in KTK, a television broadcaster and media conglomerate that provided an independent source of news and media to Kazakhstan.

193.    Defendant Mirtchev and the Corporate Defendants knew of Devincci Hourani's business relationship with KTK Television as part of their designs to strip elites such as Devincci Hourani of their assets, and, in particular, media holdings.

194.    The Defendants intentionally aided and advised President Nazarbayev, Dariga Nazarbayeva, and the Government of Kazakhstan in forcing Devincci Hourani to sign over his interest in KTK Television to the First Presidential Fund as a means of retribution for the Houranis' relationship with Rakhat Aliyev and as part of the greater ambitions for the Superkhan project.  As a result, Devincci Hourani no longer realizes the profits that his substantial investment in KTK Television once brought him and, thus, has suffered damages.

195.    Accordingly, Defendants Mirtchev, Krull Corp., GlobalOptions, and GlobalOptions Management, Inc. are liable to Plaintiffs for compensatory damages in an amount not less than TWO BILLION DOLLARS ($2.0 Billion) and reasonable attorneys' fees, expenses, and costs in amounts to be determined at trial, and all other available relief.

## FIFTH CLAIM FOR RELIEF

### *Defamation*

196.    The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 195 of the Complaint as if fully set forth herein.

197.    Under D.C. law, a plaintiff bringing a defamation suit must show:  (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.  Further, such a statement is defamatory if it tends to injure a plaintiff in his trade, profession or community standing,

or lower him in the estimation of the community.  Additionally, defamatory remarks must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous.  Finally, a court will not dismiss a complaint which alleges defamation if the communications of which the plaintiff complains were reasonably susceptible of a defamatory meaning.

198.    As explained above, Mirtchev and the Corporate Defendants proposed that, as part of the Superkhan plan, President Nazarbayev's regime work to discredit the Oligarchs and other elites in the eyes of Western authorities and media through the publication of criminal allegations about them.  Further, the November 16, 2007, A. Daulbayev letter indicates that the Kazakh Government, Mirtchev, and GlobalOptions Management specifically attempted to discredit the Houranis through actions undertaken within the District of Columbia.

199.    As part of this plan and upon information and belief, the Defendants and the government made numerous false and defamatory statements about Issam Hourani, including, but not limited to, statements that (1) he was a member of Hamas; (2) he was a supporter of Hamas; (3) he imported workers into Kazakhstan that were trained in Islamic terrorist camps; (4) he assaulted an employee of Ruby Roz Agricol; and (5) he owned an apartment in which an alleged mistress of Rakhat Aliyev was falsely imprisoned, drugged, and eventually murdered.

200.    Mirtchev and the Corporate Defendants published or caused these statements to be published in various formats, including, but not limited to, two news stories on the website of the Kazakh Embassy in Washington, D.C., a Forbes.com

editorial, internal Kazakh Government memoranda, the so-called Aliyev Dossier published by ETG, as well as various other Internet publications.

201.    The Defendants intentionally published or caused these false statements to be published as a means of discrediting Issam Hourani in the eyes of the Western authorities and media. As such, the Defendants' actions amount to more than mere negligence.

202.    Finally, given the universal condemnation of terrorism in the years since the events of September 11, 2001, there can be little doubt that Issam Hourani, a law-abiding citizen of the United Kingdom, has suffered a "special harm" by being branded as a terrorist by the Defendants.

203.    Accordingly, Defendants Mirtchev, Krull Corp., GlobalOptions, and GlobalOptions Management, Inc. are liable to Plaintiffs for compensatory damages in an amount not less than ONE HUNDRED MILLION DOLLARS ($100 Million) and reasonable attorneys' fees, expenses, and costs in amounts to be determined at trial, and all other available relief.

## SIXTH CLAIM FOR RELIEF

### *False Light Invasion of Privacy*

204.    The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 203 of the Complaint as if fully set forth herein.

205.    Plaintiffs allege, in the alternative to their defamation claim, that Mirtchev and the Corporate Defendants have committed the tort of False Light Invasion of Privacy.

206.    Under D.C. law, an invasion of privacy-false light claim requires a showing of: (1) publicity (2) about a false statement, representation, or imputation

(3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be offensive to a reasonable person. A false light invasion of privacy action differs from an action for defamation because a defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having been exposed to public view.

207.    Plaintiffs hereby incorporate specifically the allegations made in their fifth claim for relief for defamation above.

208.    With regards to the "publicity" element of the claim, Mirtchev and the Corporate Defendants made public false statements that Issam Hourani had connections to terror organizations when they published or caused such false statements to be published on the Internet and in the international media. Indeed, creating negative publicity of the Houranis was a necessary part of the Superkhan plan.

209.    With regards to the fourth element of the claim, Plaintiffs further allege that any reasonable person would be offended by their false portrayal as a terrorist.

210.    Additionally, Plaintiff Issam Hourani has suffered acute mental distress as a result of the Defendants' publication of false statements that he has connections to terror organizations and imported workers with terrorist affiliations into Kazakhstan.

211.    Accordingly, Defendants Mirtchev, Krull Corp., GlobalOptions, and GlobalOptions Management, Inc. are liable to Plaintiffs for compensatory damages in an amount not less than ONE HUNDRED MILLION DOLLARS ($100 Million) and reasonable attorneys' fees, expenses, and costs in amounts to be determined at trial, and all other available relief.

## SEVENTH CLAIM FOR RELIEF

### *Libel*

212.    The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 211 of the Complaint as if fully set forth herein.

213.    Under D.C. law, a plaintiff bringing a libel claim must demonstrate that the statements complained of are (1) defamatory, (2) false, (3) statements of fact (and not opinion), and (4) made with the requisite degree of fault.  Further, the statements in question must be "of and concerning" the plaintiff.

214.    With regards to the first two elements, Plaintiff Issam Hourani repeats the allegations stated above in his fifth claim for relief.  With regards to the third element, the statements Defendants published in the sources mentioned in the fifth claim for relief were statements of fact, not opinion.  Further, as stated above, the Defendants intentionally published or caused these false statements to be published as a means of discrediting Issam Hourani in the eyes of the Western authorities and media, thus establishing that the statements were made with the requisite degree of fault.  Finally, Issam Hourani is not a "public figure" within the legal definition of that expression and, accordingly, need not demonstrate that the statements made about him were made with actual malice, even though evidence supports that the Defendants acted with such malice.

215.    Accordingly, Defendants Mirtchev, Krull Corp., GlobalOptions, and GlobalOptions Management, Inc. are liable to Plaintiffs for compensatory damages in an amount not less than ONE HUNDRED MILLION DOLLARS ($100 Million) and reasonable attorneys' fees, expenses, and costs in amounts to be determined at trial, and all other available relief.

## EIGHTH CLAIM FOR RELIEF

### *Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.*
### *§§ 1962, 1964(c) ("RICO")*

216.   The Plaintiffs incorporate by reference the allegations in paragraphs 1 through 215 of the Complaint as if fully set forth herein.

217.   A defendant violates 18 U.S.C. § 1962(a) if they use or invest any part of income derived, directly or indirectly, from a pattern of racketeering activity in the acquisition of any interest in, or the establishment or operation of, an enterprise engaged in, or the activities of which affect, interstate or foreign commerce.  Additionally, a plaintiff suing under 18 U.S.C. § 1962(a) must demonstrate that they suffered a "racketeering injury."

218.   A defendant violates 18 U.S.C. § 1962(c) if they are employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, and they conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.  Additionally, a plaintiff suing under 18 U.S.C. § 1962(c) must demonstrate that they suffered a "racketeering injury."

219.   Also, under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate 18 U.S.C. § 1962(a) or (c).

220.   A pattern of racketeering activity requires that a defendant undertake two acts of the 35 enumerated crimes found in 18 U.S.C. § 1961(1), within the past ten year period.

221.     Under 18 U.S.C. § 1961(1), racketeering activity includes, *inter alia*, acts of robbery, bribery, extortion, or the laundering of monetary instruments in violation of 18 U.S.C. § 1956.

222.     The Houranis suffered financial injuries when Mirtchev and the Corporate Defendants violated 18 U.S.C. § 1962(a).  Since 2007, and perhaps earlier, Mirtchev and the Corporate Defendants engaged in a pattern of racketeering behavior by assisting and aiding President Nazarbayev and the Government of Kazakhstan in numerous acts of robbery and extortion directed at the Houranis.  Further Mirtchev and the Corporate Defendants laundered monetary instruments unlawfully seized from the Houranis through the aforementioned transfer of those assets to the Samruk Kazyna sovereign wealth fund and other accounts and shell companies around the globe with the purpose of concealing the source, location, and ownership of the assets.  Upon information and belief, Mirtchev has invested the proceeds of these activities, and the income he derives therefrom, into many enterprises, including, but not limited to:  oil fields in Kazakhstan and/or Uzbekistan, Krull Corp., GlobalOptions, Inc., and GlobalOptions Management, Inc. Further, upon information and belief, Krull Corp. has invested the proceeds of the activities mentioned above (and the income it derives therefrom) into its joint venture, GlobalOptions Management, Inc.  Additionally, the enterprises that both Mirtchev and Krull Corp. have invested in clearly affect interstate or foreign commerce in that the oil fields exist in Central Asia and the Corporate Defendants operate internationally, including in the District of Columbia.

223.     The Houranis suffered financial injuries when Mirtchev and the Corporate Defendants violated 18 U.S.C. § 1962(c).  Mirtchev has affiliations with, or is employed

by, all three Corporate Defendants and the Government of Kazakhstan (through his employment by the Samruk Kazyna sovereign wealth fund) and has an association in fact with President Nazarbayev and Dariga Nazarbayeva. There also can be no doubt that Mirtchev and the Corporate Defendants are engaged in an enterprise that impacts foreign and interstate commerce in that they provide international consulting, investigatory, and public relations services across borders. Further, as shown above, Mirtchev and the Corporate Defendants have transferred assets and monies into bank accounts in different countries around the world. Moreover, Mirtchev and the Corporate Defendants have engaged in a pattern of racketeering by assisting and aiding President Nazarbayev and the Government of Kazakhstan in numerous acts of robbery and extortion directed at the Houranis. Further, Mirtchev and the Corporate Defendants laundered monetary instruments unlawfully seized from the Houranis through the aforementioned transfer of those assets to the Samruk Kazyna sovereign wealth fund and other accounts and shell companies around the globe with the purpose of concealing the source, location, and ownership of the monetary instruments and/or assets.

224.    Mirtchev and the Corporate Defendants violated 18 U.S.C. § 1962(d) by knowingly and willfully conspiring with the Government of Kazakhstan to commit the acts mentioned above in violation of 18 U.S.C. § 1962(a) and (c).

225.    Under 18 U.S.C. § 1964(c), plaintiffs are entitled to treble damages and costs for injuries they sustained as a result of Mirtchev and the Corporate Defendants' violations of 18 U.S.C. § 1962(a), (c), and (d).

226.    Accordingly, Defendants Mirtchev, Krull Corp., GlobalOptions, and GlobalOptions Management, Inc. are liable to Plaintiffs for compensatory damages and

reasonable attorneys' fees, expenses, and costs in amounts to be determined at trial, and all other available relief.

## NINTH CLAIM FOR RELIEF

### *Punitive Damages*

227.    The plaintiffs incorporate by reference the allegations in paragraphs 1 through 226 of the Complaint as if fully set forth herein.

228.    Under D.C. law, a plaintiff alleging intentional torts is entitled to punitive damages if they can show by clear and convincing evidence that the torts committed by the defendant were aggravated by egregious conduct and a state of mind that justifies punitive damages. This state of mind requires evil motive, actual malice, or deliberate violence or oppression.

229.    Such a state of mind is clearly present in the case at bar. Mirtchev and the Corporate Defendants not only conspired with a brutal dictator to unlawfully divest the Plaintiffs of their significant financial investments and assets, but they systematically harassed, intimidated, and physically threatened them and their families and employees. Then, after assisting President Nazarbayev in taking all of the Houranis' assets in Kazakhstan, Mirtchev and the Corporate Defendants set out to destroy their reputations internationally by publishing or having others publish repeated false accusations on the internet that Issam and Devincci Hourani were criminals. Mirtchev and the Corporate Defendants even went so far as to publish or have others publish false statements that Issam Hourani has connections to terrorist organizations.

230.    Such statements and actions were carried out with actual malice or evil motive. The goal of Alexander Mirtchev and the Corporate Defendants was the total

destruction of the Plaintiffs at the enrichment of President Nazarbayev and themselves. Actual malice was required to achieve this goal.

231.    Accordingly, Defendants Mirtchev, Krull Corp., GlobalOptions, and GlobalOptions Management, Inc. are liable to Plaintiffs for punitive damages in an amount not less than TWO BILLION DOLLARS ($2.0 Billion) and reasonable attorneys' fees, expenses, and costs in amounts to be determined at trial, and all other available relief.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment as follows:

(a)    Enter judgment awarding Plaintiffs compensatory damages in an amount appropriate to the proof at trial;

(b)    Enter judgment awarding Plaintiffs punitive damages in an amount appropriate to the proof at trial;

(c)    Award Plaintiffs their costs and attorneys' fees, including litigation expenses, reasonably incurred in the prosecution of the action; and

(d)    Award Plaintiffs such other and future relief as the Court shall deem just and proper.

## Demand For Jury Trial

Plaintiffs demand trial by jury on all issues triable by a jury.

Respectfully submitted,

Stuart H. Newberger, DC Bar No. 294793
Michael L. Martinez, DC Bar No. 347310
Timothy L. Foden, DC Bar No. 979947
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2500 (Telephone)
(202) 628-5116 (Facsimile)

Date:   September 23, 2010