**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| _____ ) | |
| DEVINCCI SALAH HOURANI et al.          ) | |
|                                        ) | |
|                                        ) | |
| Plaintiffs                             ) | Civil Action No. 10-1618 (TFH) |
|                                        ) | |
| v.                                     ) | |
|                                        ) | |
| ALEXANDER V. MIRTCHEV et al.           ) | |
|                                        ) | |
|                                        ) | |
| Defendants                             ) | |
| _____ ) | |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, OBTAIN A MORE DEFINITE STATEMENT, STRIKE PORTIONS OF THE COMPLAINT, AND STAY DISCOVERY AND THE CASE.**

## Table of Contents

Cases    iv

Statutes  x

Rules    xi

Introduction ........................................................................................................................ 1

Factual Background ............................................................................................................ 3

I.       This Case Is Fundamentally Domestic, Involving D.C.-Based Defendants Harming
         Plaintiffs from within that Jurisdiction. ..................................................................... 3

   A.    Defendants Are D.C.-Based Commercial Consultants and Agents of Kazakhstan ........ 3

   B.    Defendants Carried out Many of Their Attacks on Plaintiffs Here in the District of
   Columbia. ............................................................................................................................. 5

   C.    Many of Defendants' Tortious Actions Took Place in the District of Columbia. ......... 11

   D.    Plaintiffs Suffered Injuries as a Result of Actions Taken by Defendants in the District
   of Columbia. ....................................................................................................................... 13

II.      The Cold Realities of Kazakhstan's Legal System. ....................................................... 15

III.     Plaintiffs Did Not Become Aware of Defendants' Role in the Plot Against Them Until
         April 2010. ................................................................................................................... 22

ARGUMENT ...................................................................................................................... 24

I.       This Case Should Not Be Stayed. ................................................................................ 24

   A.    The Mirtchev Defendants' Request for a Stay of the Entire Proceeding Pending the
   ICSID Hearing Is Unwarranted. ......................................................................................... 24

   B.    The GlobalOptions Defendants' Request for a Stay of Discovery Pending the ICSID
   Arbitration and Determination of Defendants' Motion to Dismiss. ..................................... 27

IV.      The Republic of Kazakhstan Is Not a Required Party Under Rule 19. ........................... 28

   A.    Although Kazakhstan May Be a Co-Conspirator, Joint Tortfeasor, and Principal in an
   Agency Relationship with Defendants, It Is Not a Required Party. ...................................... 30

   B.    Defendants Fail to Demonstrate That Kazakhstan Is a "Required Party" Under the
   Criteria of Rule 19(b). ......................................................................................................... 31

      1.   The Court can accord complete relief among existing parties in Kazakhstan's absence.
           32

      2.   Kazakhstan has not claimed any interest in this case, and nonjoinder would neither
      harm Kazakhstan's ability to protect its interest nor leave Defendants subject to
      "inconsistent obligations." .............................................................................................. 33

   C.    Rule 19(b): Even if Kazakhstan Were a "Required Party," Dismissal for Nonjoinder
   Would Not Be Warranted. ................................................................................................... 34

      1.   Factor One: Prejudice ............................................................................................. 35

2.    Factor Two: Mitigation of Prejudice............................................................... 37

3.    Factor Three: Adequacy of Judgment.............................................................. 38

4.    Factor Four: Adequate Alternative Remedies.................................................. 38

V.    The Kazakh Courts Are Not an Adequate Alternative to This Court. ........................... 38

A.    The Mirtchev Defendants' Half-Hearted Attempt to Argue That Kazakhstan Is an Adequate Alternative Forum Does Not Withstand Scrutiny. .................................... 41

1.    Mirtchev and Krull's submission to Kazakh legal process does not satisfy their burden of showing that the forum is adequate. ............................................................... 41

2.    Mirtchev and Krull do not present sufficient evidence that Kazakhstan is a viable alternative forum........................................................................................... 42

3.    Plaintiffs cannot obtain basic justice in Kazakhstan........................................ 43

B.    The Private Interest Factors Do Not Militate in Favor of Dismissal. ......................... 49

C.    The Public Interest Factors Do Not Weigh in Favor of Dismissal. ............................. 51

VI.    Defendants Mirtchev and Krull's Minimum Contacts Argument Has No Merit........... 53

VII.    Plaintiffs' Complaint States Claims Under District of Columbia Common Law. ......... 54

A.    Plaintiffs' Complaint Comports with the Pleading Requirements Discussed in the Supreme Court's Decisions in *Twombly* and *Iqbal*................................................. 54

B.    Plaintiffs' Complaint Alleges Sufficient Facts to Support Plausible Claims for Defamation, Libel, and False Light Invasion of Privacy. ........................................ 56

1.    Plaintiffs allege sufficient facts to support their claims of defamation and libel........... 56

2.    Plaintiffs alleged sufficient facts to establish a claim for false light invasion of privacy. 59

C.    Plaintiffs' Complaint Alleges Sufficient Facts to Support A Claim for Conversion..... 60

D.    Plaintiffs' Complaint Alleges Sufficient Facts to Support Claims for Tortious Interference with Contract and Business Advantage. ............................................... 64

1.    The Complaint pleads tortious interference with contract............................... 64

2.    The Complaint adequately states a claim for tortious interference with business advantage. ................................................................................................... 65

E.    Plaintiffs' Complaint Alleges Sufficient Facts to Support their Civil Conspiracy Claim. 66

VIII.    Plaintiffs' Complaint States Claims for Civil Violations of the Racketeer Influenced and Corrupt Organizations Act................................................................................. 69

A.    Plaintiffs Suffered Direct and Serious Personal Harm as a Result of Defendants' Racketeering Activities..................................................................................... 71

B.    GlobalOptions Defendants' Extraterritoriality Argument Is Off the Mark. ................. 72

C.    Defendants Have Engaged in a Clear Pattern of Racketeering Activities. ................... 74

1.    Defendants committed the necessary predicate acts................................... 76

D.      Defendants Are Involved in a RICO Enterprise with the Republic of Kazakhstan....... 82

E.      Defendants Have Engaged in a RICO Conspiracy. ...................................................... 84

IX.     Plaintiffs' Claims Are Not Barred By the Applicable Statute of Limitations............... 85

A.      Plaintiffs' Conversion Claim Is Not Barred by the Statute of Limitations................... 89

B.      Plaintiffs' Tortious Interference Claims Are Not Barred. ............................................. 90

C.      Plaintiffs' Defamation and Libel Claims Are Not Barred by the Statute of Limitations. 90

D.      Plaintiffs' Civil Conspiracy Claim Is Not Barred by the Statute of Limitations. .......... 93

X.      Plaintiffs Have Standing to Bring Their Claims. .......................................................... 94

XI.     Alexander Mirtchev's Distaste for Plaintiffs' Allegations Does Not  Warrant Striking Them from the Well-Pleaded Complaint. ....................................................................... 99

XII.    The Allegations Do Not Require a More Definite Statement. ..................................... 101

Conclusion ................................................................................................................................ 103

## Table of Authorities

**Cases**

*Aktielselskabet Af 21. November 2001 v. Fame Jeans Inc.*,

　　525 F.3d 8, 15 (D.C. Cir. 2008) ................................................................. 55

*Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-313 (1981) ............................. 53

*Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*,

　　885 F. Supp. 499, 502 (S.D.N.Y. 1995) .................................................... 26

*Anderson v. Hall*, 755 F.Supp. 2, 5 (D.D.C. 1991) ...................................... 29

*Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937 (2009) ................................. 55

*Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*,

　　383 F. Supp. 2d 32, 40 (D.D.C. 2005) ................................................ 57, 58

*Beck v. Prupis*, 529 U.S. 494, 507 (2000) ............................................. 84, 85

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ............................... 54, 55, 68

*Benic v. Reuters America, Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004) ........... 57, 58

*Bennett Enter., Inc. v. Domino's Pizza, Inc.*,

　　45 F.3d 493, 499 (D.C. Cir. 1995) ..................................................... 64, 66

*Boehner v. McDermott* .................................................................... 53, 54

*Bourdieu v. Pacific Western Oil Co.*, 299 U.S. 65, 70-71 (1936) ................... 29

*Boyle v. United States*, __ U.S. __, 129 S. Ct. 2237, 2243 (2009) ......... 82, 83, 84

*BPA Int'l*, 281 F. Supp. 2d at 85 ...................................................... 42

*Ca De Lupis v. Bonino*, 2010 WL 1328813, *7 (D.D.C. March 17, 2010) ....... 60, 61, 67, 68

*Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1199 (S.D.N.Y 1996) .......... 42, 45

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) ........................................ 86

*Capitol Place I Associates L.P. v. George Hyman Construction Company*,

    673 A.2d 194, 198 (D.C. Ct. App. 1996) ....................................................................... 86

*Carijano v. Occidental Petroleum*, 2010 WL 4925459, *1, *3 (9th Cir. Dec. 6, 2010)........ passim

*Casco Marina Development, L.L.C. v. District of Columbia Redevelopment Land Agency*,

    834 A.2d 77, 83 (D.C. 2003) ................................................................................ 64, 65

*Cheeks v. Fort Myer Const. Co.*, 2010 WL 2553659 (D.D.C. June 25, 2010) ........................... 95

*Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 279 (D.C. Cir. 2003) ................................. passim

*Clinton v. Jones*, 520 U.S. 681, 708 (1997) ......................................................................... 26

*Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) ............. 95

*Colbert v. Georgetown Univ.*,

    641 A.2d 469, 472-473 (D.C. 1994) .............................................................. 86, 88, 90

*Comm. to Defend U.S. Constitution v. Moon*, 776 F. Supp. 568, 571 (D.D.C. 1991) ................. 71

*Conte v. Newsday, Inc.*,

    703 F. Supp. 2d 126, 149 (E.D.N.Y. 2010) ................................................................. 96

*Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 n. 2 (D.C.Cir. 1999) ................. 56

*\*Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 33 (D.D.C. 2008) .................................. passim

*Dowd v. Calabrese*,

    589 F.Supp. 1206, 1213-14 (D.D.C. 1984) .............................................................. 67, 69

*Eastman Kodak Co. v. Kavlin*,

    978 F. Supp. 1078, 1084-1087 (S.D. Fla. 1997) ....................................................... 43, 44

*Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 140 (D.D.C. 2008) .......................... 71

*El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996) ................................ 41, 42

*El-Hadad v. Embassy of United Arab Emirates*,

    2006 WL 826098, *14 (D.D.C. March 29, 2006)................................................................ 57

*El-Hadad v. United Arab Emirates*, 496 F.3d 658 (D.C. Cir. 2007) ........................................... 57

*Eppley v. Iacovelli*,  2010 WL 3282574, *6 (S.D. Ind. Aug 17, 2010) ..................................... 56

*Estate of Raleigh v. Mitchell*, 947 A.2d 464, 469 (D.C. 2008).................................................... 98

*Farris v. Compton*, 652 A.2d 49 (D.C. 1994)............................................................................... 86

*Field v. Volkswagenwerk A.G.*, 626 F.2d 293, 298 (3rd Cir. 1980)............................................ 31

*Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir.1996)................................................. 85, 89

*Forte v. Goldstein*, 461 A.2d 469, 472 (D.C. 1983) .................................................................... 89

*Franchise Tax Bd. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990) ................................ 97, 98

*Fraternal Order of Police Library of Cong. Labor Comm. v. Library of Cong.*,

    692 F. Supp. 2d 9, 19 (D.D.C. 2010) ........................................................................... 102

*FTC v. Manager, Retail Credit Co., Miami Branch Office*,

    357 F. Supp. 347, 354 (D.D.C. 1973) ............................................................................. 34

*Georgia Bank & Trust Co. of Augusta v. Trenery*,

    2010 WL 3271732, at *6 (D.S.C. Aug. 18, 2010) ........................................................... 97

*Georgia v. Pennsylvania R. Col.*, 324 U.S. 439, 463-64 (1945)................................................... 30

*GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 193 (D.D.C. 2003)................................. 26

*Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147-148 (2d Cir. 2000)........................ 45

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)...................................................... 50, 51, 52

*H.J. Inc. v. Nw. Bell Tel. Co.*,

    492 U.S. 229, 237 (1989)............................................................................................ 75, 76

*Harpole Architects, P.C. v. Barlow*, 668 F. Supp. 2d 68, 77 (D.D.C. 2009)............................... 99

*Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 35 (D.D.C. 2004) (Urbina, J.) ........................... 26

*Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 512 (D.C. Cir. 2009)............. 61

*Iacangelo v. Georgetown University*, 580 F. Supp. 2d 111, 113-114 (D.D.C. 2008) ................. 54

*In re Spectrum, Ltd. v. Pacific Showrooms West, Inc.*,

    2007 WL 2320587, *2 ........................................................................................ 89

*Jackson v. H.R. Nicholson Co.*, 545 F. Supp. 762, 763-764 (D.D.C. 1982).............................. 100

*Jankovic v. Int'l Crisis Group*,

    494 F.3d 1080, 1091 (D.C. Cir. 2007)....................................................... 56, 91

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*,

    402 F.3d 1249, 1253 (D.C. Cir. 2005) ........................................................... 95

*Kaufman v. Societe Internationale Pour Participations Industrielles et Commerciales*,

    343 U.S. 156, 159-60 (1952) ........................................................................... 97

*Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001) .................................... 56, 57, 59, 60

*Knop v. Mackall*,

    640 F. Supp. 2d 58, 61 (D.D.C. 2009) (Kennedy, J.) ....................................... 33

*Krieger v. Trane Co.,* 765 F. Supp. 756, 763 (D.D.C. 1991)....................................... 30

*Kuwait Airways Corp. v. Am. Sec. Bank*, 890 F.2d 456 (D.C. Cir. 1990) .................................. 89

*Landis v. North American Co.*, 299 U.S. 248, 255 (1936) ........................................... 26

*Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 638 F.Supp. 1149, 1153 n.7 (D.D.C. 1986)........ 59

*Linguex, Inc. v. Murphy*, 1994 WL 289357, at *1 (D.D.C. 1994)................................. 91

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ......................................... 95

*Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1429 (11th Cir. 1996) ........................ 42

*Maupin v. Haylock*, 931 A.2d 1039, 1041-1043 (D.C. 2007)....................................... 92

*MBI Group, Inc. v. Credit Foncier Du Cameroun,

    616 F.3d 568, 575 (D.C. Cir. 2010) ............................................................. 48

*MBI Group, Inc. v. Credit Foncier Du Cameroun,

    558 F. Supp. 2d 21, 26 (D.D.C. 2008) (Bates, J.).................................... passim

Messina v. Fontana, 260 F. Supp. 2d 173, 177 (D.D.C. 2003) .................................... 56

Morrison v. National Australia Bank, __ U.S. __, 130 S. Ct. 2869, 2878 (2010) ....................... 72

Morton v. National Medical Enterprises, Inc., 725 A.2d 462, 468-69 (D.C. 1999) .................... 86

Mullin v. Washington Free Weekly, Inc.,

    785 A.2d 296, 298 n.2, 299 (D.C. 2001) ......................................................... 91

National R.R. Passenger Corp. v. Veolia Transp. Services, Inc.,

    592 F. Supp. 2d 86, 98-99 (D.D.C. 2009)......................................................... 66

Norex Petroleum Ltd. v. Access Indus., 2010 WL 4968691 (2d Cir. Sept. 28, 2010) ................. 73

Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 155-156 (2d Cir. 2005).................. 40

Nottingham v. Gen. Am. Communications Corp., 811 F.2d 873, 880 (5th Cir. 1987) .......... 30, 31

Nugent v. Unum Life Ins. Co. of America,

    2010 WL 4780847, *1 *11 (D.D.C., Nov. 24, 2010) ............................................ 100, 101

Olinger v. Am. Sv. & Loan Ass'n, 409 F.2d 142, 144 (D.C. Cir. 1969......................................... 57

Oparaugo v. Watts, 884 A.2d 63, 74 n.8 (D.C. 2005) .................................................................. 92

Pearson v. Dodd, 410 F.2d 701, 707-708 n.34 (D.C. Cir. 1969)................................................ 61

People With Aids Health Group v. Burroughs Wellcome Co.,

    1991 WL 221179, at *1 (D.D.C. Oct. 11, 1991).................................................. 27, 28

Pigford v. Veneman, 215 F.R.D. 2, 4 (D.D.C. 2003)................................................................. 100

*Piper Aircraft Co. v. Reyno,

    454 U.S. 235, 256 (1981) ................................................................................ 39, 40, 50

Potts v. Howard University, 269 F.R.D. 40, 44 (D.D.C. 2010) ........................................ 102, 103

Primedical, Inc. v. Allied Investment Corp.,

    1994 WL 149139, at *7 (D.D.C. March 31, 1994) ....................................................... 62

Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1117 (D.C. Cir. 1991) ....................... 74

Rasoulzadeh v. Associated Press, 574 F. Supp. 854, 861 (S.D.N.Y) ........................................... 45

Regional Rail Reorganization Act Cases, 419 U.S. 102, 117 (1974) ......................................... 97

Reid-Walen v. Hansen, 933 F.2d 1390, 1395 (8th Cir. 1991) ................................................ 40, 41

Republic of the Philippines v. Pimentel,

    553 U.S. 851 (2008) ....................................................................................... 35, 38

Riggs v. Home Builders Institute, 203 F. Supp. 2d 1, 25 (D.D.C. 2002) .................................... 67

S.E.C. v. Rivlin, 1999 WL 1455758, at *6 (D.D.C. 1999) ......................................................... 30

Samantar v. Yousef, __ U.S. __, 130 S. Ct. 2278 (2010) ......................................................... 41

SASCO v. Byers, 2009 WL 1010513, at *2 ............................................................................. 31

*Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 495 (1985) ................................................ 71, 72

Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998) .............................. 85

Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.,

    647 F.2d 200, 207 (D.C. Cir. 1981) ...................................................................... 29, 30

Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.,

    196 F. Supp. 2d 21, 28 (D.D.C. 2002) .......................................................................... 30

The Equity Group Ltd. v. Painewebber Inc., 48 F.3d 1285, 1286 (D.C. Cir. 1995) .............. 61, 62

*Three Affiliated Tribes of Ft. Berthold Indian Reservation v. United States*,

    637 F. Supp. 2d 25 (D.D.C. 2009) ................................................................. 29

*Tooley v. Napolitano*, 586 F.3d 1006, 1007 (D.C. Cir. 2009) ...................................................... 55

*United States v. Philip Morris USA Inc.*,

    566 F.3d 1095, 1130 (D.C. Cir. 2009) ..................................................... 73, 74

*\*United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 13, 18 (D.D.C. 2004) ............... 83, 85

*United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999) ............................................. 83

*United States v. Turkette,* 452 U.S. 576, 580 (1981) ................................................................. 83, 84

*United States v. Wiley*, 57 F.3d 1374, 1386 (5th Cir. 1995) ........................................................ 80

*Uzlyan v. Solis*, 706 F. Supp. 2d 44, 51 (D.D.C. 2010) ................................................. 99, 100, 101

*Vreven v. American Assoc. of Retired Persons*,

    604 F. Supp. 2d 9, 12-13 (D.D.C. 2009)....................................................... 56

*Washburn v. Lavoie*, 357 F. Supp. 2d 210, 214 (D.D.C. 2004)............................................. 57, 60

*Weyrich v. The New Republic*, 235 F.3d 617, 627 (D.C. Cir. 2001)............................................ 57

*Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457, 458 (D.D.C. 1994) ...................................... 100

## **Statutes**

18 U.S.C § 1962(d) ..................................................................................................................... 84

18 U.S.C. § 1544........................................................................................................................... 76

18 U.S.C. § 1951 ........................................................................................................................... 76

18 U.S.C. § 1951(a) ................................................................................................................. 77, 78

18 U.S.C. § 1956 ........................................................................................................................... 81

18 U.S.C. § 1956(a)(1)................................................................................................................... 80

18 U.S.C. § 1957(a) ...................................................................................... 81

18 U.S.C. § 1961(1) ...................................................................................... 76

18 U.S.C. § 1961(4) ...................................................................................... 84

18 U.S.C. § 1961(5) ...................................................................................... 75

18 U.S.C. § 1961(a) ...................................................................................... 80

18 U.S.C. § 1962(a) ...................................................................................... 74

18 U.S.C. § 1962(c) ...................................................................................... 82

18 U.S.C. § 1964(c) ................................................................................ 69, 70

18 U.S.C. §§ 1956 and 1957 ........................................................................ 79

18 U.S.C. §1961(1) ....................................................................................... 79

28 U.S.C. § 1604 .......................................................................................... 35

28 U.S.C. § 1605(a)(5)(B) ....................................................................... 88, 92

550 U.S. at 555 ............................................................................................. 55

75 F.3d at 677 ............................................................................................... 42

8 U.S.C. § 1962(a) and (c) ........................................................................... 74

D.C. Code § 12-301(4) .................................................................................. 91

D.C. Code § 12-301(8) ............................................................................ 90, 93

WRIGHT & MILLER, 7 FED. PRAC. & PROC. CIV. § 1604 (3d ed. 2001) ........................................ 34

WRIGHT & MILLER, 7 FED. PRAC. & PROC. CIV. § 1609 (3d ed. 2001) ........................................ 29

WRIGHT & MILLER, 7 FED. PRAC. & PROC. CIV. § 1623 (3d ed. 2001) ........................................ 31

## **Rules**

FED. R. CIV. P. 12(e) .................................................................................. 101

FED. R. CIV. P. 19(a) ............................................................................................................ 30

FED. R. CIV. P. 19(a)(1) ....................................................................................................... 31

FED. R. CIV. P. 19(a)(1)(A) .................................................................................................. 32

FED. R. CIV. P. 19(a)(1)(B) ............................................................................................ 31, 33

FED. R. CIV. P. 19(a)(1)(B)(i) ............................................................................................... 33

FED. R. CIV. P. 19(a)(1)(B)(ii) .............................................................................................. 33

FED. R. CIV. P. 19(b) ............................................................................................................ 34

FED. R. CIV. P. 19(b)(1) ....................................................................................................... 35

FED. R. CIV. P. 19(b)(2) ....................................................................................................... 37

FED. R. CIV. P. 19(b)(3) ....................................................................................................... 38

FED. R. CIV. P. 19(b)(4) ....................................................................................................... 38

FED. R. CIV. P. 19(b), Advisory Committee's Notes on 1966 Amendments ............................... 35

FED. R. CIV. P. 8(a)(2) .......................................................................................................... 55

## Introduction

In the present case, two brothers—one a United States citizen, living in Virginia, the other a British citizen living in London—seek damages against individual and corporate defendants, all located and acting in the District of Columbia.  The case arises from actions violating District of Columbia and federal law.  Those actions caused Plaintiffs tremendous damages—over two billion dollars in documented losses of business investment and family assets—as well as serious damage to their reputations from slanderous published statements.  In these respects, this is a dispute that arose in, and is properly and timely brought within, this jurisdiction by virtue of diversity and federal question jurisdiction.

Defendants carried out many of these unlawful activities within the District of Columbia at the behest of the dictatorial ruler of a foreign government, President Nursultan Nazarbayev of the Republic of Kazakhstan.  Defendants are Washington-based consultants and advisors for President Nazarbayev and his Government, and were commercially engaged by him to carry out these very activities precisely because they are located in Washington and specialize in providing such "services" to governments around the world.

Defendants' effort to have this case dismissed because of the identity of their fee-paying client—the Government of Kazakhstan—is preposterous.  That the Government of Kazakhstan engaged these defendants to carry out these actions does not deprive this Court of the authority to resolve the merits and award damages against these private Defendants in a case that is otherwise properly pled and before the Court.  Nor can Defendants hide behind the fact that a company owned by one of the Plaintiffs, Caratube International Oil Company ("Caratube"), is pursuing a separate claim against Kazakhstan.  Caratube's claim is against Kazakhstan pursuant to

international treaties, and involves but one part of the damages potentially at issue here. Defendants are not parties to that claim.

Further, the various "kitchen sink" procedural issues raised by Defendants cannot support the dismissal of the core of Plaintiffs' case against these Defendants.  There is little doubt that Plaintiffs have standing to bring their timely claims.  Moreover, the extremely detailed factual allegations go far beyond the pleading requirements of Rule 12 of the Federal Rules of Civil Procedure to state a proper claim.

But even beyond that threshold, Plaintiffs, with this filing submit additional factual materials, including documentary evidence and detailed declarations from those persons with first-hand knowledge of these facts, namely the Plaintiffs and Dr. Rakhat Aliyev (Isaam Hourani's brother-in-law and the former son-in-law of President Nazarbayev).  These materials are directly addressed to the jurisdictional issues and argument that Plaintiffs might find their recourse in the courts of Kazakhstan.  They demonstrate that such an effort is impossible both because of the nature of that judicial system and because the case, at bottom, involves President Nazarbayev's international campaign to destroy Dr. Aliyev and his relatives, a campaign that these D.C.-based Defendants were hired to plan and execute.  President Nazarbayev's other agents operating in the European Union have even attempted to assassinate Dr. Aliyev in order to prevent his appearing as a critical witness in the upcoming Caratube arbitration in Paris, a desperate act inconsistent with the notion that recourse might be had in Kazakhstan.

Simply put, this case involves issues and personalities that are centered in this jurisdiction but also events outside the United States.  That is something entirely unexceptional for this Court's docket.  Given the detailed allegations of the Complaint and the evidence and testimony now put forward to support those allegations, this case should promptly proceed to discovery and

a trial date.  On that basis, the motions to dismiss, stay, strike, and for a more definite statement

should be denied.

**Factual Background**

I.     **This Case Is Fundamentally Domestic, Involving D.C.-Based Defendants Harming
       Plaintiffs from within that Jurisdiction.**

1.     Defendants claim that the Complaint reads like a "fiction novel"—and in some respects it

       does.  There are allegations of political manipulation and palace intrigue, of high-priced

       consultants, power plays and *dezinformatsia*.[1]  But this is not fiction.  It is a true story, in

       which Defendants' machinations resulted in concrete harms to two brothers, an American

       businessman and his British brother, Plaintiffs in this case.

       A.     **Defendants Are D.C.-Based Commercial Consultants and Agents of
              Kazakhstan**

2.     Defendants suggest that the courts of Kazakhstan are where this case should be

       pursued—as if it could be pursued there.  But this case involves Defendants who reside

       and work in the District of Columbia; who, from their District offices, acted as agents of

       the Republic of Kazakhstan; who worked with officials both in Kazakhstan and at the

       Kazakh Embassy in the District of Columbia; and who inflicted severe financial and

       reputational injuries on Plaintiffs.

3.     Defendants are consultants to fee-paying clients the world over, including dictators such

       as Nazarbayev, but carry out their work from offices in the District of Columbia.  Indeed,

       one might say that Defendants could operate *only* in a place like Washington.  Defendant

       Mirtchev, for example, boasts of his extensive ties to elected politicians and appointees in

       the U.S. Government.  Complaint ¶¶ 25-28, 56-57.

---

[1] Russian for "disinformation."

3

4.   Kazakhstan pays handsomely for Mirtchev's services with his compensation based on, and sometimes derived from, the expropriation of Plaintiffs' assets.  Complaint ¶ 141. Twice a year, Kazakh officials send Mirtchev a payment of $1 million, in cash, via diplomatic pouch.  *Id.* ¶¶ 66-67.  Mirtchev receives his payments at the Kazakh Embassy, located at 1401 16th Street N.W., Washington, D.C.  *Id.* ¶ 67.  Krull is also paid in this manner.  *Id.* ¶ 68.  Further, Mirtchev has funneled the proceeds and income he earned from his services to Kazakhstan into a number of different investment vehicles, including Kazakh and/or Uzbek oil fields, Krull Corp., GlobalOptions, Inc., and GlobalOptions Management, Inc.  Krull Corp. has similarly invested the proceeds of its work for Kazakhstan into GlobalOptions Management, Inc., Krull's joint venture with GlobalOptions, Inc.  *Id.* ¶ 222.  Finally, Mirtchev stores commissions obtained from the transfer of Kazakh funds into two bank accounts located in the District of Columbia.  *Id.* ¶ 91.  These commissions are substantial:  from 2007 to 2009, Mirtchev has pocketed $4.5 million for making transfers on behalf of the Kazakh Government.  *Id.* ¶ 92.

5.   As part of his work for the President of Kazakhstan, Mirtchev has offered advice and counsel on ways that Kazakhstan can expropriate the assets and destroy the reputations of Nazarbayev's enemies, a group that includes Plaintiffs.  Complaint ¶¶ 15, 131-56.  From within the District, Mirtchev has worked with the Corporate Defendants to help Kazakhstan plan and carry out this campaign against Plaintiffs.  *Id.* ¶¶ 131-42. Defendants also helped Kazakhstan move expropriated assets out of Kazakhstan.  *Id.* ¶¶ 87-92.

6.   Mirtchev also advises Kazakhstan on hiring American lobbyists to boost the Government's public reputation and standing within Congress.  *Id.* ¶¶ 58-60.

4

7.      Defendants carried out this work for Kazakhstan from their offices in the District.

Defendant Krull Corp. advertises that it is based in Washington, D.C., and maintains a

headquarters at 1825 Eye Street N.W., Suite 400, Washington, D.C.  GlobalOptions, Inc.,

is located at 1501 M Street N.W., Washington, D.C.  GlobalOptions Management, Inc., a

joint venture between Krull Corp. and GlobalOptions Group, is located at 1615 L Street,

N.W., Washington, D.C.  *Id.* ¶¶ 3, 15-17.  Plaintiffs have alleged that all of these

defendants conduct business systematically and regularly in the District of Columbia, *and

nowhere in their pleadings do Defendants deny that this is the case*.

**B.      Defendants Carried out Many of Their Attacks on Plaintiffs Here in the
District of Columbia.**

8.      In addition to Defendants being headquartered in Washington, D.C., many of their

tortious acts against Plaintiffs were committed here.  Complaint ¶¶ 44-46, 143, 148-52,

155-56.

9.      Defendants drafted a plan for President Nazarbayev, known informally as the "Superkhan

Memorandum" (officially titled "Political, Market, and Administrative Regulation of

Main Economic, Political, and International Resources of Oligarchs").  *Id.* ¶ 45.  *See* Ex.

1, *Political, Market, and Administrative Regulation of Main Economic, Political, and

International Resources of Oligarchs* ("Superkhan Memo").  Defendants prepared this

document in their offices in Washington, D.C., and shared it with Kazakhstan and its

D.C.-based Ambassador to the United States.  *See* Complaint ¶ 46.

10.     The Superkhan Memorandum details steps President Nazarbayev and his inner circle

should undertake to: (1) eliminate rivals, the so-called "Oligarchs" and "Financial and

Industrial Groups" ("FIGs"), by "neutralizing" them; (2) seize rivals' assets; (3) discredit

rivals by disseminating damaging allegations about them to Western media and through

the Internet; (4) nationalize all independent media sources critical of Nazarbayev; and

(5) "rebrand" Kazakhstan's image in the West by casting Nazarbayev as a benevolent but

powerful "Superkhan," a "strong and just leader," committed to cleaning up corruption.

*Id.* ¶¶ 45-48, 52-54; *see also* Superkhan Memo, Ex.1, at 6-17.  To achieve these goals, the

Memorandum suggests "coordinated measures" the government should take, including

political and economic strategies, "administrative and compulsory" tactics, law

enforcement, lobbying, and public relations plans.  Superkhan Memo, Ex. 1, at 8.

11.    Specifically, the Memorandum explains how the assets of the "Oligarchs" and "FIGs"

can be "fully inventoried, accounted for and placed under the control of the state and

[President Nazarbayev] personally," all under the guise of a public "anticorruption"

campaign meant to bolster Nazarbayev's image, both abroad and at home.  *See*

Complaint ¶ 48; Superkhan Memo, Ex. 1, at 26.

12.    The Memorandum also directs Nazarbayev and his inner circle to pressure and threaten

the Oligarchs not to participate in Kazakh politics.  Complaint ¶ 49.  Oligarchs "should

be warned … quite clearly and unequivocally that the continuation of such activities will

lead to adverse consequences for themselves, for their business interests and [for the]

well-being of their families."  Superkhan Memo, Ex. 1, at 19.

13.    One of the targets identified in the Superkhan Memorandum is Rakhat Aliyev, brother-in-

law of Plaintiff Issam Hourani.  Aliyev is also the former Kazakh Ambassador to Austria.

Aliyev's assets are identified in the Superkhan Memorandum as targets for expropriation.

Complaint ¶¶ 50-51; Superkhan Memo, Ex. 1, at 15.

14.    The Memorandum acknowledges that expropriation efforts must be carried out with the

appearance of legitimacy, and suggests tactics for conducting the campaigns against the

"Oligarchs" and "FIGs," including pretextual investigations of tax violations, administrative violations, and prosecutions for "heinous" crimes. Superkhan Memo, Ex. 1, at 25; *see also* Complaint ¶¶ 50-52. The Memorandum explains that through these actions, the targets would be forced to transfer assets to the Republic of Kazakhstan, and that President Nazarbayev would take personal control of the assets. Superkhan Memo, Ex. 1, at 25; Complaint ¶ 52. As discussed *infra*, President Nazarbayev and his inner circle followed the plan drafted by the Washington-based Defendants.

15. The Superkhan Memorandum advises Nazarbayev to set up a sovereign wealth fund so that he can obtain and control the assets seized from the "Oligarchs" and "FIGs." Superkhan Memo, Ex. 1, at 7-9; Complaint ¶¶ 53, 131-42. According to the Memorandum, "all assets and financial flows including personal financial resources of key FIG leaders have to be under first-hand control" of President Nazarbayev and his trustees. Superkhan Memo, Ex. 1, at 9. This recommendation led to the creation of the Samruk-Kazyna sovereign wealth fund, on whose board of directors Defendant Mirtchev currently serves. Complaint ¶¶ 13, 140.

16. In addition to these domestic measures, the Superkhan Memorandum also advises Nazarbayev to take steps to discredit the "Oligarchs" in the West while simultaneously bolstering his own image among Western leaders as a reformer. The Memorandum suggests that Nazarbayev communicate with Western law enforcement officials to create an international perception that the "Oligarchs" are criminals, while reinforcing this message in the media by disseminating negative information about the "Oligarchs." Superkhan Memo, Ex. 1, at 10, 27-33; Complaint ¶ 54. These behind-the-scenes efforts to discredit the "Oligarchs" should, the Memorandum suggests, be accompanied by

7

highly visible public-relations tactics designed to improve the image of Kazakhstan and its president abroad.  Superkhan Memo, Ex. 1, at 31-32; Complaint ¶ 55.  President Nazarbayev followed the advice of his Washington-based consultants, using Mirtchev's extensive D.C. connections to meet with top officials, and even paying for advertisements bearing his photograph to be posted at Washington, D.C., bus stops this past April.  Complaint ¶¶ 55-56.

17.     The Superkhan Memorandum's definition of "FIGs" or Oligarchs encompasses Plaintiffs.  The Memorandum describes FIGs as large Kazakh businesses with assets inside and outside of the country and the resources to challenge "the unconditional supremacy of the state power."  Superkhan Memo, Ex. 1, at 7.  The Memorandum defines Oligarchs broadly to include business leaders in Kazakhstan with "big financial resources," access to media, and the connections necessary to accumulate "material resources and instruments of political influence," and who might therefore pose a threat to President Nazarbayev's dictatorial rule.  *See id.*, Ex. 1, at 4-8.  As detailed in the Complaint, Plaintiffs owned a variety of large businesses within Kazakhstan worth billions of dollars; these businesses included media companies with the power to influence the political debate within Kazakhstan.  Complaint ¶¶ 98-107.  These are precisely the sorts of businesses and individuals the Superkhan Memorandum targets.

18.     The Superkhan Memorandum does not mention Plaintiffs by name, nor does it mention Defendants.  Though Plaintiffs first learned of Defendants' role in the injuries they sustained in April 2010, it was not until August 2010 that they learned through this memorandum that they were specifically targeted as part of the Superkhan plan.  *See* I. Hourani Decl. ¶¶ 31-35; D. Hourani Decl. ¶¶ 12-16.

19.     In August 2010, Plaintiffs first received a copy of a letter written by a top Kazakh

prosecutor and member of the Kazakh KNB, and addressed to Kazakhstan's Ambassador

to the United States.  Attached to the letter was a copy of the Superkhan Memorandum.

Complaint ¶¶ 143-47.  In the letter, dated November 16, 2007, Colonel A. Daulbayev,

Head of the KNB Investigatory Task Force, informs the Kazakh Ambassador about the

formation of an "*investigatory task force (ITF) in order to hold an inquiry against the*

*criminals R. Aliyev …, citizen of Lebanon Issam Hourani Salah*[2] *… and the US citizen*

*Devincci (Assam) Hourani Salah.*"[3]  In the letter, Colonel Daulbayev continues:

---

[2] It should be noted that neither Issam nor Devincci Hourani is a citizen of Lebanon, although both men were born there.

[3] Unofficial translation; for official translation, and for a copy of the letter in the original Russian, see Ex. 2. Emphasis added to the translation.  Colonel Daulbayev is scheduled to testify at the upcoming Caratube arbitration hearing in Paris, France, and has recently asserted that this letter is a "forgery."  Claimant in the arbitration believes this document and other evidence obtained directly from sources inside Kazakhstan through Dr. Aliyev are authentic.  Regardless of how the ICSID Tribunal resolves these issues, this evidence is clearly relevant to this action, particularly at the Rule 12 stage.

The President of Kazakhstan  N.A.Nazarbayev gave a personal order to the KNB ITF to organize a joint work of the KNB, Kazakh Embassy in the USA and out-of- staff adviser to the government of Kazakhstan  A.Mirtchev, President of "Global Options Management" and conduct those special actions: gathering of   the discreditable financial and bank information as well as submission of the KNB operations reports relevant both to Aliyev group and Horani Brothers to the US law-enforcement bodies. For further initiation of the investigation on tax evasion it is necessary to forward the materials of financial verification by the Kazakh Finance Police  in relation to the US citizen Devincci Hourani earlier sent by diplomatic mail.

The KNB Counter-Intelligence Department running the Operations Case N929 related to   Hourani Brothers.   According to operations data Devincci Hourani obtained the US citizenship due to sham marriage to the US citizen (Annex 1). It is necessary to use lobbyist links of A. Mirtchev for criminal proceedings against Aliyev and Hourani Brothers in order to close any opportunity of entry in the USA and spreading the KNB dossier against those persons among the US secret service and the Department of Justice.

The Embassy will be allocated an additional budget through the KNB special account for further work with "GOM" Firm directed to spread of negative and discreditable information to the mass-media and NGOs, as well as on Internet-web-sites relating to the above-mentioned criminals.

By order of the President of Kazakhstan N.A.Nazarbayev please find attached the sample program of the fight with potential financial and industrial groups jeopardize to the Head of State and the Government of Kazakhstan elaborated by the

American "GOM" Firm directed by A.Mirtchev (Annex 2).

The implementation of this program must be reported directly to the Presidential Administration.

Annex N1: 1 p.

Annex  N2: 39 pp.


**The KNB Officer of Operations   Reserve (OOR), Head of the KNB Investigatory Task  Force**

**Colonel A.Daulbaev (signature)**

20.     As this memorandum clearly establishes, President Nazarbayev enlisted, conspired with,

        and utilized the services of the Washington-based Defendants precisely to cause the harm

        to Plaintiffs giving rise to this case.  Complaint ¶¶ 143-56.

        **C.      Many of Defendants' Tortious Actions Took Place in the District of
                  Columbia.**

21.     Among other tactics, Defendants partnered with several information technology firms to

        publish false and unflattering information about Issam Hourani, including libelous claims

        that Hourani is a member or supporter of Hezbollah, Hamas, Al Qaeda, and the Muslim

        Brotherhood.  These charges appeared, among other places, on the website of the Kazakh

        Embassy in Washington, D.C.  Complaint ¶ 83; Exhibits 3, 4, 9, 10, 11.

22.     Defendants, working from their D.C. offices, also advised and assisted Kazakhstan in

        manipulating INTERPOL into issuing notices and Red Bulletins against Plaintiffs and

        their families based on false allegations.  Complaint ¶¶ 10, 115, 119, 122.  These notices

        stated falsely that Issam Hourani and a business partner were "suspected in criminal

        connection with criminal organization group which committed … kidnapping … creating

        a criminal organization group … extortion … theft … and … counterfeiting," and asked

        other nations to check their "population data base" to determine whether they had

        "nationalities of [their] respective countries."  *Id.*; Ex. 5.

23.     After this INTERPOL notice was issued, Kazakh agents raided and investigated the

        Hourani family businesses, and interrogated, harassed, and intimidated members of the

        family.  Complaint ¶¶ 116-17.  These agents conducted numerous arbitrary searches of

        Caratube's offices and the company's employees were harassed and questioned under

        threats of criminal prosecution if they did not "cooperate" and tell the authorities what the

        authorities wanted to hear in order to "build" a case against members of the Hourani

family and their associates.  *Id.*  These tactics mirror the "proposed system of coordinated

measures" described in the Superkhan Memorandum as ways for the Kazakh

Government to gain control and influence over FIGs and Oligarchs.  *See* Superkhan

Memo, Ex. 1, at 8.

24.     Upon direct orders from President Nazarbayev, as dictated in a November 16, 2007,

memorandum, Defendants published or assisted the Kazakh Embassy and others in

publishing libelous and defamatory accusations about Plaintiffs, including (1) a series of

Red Bulletin notices containing false allegations; (2) a December 18, 2008, article on the

Kazakh Embassy website stating falsely that Issam Hourani was an active member of

Hamas and imported workers into Kazakhstan that had connections to different terrorist

groups; (3) a February 18, 2009, article on the same website stating falsely that Issam

Hourani was a known supporter of Hamas; (4) the "Aliyev Dossier" published by the

Eurasian Transition Group (ETG) falsely stating the same allegations that Issam Hourani

imported workers with ties to terror groups into Kazakhstan; (5) a February 9, 2009,

article on the *Forbes* magazine website stating that Issam Hourani has ties to Hamas; and

(6) a December 8, 2008, *Eurasian Secret Services Daily Review* article posted on a

website making the same false statement.  Complaint ¶¶ 83, 149-56; *See* Exs. 3-11.

Defendants disseminated this false and defamatory information about Plaintiffs from

Defendants' D.C. offices.

25.     A later memorandum written by Colonel Daulbayev, dated March 15, 2010, addressed to

President Nazarbayev's chief of staff, describes precisely how Defendants targeted

Plaintiffs' assets for expropriation as part and parcel of the Superkhan plan.  Complaint

¶ 133; Ex. 12.  One of the sections of the March 15, 2010, memorandum is titled

"Freezing and confiscation of monetary sources in Kazakh banks of private assets as well as assets of private companies registered with Kazakh Authorities in the names of Issam and Devincci Hourani."  Complaint ¶ 134.  In this section, Colonel Daulbayev identifies each of the Houranis' Kazakhstan-based businesses, by name, as targets for expropriation.  *Id.* ¶¶ 134-35.  Daulbayev's task force seized and transferred the proceeds from the Houranis' automobiles, apartments, villas, office buildings; stripped Issam Hourani of his Kazakh citizenship in June 2007; brought criminal charges against the Hourani brothers; and transferred all property belonging to the Houranis' oil companies to the state-owned KazMunaiGaz, which is part of the Samruk-Kazyna sovereign wealth fund.  Furthermore, the memorandum makes clear that all the government actions brought against the Houranis were pretextual, carried out pursuant to the Superkhan plan, at the behest of President Nazarbayev.  *See id.* ¶ 139.[4]

> **D.**     **Plaintiffs Suffered Injuries as a Result of Actions Taken by Defendants in the District of Columbia.**

26.     Plaintiffs' family members had begun investing in Kazakhstan in the early 1990s after the collapse of the Soviet Union.  Since that time, members of the Hourani family, including Plaintiffs Devincci and Issam, started or acquired a number of profitable businesses in Kazakhstan.  *See* Complaint ¶¶ 94-107.  Issam Hourani's wife, Gulshat, is the sister of Rakhat Aliyev, the former son-in-law of President Nazarbayev.  In 2007, Aliyev, then Kazakhstan's Ambassador to Austria, had a "falling-out" with President Nazarbayev, triggered by Aliyev's announcement that he intended to run for President of Kazakhstan in 2012.  President Nazarbayev responded to this announcement by having Aliyev

---

[4] As with the other evidence obtained directly from sources inside Kazakhstan (see note 3, *supra*), Colonel Daulbayev has asserted in the ICSID proceeding that this document also is a "forgery."

criminally tried *in absentia* on various false charges.  *See* Decl. Aliyev ¶¶ 7, 35; *see also id.* ¶¶ 31-38.  Nazarbayev's agents working outside of Kazakhstan have also made several attempts on Aliyev's life.  *Id.* ¶ 38; Exhibit 40.

27. The Hourani Brothers were targeted because they were seen to be "business associates" of Aliyev, as they were related to Aliyev by marriage.  *See* Complaint ¶¶ 108-130. Although Nazarbayev's falling out with Aliyev was the triggering event for the campaign against them, it was still part of the larger Superkhan campaign—the consolidation of power in Nazarbayev through stripping rivals of assets, controlling the media, and stifling dissent.  *See* Superkhan Memo, Ex. 1.  This campaign began before the plan's details were formalized in the Superkhan Memorandum.

28. As part of President Nazarbayev's campaign against Rakhat Aliyev, the Kazakh Government pressured Plaintiffs into handing over ownership stakes in their businesses; physically threatened them and their families; forced them to flee the country; subjected their offices to repeated, invasive raids; coerced their employees into making false statements; instituted multiple baseless, pretextual "investigations;" disseminated false information about Plaintiffs describing them as criminals and terrorists; and ultimately expropriated or forced into bankruptcy every one of their family businesses and their assets.  Complaint ¶¶ 113-30.

29. As a result of these efforts, Plaintiffs suffered substantial losses and damages.  Among other losses, Issam Hourani lost his 50% ownership stake in Alma Media, a media and real estate company worth hundreds of millions of dollars; Issam and Devincci Hourani each lost a 50% ownership in Pharma Industry Corp., LLP, a diversified company worth tens of millions of dollars; and Devincci Hourani lost a 92% ownership stake in Caratube

International Oil Co., an oil company worth billions; Devincci Hourani lost a 34% ownership in KTK Television, a media company worth tens of millions.  *See* Complaint ¶¶ 98-110, 126-30.  Also, Plaintiffs suffered damage to their professional and personal reputations; Issam Hourani in particular suffered a "special" harm because Defendants branded him as a "terrorist."  *See* Complaint ¶¶ 149-55.

## II.   The Cold Realities of Kazakhstan's Legal System.

30.   The Mirtchev Defendants (Mirtchev and Krull Corp.) suggest that this case should properly be heard in a Kazakh court rather than the United States, and claim they would gladly argue the case in that country.  Mirtchev MTD at 32-36.  Notably, the GlobalOptions Defendants (GlobalOptions, Inc. and GlobalOptions Management) do not make this claim.  Notwithstanding the Mirtchev Defendants' desire to have this dispute adjudicated in a "friendly forum," the courts of Kazakhstan are rife with corruption and are wholly controlled by the President of Kazakhstan, Defendants' client.  Plaintiffs would not stand a chance of a fair trial in Kazakhstan, which is exactly why the Mirtchev Defendants make this preposterous request.

31.   President Nazarbayev is widely recognized as a brutal and corrupt dictator who uses the machinery of the Kazakh Government to punish his political rivals.[5]  Although he is not a required party in this case, he is an important player in it, and thus merits a brief

---

[5] *See, e.g.*, Ex. 14, James Love, *The Well-Connected Dictator*, HUFFINGTON POST, Oct. 6, 2007, http://www.huffingtonpost.com/james-love/the-wellconnected-dictato_b_67423.html (Nazarbayev has "a long history of rigging elections, and destroying critics and opposition parties and leaders," many of whom "have been imprisoned, beaten, murdered, or had their daughters kidnapped"); Ex. 15, Erich Follath & Christian Neef, *Dreaming of Snow Leopards: Nazarbayev Dictates a Bright Future for Kazakhstan*, SPIEGEL ONLINE, Oct. 15, 2010, http://www.spiegel.de/international/world/0,1518,721582-2,00.html (Nazarbayev is a despot who "clamps down on independent newspapers and has chased potentially threatening rivals out of the country"); Ex. 16, Peter Baker, *With Kazakh's Visit, Bush Priorities Clash*, WASH. POST, Aug. 29, 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/08/28/AR2006082801282.html ("an autocrat who runs a nation that is anything but free").

discussion.  International human rights groups describe him as a corrupt kleptocrat who

persecutes anyone he perceives as a threat.  Under his rule, torture is "widespread" and

"committed with impunity."[6]  His government is riddled with corruption at all levels.[7]  In

2009, Kazakhstan passed a "Leader of the Nation" law that threatens imprisonment for

anyone guilty of "violating the honour and dignity of the First President."[8]  The law

"gives Nazarbayev control over government policy after leaving the presidency as well as

immunity from criminal prosecution for any actions taken while in office," and "protects

all assets of the president and his family."[9]  In addition, he has a long history of going to

extreme and brutal lengths to destroy his political enemies as demonstrated in the

declaration of Scott Horton, attached to this Opposition.

32.     Those enemies have no refuge in Kazakhstan's courts.  The Kazakh judiciary and

executive branch are nearly indistinguishable.  The courts are a picture of dysfunction:

corrupt, ineffective, and wholly subservient to the President.  The U.S. Department of

State has recognized that Kazakh officials, including judges, "frequently engage[] in

corrupt practices with impunity," and that "pervasive corruption" is endemic at all levels

and branches of the government, "especially in law enforcement and the judicial

---

[6] Ex. 17, Amnesty Int'l, *Human Rights in Republic of Kazakhstan* (2009), http://amnesty.org/en/region/kazakstan/report-2009).
[7] *See, e.g.*, Ex. 18, UN High Commissioner for Refugees, *Central Asia remains a corruption problem area, while the Caucasus registers mixed gains*, Nov. 18, 2009, http://unhcr.org/refworld/country,,EURASIANET,,KAZ,,4b067563c,0.html.
[8] *See* Ex. 19, Richard Orange, *Kazakhstan Moves to Extend President's Rule*, TELEGRAPH, Dec. 27, 2010, http://telegraph.co.uk/news/worldnews/asia/kazakhstan/8227002/Kazakhstan-moves-to-extend-presidents-rule.html.
[9] Ex. 20, Raushan Nurshayeva, *Kazakh President Declared Leader of the Nation*, REUTERS, June 15, 2010, http://reuters.com/article/idUSTRE65E0WP20100615.

system."[10]  The State Department has noted that Nazarbayev exerts total control over the judiciary, and that the courts therefore lack independence.[11]

33.    In a Spring 2008 briefing for the U.N. Committee Against Torture, titled "Kazakhstan: Summary of Concerns on Torture and Ill-treatment," Amnesty International reported that evidence based on "confessions" extracted through torture "is still routinely admitted" in Kazakhstan's courts.[12]  "Corruption in law enforcement and the judiciary is believed to contribute largely to a climate of impunity….  Many people are not willing to testify against law enforcement officers out of fear of reprisals against themselves or their relatives and associates."[13]  In addition, Kazakh officials routinely invoke "[t]he fight against terrorism and other threats to national security … as crucial in securing stability," but "all too frequently, pursuance of these aims is invoked when targeting vulnerable groups or groups perceived as a threat to national or regional security."[14]

34.    In 2001, the U.N. Committee Against Torture "expresse[d] its concern about the human rights situation" in Kazakhstan, including "[t]he insufficient level of independence and effectiveness of the procuracy," "[t]he insufficient level of independence of the judiciary, with judges whose tenure lacks certain necessary safeguards," and "[t]he insufficient level of guarantees for the independence of defence counsel."[15]

---

[10] Ex. 21, U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, *Kazakhstan: 2008 Country Report on Human Rights Practices*, Feb. 25, 2009, http://kazakhstan.usembassy.gov/hrr-2008.html.
[11] *Id.*
[12] Ex. 22, Amnesty Int'l, *Kazakhstan: Summary of Concerns on Torture and Ill-Treatment*, Sept. 2008, at 1, http://www2.ohchr.org/english/bodies/cat/docs/ngos/AIKazakhstan41.pdf.
[13] *Id.* at 2.
[14] *Id.*
[15] Ex. 23, U.N. Office of the High Commissioner for Human Rights, *Concluding Observations of the Committee Against Torture: Kazakhstan*, May 15, 2001, ¶ 128, http://www.unhchr.ch/tbs/doc.nsf/(Symbol)/A.56.44.paras.121-129.En?OpenDocument.

35.    President Nazarbayev is able to exert an extraordinary level of control over Kazakhstan's courts because the Kazakh constitution "concentrates power in the presidency, permitting the president to control regional and local governments and to exercise significant influence over the legislature and judiciary.  Changes or amendments to the constitution require presidential consent."[16]

36.    Demonstrative of the lack of independence in the Kazakh judiciary is the ordeal that Rakhat Aliyev—Plaintiff Issam Hourani's brother-in-law and the former Kazakh Ambassador to Austria—has experienced at the hands of the Kazakh judiciary.  As Aliyev provides in his sworn declaration: "Since May 2007, President Nazarbayev directly has: (1) had my marriage with his daughter, Dariga, dissolved without my consent by having my signature forged on official family court documents "approving" the dissolution of my marriage; (2) had several criminal arrest warrants issued for me nationally and internationally; (3) had trumped-up criminal charges and proceedings instituted against me in Kazakhstan which led to my being tried, convicted and sentenced *in absentia* for various serious crimes that I did not commit; and (4) sought my extradition from Austria (the Vienna Court of Austria refused to comply with this request on August 7, 2007, on the grounds that I would not face a fair trial in Kazakhstan and for insufficient evidence)."  Decl. Aliyev ¶ 7; *see also id.* ¶¶ 31-38.  On January 15, 2008, according to Aliyev's declaration, a civil court sentenced him *in absentia* "to 20 years in a penal colony for alleged kidnapping and criminal activity."  *Id.* ¶ 35.  On March 26, 2008, he was again tried and sentenced *in absentia*, this time by a military tribunal, "for

---

[16] Ex. 21, U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, *Kazakhstan: 2008 Country Report on Human Rights Practices*, Feb. 25, 2009, http://kazakhstan.usembassy.gov/hrr-2008.html.

an alleged coup and alleged espionage for Austria and the USA.  These claims were also false."  *Id.*

37.     A recent decision of the Regional Court for Criminal Matters in Vienna, Austria, supports Aliyev's account.  That court found that Rakhat Aliyev could not get a fair trial in Kazakhstan's courts.  In explaining its decision to refuse Kazakhstan's extradition request for Aliyev and certain other individuals (all of whom had been convicted *in absentia* in Kazakhstan), the Vienna court noted that President Nazarbayev exercises total control over Kazakhstan's judiciary; that Nazarbayev has a well-documented history of brutally persecuting his political rivals; and that Kazakhstan's justice system denies defendants the basic human-rights and due-process protections.  *See* Ex. 24.  The court found sufficient evidence to conclude that Kazakhstan was using "criminal prosecution[s] for political reasons" in order to stifle dissent and destroy its critics.  *Id.*

38.      As Dr. Aliyev's declaration and the decision of the Vienna court both demonstrate, the Kazakh judiciary is not just generally lacking in independence; it lacks independence *specifically with regard to Plaintiffs in the present case and to their close associates*.  In other words, the Kazakh courts' lack of independence is not just a general defect of that country's judicial system, but would negatively impact these *specific plaintiffs* and deny them any chance at a fair trial.

39.     In further support of Plaintiffs position, they recently obtained a copy of a  letter from the Kazakh Ambassador in Washington, D.C., to President Nazarbayev, *dated November 26, 2010*, in which the Ambassador explains that Kazakhstan must institute additional *in*

*absentia* trials against the Hourani brothers.  The letter, translated into English,[17] reads in

full:

In accordance with Your personal order, the Embassy along with Your outside advisor, independent member of the Board of Directors of the State Holding "Samruk Kazyna" Doctor A. Mirtchev have developed a plan of action to fight and discredit the criminal group headed by R. Aliyev, as well as Devincci (Assem) Hourani, a citizen of the U.S., and his brother Issam Hourani, citizen of the U.K.

Doctor Mirtchev presented current information concerning these individuals through the channels of the former U.S. Assistant Secretary of Defense, Richard Pearl.  Presently, the Hourani brothers constantly reside in London.  Issam Hourani, a citizen of Lebanon, received UK citizenship, his wife Gulshat Hourani (Aliyev) and their daughter Aya Hourani [did so] as well.  The last time they were registered in the U.S. was upon their arrival to Washington on 10 July 2010 by flight no. United Airlines 923 and their departure on 30 July 2010 by flight no. United Airlines 922.

In connection with the lawsuits by the Hourani brothers against the Government of the Republic of Kazakhstan, we are investigating their activities within the framework of the arbitral and civil actions with the goal of determining their lobbyists in Congress and in the U.S. State Department.  The destructive actions of the Hourani brothers along with R. Aliyev in the U.S

---

[17] Unofficial translation; for official translation, and for a copy of the letter in the original Russian, see Ex. 25.  The Mirtchev Defendants have asserted that these documents—obtained from sources inside Kazakhstan—are "forgeries."  *See* Mirtchev Defendants' Consolidated Opposition to Plaintiffs' Motion to Take Jurisdictional Discovery and Motion for Sanctions at 5-7.

are being contained by "Friends of Kazakhstan", a group created by the Embassy, which is comprised of members of Congress and the U.S. Senate and the employees of their offices. The Embassy of the RK is financing them through contributions into their funds from a special foreign currency fund allocated by You.

The Embassy together with Doctor A. Mirtchev have informed the Chairman of the KNB of the RK N. Abykayev about the upcoming civil hearings in the U.S. In that regard, we requested the commencement of criminal cases concerning R. Aliyev's OPG laundering criminal monies and other crimes with the goal of impeding the financial ability of the Hourani brothers to finance their attorneys and lobbyists in the U.S. KNB RK has commenced criminal case No. 10751704710040 and has distributed through the Interpol to the law enforcement services of the EU countries as well as the American FBI a criminal dossier about the criminal grouping of R. Aliyev and I. Hourani, including a description of their multiple crimes and their ties to Islamic terrorist organizations. This will allow us to track down their financial assets in European and U.S. banks with the goal of freezing those accounts under the pretext of "laundering of criminal and terrorist monies."

The Embassy has also informed the various law enforcement organs of the U.S. about the activities of R. Aliyev, I. Hourani and others.

This is being reported in accordance with Your order.


**Ambassador**                          [signature]                          E. Idrissov


40.     As this letter makes absolutely clear, the plot to destroy Plaintiffs via the Kazakh judicial

        system is real and ongoing. Plaintiffs stand no chance of a fair trial in Kazakhstan, just as

        this Court is the only forum where this claim can be properly adjudicated.

41.     Caratube commenced arbitration proceedings under the United States–Kazakhstan

        Bilateral Investment Treaty for the harm to that particular company. However, as

        discussed below, the Houranis could not submit their defamation claims or claims for

        their personal pecuniary injuries to such international fora, nor could they bring any sort

        of claim against these Defendants, until they discovered that the plot against them

        *involved* the Defendants. Indeed, after Plaintiffs learned of Defendants' role in these

        events, they instituted the present action against Defendants within a brief period of time.

21

**III.    Plaintiffs Did Not Become Aware of Defendants' Role in the Plot Against Them Until April 2010.**

42.    The Houranis learned in or around 2007 that Mirtchev and Defendants served in some advisory capacity to the Kazakh Government.  They understood that Defendants likely worked on public relations issues relating to the prosecution of banker James Giffen.  *See* Decl. I. Hourani ¶ 28; Decl. D. Hourani ¶ 13.  They did not, however, know what that role was or whether Defendants were involved in the plot against them.  *See id.*

43.    Despite having conducted extensive due diligence in an effort to discover the identity of any other non-immune parties potentially responsible for their injuries, it was not until early April 2010 that Plaintiffs specifically learned that Defendants had a hand in the events giving rise to this case.  *See* Decl. I. Hourani ¶ 29; Decl. D. Hourani ¶ 14.

44.    Upon discovering that the Defendants had somehow assisted Kazakhstan in divesting them of their assets and sullying their reputations, Plaintiffs conferred with counsel and resolved to:  (A) investigate the extent to which Defendants assisted Kazakhstan in committing unlawful acts against them; and (B) file a petition pursuant to 28 U.S.C. § 1782 in this Court to obtain any evidence from Defendants and others that might be helpful in the International Centre for the Settlement of Investment Disputes (ICSID) arbitration brought by Caratube against the Republic of Kazakhstan.

45.    While the § 1782 petition was pending with this Court, in August 2010, Rakhat Aliyev provided Plaintiffs with a copy of the November 16, 2007, Daulbayev Memorandum definitively stating that Mirtchev and GlobalOptions Management were key players in the scheme against them, as discussed *supra*.  Attached to this memorandum was a copy of the Superkhan Memorandum, along with a copy of Devincci Hourani's United States Passport.  *See* Complaint ¶¶ 143-47; Exs. 1, 2, 28.

46.     The November 16, 2007, Daulbayev Memorandum was obtained and relayed to Plaintiffs

by Rakhat Aliyev through his sources within Kazakhstan's government.  Most of

Aliyev's sources have since been imprisoned—no surprise, given the government's past

treatment of dissenters, critics, and other "enemies."  Aliyev's sources for these

documents include Major General Sergey Kuzmenko, ex-National Security Committee

(KNB) officer Adil Abenov, former chief of KazMunai Gaz Serik Burkitbayev, and

former Prosecutor-General's Office department head Murat Musabekov.[18]  Aliyev has

other sources within Kazakhstan, but he will not disclose their identities due to the

obvious threats these individuals face.

47.     Immediately after Plaintiffs received the November 16, 2007, Daulbayev Memorandum

this past August, they instructed counsel to proceed with this case.  Though Plaintiffs had

learned that Defendants had been involved in the Republic of Kazakhstan's plot in April

2010, they had no definitive proof thereof, nor did they know the extent of that

involvement until August.  Nor could Plaintiffs have brought an action against

Defendants in the ongoing ICSID proceedings.

---

[18] *See* Decl. Aliyev; *see also* Ex. 29, U.S. Dep't of State, Diplomatic Cable 09ASTANA677, *Kazakhstan: Government's Anti-Corruption Campaign*, April 22, 2009, *available at* http://cablegate.wikileaks.org/cable/2010/01/10ASTANA72.html. Claimant is seeking to compel Kazakhstan to allow such witnesses under its control to travel to Paris to testify on these issues at the February ICISD hearing.  It is unclear as of this date whether Kazakhstan will allow these witnesses to appear and testify.

**ARGUMENT**

I.   **This Case Should Not Be Stayed.**

    A.   **The Mirtchev Defendants' Request for a Stay of the Entire Proceeding Pending the ICSID Hearing Is Unwarranted.**

       The Mirtchev Defendants request that this Court stay this case pending the outcome of the ICSID arbitration between Caratube and Kazakhstan.  This Request has no basis under the Federal Rules of Civil Procedure and further displays a profound misstatement of the nature of those proceedings.  Mirtchev MTD at 42.  The Mirtchev Defendants assert that a stay is warranted because: (1) "[n]o party would be disadvantaged;" (2) using the evidence and arguments developed before the ICSID tribunal would save time and resources; (3) the outcome of the ICSID arbitration could render some of Plaintiffs' causes of action moot; and (4) continuing this proceeding simultaneously with the ICSID proceeding would pose a "a risk of inconsistent rulings and of undermining the arbitration process."  *Id.* at 43-44.  Each argument fails.

       There is no suggestion, of course, that Plaintiffs' claims against Defendants are arbitrable in the ICSID proceeding.  The claims stem from their own personal injuries and arise from distinct bodies of law.  The ICSID claims, by contrast, are based on international treaties and relevant international law, while the claims before this Court are claims under U.S. federal and District of Columbia tort law.  ICSID Tribunals have recognized the "essential distinction" between treaty claims and claims subject to resolution in domestic forums, and have accordingly declined to stay arbitration proceedings pending domestic proceedings; there is no reason for domestic courts to adopt a different approach.[19]

---

[19] *See* Ex. 30, *Bayindir Insaat Turizm Ticaret Ve Sanaya A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction, ¶ 289 (Nov. 14, 2005), *available at*

(continued…)

For instance, in *Bayindir v. Pakistan*, an ICSID tribunal declined to stay proceedings for treaty claims even though related contract claims were also the subject of a domestic arbitration in Pakistan.[20]  The Tribunal noted that this result was "an inevitable consequence of the principle of the distinct nature of treaty and contract claims."[21]  Here, with the potential exception of the claims related to Caratube, Plaintiffs' claims are personal in nature and thus distinct from any potential treaty claims.  Also, as Defendants take pains to point out in their arguments regarding standing, Plaintiffs have a separate identity from that of Caratube, and therefore their *personal* claims should not be stayed while just one of the corporations they are affiliated with seeks redress under separate principles of international law.

Moreover, the ICISD hearing in Paris will be concluded before the end of February, with post-hearing submissions a few months later and a decision by the Tribunal expected sometime before the end of this year.  Thus, the request to stay, if granted, would likely push the resolution of the Rule 12 Motion into 2012, perhaps 18 months after the case was filed.  There is no basis for putting this case "on ice" for such a long period of time simply because a separate entity—Caratube—is litigating a distinct legal claim, under international law, against a different wrongdoer, before a separate international body that lacks *any* authority to adjudicate the claims pending before this Court.  Under these circumstances, the Court should deny the Rule 12 Motion, deny the request to stay, and allow the parties to proceed to the next phase of the case.

At bottom, the Caratube termination and seizure represents only one of many improper actions taken by Kazakhstan against the Hourani Brothers—and thus provides very little basis

---

(continued…)

http://icsid.worldbank.org/ICSID/FrontServlet?requestType=CasesRH&actionVal=showDoc&docId=DC523_En&caseId=C27.

[20] *Id.* ¶¶ 264-73.

[21] *Id.*

for supporting a stay.  "[T]he right to proceed in court should not be denied except under the most extreme circumstances"[22] and these circumstances are by no means extreme.

"The proponent of a stay bears the burden of establishing its need."[23]  The proponent "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else."[24] Furthermore, "a possibility of inconsistencies in rulings on the same issue, without any explanation on how" a plaintiff's claim will suffer any harm, "does not establish, in itself, a 'clear case of hardship.'"[25]  In deciding whether to stay litigation pending arbitration, courts consider "first, whether there are issues common to the arbitration and the court proceeding, and second, whether those issues will be finally determined by the arbitration."[26]

Defendants fail to point out any issues common to this litigation and the Caratube ICISD arbitration.  Plaintiffs readily concede that the Caratube arbitration could have some impact on the *damages* here with regard to the expropriation of *Caratube's assets*.   But it will not address, *inter alia*: (1) Plaintiffs' injuries resulting from Defendants' aiding and abetting Kazakhstan in depriving them of their interests in *KTK Television, Alma Media, and Pharma Industry Corporation*; (2) Plaintiffs' defamation claims which deal largely with false statements of criminal and terrorist conduct unrelated to the Caratube oil concession.

Moreover, that a party may obtain a partly overlapping damages award in two forums, against two different groups of wrongdoers, is no reason to prevent the two actions from proceeding.  There is no harm in obtaining a damages award arising from the same incidents

---

[22] *GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 193 (D.D.C. 2003) (Facciola, M.J.) (citation omitted).
[23] *Clinton v. Jones*, 520 U.S. 681, 708 (1997).
[24] *Landis v. North American Co.*, 299 U.S. 248, 255 (1936).
[25] *Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 35 (D.D.C. 2004) (Urbina, J.).
[26] *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995).

against two different parties.  The thing to be avoided is *collecting* twice for those same

damages.  That is addressed at the enforcement of judgment stage and is not a matter limiting the

underlying liability.

Also, the Mirtchev Defendants' arguments that "[n]o party would be disadvantaged by a

short stay" is entirely misleading:  Not only is the activity of Defendants ongoing, there is no

legitimate reason to suspend these proceedings, including the ordinary discovery, search for

documents, and depositions forthcoming, that will allow the facts to be recorded and recollected

nearer the time of the events at issue.  Finally, Mirtchev Defendants make a bare-bones argument

that staying the case would save resources without identifying the actual savings.  Where, as

here, "a defendant has failed to demonstrate beyond mere allegations that resources will be

conserved by granting the stay," the court should not grant such a stay.[27]

B.   **The GlobalOptions Defendants' Request for a Stay of Discovery Pending the ICSID Arbitration and Determination of Defendants' Motion to Dismiss.**

GlobalOptions Defendants assert that this case represents a "Plan B" attempt to procure

discovery after Judge Bates's denial of their petition under 28 U.S.C. § 1782.  *See* GlobalOptions

MTStay at 3.  Though Defendants would have this Court believe that Plaintiffs drafted a 64-page

complaint *in one day* as a reaction to Judge Bates's denial of their motion for reconsideration,

Plaintiffs obviously began preparing their Complaint in this matter independently and well

before the resolution of the separate 1782 proceedings.  *Id.* at 3-4.

The GlobalOptions Defendants' Motion for Stay must be denied because they can show

neither (1) a confluence of issues between this action and the ICSID arbitration; nor (2) that their

Motion to Dismiss has merit.  As noted above, this litigation is completely independent—both in

---

[27] *People With Aids Health Group v. Burroughs Wellcome Co.*, 1991 WL 221179, at *1 (D.D.C. Oct. 11, 1991) (Penn, J.).

the named parties and in the nature of the claims—from the ICSID arbitration.  *See* GlobalOptions MTStay ¶ 2; GlobalOptions Mem. of P. & A. to MTStay at 9  ("GlobalOptions Mem. Stay").  For all the reasons cited above, there is no basis for staying resolution of the Rule 12 Motion, or otherwise delaying the orderly progression of this case, simply because there is an ICISD case also pending.

Further, Defendant's motions to dismiss do not warrant a stay of discovery, especially in light of their failure to explain why discovery in this case—where all defendants are based in Washington, D.C.—will be all that burdensome.  "[A] pending motion to dismiss is not ordinarily a situation that in and of itself would warrant a stay of discovery."[28]  "Bare assertions that discovery will be unduly burdensome … are insufficient" to stay discovery.[29]  Here, GlobalOptions Defendants present the Court nothing more than bare assertions of "burden" by failing to: (1) identify a single potential witness but claiming that that these mystery witnesses will not cooperate with depositions; (2) explain why documents obtained from Kazakhstan "will undoubtedly be intertwined with privilege issues"; and (3) describe why Kazakhstan would refuse to provide documents to GlobalOptions, despite their ongoing commercial relationship. *See* GlobalOptions Mem. Stay at 7-8.

## IV.    The Republic of Kazakhstan Is Not a Required Party Under Rule 19.

In their Motion to Dismiss, Defendants assert that the present action "cannot justly be tried in the absence of the Republic of Kazakhstan" because the state is a "required party" under Rule 19 of the Federal Rules of Civil Procedure.  Mirtchev MTD at 36-37.  Furthermore, since the Republic of Kazakhstan's immunity likely makes joinder impossible, Defendants move to

---

[28] *People With Aids Health Group*, 1991 WL 221179, at *1 (citation omitted).
[29] *Id.* (citation and punctuation omitted).

dismiss under Rule 12(b)(7), arguing that this case cannot proceed "in equity and good conscience." *Id.* at 38-42. Defendants' circular argument fails because Kazakhstan is not a required party to this action.

Rule 19 "sets forth a three-step process for the court to apply in this context: (1) the court determines if the absent entity is 'required' to be joined in the suit; (2) if so, the court determines whether joinder is feasible (for example, joinder is not feasible where the absentee is immune from suit); and (3) if the absentee cannot be joined, the court must determine whether, 'in equity and good conscience,' the action should nonetheless proceed."[30]

Dismissal under Rule 19 is rare. The "recognized philosophy" of the rule is "to avoid dismissal whenever possible."[31] "Federal courts are extremely reluctant to grant motions to dismiss based on nonjoinder and, in general, dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result."[32] "[I]f the merits of the cause may be determined without prejudice to the rights of the necessary parties, absent and beyond the jurisdiction of the court, it will be done; and a court of equity will strain hard to reach that result."[33]

Rule 19 defines "required party" as follows:

> (1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined if:

---

[30] *See Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 33 (D.D.C. 2008) (Oberdorfer, J.) (citing FED. R. CIV. P. 19). As with all Rule 12 motions, the moving party bears the burden of persuasion. *See Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 242 (D.C.Cir. 1981). A court may consider materials outside of the pleadings in resolving a motion to dismiss under Rule 12(b)(7), *Anderson v. Hall*, 755 F.Supp. 2, 5 (D.D.C. 1991) (Harris, J.), and consideration of such materials will not convert the motion into a Rule 56 motion for summary judgment. *Three Affiliated Tribes of Ft. Berthold Indian Reservation v. United States*, 637 F. Supp. 2d 25 (D.D.C. 2009) (Bates, J.).

[31] *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 207 (D.C. Cir. 1981).

[32] WRIGHT & MILLER, 7 FED. PRAC. & PROC. CIV. § 1609 (3d ed. 2001) (citing cases).

[33] *Bourdieu v. Pacific Western Oil Co.*, 299 U.S. 65, 70-71 (1936).

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, triple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a).

### A.     Although Kazakhstan May Be a Co-Conspirator, Joint Tortfeasor, and Principal in an Agency Relationship with Defendants, It Is Not a Required Party.

Absent persons do not become required parties merely because they conspired or acted in concert with a party to a case.  For instance, if two burglars break into someone's home and steal a painting, and the homeowner wishes to sue for conversion, she need not sue both burglars; she can sue either.  As the Supreme Court recognized more than sixty years ago, the fact that a defendant conspired with an absent party does not mandate joinder of the absent conspirator.[34]

Nor is an absentee transformed into a required party simply because it is a joint tortfeasor.  In cases involving joint tortfeasors, a plaintiff a may choose to sue however many of the tortfeasors the plaintiff wishes, and "those left out of the lawsuit … are not indispensable parties."[35]  Rule

---

[34] *Georgia v. Pennsylvania R. Col.*, 324 U.S. 439, 463-64 (1945) ("In a suit to enjoin a conspiracy not all the conspirators are necessary parties defendant."); *see also* WRIGHT & MILLER, 7 FED. PRAC. & PROC. CIV. § 1623 (3d ed. 2001) ("coconspirators, like other joint tortfeasors, will not be deemed indispensable parties").

[35] *Stabilisierungsfonds Fur Wein*, 647 F.2d at 207.  *See also Nottingham v. Gen. Am. Communications Corp.*, 811 F.2d 873, 880 (5th Cir. 1987), *cert. denied*, 484 U.S. 854 (1987) ("it is well-established that Rule 19 does not require the joinder of joint tortfeasors."); *Krieger v. Trane Co.*, 765 F. Supp. 756, 763 (D.D.C. 1991) (Oberdorfer, J.) ("it is ... well-settled that joint tortfeasors are not indispensable parties"); *S.E.C. v. Rivlin*, 1999 WL 1455758, at *6 (D.D.C. 1999) (Lamberth, J.) ("It is well settled … that in cases involving joint tortfeasors who are jointly and severally liable, those defendants who are left out of the suit are not indispensable parties."); *Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 28 (D.D.C. 2002) (Bates, J.) ("joint tortfeasors are not indispensable parties under Rule 19"); *SASCO v. Byers*, 2009 WL 1010513, at *1 (N.D. Cal. Apr. 14, 2009) ("because each tortfeasor is jointly and severally liable, the plaintiff may choose whom he wishes to sue; if the plaintiff elects to sue fewer than all defendants, those sued cannot compel joinder of the other tortfeasors.").

19 does not require joinder of joint tortfeasors, "[n]or does it require joinder of principal and agent."[36]  A plaintiff "may bring his suit against either the servant or the master."[37]  Finally, an absentee does not become a required party to an action merely because a defendant may have a contractual right of indemnification against the absentee.[38]  Thus, regardless of whether Kazakhstan was a joint tortfeasor, an employer of Defendants, or the principal in an agency relationship, and despite any indemnity agreement Defendants and Kazakhstan may have had, these factors would not transform Kazakhstan into a required party in the present case.

**B.     Defendants Fail to Demonstrate That Kazakhstan Is a "Required Party" Under the Criteria of Rule 19(b).**

The Defendants fail to establish that Kazakhstan satisfies the criteria set out in Rule 19 for a "required party."  As discussed below, this Court is capable of granting "complete relief" to Plaintiffs without Kazakhstan's joinder.  FED. R. CIV. P. 19(a)(1).  Kazakhstan has not "claim[ed] an interest relating to the subject of the action" here.  *Id.*  Kazakhstan's absence will not impair its ability to protect any interest, nor will it leave Defendants "subject to a substantial risk of incurring … inconsistent obligations."  FED. R. CIV. P. 19(a)(1)(B).  For these reasons, Kazakhstan is not a required party, and dismissing this case for nonjoinder therefore would be improper.

---

[36] *Nottingham*, 811 F.2d at 880-81; *see also* WRIGHT & MILLER, 7 FED. PRAC. & PROC. CIV. § 1623 (3d ed. 2001) ("joinder has not been required of principals and agents").  "[A]n 'employee is not a necessary party to a suit against his employer under *respondeat superior*.'"  *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 2010 WL 3833957, at *5 (D.D.C. Sept. 30, 2010) (Friedman, J.) (citation omitted).

[37] *Weekley v. Pennsylvania R. Co.*, 104 F. Supp. 899, 900 (E.D. Ill. 1952).

[38] "[A] defendant's possible right of reimbursement, indemnity, or contribution against an absent party is not sufficient to make the absent party indispensable to the litigation."  *SASCO v. Byers*, 2009 WL 1010513, at *2 (citing *Nottingham v. Gen. Am. Commc'ns Corp.*, 811 F.2d 873, 880 (5th Cir. 1987) and *Field v. Volkswagenwerk A.G.*, 626 F.2d 293, 298 (3rd Cir. 1980)).

31

1.    **The Court can accord complete relief among existing parties in Kazakhstan's absence.**

Under Rule 19(a)(1)(A), a required party is a person without whose presence the court would be unable to grant "complete relief." FED. R. CIV. P. 19(a)(1)(A).  This subsection of Rule 19 does not fit here.  Joinder of Kazakhstan is not necessary for this court to grant Plaintiffs the relief they seek—an award of compensatory and punitive damages, plus attorneys' fees, for the tortious acts that Defendants aided and abetted Kazakhstan in committing.  Here, as in *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 33 (D.D.C. 2008) (Oberdorfer, J.), "subsection (A) [of Rule 19(a)(1)] is not applicable because the court can accord 'complete relief'—full compensatory … relief against the Defendants, should they ultimately be deemed liable."

In *Exxon Mobil*, Indonesian villagers brought a suit under the Alien Tort Claims Act and the Torture Victim Protection Act against Exxon, two of the corporation's American affiliates, and the corporation's Indonesian subsidiary.  The plaintiffs alleged that the Indonesian military had killed and tortured villagers at the direction of the corporation's Indonesian subsidiary.  At the time, the subsidiary worked as a contractor for Indonesia's state-owned oil and gas company, Pertamina.  The lower case defendants argued that Pertamina was a "required party" to the suit; that Pertamina, "as an entity owned by the sovereign Indonesia," could not be joined in the action; and that therefore, "the entire suit must be dismissed."  *Id.* at 31.  " Not so," the court concluded, because the relief sought by the plaintiffs did not require bringing in the sovereign nonparty.  *Id.*  Similarly, the relief that Plaintiffs seek in the present case can be fully granted in Kazakhstan's absence.  Plaintiffs seek redress for the harms that were inflicted particularly by Defendants.  By obtaining an award of compensatory and punitive damages against Defendants for those particular harms, Plaintiffs will be accorded the relief they seek.

> **2.    Kazakhstan has not claimed any interest in this case, and nonjoinder would neither harm Kazakhstan's ability to protect its interest nor leave Defendants subject to "inconsistent obligations."**

Rule 19(a)(1)(B) offers an alternative definition of "required party:" someone who "claims an interest relating to the subject of the action" and who "is so situated that disposing of the action in the person's absence may … impair or impede the person's ability to protect the interest." FED. R. CIV. P. 19(a)(1)(B)(i).  To be a required party under this section of Rule 19, the absentee's interest in the "subject of the action" would need to be "essential to the Court's ability to 'enter a final judgment consistent with equity and good conscience.'"[39]  But this portion of Rule 19 is inapplicable in the present case because Kazakhstan has not "claim[ed] an interest relating to the subject of the action." FED. R. CIV. P. 19(a)(1)(B).  Plaintiffs did not name Kazakhstan as a defendant in this case, and Kazakhstan has not chosen to intervene.[40]  Furthermore, as Defendants point out, Kazakhstan is likely protected by sovereign immunity.  Subsection (B)(i) of Rule 19 is therefore inapplicable in the present case because, as in *Exxon Mobil*, "a judgment against Defendants would not require compensatory relief" from Kazakhstan, nor would it bind Kazakhstan "to a particular course of action; thus, the action would not 'impair or impede its ability to protect' its interest." *Exxon Mobil*, 573 F. Supp. 2d at 33.  In sum, Kazakhstan has no interest to protect because no interest will be exposed to liability.

Moreover, Subsection (B)(ii) of Rule 19 only applies where the non-party is so situated that disposing of the action in the person's absence may "leave an existing party subject to a substantial risk of incurring double, triple, or otherwise inconsistent obligations because of the interest." FED. R. CIV. P. 19(a)(1)(B)(ii).  The risk of incurring inconsistent obligations must be

---

[39] *Knop v. Mackall*, 640 F. Supp. 2d 58, 61 (D.D.C. 2009) (Kennedy, J.).
[40] Notably, in the § 1782 case, upon which Defendants partially hang their hats, Kazakhstan did move to intervene and, without objection, were permitted to do so by Judge Bates.

substantial, and cannot be "remote."[41]  But this portion of Rule 19 is also inapplicable in the

present case because, as in *Exxon Mobil*, "resolving this suit will not subject Defendants to a

substantial risk of the sort of 'inconsistent obligations' contemplated by the rule."  *Exxon Mobil*,

573 F. Supp. 2d at 33.  Defendants face no "substantial risk"—or even a remote risk—that they

will incur inconsistent obligations should this action proceed in Kazakhstan's absence.

   C.    **Rule 19(b): Even if Kazakhstan Were a "Required Party," Dismissal for
          Nonjoinder Would Not Be Warranted.**

   Because Kazakhstan is not a "required party" under Rule 19, it is unnecessary to

determine whether joinder of Kazakhstan would be feasible or to proceed with the rest of the

Rule 19(b) analysis.  However, even if Kazakhstan *were* a required party, dismissal would be

inappropriate here.  Assuming *arguendo* that joinder is not feasible here, the court could

nevertheless proceed with this action consistent with "equity and good conscience."  FED. R. CIV.

P. 19(b).  This subdivision of the Rule sets out four factors for courts to consider in deciding

whether to allow an action to proceed in the absence of a required party.  None apply here.

---

[41] *FTC v. Manager, Retail Credit Co., Miami Branch Office*, 357 F. Supp. 347, 354 (D.D.C. 1973), *rev'd on other grounds*, 515 F.2d 988 (1975); *see also* WRIGHT & MILLER, 7 FED. PRAC. & PROC. CIV. § 1604 (3d ed. 2001) ("The key is whether the possibility of being subject to multiple obligations is real; an unsubstantiated or speculative risk will not satisfy the Rule 19(a) criteria.").

### 1.    Factor One: Prejudice

The first factor under Rule 19(b) directs courts to consider "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties." FED. R. CIV. P. 19(b)(1).  According to the Advisory Committee Notes accompanying this part of the Rule, courts should ask: "Would the absentee be adversely affected in a practical sense, and if so, would the prejudice be immediate and serious, or remote and minor?"[42]

GlobalOptions Defendants claim that "[t]he 'potential for injury' to the Republic of Kazakhstan's comity and dignity interests is the type of prejudice Rule 19(b) seeks to avoid," and that a judgment against them would inevitably "impugn liability" on Kazakhstan. GlobalOptions MTD at 28.  However, as Defendants repeatedly note, Kazakhstan is arguably immune from suit and liability pursuant to Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1604, *et seq*.  Therefore, a judgment against Defendants cannot "impugn liability" on an immune party because that party is immune from suit and liability.

GlobalOptions Defendants rely also on *Republic of the Philippines v. Pimentel*, 553 U.S. 851 (2008), to argue that, "in considering whether a party will incur prejudice if a case proceeds in its absence, a court must give adequate weight to a nation's sovereign status."  GlobalOptions MTD at 28.  Mirtchev Defendants, too, rely on the case.  *See* Mirtchev MTD at 38-41.  In that case, a class of human rights victims had obtained a large judgment in federal district court against Ferdinand Marcos, the former president of the Philippines.  The class then sought to attach the assets of a company incorporated by Marcos, *and the Republic of the Philippines intervened*, *claiming an entitlement to those assets*.  To determine the ownership of those assets, Merrill Lynch, which held the assets, brought an interpleader action.  The Philippines and a

---

[42] FED. R. CIV. P. 19(b), Advisory Committee's Notes on 1966 Amendments.

government commission were named as defendants.  The government invoked its sovereign immunity under the FSIA.  The district court allowed the case to proceed in the Republic's absence, after which the Republic filed a Motion to Dismiss.  The Supreme Court held that the suit should not have been allowed to proceed because the Republic *was* a required party under Rule 19(a), joinder was not feasible, and the Rule 19(b) factors supported dismissal.

This case is entirely distinguishable from *Republic of the Philippines*.  First, plaintiffs in that case sought to recover specific property stolen by Marcos to which the Republic claimed an entitlement under Filipino law.  In the present case, Plaintiffs seek money damages from Defendants, U.S.-based private consultants, not a former state enterprise.  Nor do Plaintiffs seek the return of any property held by Kazakhstan or to attach any assets to which Kazakhstan claims an entitlement.  Second, the *Republic of the Philippines* interpleader named the Philippines in their original suit.  Plaintiffs in the present case do not name Kazakhstan or President Nazarbayev.  Third, in *Republic of the Philippines*, the Republic specifically inserted itself in the action and invoked its FSIA sovereign immunity.  Kazakhstan, by contrast, has not involved itself in the present case in any way.  Nor will it need to do so, as Plaintiffs have no intention of taking judicial action against the Republic of Kazakhstan or its assets on the claims asserted in this case.  Fourth, the Court found it highly significant that the plaintiff in *Republic of the Philippines* was not the class of Marcos's victims, but rather Merrill Lynch, an interpleader in the action.  The Court held that the victims' "interests are not irrelevant to the Rule 19(b) equitable balance; but the other provisions of the Rule are the relevant ones to consult." *Republic of the Philippines*, 553 U.S. at 871.

This case, by contrast, is brought by the victims who suffered the alleged harms, and not by an interpleader stakeholder.  If the present action is dismissed for nonjoinder, Plaintiffs will

36

be unable to bring it anywhere else.  As explained below, the courts of Kazakhstan are not a suitable alternative.  Thus, this Court is the *only* potential venue in which these claims can be brought, shifting the "equitable balance" in Plaintiffs' direction.  Finally, unlike *Republic of the Philippines*, this case does not concern a sovereign state's claim to assets.  It concerns only aiders and abettors; thus, the important comity interests related to sovereign immunity, discussed in *Republic of the Philippines*, play no role here.

Nor would continuing this case without Kazakhstan prejudice Defendants.  Defendants contend that because of the sovereign immunity protections that those parties enjoy, Defendants would be unable to obtain discovery from them.  Mirtchev MTD at 40-41; GlobalOptions MTD at 28-30.  However, Plaintiffs sue Defendants for their own actions, not Kazakhstan's.  As Plaintiffs noted in their motion for jurisdictional discovery, the commercial nature of the relationship between Defendants and Kazakhstan may have resulted in Kazakhstan's waiver of sovereign immunity such that Defendants would be able to obtain discovery from it in a separate action.  In any event, both parties may have difficulty obtaining certain documents—but that is not dispositive.

### 2.    Factor Two: Mitigation of Prejudice

The second Rule 19(b) factor is "the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures."  FED. R. CIV. P. 19(b)(2).  Here sovereign immunity protects Kazakhstan from any possible prejudice that could result from a judgment made in Kazakhstan's absence.  To the extent that Defendants complain that they would be prejudiced by the absence of Kazakhstan as a joint tortfeasor in this suit, that situation can be alleviated by Defendants pursuing their own remedies under theories of contribution or indemnification pursuant to the contractual and commercial relationships they possess with Kazakhstan.

37

### 3. Factor Three: Adequacy of Judgment

The third factor under Rule 19(b) is "whether a judgment rendered in the person's absence would be adequate." FED. R. CIV. P. 19(b)(3). The Supreme Court has held that "adequacy" in this context "refers to 'the public stake in settling disputes by wholes, whenever possible.'" *Republic of the Philippines*, 553 U.S. at 870. "This 'social interest in the efficient administration of justice and the avoidance of multiple litigation' is an interest that has 'traditionally been thought to support compulsory joinder of absent and potentially adverse claimants.'" *Id.* But as discussed above, Kazakhstan generally enjoys immunity from suit in U.S. courts under the FSIA. Therefore, allowing the present case to continue in Kazakhstan's absence would create no danger of inefficient administration of justice as Plaintiffs do not intend to bring suit against Kazakhstan in the federal courts for want of subject matter jurisdiction. Further, Plaintiffs are statutorily barred from bringing defamation or libel claims against the Republic of Kazakhstan or its Embassy, so those claims can only be brought against the commercial agents who are defendants in the current action.

### 4. Factor Four: Adequate Alternative Remedies

Rule 19(b)'s fourth factor calls for courts to consider "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." FED. R. CIV. P. 19(b)(4). Defendants claim that Plaintiffs would have an adequate alternative remedy if this action were dismissed, because Plaintiffs could bring these claims in the Caratube arbitration. As previously explained, that is simply not possible as a matter of law.

## V. The Kazakh Courts Are Not an Adequate Alternative to This Court.

The Mirtchev Defendants' argument that the courts of Kazakhstan provide a more convenient forum than this Court is preposterous. Not only is it bizarre for a Washington-based firm to put forward such an argument, but this bizarre request is underscored by the fact that the

GlobalOptions Defendants do not join them in making it.  Moreover, the surprising willingness

of the Mirtchev Defendants to waive service of process and "all procedural obstacles to Plaintiffs

bringing" suit against them in Kazakhstan displays for the Court Mirtchev's dedication to his

role as an agent and advisor to the Kazakh dictatorship.  *See* Mirtchev MTD at 33.  As is

explained *infra* and in the declaration of Mr. Scott Horton, foreigners would not submit

themselves to the jurisdiction of such an arbitrary judicial system without reassurances of the

final result.

A determination on *forum non conveniens* is committed to the sound discretion of the

trial court.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981).  Courts undertake a three-step

process in applying the doctrine:  "A court first determines whether there is an adequate

alternative forum and, if so, then proceeds to balance both private interest factors and public

interest factors in favor of the respective forums."  *MBI Group, Inc. v. Credit Foncier Du

Cameroun*, 558 F. Supp. 2d 21, 26 (D.D.C. 2008) (Bates, J.).  "A strong tilt towards a particular

forum in the private interest factors or the public interest factors counsels towards dismissal."

*Id.* at 26-27.  Once the existence of an adequate alternative forum is established, the Court

weighs all relevant factors of private and public interest against the presumed validity of the

plaintiff's choice of forum.  *Id.* at 27 (citation omitted).  The mere fact that a case involves

foreign conduct or plaintiffs, as here, is not enough for dismissal on *forum non conveniens*

ground.  *Carijano v. Occidental Petroleum*, 2010 WL 4925459, *1, *3 (9th Cir. Dec. 6, 2010).

The presumption in favor of the plaintiff's choice of forum is a strong one.  *Piper

Aircraft Co.*, 454 U.S. at 255-256.  The Mirtchev Defendants argue incorrectly that no deference

should be given to the Plaintiff's choice of forum.  In so doing they rely on the decision in *BPA

Int'l, Inc.* for its overstated interpretation of the *Piper Aircraft* holding that less weight should be

afforded a plaintiff's choice of forum when they are a "stranger to the forum." *MBI Group, Inc.*, 558 F. Supp. 2d at 26-27; Mirtchev MTD at 32 n.20.  However, no such language appears in *Piper Aircraft*.  *See Piper Aircraft Co.*, 454 U.S. at 255-256.  Rather, *Piper Aircraft* actually states that a *foreign* plaintiff's choice of forum should be accorded *less* deference, and goes on to state that "[c]itizens or residents deserve somewhat more deference than foreign plaintiffs…." *Id.* at 256 n.23.  Of course, "less deference is not the same thing as no deference," and the decision in *Piper* "does not in any way stand for the proposition that when both domestic and foreign plaintiffs are present, the strong presumption in favor of the domestic plaintiff's choice of forum is somehow lessened."  *Carijano*, 2010 WL 4925459, at *8, *9 (citation omitted).

This distinction has relevance in the instant application of the *forum non conveniens* analysis because Plaintiff Devincci Hourani is a U.S. citizen.  Citizens should rarely be denied access to the courts of the United States.[43]  Even though Devincci Hourani brings his claims with his brother, a British citizen, his choice of forum is still accorded a strong presumption in its favor, irrespective of whether he and his brother are "strangers" to the particular forum of District of Columbia.  *Carijano*, 2010 WL 4925459, at *9.[44]  This is especially true in the instant case because Plaintiffs bring their claims in the Defendants' "home jurisdiction and a forum with a strong connection to the subject matter" of the case and in an effort to obtain jurisdiction over Defendants, thus dispelling any concerns that they are forum shopping.  *Id.* at *10.  In such instances, even a completely foreign plaintiff's choice of forum is entitled to "substantial deference."[45]

---

[43] *See Reid-Walen v. Hansen*, 933 F.2d 1390, 1395 (8th Cir. 1991).
[44] *See id.* at 1394 (stating that the "home" forum for the plaintiff is any federal district in the United States, not the particular district where the plaintiff lives.").
[45] *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 155-156 (2d Cir. 2005) ("substantial deference" should be accorded a foreign plaintiff's choice of forum when it sues a defendant in its home forum to obtain jurisdiction

(continued…)

### A.   The Mirtchev Defendants' Half-Hearted Attempt to Argue That Kazakhstan Is an Adequate Alternative Forum Does Not Withstand Scrutiny.

The threshold question in a *forum non conveniens* analysis is whether the proffered alternative forum is adequate.  *See MBI Group, Inc.*, 558 F. Supp. 2d at 28.  The burden for establishing the adequacy of the forum rests with the defendant.  *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996) (citing cases), *abrogated on other grounds by Samantar v. Yousef*, __ U.S. __, 130 S. Ct. 2278 (2010).  Although the Mirtchev Defendants have the burden of demonstrating that an alternative forum is adequate, they only make at best a half-hearted showing at doing so.  *See* Mirtchev MTD at 32-33.  As such, the record evidence does not demonstrate that Kazakhstan is an adequate alternative forum.

### 1.   Mirtchev and Krull's submission to Kazakh legal process does not satisfy their burden of showing that the forum is adequate.

One element of the adequate-forum question is whether the foreign forum has personal jurisdiction over the defendants.  Here, the Mirtchev Defendants' willingness to submit to the jurisdiction of the Kazakh courts is nothing more than a disingenuous ploy by two defendants who know that were this dispute actually to be submitted to the courts of Kazakhstan—which it cannot—they would be assured of victory because of their agency relationship with a dictator that directly controls the judiciary.  *See* Mirtchev MTD at 33.  Putting this cynical maneuvering aside, this willingness still does not carry their burden in showing the adequacy of the alternative forum because the GlobalOptions Defendants are not apparently willing to follow them. Mirtchev and Krull rely on *BPA International* and an Eleventh Circuit case, *Magnin v. Teledyne*

---

(continued…)

over them); *see also Reid-Walen*, 933 F.2d at 1395 (holding that in the "unusual situation" where a forum resident seeks dismissal for forum non conveniens in his home jurisdiction, that fact should weigh strongly against dismissal and stating "it will be the rare case indeed when a case filed in the federal district where the defendant resides and in the home forum of the plaintiff is dismissed on the ground of forum non conveniens.").

*Continental Motors*, 91 F.3d 1424, 1429 (11th Cir. 1996), to show that submitting to the jurisdiction of the alternative fora renders it available.  However, in both cases, *all* of the defendants agreed to submit to the alternative forum.  *Id.*; *BPA Int'l*, 281 F. Supp. 2d at 85.  The GlobalOptions defendants have made no such averment.

### 2.   Mirtchev and Krull do not present sufficient evidence that Kazakhstan is a viable alternative forum.

That a defendant is "amenable to process" is not enough by itself to establish the adequacy of an alternative forum.  The defendant "must provide enough information to enable the District Court" to evaluate the adequacy of the alternative forum.  *El-Fadl*, 75 F.3d at 677 (citing *Piper Aircraft Co.*, 454 U.S. at 258).  As the D.C. Circuit explained in *El-Fadl*:

> Because the defendant has the burden of establishing that an adequate alternative forum exists, this court will reverse when "the affidavit through which [the defendant] attempted to meet its burden contains substantial gaps."  The amount of information that the defendant must provide, in supporting affidavits or other evidence, depends on the facts of the individual case. Accordingly, the defendant must provide more detailed information if the plaintiff provides evidence that controverts the defendant's evidence.

75 F.3d at 677 (citations omitted).  Where the remedies provided by the alternative forum are so clearly inadequate or conditions in the foreign forum plainly demonstrate that it is unlikely that plaintiffs will obtain basic justice therein, the motion for dismissal on *forum non conveniens* grounds should be denied.[46]

In the instant case, Mirtchev and Krull have presented scant evidence to substantiate their claims that Kazakhstan is a suitable alternative legal forum for the claims brought by Plaintiffs. *El-Fadl*, 75 F.3d at 677.  The Mirtchev Defendants submitted a tardy affidavit that states simply,

---

[46] *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1199 (S.D.N.Y 1996).

without explanation, nuance, or citation to statute or court decision, that Plaintiffs could bring

their claims under Kazakh law.  *See* Affidavit of Mr. Benjamin and Ms. Simonova, Dec. 9, 2010,

Dkt. No. 20.  Plaintiffs' expert, Mr. Scott Horton, casts doubt on this view, however.  *See* Decl.

Horton ¶¶ 17-18.  Most importantly, the Mirtchev Defendants' affidavit provides *no* guidance as

to whether the courts of Kazakhstan would serve as an adequate forum in this particular case,

with all of its political overtones.  It says nothing about the independence of the judiciary or the

efficacy of the civil legal system.  Thus, this document has "substantial gaps" and is insufficient

to establish the existence of adequate forum.  *El-Fadl*, 75 F.3d at 677.  With only this

perfunctory, tardy evidence in the record, the Court could end the *forum non conveniens* analysis

here.  However, Plaintiffs submit an abundance of evidence demonstrating not only that pursuing

legal claims against the Defendants in Kazakhstan would likely endanger their lives, but that it

would be impossible to obtain a fair trial of their claims in that country.

### 3.    Plaintiffs cannot obtain basic justice in Kazakhstan.

Plaintiffs provide specific and ample evidence that the courts of Kazakhstan do not

present a viable alternative legal forum to adjudicate this dispute.  Although some courts have

looked upon "the alternative forum is too corrupt" argument with some level of skepticism, even

in some cases where the Court found ultimately that the forum was indeed too corrupt to hear the

plaintiff's claims, *see Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084-1087 (S.D. Fla.

1997), here Plaintiffs are not presenting some isolationist view of a foreign judicial system, nor

are they making "general allegations of corruption" concerning the Kazakh legal system.  *See*

*MBI Group, Inc.*, 558 F. Supp. 2d at 29, 30; *El-Fadl*, 75 F.3d at 678.  Rather, Plaintiffs below

provide substantial evidence establishing that Kazakh courts will not provide these two specific

plaintiffs an adequate means of redress.  Where plaintiffs have presented such proof against the

backdrop of a defendant's inability to carry their burden of persuasion, the district courts have denied motions to dismiss on *forum non conveniens* grounds.[47]

The nature of the affirmative evidence cited below, and the dearth of evidence provided by the Mirtchev Defendants, distinguishes this case entirely from Judge Bates's decision in *MBI Group, Inc.*, rejecting weaker arguments that a forum was too corrupt. First, in *MBI Group, Inc.*, the defendants made "a strong initial showing that the courts of Cameroon [were] open to hear plaintiffs' claims and represent an adequate alternative" venue. 558 F. Supp. 2d at 28. As stated, the Mirtchev Defendants have made a very weak showing here. Further, the plaintiffs in *MBI Inc.* presented only "generalized allegations regarding the state of Cameroon's judiciary" where as here Plaintiffs present particularized allegations regarding the Kazakh dictatorship's influence over the judiciary and their own family's persecution through Kazakh legal procedures. *Id.* at 29. Also, of key importance in Judge Bates' decision was the fact that the contract at issue in the case called for Cameroonian law to govern any dispute, which is clearly not the case here. *Id.* at 28.

### a.    Plaintiffs and their counsel would be killed or imprisoned were this case to be heard in Kazakhstan.

As alleged in the Complaint and outlined in the evidence below, Plaintiffs and their counsel would be imprisoned or murdered if they were forced to take this dispute to Kazakhstan.

---

[47] *See Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1085-1087 (S.D. Fla. 1997) (plaintiffs presented "an extensive record demonstrating substantial problems with sending the [case] back to Bolivia", including: (1) a newspaper article containing quotes by the Bolivian Minister of Justice damning his own judicial system; (2) an affidavit and a legal declaration by experts explaining the extent of corruption in the Bolivian legal system and stating that "the system of justice in Bolivia has been an extremely powerful tool for politically powerful or wealthy individuals to blackmail opponents … or business competitors"; and (3) a State Department Country Report on Human Rights Practices in Bolivia evidencing the extent of the problems in the Bolivian judiciary).

Courts have recognized that plaintiffs should not be forced to litigate in alternative forums that pose threats to the safety or emotional well being of the litigants.[48]

Plaintiffs fear that they would be arrested or imprisoned if they traveled to Kazakhstan to litigate their claims.[49] This fear is well-grounded. As explained in greater detail below, those imprisoned in Kazakhstan are routinely subjected to torture, and Kazakh prisons have extraordinarily high death rates.[50] Further, Plaintiffs allege that the Government of Kazakhstan threatened their safety and that of their families and employees, and forced them into exile. Plaintiff Issam Hourani was approached by Kazakh officials who demanded that he divorce his wife, denounce his brother-in-law publicly, and sign over all of his corporate holdings to the Kazakh Government, which they later took through coercion.[51] Kazakh officials have investigated Plaintiffs for a series of trumped-up criminal charges that are wholly political in nature, as evidenced by the various memoranda drafted by Ambassador Idrissov and Colonel Daulbayev discussed above.[52]

Moreover, Kazakh law enforcement officials have dispatched several INTERPOL Red Bulletin notices falsely claiming that Issam Hourani was engaged in various criminal activities and requesting his arrest and extradition.[53] Plaintiffs, their families, and their businesses were investigated, harassed, and raided by armed Kazakh officials and their employees were pressured to provide false evidence against them.[54] Further, Kazakh law enforcement officers monitored

---

[48] *See Cabiri*, 921 F. Supp. at 1199; *see also Rasoulzadeh v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y) (finding that citizens of Iran would be unable to obtain justice in the courts of Iran because they would likely be killed); *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147-148 (2d Cir. 2000).

[49] *See* Decl. D. Hourani ¶ 22; Decl. I. Hourani ¶ 26.

[50] *See* Decl. Horton ¶¶ 42-43.

[51] Complaint ¶ 114; Decl. I. Hourani ¶¶ 5, 14, 20.

[52] *See* Exhibits 2, 12, 25; Decl. I. Hourani ¶ 6, 16-17, 23-24, 31; Decl. D. Hourani ¶ 8-11, 16-17.

[53] Complaint ¶¶ 115, 119, 122; Exs. 5-8; Decl. I. Hourani ¶¶ 5, 15-19, 22-24.

[54] Complaint ¶¶ 116, 120, 122, 123, 125; Decl. I. Hourani ¶¶16-21, 25; Decl. D. Hourani ¶¶ 8-10.

Devincci Hourani's every movement in Kazakhstan before his departure and one night even dragged him from his home in the middle of the night, drove him to a secret location, and interrogated him until morning.[55]   Additionally, Plaintiffs were told that actions would be taken against them and their families if they did not sign their interests in KTK Television and Alma Media over to the Kazakh Government.[56]   Both Plaintiffs left Kazakhstan in fear for their safety, and they continue to hold such fears today.[57]

Additionally, internal Kazakh Government documents reveal that Plaintiffs are specific targets of that country's law enforcement officials.   As explained in the November 16, 2007, Daulbayev Memorandum, Mirtchev and GlobalOptions were to work with Kazakh law enforcement officials as part of a task force specifically to target the Houranis for tax evasion and other fabricated criminal charges.   *See* Ex. 2; Facts ¶¶ 19-24, 45-47.   A March 15, 2010, Memorandum from Daulbayev to President Nazarbayev's chief of staff demonstrates the success that this task force had in bringing pretextual criminal charges against the Hourani brothers and freezing and confiscating their personal assets and those of their businesses.   *See* Ex. 12; Facts ¶ 25.   Of course, this memorandum also states that these activities were undertaken at the behest of the "Head of State," President Nazarbayev.   *Id.*

Plaintiffs' fears that they would not receive a fair hearing in Kazakhstan are confirmed by Kazakh Government correspondence obtained within just the past few weeks.   In a memorandum signed by President Nazarbayev himself, he orders that because of the "civil suits"—which presumably means this litigation—"it is essential to conclude new *in absentia* trials in Kazakhstan" of "I.Hourani" and "R.Aliyev" in order to obtain their obtain their arrest and

---

[55] Complaint ¶¶ 121, 124.
[56] Complaint ¶ 126; Decl. I. Hourani ¶¶ 5-7; Decl. D. Hourani ¶¶ 6-9.
[57] Complaint ¶ 130; Decl. D. Houran ¶¶ 10-11, 22; Decl. I. Hourani ¶¶ 26, 38.

extradition through INTERPOL.  Ex. 25.  Presumably in response to this order, Ambassador Idrissov wrote President Nazarbayev, stating that he worked with Mirtchev "to fight and discredit the criminal group headed by R.Aliyev, as well as Devincci (Assem) Hourani, a citizen of the U.S., and his brother Issam Hourani, citizen of the U.K."  *Id.*; Facts ¶ 39.  Idrissov explains that he and Mirtchev have informed the head of the KNB about the "upcoming civil hearings in the U.S." and that in response, they requested "the commencement of criminal cases … with the goal of impeding the financial ability of the Hourani brothers to finance their attorneys."  *See* Ex. 25; Facts ¶ 39.  Further, Idrissov states that he and Mirtchev distributed a dossier—which very well could be the "Aliyev Dossier"—about the Houranis and "their ties to Islamic terrorist organizations" so that they can then freeze Hourani assets in the U.S. and Europe "under the pretext" that the funds are laundered terrorist assets.  *See* Ex. 25; Facts ¶ 39.  This evidence speaks for itself.

Finally, Plaintiffs' fears for their safety are supported by the actions Kazakhstan has taken towards Issam Hourani's brother-in-law, Rakhat Aliyev.  Mr. Aliyev has been the target of death threats and assassination attempts.[58]  Additionally, he has been tried *in absentia* several times.[59]  Notably, an Austrian Court refused the extradition of Aliyev to Kazakhstan because it found that he could not receive a fair trial there.[60]  In doing so, the court stated that President Nazarbayev exercises complete control over the Kazakh judiciary, and its court system denies due process protections.[61]  As shown below, others agree with the Austrian court's conclusion that Kazakhstan is not an adequate forum.

---

[58] *See* Decl. Aliyev ¶¶ 38; Facts ¶ 28; Ex. 40.
[59] *See* Decl. Aliyev ¶¶ 7, 35; Facts ¶¶ 26, 36.
[60] *See* Decl. Aliyev ¶ 37; Facts ¶ 37.
[61] *Id.*

**b.    The Kazakh judiciary is a mere rubber stamp for President Nazarbayev.**

That Plaintiffs could not obtain justice in Kazakh courts is obvious from the fact that Defendants' principal, President Nazarbayev, exerts total control over the judiciary, ensuring that the Courts lack independence.  *See* Facts ¶¶ 30-40; Ex. 21.[62]  Indeed, the Constitution of the Republic of Kazakhstan allows him to exercise such power over the judiciary.  *See* Facts ¶ 35.  The United Nations and Amnesty International agree, and have stated that the Kazakh judiciary lacks independence and is thoroughly dominated by President Nazarbayev.  *See* Facts ¶¶ 33-34.

Moreover, the Kazakh judiciary and the country's law enforcement agencies are thoroughly corrupt.  The U.S. State Department has reported that Kazakhstan's judges "frequently engage[] in corrupt practices with impunity."  Facts ¶ 32.  The U.N. Committee Against Torture stated similarly in 2008 that confessions extracted through torture are routinely admitted in Kazakh courts and that corruption in the judiciary contributes "to a climate of impunity."  Facts ¶ 34.  Further, Scott Horton states that the U.S. Embassy in Kazakhstan has noted that, historically, corruption is rampant in the various branches of the Kazakh Government and its agencies.  Decl. Horton ¶ 51.  Mr. Horton states further that Kazakh judges "have a strong reputation for handling cases … as proxies for the Executive."  *Id.* ¶ 41.  Of specific relevance to this case is the U.N. Committee Against Torture's finding that Kazakh officials routinely invoke "[t]he fight against terrorism and other threats to national security … as crucial in securing stability," but "all too frequently, pursuance of these aims is invoked when targeting vulnerable groups or groups perceived as a threat to national or regional security."  *See* Facts ¶ 34.

---

[62] This information comes from the 2008 U.S. State Department Country Report on Human Rights Practices in Kazakhstan, Ex. 21.  State Department "reports [are] relevant to the extent they provide reliable information that corroborates a plaintiff's claims about the character of another nation's judiciary."  *MBI Group, Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 575 (D.C. Cir. 2010)

Finally, the declaration of Scott Horton—who has studied the Kazakh courts since

1992—establishes definitively that Plaintiffs cannot obtain justice in Kazakhstan.  Mr. Horton

provides a wealth of information about the Kazakh judiciary and states that "Kazakhstan's rule-

of-law traditions are extremely weak, and even President Nazarbayev has acknowledged that

judicial independence and integrity is a weak point for his country."  Decl. Horton ¶ 33; *see also*

*id.* ¶¶ 19-66.  Additionally, "[t]he procuracy, courts, state-security apparatus and financial police

often act in tandem to work the will of President Nazarbayev—frequently this is to dispossess

persons he has identified as enemies[.]"  *Id.* ¶ 48.  Finally, Horton references the United Nations

Special Rapporteur, Prof. Leandro Despouy, who studied Kazakhstan's civil litigation system

and concluded:

> In civil cases, the Procuracy has the right to intervene at any stages
> of the trial, even where the State does not have a clear and
> legitimate interest. This situation reportedly occurs with some
> regularity, especially where there exists an economic interest: it
> forms part of a frustrating power relationship between judges and
> prosecutors and it was alleged that, sometimes, this leads
> individuals who have the political or financial means of soliciting
> the Procuracy (possibly by offering a bribe) to intervene and
> appeal a decision that runs against their interest.

*Id.* ¶ 49.  On the basis of this and numerous other factors cited in his report, Horton concludes

that the judiciary is under the "effective control of the executive in Kazakhstan." *Id.* ¶ 39.

Horton's report provides a full view of the Kazakh executive's comprehensive control of the

judiciary and is incorporated by reference herein.

**B.     The Private Interest Factors Do Not Militate in Favor of Dismissal.**

Even if the Mirtchev Defendants met their burden of persuasion and were successful in

showing that Kazakhstan is an adequate alternative forum, the private and public factors do not

suggest that this case should be heard in Kazakhstan.  If an alternative adequate forum is

available, a court must next balance the private interest factors to determine if "trial in the chosen

forum would be unnecessarily burdensome for the defendant or the court." *Piper Aircraft Inc.*, 454 U.S. at 256 n.23.  The pertinent private interest factors are:

> (1) the relative ease of access to sources of proof; (2) the availability of process for compelling unwilling witnesses; (3) the cost for obtaining attendance of willing witnesses; (4) the possibility of inspecting the premises, if appropriate; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive.

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).  These factors favor this forum.

Because Plaintiffs' claims turn not on the physical location of their injuries, but largely on the mental state of Defendants in making decisions that resulted in Plaintiffs' injuries, much of the proof relevant to this case can be found here in the District of Columbia.  *Carijano*, 2010 WL 4925459, at *11.  Mirtchev and his corporate affiliates are based in Washington, D.C. with offices not far from this Courthouse.  *See* Complaint ¶¶ 3, 15-17, 27.  It is a reasonable assumption that these Defendants store records and documents in those offices.  Additionally, given that Defendants are an American citizen and three U.S.-based corporations, this Court can safely presume that the vast majority of those records and documents are in English and thus will not require large amounts of translation.  *Compare MBI Group, Inc.*, 558 F. Supp. 2d at 32-33 (analyzing private interest factors and stating that the heavy translation needs of the documents would "add a substantial overlay of costs" and consume valuable time).  Additionally, the employees of Krull and GlobalOptions are subject to process for compulsion to testify, as, of course, is Mr. Mirtchev.  Further, Defendants do not explain their wholly speculative contention that this case will require assistance from Kazakh legal experts.  Mirtchev MTD at 35.  Plaintiffs bring tort claims grounded in the D.C. law, so there is no foreseeable need for the testimony of such an expert.  *See* Complaint ¶¶ 159-231.

Of course, without having had the benefit of *any* discovery at this preliminary stage in this case, it is premature to speculate as to whether, as Defendants suggest, "many key witnesses in this action … are located in Kazakhstan."  Mirtchev MTD at 34.  Even if true, courts have noted that the question in assessing the private interest factors is not whether the witnesses are beyond the reach of compulsory process, but whether they are *unwilling* to testify.  *Carijano*, 2010 WL 4925459, at *11 (citing cases).  Defendants have not represented that any of the putative witnesses in this case are unwilling to testify.

Finally, in light of the fifth private interest factor, Plaintiffs have already submitted significant evidence above establishing that trying a case in a country that they fled in fear of their lives would be anything but "easy, expeditious, and inexpensive."  *Gulf Oil Corp.*, 330 U.S. at 508.  More importantly, Defendants fail even to mention that the enforcement of a Kazakh judgment in jurisdictions where Defendants are likely to have assets—including this one—would likely prove difficult.  *Carijano*, 2010 WL 4925459, at *12-13.

### C. The Public Interest Factors Do Not Weigh in Favor of Dismissal.

Even were the Defendants able to show that Kazakhstan was an adequate forum and that private factors counseled in favor of dismissal, the public interest factors tip the scales in favor of maintaining this action in the current forum.  Relevant public interest factors include:

> (1) administrative difficulties caused by foreign litigation congesting local court dockets; (2) local interest in having localized controversies decided at home; (3) imposing jury duty on residents of a jurisdiction having little relation to the case; and (4) avoiding unnecessary problems in choice-of-law and the application of foreign law.

*Gulf Oil Corp.*, 330 U.S. at 508-509.

With respect to the first three factors, Plaintiffs do allege that Defendants aided and abetted a foreign dictator in robbing them of the assets largely located in Kazakhstan, but also

allege that this plan originated with Defendants *here*, in Washington, D.C., not in Astana.  *See* Complaint ¶¶ 3-17, 44-62.  Further, the documents transmitted to Kazakhstan in formulating the Superkhan plan appear to have been produced in Washington by Defendants.  *See* Ex. 33.  Finally, as evidenced by the various memoranda produced by Ambassador Idrissov and Colonel Daulbayev, Alexander Mirtchev and Defendants have worked extensively with the Kazakh Embassy in Washington, D.C., not only to "discredit" Plaintiffs as criminals and terrorists, but to attempt to freeze their assets and buy influence by channeling funds to the "Friends of Kazakhstan" group.  *See* Facts ¶¶ 10-16.  The courts of a district have a "significant interest" in providing a forum for those harmed by the actions of that district's citizens.  *Carijano*, 2010 WL 4925459, at *13.  As such, this jurisdiction has an interest in having this "localized controversy decided at home" and doing so would not improperly impose jury duty on residents of a jurisdiction that had little relation to the case.  *Gulf Oil Corp.*, 330 U.S. at 508-509.  Further, because Plaintiffs bring claims pursuant to District of Columbia law, this Court will not be forced to wade into a complex choice-of-law analysis or the application of Kazakh law.  *Id.*

Finally, this case differs vastly from the decision in *MBI Group, Inc.*, 558 F. Supp. 2d at 34, and Defendants' reliance thereupon is misplaced.  There, Judge Bates agreed that the case and had almost no nexus with the District of Columbia and thus, the "dispute center[ed] on Cameroon and almost everything relevant to the dispute occurred in Cameroon."  *Id.*  Unlike *MBI Group, Inc.*, in the present case all Defendants are based in this jurisdiction *and* a significant portion of their actionable behavior occurred in Washington.  *See* Facts ¶¶ 2-16.  Additionally, there is no contract in this case mandating the application of Kazakh law.  *See MBI Group, Inc.*, 558 F. Supp. 2d at 35.  Therefore, the "'nub' of the controversy" is not "entirely foreign."  *Id.* at 36 (citation omitted).

52

**VI.**    **Defendants Mirtchev and Krull's Minimum Contacts Argument Has No Merit.**

The Mirtchev Defendant's "minimum contacts" argument makes no sense.  Mirtchev and Krull do not argue that this Court lacks personal jurisdiction over the dispute because they cannot.  Rather, they contend that Plaintiffs only assert three "conclusory allegations" related to the Defendants' activity in Washington, D.C., so as to provide for the application of District of Columbia law to this law suit.  In so doing, Mirtchev and Krull rely on case law that quickly unwinds their argument.

The Mirtchev Defendants rely chiefly on *Boehner v. McDermott*, in which this Court determined that due process did not support the extraterritorial application of a Florida wiretapping statute to a dispute that was centered largely in the District of Columbia.  332 F. Supp. 2d 149, 151-155 (D.D.C. 2004) (Hogan, J.).  This Court relied on the Supreme Court's decision in *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-313 (1981), in explaining that, for a state's laws to apply in a given case, the state must have sufficient contacts with the dispute so that the choice of its law is not "fundamentally unfair."  *Boehner*, 332 F. Supp. 2d at 154.  To do so, a "[p]laintiff must show that [a] Defendant 'voluntarily and purposefully availed himself of the protection of the forum state's laws.'"  *Id.*  Clearly, that is the case here.

As an initial matter, *Boehner* is distinguishable from this case on a legal basis.  Plaintiffs have never asked this Court to apply the law of another forum extraterritorially.  *Id.*  Rather, they have asked a court sitting in the District of Columbia to apply the law of that same territory to conduct that largely took place here.  Further, Defendants do not specifically suggest that another forum's laws should apply and that the Court must undertake a choice of law analysis.  *See Allstate*, 449 U.S. at 307-308 (analyzing this issue in a choice of law analysis).  Therefore, the Court not need endeavor into the analysis set forth in *Boehner* and *Allstate*.

However, even if it were necessary to explore this issue, Defendants cannot argue that they do not have "significant" contacts with the District of Columbia. *Boehner*, 332 F. Supp. 2d at 154. After all, Defendants are each based in the District of Columbia. Complaint ¶¶ 3, 15-17. Therefore, because Defendants have made the decision to reside in the District of Columbia, they have availed themselves of its laws. Moreover, the Defendants have committed significant acts in the District of Columbia demonstrating that its law applies. For instance, Mirtchev and GlobalOptions Management drafted the Superkhan memorandum that mapped out President Nazarbayev's consolidation of power at the expense of Kazakhstan's elite, including Plaintiffs. Given that Mirtchev and GlobalOptions are both based in the District of Columbia, it can be inferred that this roadmap was created in that location. *See* Ex. 1; Complaint ¶ 46. Mirtchev also receives commissions for channeling Kazakh money around the globe in two District of Columbia-based bank accounts. Complaint ¶¶ 91-92. Further, Mirtchev, Krull, and GlobalOptions work extensively with the Kazakh Ambassador to the United States in the District of Columbia, where they are also paid for their services. *Id.* ¶¶ 63, 66-68, 78, 143-155.

## VII.  Plaintiffs' Complaint States Claims Under District of Columbia Common Law.[63]

### A.  Plaintiffs' Complaint Comports with the Pleading Requirements Discussed in the Supreme Court's Decisions in *Twombly* and *Iqbal*.

Defendants assert that in the wake of *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), Plaintiffs cannot rely extensively upon information-and-belief allegations. *See* Mirtchev MTD at 4. But nothing in *Twombly* or its progeny explicitly states that Plaintiffs cannot make significant

---

[63] Plaintiffs acknowledge that District of Columbia precedent indicates claims for punitive damages cannot be brought as stand-alone "claims" in a Complaint. However, this formalistic rule of pleading in no way disentitles Plaintiffs from obtaining punitive damages as a remedy and, what is more, Plaintiffs requested such relief in their prayer. *See Iacangelo v. Georgetown University*, 580 F. Supp. 2d 111, 113-114 (D.D.C. 2008), *report and recommendation rejected in part by, judgment amended by* 595 F.Supp.2d 87 (D.D.C. 2009); Mirtchev MTD at 31, n. 19.

use of such allegations.  Here, the standards articulated in *Twombly* and the cases interpreting it in this Circuit have been met by Plaintiffs' Complaint.

In fact, the Court of Appeals has stated that while *Twombly* is an important decision for purposes of interpreting Federal Rule of Civil Procedure 12(b)(6), it "leaves the long-standing fundamentals of notice pleading intact."  *Aktielselskabet Af 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008).[64]  Rule 8, which governs the notice pleading standard, states that a Complaint should provide simply "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  *Twombly* noted that a complaint attacked by a 12(b)(6) motion "does not need detailed factual allegations but does require more than mere labels and conclusions and a formulaic recitation of the elements of a cause of action." 550 U.S. at 555.  In general, the complaint should identify the "circumstances, occurrences, and events" giving rise to the claim.  *Id.* at 556, n.3.  The decision in *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009), requires that a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face.  Factual plausibility means that the factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.*  Of course, in doing so, a court must assume the allegations to be true, even if doubtful in fact.  *Twombly*, 550 U.S. at 555-556.  Importantly, a complaint should be construed liberally in a plaintiff's favor and a court must give the plaintiff the benefit of all

---

[64] In the wake of the Supreme Court's decision in *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937 (2009), the United States argued in *Tooley v. Napolitano*, 586 F.3d 1006, 1007 (D.C. Cir. 2009), that the decision had extended *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) and thus invalidated the D.C. Circuit's construction of *Twombly* in *Aktielselskabet Af 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008).  The D.C. Circuit did not reject this argument, but affirmed the district court "for reasons distinct but not inconsistent with the holding in *Iqbal*."  Accordingly, the decision in *Fame Jeans* is still good law in this Circuit.

inferences that can be derived from a factually-supported complaint. *Vreven v. American Assoc. of Retired Persons*, 604 F. Supp. 2d 9, 12-13 (D.D.C. 2009) (Friedman, J.).[65]

    **B.**    **Plaintiffs' Complaint Alleges Sufficient Facts to Support Plausible Claims for Defamation, Libel, and False Light Invasion of Privacy.**

        **1.**    **Plaintiffs allege sufficient facts to support their claims of defamation and libel.**

Plaintiffs' Complaint easily demonstrates that they are entitled to damages for Defendants' publication and involvement in the publication of defamatory and/or libelous statements about them. As a preliminary matter, and contrary to arguments made by Defendants, heightened pleading standards do not apply in defamation actions.[66] However, such claims must be pled with particularity and specify the persons to whom the statements were published. *Vreven,* 604 F. Supp. 2d at 15. Where a defamatory statement has been publicized in a report, like the ones published by the Kazakh Embassy and ETG, the Court of Appeals has held that a *prima facie* case of defamation has been established.[67] Critically, in considering a Rule 12(b)(6) motion to dismiss a defamation action, a court must assume the falsity of the statements at issue and that the statements were made by the defendants with knowledge of their falsity or reckless disregard for their truth. *Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001).

---

[65] The Mirtchev Defendants submitted the declaration of two practitioners of Kazakh law stating that Plaintiffs would have causes of action available to them under Kazakh law. *See* Dkt. No. 20. Plaintiffs likewise introduce evidence in support of their arguments against Defendants' jurisdictional defenses.

[66] See *Messina v. Fontana*, 260 F. Supp. 2d 173, 177 (D.D.C. 2003), *relying on Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 n. 2 (D.C.Cir. 1999) (a defamation complaint "must allege the elements of the cause of action; the Federal Rules of Civil Procedure impose no special pleading requirements for defamation as they do for a specified list of other matters. *See, e.g.*, FED. R. CIV. P. 9.").

[67] *See Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) (holding that a plaintiff's allegation that a nongovernmental organization's report could be read to conclude that the plaintiff was in an active alliance with Slobodan Milosevic and his regime made out a *prima facie* case of defamation); *see also Eppley v. Iacovelli*, 2010 WL 3282574, *6 (S.D. Ind. Aug 17, 2010) (finding that defendant's defamatory postings on the internet constituted "publication" for purposes of a defamation claim).

To establish defamation for libel in the District of Columbia, Plaintiffs must show: "(1) that the defendant made a false and defamatory statement concerning plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law or caused the plaintiff special harm."[68]  A statement is defamatory if it tends to injure a plaintiff in his trade, profession, or community standing, or lowers him in the estimation of his community.[69]  "Whether a statement is capable of defamatory meaning is a question of law."[70]  However, if a statement is capable of defamatory meaning, whether it is defamatory or false is for the jury.[71]  A defamatory statement "must be more than unpleasant or offensive," but rather, must be "odious, infamous, or ridiculous."  *Klayman*, 783 A.2d at 613.

Unless a publication constitutes libel *per se*, the plaintiff has the burden of proving the defamatory nature of a libelous publication.[72]  Establishing that a statement constitutes libel *per se* also serves as an exception to the general rule that libel is not actionable unless actual damages are demonstrated.[73]  "Libel *per se* requires the actual imputation of a criminal offense."[74]  In determining if a statement constitutes libel *per se*, a court should ask "whether, from the language attributed to the defendant, there is something from which the commission of a crime involving moral turpitude can be inferred."[75]

---

[68] *El-Hadad v. Embassy of United Arab Emirates*, 2006 WL 826098, *14 (D.D.C. March 29, 2006); *rev'd on other grounds by El-Hadad v. United Arab Emirates*, 496 F.3d 658 (D.C. Cir. 2007).
[69] *Id.* (citing *Olinger v. Am. Sv. & Loan Ass'n*, 409 F.2d 142, 144 (D.C. Cir. 1969)).
[70] *Weyrich v. The New Republic*, 235 F.3d 617, 627 (D.C. Cir. 2001).
[71] *Benic v. Reuters America, Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004) (Leon, J.).
[72] *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 40 (D.D.C. 2005) (Friedman, J.).
[73] *Washburn v. Lavoie*, 357 F. Supp. 2d 210, 214 (D.D.C. 2004) (Leon, J.).
[74] *Bannum, Inc.*, 383 F. Supp. 2d at 40.
[75] *Id.* (citation omitted).

Plaintiffs allege that Defendants published or had others publish: (1) a series of false red notices (noted above); (2) a December 18, 2008, article on the Kazakh Embassy website stating falsely that Issam Hourani was an active member of Hamas and imported workers into Kazakhstan that had connections to different terrorist groups; (3) a February 18, 2009, article on the same website stating falsely that Issam Hourani was a supporter of Hamas; (4) the Aliyev Dossier published by the ETG falsely stating the same allegations that Issam Hourani imported workers with ties to terror groups into Kazakhstan; (5) a February 9, 2009, article on the website for *Forbes* magazine stating that Issam Hourani has ties to Hamas; and (6) a December 8, 2008, *Eurasian Secret Services Daily Review* article posted on a website making the same false statement.  *See* Complaint ¶¶ 115, 119, 122, 150-155.

Each of these allegations is defamation or libel per se because they impute criminal offenses—indeed, grave offenses such as accessory to murder and the funding and support of terrorist organizations—to Issam Hourani.[76]  Moreover, each of these statements was "published" through the distribution of reports and the posting of the defamatory remarks on the internet.  *See* Complaint ¶¶ 115, 119, 122, 150-155.  To the extent that Defendants challenge the defamatory character of these statements, that issue is one for a jury, not one that should be decided on a motion to dismiss, because each is at least capable of defamatory meaning.[77]

 Importantly, Plaintiffs allege that Defendants were responsible for the publication of these statements.  Specifically, Defendants formulated the Superkhan plan, a significant part of which explains the importance of discrediting Oligarchs and FIGs by disseminating damaging allegations—including accusations of "heinous crimes"—about them on the internet, Western

---

[76] *Bannum, Inc.*, 383 F. Supp. 2d at 40.
[77] *Benic*, 357 F. Supp. 2d at 221.

Media, and through foreign law enforcement agencies.  Complaint ¶¶ 45-48, 52-54; Ex. 1.

Further, around the same time, Kazakhstan instructed Mirtchev and GlobalOptions Management,

in a memorandum attaching a copy of the plan, to work with the Kazakh Embassy in Washington

to "*spread*" negative and discrediting information about the Houranis to NGOs such as the ETG

and to the mass media.  *See* Complaint ¶¶ 143-147.  Within weeks of receiving these

instructions, Defendants published or had others publish these defamatory remarks both on the

Kazakh Embassy website, in accordance with the instructions provided to them, and through the

dissemination of the same remarks to the mass media and NGOs.  *Id.* ¶¶ 149-155.  Further,

Mirtchev had direct email contact with the NGO that published defamatory remarks accusing

Issam Hourani of supporting terror and importing terrorists into Kazakhstan.  Complaint ¶ 153-

155.  Similarly, it was within this time frame that a number of INTERPOL Red Bulletins and

notices were issued falsely accusing Issam Hourani of crimes.  *Id.* ¶¶ 115, 119, 122.

The GlobalOptions Defendants assert that Plaintiffs have not demonstrated that the

defamatory statements made about them are false.  *See* GlobalOptions MTD at 16.  As stated

above, this Court is to assume that the statements made are false.  *Klayman*, 783 A.2d at 614.

Moreover, though truth is a defense to defamation, the Defendants carry the burden of

establishing this defense.[78]  Plaintiffs have, in fact, alleged the falsity of the defamatory

statements about Issam Hourani.  *See* Complaint ¶¶ 119, 199-202.

### 2.    Plaintiffs alleged sufficient facts to establish a claim for false light invasion of privacy.

Plaintiffs' Complaint alleged sufficient facts to establish a claim for false light invasion

of privacy.  To present such a claim, a plaintiff must show: (1) publicity; (2) of a false statement,

---

[78] *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 638 F.Supp. 1149, 1153 n.7 (D.D.C. 1986).

representation, or imputation; (3) which is understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be highly offensive to the reasonable person. *Klayman*, 783 A.2d at 613-614. "The false light invasion of privacy action differs from an action for defamation because a defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having been exposed to public view."[79]

As shown above, Plaintiffs' Complaint presents compelling facts to demonstrate that Defendants publicized or had others publicize, through the internet and other published reports, false statements that Issam Hourani engaged in criminal and terrorist conduct in a manner that would offend any reasonable person. *See* Complaint ¶¶ 115, 119, 122, 150-155. Clearly, the imputation of terrorist conduct is offensive to the reasonable person. Moreover, the Complaint states specifically that Issam Hourani has "suffered acute mental distress" as a result of the publication of these false statements. *Id.* ¶ 210. Accordingly, Plaintiffs alleged sufficient facts to state a plausible claim for false light invasion of privacy.

### C.   Plaintiffs' Complaint Alleges Sufficient Facts to Support A Claim for Conversion.

The Complaint alleges that Mirtchev not only formulated a plan for the taking of Plaintiffs' various holdings, but that he also received those assets as a director of the Samruk-Kazyna fund and as an agent of Kazakhstan, thus, Plaintiffs allege a claim for conversion.[80] To establish a claim for conversion under District of Columbia law, a defendant must exercise "ownership, dominion, or control over the personal property in denial or repudiation of his rights thereto." *Ca De Lupis v. Bonino*, 2010 WL 1328813, *7 (D.D.C. March 17, 2010) (Walton, J.) (citations omitted). There must be a dispossession of property rights in order for a claim of

---

[79] *Washburn*, 437 F.3d at 88 n.3.
[80] Plaintiffs are bringing the conversion claim only against Defendant Mirtchev, because he sits on the Board of the Kazakh sovereign wealth fund which ultimately took over Plaintiffs' assets.

conversion to be successful.  *Id.* (citation omitted).  Further, this dispossession or interference with the property must be so serious that the defendant is justifiably required to pay the plaintiff for the full value of the property.  *Id.* at *8 (citation omitted).  A plaintiff "need only aver title or ownership in himself to support a cause of action for conversion."  *Id.* at *7 (citation omitted).

The Mirtchev Defendants argue that Plaintiffs' conversion claim fails under District of Columbia law because it relates to intangible property, i.e., their "business interest" in their various companies.  This argument suffers from a mistaken reading of both the law and the Complaint.  Plaintiffs bring this claim for: (1) the forced transfer of their shares in KTK Television and Alma Media in July 2007; and (2) the expropriation of Devincci Hourani's ownership interest in Caratube in February 2008 and beyond.  Plaintiffs can bring these claims because those ownership interests are merged with documents such as stock certificates.

While the traditional rule is that conversion only lies for the taking of tangible property, the Court of Appeals for the District of Columbia long ago recognized that this rule has been relaxed.  In *Pearson v. Dodd*, 410 F.2d 701, 707-708 n.34 (D.C. Cir. 1969), the Court of Appeals stated that this traditional rule was "overly restrictive" and had been "relaxed in favor of the reasonable proposition that any intangible generally protected as personal property may be the subject matter of a suit for conversion."  Part of this relaxation is the recognition that conversion may lie as to the type of intangible rights customarily "merged in, or identified with some document" such a stock certificates.[81]  Where a plaintiff alleges that their rights, as embodied in a document, have been converted, they are "allowed to recover not only the value of the converted document, which usually is slight … but also the full value of the intangible rights

---

[81] *The Equity Group Ltd. v. Painewebber Inc.*, 48 F.3d 1285, 1286 (D.C. Cir. 1995); *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 512 (D.C. Cir. 2009) (intentional trespass to chattels context).

identified with it[.]"[82]  So while this jurisdiction does not recognize conversion claims based on intangibles such as management expertise, business systems, and the like, those less-concrete interests are clearly not the basis of Plaintiffs' conversion claim.[83]

Moreover, Plaintiffs' Complaint alleges that Mirtchev, in his role as a director of Samruk-Kaznya and as part of the Superkhan plan he designed, converted their interests, and indeed, their shares, in their various companies.  In July 2007 and February 2008, the Republic of Kazakhstan, as assisted and aided by Mirtchev, took unlawful ownership, dominion, and control over their shares in KTK Television, Alma Media, and Caratube.  Complaint ¶¶ 126-129, 131-142, 169-176.  Plaintiffs allege that the conversion of these interests was undertaken pursuant to the Superkhan plan, an allegation supported by the various memorandum described in the Complaint showing that the Houranis and their assets were specifically targeted as a means of obtaining retribution against Rakhat Aliyev and to assist in consolidating power in President Nazarbayev and thus, the Kazakh State.

The November 16, 2007, Daulbayev Memorandum to Ambassador Idrissov shows that Nazarbayev instructed Mirtchev and GlobalOptions Management to work with Kazakh Embassy personnel to target the Houranis and their assets, and that Nazarbayev requested that Idrissov and Mirtchev carry out their duties pursuant to the Superkhan memorandum prepared by Mirtchev and GlobalOptions Management.  These instructions memorialize orders that Mirtchev and others had already started to carry out in July 2007.  Complaint ¶¶ 143-147.  The March 15, 2010, Daulbayev Memorandum demonstrates further that the unlawful control of Plaintiffs' assets was carried out pursuant to the Superkhan plan.  *Id.* ¶¶ 132-133.  Specifically, the

---

[82] RESTATEMENT (SECOND) OF TORTS § 242, Comment a.
[83] *Primedical, Inc. v. Allied Investment Corp.*, 1994 WL 149139, at *7 (D.D.C. March 31, 1994) (Johnson, J.); *The Equity Group*, 48 F.3d at 1286.

memorandum recounts Kazakh efforts to investigate the Houranis and confiscate their assets so as to cut off funding to Rakhat Aliyev and any independent media outlets in Kazakhstan.  *Id.* ¶¶ 131-139.  Additionally, a task force had confiscated over $500 million in "movable and immovable property" belonging to the Houranis and their companies and that the "[c]onfiscated property of [Caratube] and licenses for the right to exploit oil and gas fields … were transferred to" KazMunaiGaz, a wholly-owned company of Samruk-Kaznya.  *Id.* ¶¶ 135-136; Ex. 12.

Plaintiffs' Complaint describes these memoranda as the implementation of the roadmap created by Mirtchev in taking their ownership interests and shares in KTK Television and Alma Media and the effective conversion of Devincci Hourani's 92% interest in Caratube through the cancellation of its contract and the absorption of its assets—which sprang from his investment— into a state-owned oil company.  Mirtchev, as a director of Samruk-Kaznya, exercised unlawful dominion or control over those interests.  In that role, Mirtchev presided over the KazMunaiGaz oil and gas company that absorbed Devincci Hourani's interest in Caratube.  Complaint ¶¶ 136-141; Ex. 12.  Further, Mirtchev, through his alternate name "Anton Nikolov," was employed directly by KazMunaiGaz, drawing a salary since 2007.  *Id.* ¶ 137.  Mirtchev received compensation from the proceeds of the expropriation of the Hourani's assets.  *Id.* ¶ 141.  Finally, pursuant to the Superkhan plan, Mirtchev, in his role as an advisor to the Government, exercised control over KTK Television and Alma Media, after their absorption into the First Presidential Fund, as part of the plan's stated goal to centralize control of the media in the Government.  *Id.* ¶¶ 126, 169-176.  Accordingly, Plaintiffs' Complaint makes out a claim for conversion against Mr. Mirtchev.

**D.     Plaintiffs' Complaint Alleges Sufficient Facts to Support Claims for Tortious Interference with Contract and Business Advantage.**

**1.     The Complaint pleads tortious interference with contract.**

Plaintiffs' Complaint alleges facts sufficient to state a claim for tortious interference with contract.  To do so, a plaintiff must plead:  "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach."[84]  With respect to the third element, plaintiffs need not plead the existence of a breach *per se*, but can also allege facts that a third party unlawfully caused a party to a contract to cancel or not perform their obligations under the contract.[85]  Further, the breach or cancelation must have been intentionally procured.[86]  "[A] general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability."[87]

Plaintiffs' Complaint sets forth the existence of a contract between Plaintiff Devincci Hourani's Caratube International Oil Company and The Republic of Kazakhstan's MEMR for an oil concession.  *See* Complaint ¶¶ 103, 129, 179.  Further, Alexander Mirtchev, and, thus, the Defendants, knew of that contract because of Mirtchev's position as an advisor to the Kazakh Government, a director of the Samruk-Kaznya sovereign wealth fund, and through working with the task force dedicated to investigating and punishing Rakhat Aliyev and his associates.  *See* Complaint ¶¶ 135-140, 143-147, 180-181.  More specifically, Mirtchev advised President Nazarbayev on how to respond to the rift with Rakhat Aliyev, and was aware as early as November 16, 2007, that the Houranis and their business interests—including Caratube—were to be neutralized as instructed in the Daulbayev memorandum of that date and the Superkhan

---

[84] *Casco Marina Development, L.L.C. v. District of Columbia Redevelopment Land Agency*, 834 A.2d 77, 83 (D.C. 2003).
[85] *Id.* at 83-84.
[86] *Bennett Enter., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995).
[87] *Id.*

Memorandum outlining steps to be taken against certain FIGs and Oligarchs.  *Id.* ¶¶ 129, 136, 180-181.  In fact, the deliberate breach of the Caratube contract by MEMR was based on a series of prextextual allegations of noncompliance that mirror the guidelines set forth in the Superkhan Memorandum on how to wrest assets from Oligarchs and FIGS through the use of "legitimate" pretext.  The Memorandum specifically names Rakhat Aliyev and his financial and industrial group as a target.  *Id.* ¶¶ 50-52, 129.

Plaintiffs also allege that Mirtchev, in his role as advisor to Kazakhstan and director of Samruk-Kaznya, counseled Kazakhstan unlawfully to cancel (i.e., breach) the Caratube contract on the basis of those pretextual allegations of noncompliance as a means of neutralizing the Houranis as rivals and enriching President Nazarbayev through the absorption of Caratube's assets into a company owned by Samruk-Kaznya.  *Id.* ¶¶ 52, 103, 129, 134, 136, 138-140, 181.  Finally, Plaintiff Devincci Hourani suffered massive financial damages through, *inter alia*, the intentional breach of the Caratube contract.  Mr. Hourani had invested millions in the company and was on the verge of producing an enormous return.  In effect, the entirety of the company was stripped away, reduced to a shell.  *Id.* ¶¶ 103, 129, 134-135, 182.  These facts, as pled in the Complaint, establish a valid claim for tortious interference with contract.[88]

>    **2.**   **The Complaint adequately states a claim for tortious interference with business advantage.**

Plaintiffs' Complaint alleged sufficient facts to establish that they were entitled to relief on their claim of tortious interference with business advantage.  To establish that claim, they must show:  (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing

---

[88] *Casco Marina Development, L.L.C.*, 834 A.2d at 83.

or causing a breach or termination of the relationship or expectancy; and (4) resultant damage.[89] A plaintiff may show an interferer's knowledge of a business relationship through allegations concerning the interferer's conduct or spiteful or threatening words.[90]  Resultant damages reasonably flow from the intentional interference of a business relationship.[91]

Plaintiffs allege the existence of three separate business relationships or expectancies: their joint interest in Pharma Industry Corporation; Issam Hourani's 50% interest in Alma Media; and Devincci Hourani's 34% interest in KTK Television.[92]  Further, as outlined above, Defendants knew about these business relationships.[93]  Also, Defendants formulated a plan to coerce Devincci Hourani to sign over his and his brother's shares in Alma Media and KTK Television and driving Pharma Industry into unnecessary bankruptcy, thus establishing that Defendants interfered with the three relationships named above.[94]  They also assisted in the implementation of that plan.[95]  Damages flowed from this interference in that Plaintiffs no longer realized the profits that they derived from their shares in these particular companies and they lost the benefit of their investments in them.[96]

### E.    Plaintiffs' Complaint Alleges Sufficient Facts to Support their Civil Conspiracy Claim.

Notwithstanding Defendants' reliance on inapplicable case law interpreting the Sherman Act, Plaintiffs' Complaint states cognizable claims that Defendants committed several torts against them as part of a civil conspiracy.  To demonstrate a cause of action for civil conspiracy,

---

[89] *Bennett Enter., Inc., Inc.*, 45 F.3d at 499.
[90] *National R.R. Passenger Corp. v. Veolia Transp. Services, Inc.*, 592 F. Supp. 2d 86, 98-99 (D.D.C. 2009) (Walton, J.).
[91] *Id.* at 100.
[92] Complaint ¶¶ 99, 104, 105, 186-192.
[93] *National R.R. Passenger Corp.*, 592 F. Supp. 2d at 98-99; Complaint ¶¶ 52, 103, 129, 133-134, 136, 138-140, 143-147, 181.
[94] Complaint ¶¶ 46-52, 126, 128, 186-192.
[95] *Id.*
[96] *National R.R. Passenger Corp.*, 592 F.Supp.2d at 98-99; Complaint ¶¶ 126, 128, 186-192.

a plaintiff must show:  "(1) an agreement between two or more persons; (2) to participate in an

unlawful act, or in a lawful act in an unlawful manner, and (3) an injury caused by an unlawful

overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of,

the common scheme."[97]  As this Court has acknowledged, "civil conspiracy depends on the

performance of some underlying tortious act.  It is thus not an independent action; it is, rather, a

means for establishing vicarious liability for the underlying tort."[98]  A conspiracy claim spreads

liability for a tort claim to all members of the conspiracy, irrespective whether they actually

committed the underlying tortious act.  *Ca de Lupis*, 2010 WL 1328813 at *10.

To demonstrate the agreement element, there must be a "single plan, the essential nature

and general scope of which [were] known to each person who is to be held responsible for its

consequences."  *Id.* at *9 (citation omitted).  However, though the conspirators must share the

general conspiratorial objective, they do not need to know all of the details of the plan or even

possess the same motives.  *Id.* (citation omitted).  The "overt act" requirement of a conspiracy

claim is satisfied where an injury caused by the unlawful overt act is performed by *one* of the

parties to the agreement, pursuant and in furtherance of the common scheme.  *Id.* (citation

omitted) (emphasis in original).  With regards to the defamation claim, Plaintiffs must provide

specific evidence of a joint purpose to defame, rather than proof of separate and distinct

improper purposes by each co-conspirator.[99]

As an initial matter, the Mirtchev Defendants improperly rely on the Supreme Court's

decision in *Twombly* to argue that Plaintiffs failed to meet the pleading requirements for their

civil conspiracy claim.  Mirtchev MTD at 16.  *Twombly* dealt with a conspiracy in restraint of

---

[97] *Riggs v. Home Builders Institute*, 203 F. Supp. 2d 1, 25 (D.D.C. 2002) (Hogan, J.).
[98] *Id.*
[99] *Dowd v. Calabrese*, 589 F.Supp. 1206, 1213-14 (D.D.C. 1984).

trade under the Sherman Act, not a civil conspiracy alleging underlying tortious conduct like that pled by Plaintiffs. *Twombly*, 550 U.S. at 564-566.   Accordingly, Defendants' naked assertion that they may have engaged in nothing more than parallel conduct is inapplicable to an analysis of the adequacy of Plaintiffs' conspiracy claim.   Mirtchev MTD at 16.

Here, Plaintiffs have pled a civil conspiracy claim based on the underlying torts of defamation, libel, false light invasion of privacy, conversion, and tortious interference. Mirtchev, GlobalOptions Inc., Krull Corporation, GlobalOptions Management, Inc., Kaloyan Dimitrov, Dariga Nazarbayev, President Nazarbayev, and other members of the Kazakh Government, as part of the Superkhan plan and in retribution for the actions of Rakhat Aliyev, entered into an agreement to undertake those tortious acts.   They did so after the Defendants' engagement by Kazakhstan to assist in dealing with the Kazakhgate crisis and before October 2007 when Mirtchev and the Defendants presented the Superkhan memorandum and proposal to President Nazarbayev.[100]   Second, Mirtchev and the Corporate Defendants formulated the Superkhan plan for President Nazarbayev in 2007 and then continued in their roles as advisors to assist in the implementation of this plan to the detriment of Plaintiffs.[101]   Third, various memoranda explain how Mirtchev and GlobalOptions Management worked with the KNB Task Force that both stripped Plaintiffs of their business interests and published negative and libelous information about Issam Hourani.[102]   These allegations demonstrate a "single plan"—the objectives of which were known to Defendants and their co-conspirators—to neutralize the Houranis as "Oligarchs" in accordance with the Superkhan plan.   *Ca de Lupis*, 2010 WL 1328813 at *9.

---

[100] Complaint ¶¶ 34-35, 43-55.
[101] *Id.* ¶¶ 44-57, 131-147, 160-167.
[102] *Id.* ¶¶ 131-147.

Further, the November 16, 2007, Daulbayev Memorandum demonstrates affirmatively that Defendants had a joint purpose to discredit and defame Issam Hourani through the publication of false allegations of criminal and terrorist conduct[103] and that the members of this conspiracy engaged in number of overt acts.[104]  Plaintiffs suffered millions of dollars in pecuniary losses and, in the case of Issam Hourani, incurred reputational injuries as well.[105] Finally, these tortious actions, and the injuries that resulted, were in furtherance of the conspiracy and its objectives, namely, carrying out the Superkhan plan and enacting retribution against Rakhat Aliyev's associates and family because of his decision to run for President in 2012.[106]

## VIII.  Plaintiffs' Complaint States Claims for Civil Violations of the Racketeer Influenced and Corrupt Organizations Act.

Plaintiffs' Complaint asserts viable causes of action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Also, despite Defendants' red herring arguments to the contrary, this Court need not apply RICO in an extraterritorial manner.

Under RICO's civil provisions, if a defendant engages in a "pattern" of racketeering activity, or receives certain benefits from such activity, and if the plaintiff's business or property interests are harmed "by reason of a violation" of § 1962, then the plaintiff may sue the defendant "in any appropriate United States district court."  18 U.S.C. § 1964(c).

RICO proscribes a number of types of conduct:
>(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, *to use or invest,*

---

[103] *Dowd*, 589 F.Supp. at 1213-14; Complaint ¶¶ 143-155.
[104] Complaint ¶¶ 44-57, 63-92, 160-167.
[105] *Id.* ¶¶ 107, 126, 128, 129, 149-155, 166-167, 170-175, 182, 188, 191, 202, 210.
[106] *Id.* ¶¶ 13-15, 30, 33, 43, 44-55, 107-129, 131-156.

69

> *directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.* A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
>
> …
>
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs* through a pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to *conspire* to violate any of the provisions of subsection (a), (b), or (c) of this section.

*Id.* § 1962 (emphasis added).  Plaintiffs allege violations of each of these subsections of § 1962.

The Mirtchev Defendants alone argue that the events described in Plaintiff's Complaint "are only peripherally connected to the United States" and that RICO does not apply extraterritorially.  Mirtchev MTD at 21-22.  Both Defendants argue that Plaintiffs have not adequately alleged a "pattern" of racketeering activity or the existence of a RICO "enterprise." *Id.* at 27-29; GlobalOptions MTD at 19-23.  Defendants argue additionally that Plaintiffs have failed to allege that they suffered any harm as a result of Defendants' alleged racketeering activity.  Mirtchev MTD at 29-30; GlobalOptions MTD at 23-24.  Both Defendants argue that Plaintiffs have not adequately pleaded a RICO conspiracy.  Mirtchev MTD at 31; GlobalOptions

MTD at 24-25.  Finally, the GlobalOptions Defendants argue alone that Plaintiffs lack standing

to sue under the Act.  GlobalOptions MTD at 18-19.  Each of these arguments falls short.

### A.  Plaintiffs Suffered Direct and Serious Personal Harm as a Result of Defendants' Racketeering Activities.[107]

Plaintiffs clearly have standing to bring claims under RICO.  For a civil plaintiff to have

standing, he must allege an injury to his "business or property by reason of" a violation.  *Sedima,*

*S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985).  "[A] plaintiff must show that it 'was injured by

reason of predicate acts which were directed at him, as opposed to others.'"[108]  However, RICO

"requires no more than this."  *Id.*  So long as a plaintiff has alleged all of the elements of the

violation in question, then "the compensable injury necessarily is the harm caused by predicate

acts sufficiently related to constitute a pattern, for the essence of the violation is the commission

of those acts in connection with the conduct of an enterprise."  *Id.*  Furthermore, the Supreme

Court has made clear that "RICO is to be read broadly."  *Id.* at 497.  Congress, too, has stated

that "RICO is to 'be liberally construed to effectuate its remedial purposes.'"  *Id.* at 498 (quoting

Pub. L. 91-452, § 904(a), 84 Stat. 947).

Plaintiffs' Complaint alleges each element required to establish standing under RICO.

Plaintiffs bring their claims for injuries they suffered personally, not for injuries suffered by the

corporations that they held ownership interests in, as alleged by Defendants.  *See* Complaint

¶¶ 9-11, 94-109, 116-29.  "The RICO pattern of acts proximately cause a plaintiff's injury if they

are a substantial factor in the sequence of responsible causation, and if the injury is reasonably

foreseeable or anticipated as a natural consequence."[109]  Here, Defendants' acts were a

"substantial factor in the sequence of responsible causation" that allowed Kazakhstan to

---

[107] Plaintiffs address their standing to bring their common law claims below.
[108] *Comm. to Defend U.S. Constitution v. Moon*, 776 F. Supp. 568, 571 (D.D.C. 1991) (citation omitted).
[109] *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 140 (D.D.C. 2008).

appropriate Plaintiffs' assets and destroy their reputations.[110]  Furthermore, Plaintiffs' injuries were not only "reasonably foreseeable or anticipated as a natural consequence" of Defendants' actions:  inflicting these specific injuries upon Plaintiffs was the very task that Kazakhstan hired Defendants to perform.[111]  *See* Complaint ¶¶ 11, 15, 44-62, 81-83, 108-109.  Moreover, Defendants *specifically targeted* Plaintiffs for politically-motivated retribution and the expropriation of their business interests; any damage done to their companies was ancillary to the harms intended for Plaintiffs personally.  *Id.*  Thus, Defendants' arguments that Plaintiffs are raising claims for injuries suffered by companies stem from their misreading of the Complaint.

### B.      GlobalOptions Defendants' Extraterritoriality Argument Is Off the Mark.

In arguing that it would require an extraterritorial application of RICO, GlobalOptions misapprehends the nature of this case.  As discussed *supra*, this case centers on the behavior of commercial agents based in the District of Columbia who performed a great deal of their tortious actions in that jurisdiction, and thereby damaged the reputations and livelihoods of Plaintiffs. *See* Complaint ¶¶ 14-17, 44-68, 150-51.  Accordingly, this Court need not apply RICO extraterritorially.

The RICO statute is silent as to its extraterritorial effects.  The Supreme Court recently stated that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison v. National Australia Bank*, __ U.S. __, 130 S. Ct. 2869, 2878 (2010). However, *Morrison*'s scope was limited to the Securities Exchange Act of 1934; the Court did not discuss the extraterritoriality of RICO or other statutes.  *See id.* at 2875.  In the wake of *Morrison*, the Second Circuit held in *Norex Petroleum Ltd. v. Access Indus.*, 2010 WL 4968691

---

[110] *Id.*
[111] *Id.*

72

(2d Cir. Sept. 28, 2010), that RICO does not have extraterritorial effect and that, further, "simply alleging that some domestic conduct occurred cannot support a claim of domestic application." *Id.* at *3. The "slim contacts" between the defendants and the United States were "insufficient to support extraterritorial application of the RICO statute." *Id.*

Here, however, the parties' contacts with the United States are anything but "slim." The Corporate Defendants are based here, Complaint ¶¶ 3, 15-17, and Mr. Mirtchev is a naturalized U.S. citizen, *id.* ¶¶ 3, 12. Furthermore, one of the Plaintiffs is also a U.S. citizen. *Id.* ¶ 2. In addition, the dispute at the heart of this case involves assets stolen from Plaintiffs by the Kazakh Government, with the assistance of Defendants, and transferred eventually from Kazakh banks to banks in the United States, including Citibank and BB&T accounts in Washington, D.C. Facts ¶¶ 2-5, 14-15, 25. More directly, Defendants planned their activity here and worked with the Kazakh Embassy in D.C. to publish defamatory material about Plaintiffs in this very jurisdiction—and presumably continued their involvement from their Washington, D.C., offices. Facts ¶¶ 21-29. In *Norex*, by contrast, the defendants' U.S. contacts were minimal.

Moreover, and quite apart from the location of the conduct, in *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1130 (D.C. Cir. 2009), the D.C. Circuit found that RICO jurisdiction exists when a defendant's foreign conduct has "substantial domestic effects."

> Because conduct with substantial domestic effects implicates a state's legitimate interest in protecting its citizens within its borders, Congress's regulation of foreign conduct meeting this "effects" test is "*not* an *extraterritorial* assertion of jurisdiction." … Thus, when a statute is applied to conduct meeting the effects test, the presumption against extraterritoriality does not apply.

*Id.* (emphasis in original) (citations omitted). *Philip Morris* remains good law and binding precedent within the D.C. Circuit. In this case, Plaintiffs have put forward numerous examples of the substantial domestic effects of Defendants' racketeering activities. Defendants'

actions caused enormous damage to the reputations and livelihoods of Plaintiffs, one of whom is a U.S. citizen and lives in Virginia (Complaint ¶¶ 9-11, 14-15, 46-62, 94-107, 143-156, 157-231); enabled vast sums of money, including money stolen from Plaintiffs, to flow from Kazakhstan into U.S. bank accounts controlled by Mirtchev for purposes of money laundering (*id.* ¶¶ 15, 30, 76, 84-93, 140); and enriched Defendants, all U.S. citizens or U.S. companies with headquarters in the District of Columbia (*id.* ¶¶ 3, 12-17, 66-68, 141, 222).  Thus, Kazakhstan's foreign conduct—aided and abetted by Defendants' domestic conduct—resulted in "substantial domestic effects."  *Philip Morris*, 566 F.3d at 1130.  Therefore, Defendants' extraterritoriality argument fails.

### C.      Defendants Have Engaged in a Clear Pattern of Racketeering Activities.

The Complaint sufficiently alleges that Defendants violated 18 U.S.C. § 1962(a) and (c), both of which involve "patterns" of racketeering activity.  Subsection (a) requires that a defendant receive "income derived, directly or indirectly, from a pattern of racketeering activity" and that this income or its proceeds allowed the defendant to acquire an interest in "any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).  Subsection (c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  *Id.* § 1962(a). As summarized by the D.C. Circuit, this subsection of RICO requires a plaintiff to establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."[112]

---

[112] *Pyramid Sec. Ltd. v. 1B Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C. Cir. 1991).

RICO defines a "pattern of racketeering activity"[113] as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). This subsection of RICO "thus places an outer limit on the concept of a pattern of racketeering activity that is broad indeed."[114] However, the Supreme Court has read into the statute additional requirements: "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff … must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."[115] "If the alleged predicate criminal activity has ended, … a pattern may still be shown, but the Court must consider such factors as 1) the number of unlawful acts; 2) the length of time over which the acts were committed; 3) the similarity of the acts; 4) the number of victims; 5) the number of perpetrators; and 6) the character of the unlawful activity."[116]

To satisfy RICO's "pattern" requirement, a defendant's racketeering need *not* be connected to multiple criminal schemes. "[D]epending on the specific circumstances a single scheme may suffice …."[117] As the Supreme Court has made clear, "although proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to

---

[113] "Racketeering activity," is defined in § 1961(1) by way of example. Racketeering activities include, *inter alia*, "any act or threat involving … robbery, bribery, extortion," "any act which is indictable … under [18 U.S.C. § 1028] (relating to fraud in connection with identification documents), … section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), … section 1542 (relating to false statements in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), … section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), … section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity)," and violations of the Currency and Foreign Transactions Reporting Act. 18 U.S.C. § 1961(1).
[114] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989).
[115] *Id.* at 239 (emphasis in original).
[116] *Ganzi v. Washington-Baltimore Reg'l 2012 Coal.*, 98 F. Supp. 2d 54, 57 (D.D.C. 2000).
[117] *W. Associates Ltd. P'ship, ex rel. Ave. Associates Ltd. P'ship v. Mkt. Square Associates*, 235 F.3d 629, 634 (D.C. Cir. 2001).

the inquiry into the continuity of the defendant's racketeering activity, it is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes."[118]

### 1.     Defendants committed the necessary predicate acts.

Plaintiffs have alleged sufficient "predicate acts."  For example, Plaintiffs allege that Mirtchev uses a diplomatic passport bearing the false name of Anton G. Nikolov, a Kazakh National Security Committee security officer, so that no immigration logs in the United States will connect Mirtchev to Kazakhstan.  Complaint ¶¶ 64-65.  One of the categories of "racketeering activity" listed in 18 U.S.C. § 1961(1) is "misuse of a passport."  The definition of this crime includes "willfully and knowingly us[ing], or attempt[ing] to use, any passport issued or designed for the use of another."  18 U.S.C. § 1544.  As detailed in the Complaint, Mirtchev knowingly has used a "cover" diplomatic passport bearing the name of a Kazakh Government official—a "passport issued … for the use of another."  *Id.*  This passport enables Mirtchev to assist President Nazarbayev in the campaign to defame and steal from Plaintiffs.  Thus, Mirtchev has engaged in "racketeering activity" through his misuse of a passport.

Defendants' actions also qualify as "racketeering activities" under RICO because they interfered with commerce by conspiring to commit robbery and extortion.  Interference with commerce is one of the "racketeering activities" proscribed by RICO.  *See* 18 U.S.C. § 1961(1). Interference with commerce is defined in 18 U.S.C. § 1951:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, … shall be fined under this title or imprisoned not more than twenty years, or both.

---

[118] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989).

18 U.S.C. § 1951(a).  The statute defines "commerce" broadly to include, *inter alia*, all commerce within the District of Columbia or any state, and "all commerce between any point in a State … or the District of Columbia and any point outside thereof."  *Id.* § 1951(b)(3).  As detailed in the Complaint, Plaintiff Devincci Hourani is a U.S. citizen who resides in Virginia. Complaint ¶¶ 2, 6.  He engages in commerce in the United States and abroad, and he and his brother own businesses abroad, including in Kazakhstan.  *Id.* ¶¶ 6-7.

Section 1951 defines "robbery" as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining."  *Id.* § 1951(b)(1).  As detailed in the Complaint, Defendants conspired with Kazakhstan to formulate a plan for the expropriation of Plaintiffs' assets, and Kazakhstan carried out this plan with the aid of Defendants.  *See* Complaint ¶¶ 11, 15, 44-156.  Specifically, Plaintiffs allege that Kazakhstan, acting on the plan set forth by Defendants, confiscated all Plaintiffs' personal assets through the use of harassment, intimidation, and "physical violence, threats, and the initiation of spurious criminal … investigations."  Complaint ¶¶ 109, 113-126.  Further, the Government stole the Houranis' personal assets including, *inter alia*, cars, villas, office buildings, and apartments.  Complaint ¶¶ 131-142; Ex. 12.  These efforts were often undertaken by armed government officials. Complaint ¶¶ 121, 123; *see also* Decl. D. Hourani ¶ 10 (describing an armed raid of his family home).  Finally, Plaintiffs allege that Defendants facilitated these efforts, which were part of the larger Superkhan project.  Complaint ¶¶ 131-133

Similarly, section 1951 defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  As explained more fully in the Complaint—and as detailed in the Superkhan Memorandum prepared for President Nazarbayev by Defendants (Ex. 1)—Defendants helped Kazakh officials formulate a plan to expropriate Plaintiffs' property through official government action and "under color of official right." Complaint ¶¶ 44-62, 94-156.  These efforts were accompanied by a clear pattern of terror, threats, and intimidation—including threat of even greater harm if Plaintiffs did not succumb. *Id.* ¶¶ 9, 14, 108-56.  For instance, Issam Hourani was subjected to various threats shortly after the falling out between Aliyev and Nazarbayev.  *Id.* ¶¶ 114.  Further, Plaintiffs and their various businesses were investigated on the thinnest of pretextual criminal and civil charges and they and their employees were subjected to constant government harassment, raids, and even 24-hour monitoring.  *Id.* ¶¶ 113-130.  The denouement of this campaign of harassment came when Dariga Nazarbayeva told Devincci Hourani that unless he signed over his family's interests in KTK Television and Alma Media to a Kazakh sovereign wealth fund, his entire family would continue to face persecution and "that the government would take more drastic actions."  *Id.*  In response to this threat, Devincci Hourani relented, signed over the shares, and later fled Kazakhstan in fear for his life.  *Id.* ¶¶ 126, 130; Decl. D. Hourani ¶¶ 9-11.

These allegations qualify as "the obtaining of property from another with his consent, induced by wrongful use of actual or threatened force … under color of official right." § 1951(b)(2).  Importantly, the Complaint states that "Mirtchev and the Corporate Defendants assisted" the Government in determining that these steps should be taken and facilitated these acts.  Complaint  ¶¶ 108, 131-132.

Further, Mirtchev and Krull have worked with several organizations and information technology firms to publish false and unflattering information about Issam Hourani, including libelous claims that he is a member or supporter of Hezbollah, Hamas, Al Qaeda, and the Muslim Brotherhood.  Complaint ¶ 83.  Defendants also worked with Kazakhstan to send out INTERPOL notices that described Plaintiffs as criminals and terrorists.  *Id.*  All of these activities constitute extortive actions taken "under color of official right."

Defendants also engaged in money laundering and in "monetary transactions in property derived from" money laundering—actions proscribed by 18 U.S.C. §§ 1956 and 1957, respectively.  These actions constitute "racketeering activity" under RICO.  *See* 18 U.S.C. §1961(1).  Section 1956 provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A)
>> (i) with the intent to promote the carrying on of specified unlawful activity; or
>>
>> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B) knowing that the transaction is designed in whole or in part—
>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>>
>> (ii) to avoid a transaction reporting requirement under State or Federal law,
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1).  The "specified unlawful activity" in the statute includes, *inter alia*, the "racketeering activities" listed in 18 U.S.C. § 1961(a).

Defendants have worked together to help Kazakhstan seize Plaintiffs' assets by force and threats of violence, using the full power of the state.  *See* Complaint ¶¶ 113-30; *see also* Decl. D. Hourani ¶¶ 5-19; Decl. I. Hourani ¶¶ 5-29.  Defendants helped launder money for President Nazarbayev—including money stolen from Plaintiffs—by funneling Nazarbayev's accounts through a series of international transactions and shell companies, including the Samruk-Kazyna sovereign wealth fund.  Defendants' tactics are designed to mask the ownership of Nazarbayev's accounts and launder the contents of those accounts in order, ultimately, to disguise the sources of those illegally-obtained funds.  *See* Complaint ¶¶ 84-92, 222, 223.  Further to that point, Defendants use otherwise legal accounts to facilitate their expropriations and receipt of those funds, further demonstrating that Defendants intended to launder these funds.[119]  *Id.* ¶¶ 76, 84-93.  Defendants know and have always known that the property involved in these transactions "represents the proceeds of some form of unlawful activity," since Defendants drafted the very plan that Kazakhstan has used to expropriate Plaintiffs' assets—the Superkhan Memorandum. *Id.* ¶¶ 44-57.  Thus, Defendants have helped Kazakhstan "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(B)(i), and therefore have engaged in money laundering, one of the "racketeering activities" specified by RICO.

In addition, Defendants have engaged in monetary transactions involving proceeds derived from this money laundering—actions that also constitute "racketeering activity" under

---

[119] *United States v. Wiley*, 57 F.3d 1374, 1386 (5th Cir. 1995) (stating that the commingling of illegitimate monies with legitimate monies may suffice in showing a design of laundering ill-gotten monies).

RICO.  *See* Complaint ¶¶ 15, 63, 76, 84-92, 222-23.  Section 1957 provides that if a U.S. defendant "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from" the money-laundering activities described in 18 U.S.C. § 1956, then the defendant shall be punished as provided by the statute.  18 U.S.C. § 1957(a).  The Section defines "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument … by, through, or to a financial institution…."  *Id.* § 1957(f)(1).  The statute defines "criminally derived property" as "property constituting, or derived from, proceeds obtained from a criminal offense."  *Id.* § 1957(f)(2).

Mirtchev has invested the proceeds from the Superkhan plan, as well as the income he derives from his work for Kazakhstan, into a variety of enterprises, including oil fields in Kazakhstan and/or Uzbekistan, Krull Corp., GlobalOptions, Inc., and GlobalOptions Management, Inc.  *See* Complaint ¶ 222.  Additionally, Krull Corp. has invested the proceeds from the Superkhan activities, along with the income it receives from Kazakhstan for its services, into its joint venture with GlobalOptions, Inc., GlobalOptions Management, Inc.  *Id.*  These investments clearly affect interstate and foreign commerce, since the oil fields are in Central Asia and Defendants operate internationally, including in the District of Columbia.  *Id.*  These funds were "criminally derived property" because Kazakhstan obtained them through the extortion and robbery of Plaintiffs, then worked with Defendants to move them out of Kazakhstan and launder them through various international channels, including into U.S. bank accounts.  Because Defendants made large monetary transactions that affected interstate and foreign commerce, using criminally derived property, they have engaged in "racketeering activity" as defined by RICO.

Defendants engaged in a pattern of racketeering activity.  The Complaint alleges that Mirtchev Defendants, acting in concert with GlobalOptions Defendants, committed numerous predicate acts between 2007 and the present, including money laundering, false use of a passport, and extortion.  These acts were part of an overall scheme, directed by the Kazakh Government and designed by Defendants, to damage the reputation of Plaintiffs and others and deprive them of their property; the acts were therefore clearly "related."  In addition, the acts satisfy RICO's "continuous" requirement because the Kazakh Government's scheme to defame and steal from Plaintiffs was unrelenting *and is in fact still ongoing*, as evidenced by the November 26, 2010, order issued by President Nazarbayev and by Ambassador Idrissov's response.  *See* Ex. 25.

> **D.    Defendants Are Involved in a RICO Enterprise with the Republic of Kazakhstan.**

Plaintiffs' Complaint satisfies the "enterprise" requirements of a civil RICO violation. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

RICO defines "enterprise" broadly:  it "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  *Id.* § 1961(4).  "The term 'any' ensures that the definition has a wide reach … and the very concept of an association in fact is expansive."  *Boyle v. United States*, __ U.S. __, 129 S. Ct. 2237, 2243 (2009) (citations omitted).  In addition, RICO's language should be read broadly.  *See id.* ("the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes'" (quoting Pub. L. 91-452, § 904(a), 84 Stat. 947)).

To establish an enterprise under RICO, "a plaintiff must allege and prove the existence of two distinct entities: (1) a 'person' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name .... [A] RICO defendant, or 'person' must be distinct from the RICO 'enterprise' that the defendant is associated with or employed by."[120]  "[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'"  *Boyle*, 129 S. Ct. at 2244 (2009) (citation omitted).  "[A]n enterprise includes any union or group of individuals associated in fact," and RICO's reach includes "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 580 (1981).  "[T]he enterprise is established by (1) a common purpose among the participants, (2) organization, and (3) continuity." *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999) (citations omitted).

Plaintiffs have met these requirements in their Complaint.  They have alleged that Defendants engaged in an enterprise with a clear purpose, i.e., to help Kazakhstan destroy and steal from Oligarchs and FIGs—including Plaintiffs—who posed a potential challenge to President Nazarbayev's power, a plan detailed in the Superkhan Memorandum and other documents.  Complaint ¶¶ 44-62.  The Superkhan plan involved a continuing association of private consultants, including Defendants, and Kazakh officials, including the President and his daughter, who targeted multiple Oligarchs and FIGs for expropriation and persecution.  *Id.* ¶¶ 15, 33-43, 44-62, 166-127, 133-142.  The plan, consequently, was not strictly limited to Plaintiffs. *Id.* ¶¶ 44-62.  Further, as the Superkhan memorandum and its framework for the enterprise's efforts and the various Daulbayev Memoranda's description of a task force demonstrate, this enterprise had "organization" and that Defendants and Kazakh officials functioned as a

---

[120] *United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 13, 18 (D.D.C. 2004) (Kessler, J.) (citations omitted).

continuing unit.  *Id.* ¶¶ 131-142; *Turkette*, 452 U.S. at 583.  Moreover, this enterprise was

continuous:  it formed around 2003 with Mirtchev's original meeting with Dariga Nazarbayeva

as a response to dealing with the Kazakhgate scandal, and continues to this day, as indicated by

the March 15, 2010, Daulbayev Memorandum.  Complaint ¶¶ 34-43, 44-62, 133-142.

     Defendants argue that Plaintiffs fail to distinguish between RICO defendants, or

"persons," and the RICO "enterprise."  *See* GlobalOptions MTD at 22.  This argument does not

withstand scrutiny.  Plaintiffs' Complaint alleges that GlobalOptions, Krull, and Mirtchev

worked together with Kazakhstan, President Nazarbayev, and Dariga Nazarbayeva for the

common purpose of destroying Plaintiffs' reputations and expropriating Plaintiffs' property

through a pattern of racketeering activity.  *Id.* ¶¶ 15, 33-43, 44-62, 166-127, 133-142.  The

partnership between Defendants, Kazakhstan, and Kazakhstan's president constitutes a RICO

"enterprise" because it is a "group of individuals associated in fact although not a legal entity."

18 U.S.C. § 1961(4).  It is clear that they constitute "a group of persons associated together for a

common purpose of engaging in a course of conduct."  *Boyle*, 129 S. Ct. at 2244 (2009).

    **E.**    **Defendants Have Engaged in a RICO Conspiracy.**

     Finally, Plaintiffs' Complaint clearly alleges a "conspiracy" as defined by the RICO

statute.  A person commits conspiracy to violate RICO if he "conspire[s] to violate any of the

provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."  18 U.S.C § 1962(d).  A RICO

plaintiff may not sue for civil RICO conspiracy under § 1962(d) "for injuries caused by an overt

act that is not an act of racketeering or otherwise unlawful under the statute."  *Beck v. Prupis*,

529 U.S. 494, 507 (2000).  As at common law, a RICO conspiracy plaintiff must allege injury

from an act analogous to an 'ac[t] of a tortious character[.]'"  *Id.* at 505-506.  A defendant who

participates in a RICO conspiracy "is liable for the acts of his co-conspirators even if that

defendant did not personally agree to commit, or to conspire with respect to, any particular one of those acts."[121]

The Complaint includes numerous allegations that an agreement exists.  Complaint ¶¶ 34-35, 43-55.  And as discussed *supra* these allegations are supported by documentation, including the Superkhan Memorandum and Colonel Daulbayev memorandum to Kazakhstan's Ambassador to the United States, in which Daulbayev tells the Ambassador to work with Mirtchev and GlobalOptions in order to target the Houranis and discredit them with false and defamatory information.  *See* Ex. 2.  Furthermore, Plaintiffs have clearly alleged an "injury from an act that is analogous to an 'act of tortious character.'"  *Beck*, 529 U.S. at 507.  Plaintiffs' injuries are the result of a pattern of predicate acts of racketeering committed by Defendants and Kazakhstan as part of a RICO enterprise.  Defendants are therefore liable for RICO conspiracy as well as for the substantive RICO offenses described herein.

## IX.    Plaintiffs' Claims Are Not Barred By the Applicable Statute of Limitations.

Plaintiffs' claims were timely pursued.  Statute of limitations defenses can be raised in a Rule 12(b)(6) motion when the facts that give rise to the defense are clear from the face of the complaint.[122]  However, statute of limitations issues often depend on contested questions of fact, so a court should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint.[123]  Courts should only grant a motion to dismiss if the complaint on its face is conclusively time-barred.[124]

---

[121] *Philip Morris USA, Inc.*, 327 F. Supp. 2d at 18.
[122] *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).
[123] *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).
[124] *Id.*

For statute of limitations purposes, a cause of action must be brought within a certain period "from the time the right to maintain the action accrues."[125]  A claim usually accrues when injury occurs.[126]  In cases where the relationship between the fact of injury and the alleged unlawful conduct is obscure, however, the date by which the claim accrued is determined through application of the discovery rule.[127]  The discovery rule is a limitations tolling device designed "[t]o avoid the injustice that periods of limitation may work upon those parties that did not know, and could not have reasonably known, that a cause of action existed."[128]  Under this rule, accrual occurs when a party knows or by the exercise of reasonable diligence should know: (1) of the injury; (2) the injury's cause in fact; and (3) "of *some evidence*" of the defendant's wrongdoing.  *Morton v. National Medical Enterprises, Inc.*, 725 A.2d 462, 468-69 (D.C. 1999) (examining negligence action) (emphasis in original); *Colbert v. Georgetown Univ.,* 641 A.2d 469, 472-473 (D.C. 1994) (malpractice context).

Furthermore, the statue of limitations for any particular cause of action is equitably tolled where a plaintiff, despite due diligence, is unable to discover vital information bearing on the existence of his or her claim.  *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 34 (D.D.C. 2008) (Oberdorfer, J.).  The doctrine applies where a plaintiff knows he has been injured, but is unaware that his injury may be the result of possible misconduct by the defendant.  *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 279 (D.C. Cir. 2003).[129]  Equitable tolling typically allows a

---

[125] D.C. Code § 12-301; *Capitol Place I Associates L.P. v. George Hyman Construction Company*, 673 A.2d 194, 198 (D.C. Ct. App. 1996) (citing D.C. Code § 12-301 (1995 Repl.)).
[126] *Id.*
[127] *Id.*
[128] *Capitol Place* at 199; *Farris v. Compton*, 652 A.2d 49 (D.C. 1994) (under the discovery rule, a determination when a claim accrues is guided by considerations of basic fairness; a legislature should not be presumed to have intended to deny a day in court to a plaintiff who did not know, and could not reasonably have known, of her injury at the time that it occurred, provided that she timely filed suit after she learned or should have learned the facts.).
[129] Citing *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) (explaining that equitable tolling applies where a plaintiff is "assumed to know that he has been injured so that the statute of limitations has begun to

(continued…)

plaintiff to bring suit within a reasonable time after he has obtained, or by due diligence could have obtained, the necessary information to file suit.  *Id.* at 453.

Plaintiffs' tort claims did not accrue until they discovered the involvement of Defendants in the commission of the various torts against them.  In fact, Plaintiffs did not discover that Defendants played any role in these tortious actions until April 2010, when they learned that Defendants were likely involved.[130]  Further, after receiving definitive proof of Mirtchev's involvement by obtaining the November 16, 2007, Daulbayev Memorandum, Plaintiffs immediately consulted counsel about filing U.S. civil claims.[131]

Before April 2010, all factual evidence available indicated that the Republic of Kazakhstan, Dariga Nazarbayev, and President Nazarbayev alone were responsible for their injuries.[132]  Plaintiffs' allegations support this view, as it was only Ms. Nazarbayeva and other Government officials who transmitted threats or stated the intentions of the Government to confiscate Plaintiffs' shares in those companies.[133]  Further, the defamatory allegations about Defendants appeared on the Kazakh Embassy website and in a series of reports and various other publications that did not indicate any level of involvement by Defendants.[134]  Plaintiffs, however, continued to exercise due diligence in determining the exact circumstances behind the confiscation of their various investments by employing private investigators and asset location specialists, and by maintaining contact, through Rakhat Aliyev, with various sources in the

---

(continued…)

run; but he cannot obtain information necessary to decide whether the injury is due to the wrongdoing and, if so, wrongdoing by the defendant.").
[130] *See* Decl. I. Hourani ¶¶ 29; Decl. D. Hourani ¶¶ 14.
[131] *See* Decl. I. Hourani ¶¶ 29; Decl. D. Hourani ¶¶ 15.
[132] *See* Decl. I. Hourani ¶¶ 27; Decl. D. Hourani ¶¶ 12.
[133] Complaint ¶¶ 118-27.
[134] Complaint ¶¶ 80-83, 148-52.

Kazakh Government.[135]  Of course, the Republic of Kazakhstan is likely immune from liability

for their actions in U.S. courts, so Plaintiffs were left without remedies under U.S. or D.C. law.

In fact, the FSIA, 28 U.S.C. § 1605(a)(5)(B), explicitly states that no waiver of a foreign state's

immunity exists for libel and defamation actions.  Accordingly, they did not know that causes of

action lay in the District of Columbia until learning of Defendants' involvement this past

April.[136]

Since Plaintiffs, despite their diligent efforts, were unable to determine neither the cause

in fact of their injuries, nor Defendant's wrongdoing, until April 2010, their tort claims did not

accrue until then.  *Colbert*, 641 A.2d at 472-473.  Plaintiffs waited to obtain substantive evidence

of Defendants' actions before filing a claim and then, after Rakhat Aliyev provided them with

the November 16, 2007, memorandum in August 2010, they filed their Complaint within a few

weeks.  In so doing, Plaintiffs brought their claims less than a year after they accrued in April

2010.  Therefore, Plaintiffs' claims fall within the respective one and three year periods

applicable to their claims.

Alternatively, Plaintiffs' tort claims were equitably tolled until they learned of

Defendant's involvement in the tortious actions committed against them.  Because Plaintiffs

were unable to discover vital information bearing on the existence of their claims, namely, the

role of Alexander Mirtchev and Defendants in converting their interests in the companies,

tortiously interfering with the oil concession contract and Plaintiffs' existing business

relationships, and publishing libelous and defamatory allegations about Issam Hourani, their

claims were equitably tolled.  *Doe*, 573 F. Supp. 2d at 34.  Plaintiffs knew they were injured

---

[135] *See* Decl. I. Hourani ¶ 27; Decl. D. Hourani ¶¶ 12, 21.
[136] *See* Decl. I. Hourani ¶¶ 28; Decl. D. Hourani ¶¶ 13.

when their interests in their companies were stolen from them in July 2007 and February 2008,

but believed that Kazakhstan and President Nazarbayev acted alone and were immune from suit

in federal courts.  More importantly, for purposes of this analysis, Plaintiffs were unaware that

these injuries were the result of misconduct by Defendants.  *Chung*, 333 F.3d at 279.  When

Plaintiffs, in April 2010, learned that Defendants had played some role in formulating and

carrying out the plan that involved the tortious acts described above, they brought tort claims

within a few short months, thus acting within a reasonable period of time.  *Id.*  Finally, as this

discussion makes clear, resolution of the timeliness of Plaintiffs' claims is inappropriate at the

motion to dismiss stage because this it raises issues of fact that go beyond the face of the

Complaint.[137]

> **A.      Plaintiffs' Conversion Claim Is Not Barred by the Statute of Limitations.**

Plaintiffs' claim for the conversion of their business interests is not time-barred.  The

statute of limitations for a conversion claim is three years.[138]  Plaintiffs filed their Complaint on

September 23, 2010.  Plaintiffs' Complaint alleges that the conversion of Caratube took place on

February 1, 2008, well within the three year statute of limitations.  *See* Complaint ¶ 129.  The

discovery rule also applies to conversion claims in a non-commercial paper context.[139]

Accordingly, their claim for conversion of *any* of their business interests, including KTK

Television and Alma Media, did not accrue until April 2010, when they discovered the role of

Defendant Alexander Mirtchev in converting their interests in those companies.  Alternatively,

that claim was equitably tolled, as explained above.  *Chung*, 333 F.3d at 279.

---

[137] *Firestone*, 75 F.3d at 1209.

[138] *See Forte v. Goldstein*, 461 A.2d 469, 472 (D.C. 1983); D.C. Code § 12-301(8).

[139] *In re Spectrum, Ltd. v. Pacific Showrooms West, Inc.*, 2007 WL 2320587, *2 (Bkrtcy. D.D.C. 2007) (finding that discovery rule could be applicable to conversion of assets claim in a bankruptcy case and finding that the holding in *Kuwait Airways Corp. v. Am. Sec. Bank*, 890 F.2d 456 (D.C. Cir. 1990) that the discovery rule is inapplicable to conversion claims in a commercial paper context did not limit the applicability of the rule in other conversion cases).

### B.     Plaintiffs' Tortious Interference Claims Are Not Barred.

Tortious interference claims in the District of Columbia have a three year statute of limitations.  *See* D.C. Code § 12-301(8).  Plaintiffs' Complaint alleges that the tortious interference with contract emanates from Alexander Mirtchev's role in the cancelations of Devincci Hourani's oil concession contract with MEMR on February 1, 2008.  Accordingly, Plaintiffs' claim is well within the three-year statute for such claims.

Further, neither Plaintiffs' tortious interference with contract nor their tortious interference with business advantage/relationship claims accrued until April 2010, when they learned of Defendants' role.  Plaintiffs knew that the Republic of Kazakhstan, through its instrumentality, MEMR, had canceled the Caratube Oil Concession contract on February 1, 2008, but they were unaware that a third party, namely Defendants, had contributed to the cancelation of that contract.  *See* Decl. D. Hourani ¶¶ 7, 12-13.  Similarly, Plaintiffs had no knowledge that Defendants had advised the Republic of Kazakhstan, Dariga Nazarbayeva, and President Nazarbayev to convert their respective interests in Alma Media and KTK Television until April 2010.  This was also the case with Pharma Industry Corporation LLP, which the government intentionally bankrupted.  Accordingly, their causes of action for tortious interference did not accrue until April 2010.  *Colbert*, 641 A.2d at 472-473.  Alternatively, Plaintiffs' claims for tortious interference with economic advantage or business relationship were equitably tolled until that time.  *Doe*, 573 F. Supp. 2d at 34; *Chung*, 333 F.3d at 279.

### C.     Plaintiffs' Defamation and Libel Claims Are Not Barred by the Statute of Limitations.

Defendants' assertion of a statute-of-limitations defense to the defamation and libel claims fails because it overlooks two key facts: (1) Plaintiffs are foreclosed by federal statute from bringing defamation and libel claims against the Republic of Kazakhstan or its Embassy

and (2) Plaintiffs were unaware of Defendants' role in the publication of defamatory remarks made about them until learning of their involvement in April 2010.  The upshot of these facts is that Plaintiffs were unable to bring their defamation and libel claims until they filed their Complaint, and, as a result, those claims are not time-barred.

The limitations period for claims of libel or defamation in the District of Columbia is one year from the date of publication.  D.C. Code § 12-301(4).  Claims of false light invasion of privacy are subject to the same one year period when such causes of action are "intertwined" with defamation, a cause for which a specific statute of limitations is outlined in the D.C. Code.[140]

This Court has applied the discovery rule in defamation cases previously.  In *Linguex, Inc. v. Murphy*, 1994 WL 289357, at *1 (D.D.C. 1994) (Pratt, J.), this Court granted a Defendant's motion for a jury trial on a defamation counterclaim and acknowledged that no District of Columbia case had explicitly applied the discovery rule to toll an action for defamation, but found that it was proper to do so.  In making this decision, Judge Pratt stated that the plaintiff would, at the close of discovery, have an opportunity to seek summary judgment on the timeliness of the Defendant's defamation counterclaim, but that it would be inappropriate to deny the Defendant an opportunity to present the jury evidence showing that the statute of limitations had been tolled.  *Id.*[141]  Therefore, this Court should apply the discovery rule to Plaintiffs' defamation claims, or, in the alternative, find that they were equitably tolled.

---

[140] *Jankovic,* 429 F. Supp. 2d at 171.

[141] The courts of the District of Columbia have debated whether the discovery rule applies in defamation cases, but, the most recent cases have applied the rule.  *Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 298 n.2, 299 (D.C. 2001) (adopting a rule that in a case alleging defamation through a mass media outlet such a as a book, magazine, or newspaper, the limitations period begins to run when the publication is first generally available to the public", but also expressing no opinion as to whether the discovery rule might be justified where the statement was inherently undiscoverable because it was published secretly or in a circular, newsletter, or newspaper dedicated to a

(continued…)

Application of the discovery rule defeats any statutory bar to Plaintiffs bringing their defamation and libel claims based on the above-mentioned nine defamatory statements.  Though Mr. Isaam Hourani knew that the Republic of Kazakhstan was behind the publication of each of the defamatory statements made about him, he was statutorily foreclosed from pursuing any legal remedies for these injuries.  The FSIA, 28 U.S.C. § 1605(a)(5)(B), explicitly states that no waiver of a foreign state's immunity exists for libel and defamation actions.  Therefore, Plaintiff Issam Hourani was excluded from pursuing a judicial remedy for these harms *as a matter of law*.  Until, of course, he discovered that these injuries were the result of the machinations of commercial agents[142] working on behalf of Kazakhstan they had no viable claim.  Plaintiffs brought their claims on September 23, 2010, only a short time after discovery of Defendants' involvement.

Alternatively, the equitable tolling doctrine acted to toll the limitations period until Plaintiffs obtained information necessary to decide that Issam Hourani's injuries were due to the wrongdoing of Defendants.  *Chung*, 333 F.3d at 279.  Again, application of the equitable tolling doctrine is particularly compelling here, not just because Plaintiffs had no awareness of Defendants involvement in the publication of libelous and defamatory statements about them, but because a statutory bar foreclosed Plaintiffs from seeking judicial vindication for their reputational injuries against the one party they knew to be involved, Kazakhstan.

---

(continued…)

specialized readership); *but see Oparaugo v. Watts*, 884 A.2d 63, 74 n.8 (D.C. 2005) (explicitly leaving open the question of whether the discovery rule might apply if the issue were clearly raised and briefed in a defamation case); *Maupin v. Haylock*, 931 A.2d 1039, 1041-1043 (D.C. 2007) (applying, without explicitly deciding, the discovery rule to allegedly defamatory statements made in newsletters).

[142] In their Opposition to Plaintiffs' Motion for Leave to Conduct Jurisdictional discovery, Mirtchev Defendants argue that Plaintiffs have shifted their stance on whether Defendants are "commercial" or "political" agents. Plaintiffs, in their Complaint, never referred to Defendants as "political agents."  Rather, Plaintiffs allege that the Republic of Kazakhstan pays Defendants for services, thus making them commercial agents. *See generally* Complaint.

**D.      Plaintiffs' Civil Conspiracy Claim Is Not Barred by the Statute of Limitations.**

The GlobalOptions Defendants' argument that Plaintiffs' civil conspiracy claim is time-barred is flatly incorrect.  Civil conspiracy claims in the District of Columbia have a three year statute of limitations.  D.C. Code § 12-301(8); GlobalOptions MTD at 8-9.  Plaintiffs filed suit against the Defendants on September 23, 2010.

Plaintiffs allege that the conspiracy at the heart of this case began sometime after Kazakhstan engaged Defendants to assist it in dealing with the Kazakhgate affair, and sometime before October 2007, when Mirtchev and the Defendants presented the Superkhan Memorandum and proposal to President Nazarbayev.  *See* Complaint ¶¶ 44-55.  Thus, Plaintiffs allege that the agreement likely took place within three years of filing the Complaint.  This presentation named Rakhat Aliyev and his "FIG," which Plaintiffs allege includes them, as targets of efforts in accordance with the Superkhan plan.  *Id.* ¶¶ 50-51, 108-109.

The Complaint then goes on to recite a list of overt acts, as shown above, nearly all of which occurred within three years of Plaintiffs filing their Complaint.  For instance, in that time frame, Defendants worked in concert with their co-conspirators in the Kazakh Government to: (1) issue INTERPOL Red Notices in 2007, 2008, and 2009 containing defamatory statements about Issam Hourani; (2)  terminated Caratube's oil concession contract with MEMR on February 1, 2008; (3) in accordance with a November 15, 2007, order by co-conspirator President Nazarbayev, gathered discrediting financial and bank information about Plaintiffs; (4) in accordance with that same order, submitted KNB reports on the Houranis to U.S. law enforcement organizations; (5) published a December 18, 2008, article on the Kazakh Embassy website making the defamatory statements about Issam Hourani; (6) published a February 18, 2009, article on the same website stating that Issam Hourani was a known supporter of Hamas;

(7) spread further defamatory information to online publications about Issam on February 9,

2009, and December 8, 2008; and (8) had the ETG publish the "Aliyev Dossier" in July 2009.

*See* Complaint ¶¶ 119, 122, 126, 128, 129, 143-155.  Each of these actions constitutes an "overt

act" in furtherance of the conspiracy and most took place within three years of Plaintiffs'

September 23, 2010, Complaint.

Moreover, even though most of these overt acts took place within the past three years, the

discovery rule and the equitable tolling doctrine apply with the same force to Plaintiffs' civil

conspiracy claim as the other claims described above.  Consequently, Plaintiffs' cause of action

for civil conspiracy did not accrue until they learned of Defendants' wrongdoing in April 2010,

or, in the alternative, the equitable tolling doctrine works to defeat any limitations defense raised

by the GlobalOptions Defendants.  *Colbert*, 641 A.2d at 472-473; *Chung*, 333 F.3d at 279.

## X.    **Plaintiffs Have Standing to Bring Their Claims.**

Defendants' argument that Plaintiffs do not have standing to bring their claims ignores

the plain language of Plaintiffs' complaint.  *See* Mirtchev MTD at 12; GlobalOptions MTD at 5-

7.[143]  Plaintiffs are not bringing claims for the harms done to the companies they currently or

once held interests in.  Rather, they are bringing claims for injuries that they suffered *personally*

when the Kazakh Government, with the assistance of, and acting on a plan devised by,

Defendants: (1) converted and tortiously interfered with Plaintiffs' shares in KTK Television and

Alma Media by forcing Devincci Hourani to sign them over to Dariga Nazarbayeva;

(2) converted and tortiously interfered with Devincci Hourani's ownership interest in Caratube

through the cancellation of the oil concession contract and the eventual absorption of its assets

---

[143] Defendants do not argue that Plaintiffs have no standing to assert their defamation, libel, and civil conspiracy claims.  *See* Mirtchev MTD at 12-13; GlobalOptions MTD at 7.

by a subsidiary of the Mirtchev-directed Samruk-Kaznya sovereign weight fund; and

(3) published a number of defamatory statements about Issam Hourani.  *See* Complaint ¶¶ 126-

129, 159-231.  These injuries were suffered by Plaintiffs, and the Plaintiffs, not their companies,

would recover for those injuries, so there is no basis for Defendants' arguments that this case

must be brought derivatively.

Where a defendant raises questions about a plaintiff's standing to bring a claim, a court

must consider whether it has subject matter jurisdiction pursuant to Rule 12(b)(1).[144]  A court

examining its own subject matter jurisdiction may "consider the complaint supplemented by

undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus

the court's resolution of disputed facts."[145]  In doing so, the district court may consider materials

outside of the pleadings.[146]  "At the motion to dismiss stage, counseled complaints … are to be

construed with sufficient liberality to afford all possible inferences favorable to the pleader on

allegations of fact."[147]  Plaintiff must show: (1) that he or she suffered an injury in fact that is

(a) concrete and particularized and (b) actual or imminent; (2) a causal relationship between the

injury and the challenged conduct; and (3) that the injury will likely be remedied by a favorable

court decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs clearly have standing to bring their claims.  The Defendants assisted

Kazakhstan in depriving them of their ownership interests in KTK Television, Alma Media,

Pharma Industry Corporation, LLP, and Caratube and then set about publishing or having others

publish defamatory remarks about Plaintiffs themselves on the World Wide Web.  *See generally*

---

[144] *Cheeks v. Fort Myer Const. Co.*, 2010 WL 2553659 (D.D.C. June 25, 2010) (Kollar-Kotelly, J.).

[145] *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted).

[146] *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

[147] *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005).

Complaint ¶¶ 98-155.  For each of these actions, the Plaintiffs suffered pecuniary, emotional, or reputational harms that this Court can remedy through an award of money damages.

That Plaintiffs bring their claims in their own capacity is underscored by the nature of their allegations.  The Houranis themselves—and not the companies that they held interests in— were the ultimate targets of the Defendants' plan.  *See* Complaint ¶¶ 159-231; *see also* Exs. 1, 2, 12.  This plan, devised by Defendants and set out in the Superkhan Memorandum, called for the pretextual seizure of personal assets from Oligarchs such as the Houranis and the absorption of their corporate interests by the state.  Facts ¶¶ 9-20.  The plan explains that after this confiscation, "FIGs" such as the Houranis should be discredited in the world media.  *Id. ¶¶ 10-16.*  What is more, Plaintiffs allege that, as illustrated by the Daulbayev memoranda, this plan was executed against them to the letter by Defendants and the Republic of Kazakhstan.  Facts ¶¶ 18-20; Ex. 2, 12.

Further, with the exception of Caratube, the companies that the Houranis once held interests in are in the hands of the Republic of Kazakhstan or its sovereign wealth fund, Samruk-Kaznya.  In such circumstances, where the company has been destroyed <u>and</u> the ownership stake either seized or rendered meaningless, it is quite apparent that the former shareholder must be able to maintain the claim lest there be no remedy available at all.  Moreover, the resolution of this particular type of standing issue at the motion to dismiss stage is inappropriate.  *See Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 149 (E.D.N.Y. 2010) (relying on its previous decision in stating that the resolution of issues pertaining to plaintiff's ability to bring a claim on behalf of a dissolved corporation presents fact questions that cannot be decided at the motion to dismiss stage).

With respect to Caratube, the standing distinctions that Defendants attempt to draw unfairly ignore that not only was Devincci Hourani's 92% *personal* interest in Caratube targeted, but also that the Company's assets and its contractual rights to the oil concession were targeted *because of his ownership*.  Defendants and the Republic of Kazakhstan accomplished these goals with the cancellation of the contract in February 2008 and the subsequent merging of its assets with KazMunaiGaz.  Facts ¶¶ 25-29; Complaint ¶ 103.  Actions that effectively seize the entirety of a company's assets belie any nice distinctions between the company and the shareholders of the company.  The Supreme Court has long recognized that a shareholder may have a property interest in a corporation's assets which can, in turn, support the shareholder's standing to sue in his individual capacity for an injury those assets.[148]  Plaintiffs here present a special case because Plaintiffs have standing to sue generally and because Defendants and Kazakhstan affected the *complete* seizure of Caratube's assets, leaving nothing more than a shell.   In such circumstances, the investor has been deprived of all his worth, so this Court need not venture now into an analysis of the shareholder standing doctrine as applicable to Caratube, but, for the sake of completeness, Plaintiffs provide a discussion of its inapplicability below.

The shareholder standing doctrine "prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment."  *Franchise Tax Bd. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).[149]  "The reasons for the general rule precluding

---

[148] *See Kaufman v. Societe Internationale Pour Participations Industrielles et Commerciales*, 343 U.S. 156, 159-60 (1952) ("when the Government seizes assets of a corporation organized under the laws of a neutral country, the rights of innocent stockholders to an interest in the assets proportionate to their stock holdings must be fully protected."); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 117 (1974).
[149] Whether this doctrine should apply to closely-held corporations is a matter that is subject to increasing scrutiny. *See Georgia Bank & Trust Co. of Augusta v. Trenery*, 2010 WL 3271732, at *6 (D.S.C. Aug. 18, 2010) (stating that, under Georgia law, there is an exception to the shareholder standing rule where a suit involves a closely-held

(continued…)

shareholders from suing individually to redress a corporate right are to avoid multiple suits, to prevent a bar to the corporation's right of action, and to ensure that any damages recovered will be available to the corporation's creditors and any other shareholders." *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 469 (D.C. 2008).

An analysis of these policy reasons demonstrates that the shareholder standing rule is inapplicable to this case. Foremost, Plaintiffs are not suing to redress the rights of any of these corporations, but instead are suing for the loss of their own interests in these companies. As such, their decision to bring suit here in the District of Columbia *for their own injuries* will not lead to multiple suits stemming from damages to the corporations. Nor will Plaintiffs' suit bar any rights the corporation may have, because, as explained above, those companies have either been destroyed <u>or</u> the ownership stake has been seized or rendered meaningless. Moreover, given that most of these companies are now in the hands of one of the tortfeasors, Kazakhstan, it is entirely unrealistic to expect the corporation's current management to pursue any remedies. *Franchise Tax Bd..*, 493 U.S. at 336.

Further, there is a well understood exception to the shareholder standing rule that allows a shareholder to bring a claim when he is injured as an individual and has a "direct, personal interest in a cause of action ... even if the corporation's rights are also implicated." *Franchise Tax Bd.,* 493 U.S. at 336. In such circumstances, a shareholder "must identify a legal interest that has been directly or independently harmed, i.e., a 'special injury' that does not derive from the injury to the corporation." *Harpole Architects, P.C. v. Barlow*, 668 F. Supp. 2d 68, 77

---

(continued…)

corporation and the facts do not implicate the traditional policy goals favoring derivative suits including (1) preventing multiple shareholder suits; (2) protection of corporate creditors by ensuring that recoveries go to the corporation; (3) prevention of prejudice to shareholders not involved in the case at bar; and (4) ensuring adequate compensation to injured shareholders by increasing the value of their aliquot shares.)

(D.D.C. 2009) (Huvelle, J.).  Even if this doctrine applied, Plaintiffs' claims fall within the direct

injury exception to that doctrine because they allege independent harms to their own pecuniary

interests in their companies that do not derive from the any injuries to the corporation, and

further, allege that all the actions were targeted at them, to do them injury.  *Id.*; Complaint

¶¶ 172-176, 179-183, 186-195.

## XI.     Alexander Mirtchev's Distaste for Plaintiffs' Allegations Does Not  Warrant Striking Them from the Well-Pleaded Complaint.

The Mirtchev Defendants seek to have over 80 paragraphs—more than one third of the

Complaint—excised on dubious grounds, and without attempting to explain how such

paragraphs prejudice them.  Among the asserted bases for granting their motion, Defendants

include a wild accusation: that Plaintiffs bring this case as proxies for Rakhat Aliyev.  Krull

MTStrike at 2-3.  This is simply untrue.

Federal Rule of Civil Procedure 12(f) allows a court to "order stricken from any pleading

any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

Striking portions of a pleading is a "drastic remedy" and motions requesting such relief are

disfavored.  *Uzlyan v. Solis*, 706 F. Supp. 2d 44, 51 (D.D.C. 2010) (Collyer, J.) (citations

omitted).  Courts view motions under the rule "with such disfavor that many courts will grant

such a motion only if the portions sought to be stricken as immaterial are also prejudicial or

scandalous."  *Id.* at 52 (citations omitted).  In fact, motions for relief under Rule 12(f) are

considered "purely cosmetic" or "time wasters" and there appears to be universal agreement

amongst courts that they "should be denied unless the challenged allegations have *no possible*

*relation or logical connection* to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties."[150]

The word "scandalous" as used in Rule 12(f) means "any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Uzlyan*, 706 F. Supp. 2d at 58. Further, "[i]n the absence of pejorative adjectives characterizing the facts alleged or other colorful language, the fact that a plaintiff's allegations may cast the defendant in a 'derogatory light' is insufficient to warrant the striking of allegations from a complaint." *Id.* This Court's decisions indicate that the allegations in Plaintiffs' Complaint are not "scandalous" as that term is used in Rule 12(f).[151]

Plaintiffs' allegations all center on the Mirtchev Defendants' role and actions as an advisor and co-conspirator with the Government of Kazakhstan, and they certainly do not rise to the level of racism, genocide, or insinuations of illegal drug use such that they warrant striking. The Complaint lacks "pejorative adjectives" and the simple fact that they describe Mr. Mirtchev's actions—as nefarious as those actions may be—does not mean that over 80 paragraphs of the Complaint are worthy of striking. *Uzlyan*, 706 F. Supp. 2d at 58. The more appropriate tactic for Defendants is to simply deny these allegations in an Answer.

Also, the allegations that the Mirtchev Defendants refer to as immaterial or impertinent, such as those relating to Mirtchev's background, the operations of Krull, Mirtchev's finances, the

---

[150] WRIGHT & MILLER, 7 FED. PRAC. & PROC. § 1382 (3d ed. 2001) (emphasis added); *see also Nugent v. Unum Life Ins. Co. of America*, 2010 WL 4780847, *1 *11 (D.D.C., Nov. 24, 2010) (stating similarly that requests to strike should usually be denied "unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation") (citation omitted).

[151] *See e.g.*, *Pigford v. Veneman*, 215 F.R.D. 2, 4 (D.D.C. 2003) (striking allegations that accused counsel for defendant of racism, but were unsupported by evidence); *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457, 458 (D.D.C. 1994) (Lamberth, J.) (striking allegations that an employee of defendant was abusing illegal drugs because the allegations did not support plaintiff's race-based discrimination claims, but actually cut against them); *Jackson v. H.R. Nicholson Co.*, 545 F. Supp. 762, 763-764 (D.D.C. 1982) (Green, J.) (striking allegation that a manufacturer of artificial sweetener attempted to commit genocide).

Giffen Affair, President Nazarbayev, and threats against the Plaintiffs, are both supported by the exhibits Plaintiffs submit with this Opposition and are necessary to explain: (1) Mirtchev's political expertise; (2) the relationship amongst and between the Defendants and their co-conspirators; (3) how Mirtchev interacts with co-conspirators such as Nurieva and Dimitrov; (4) Mirtchev's money laundering on behalf of Kazakhstan; (5) Defendants' pattern or practice of behavior towards those who find themselves at the mercy of the Kazakh regime; and (6) how Plaintiffs came to be targeted by Defendants and that regime.  Thus, it cannot be said that these allegations have "no possible bearing on the subject matter" of this dispute.[152]  Accordingly, this Court should, as the Court in *Uzlyan* stated, find that "the efforts of the parties and the attention of the court are better spent on the substantive merits of the action rather than the contents of the pleadings."  706 F. Supp. 2d at 58 (citation omitted).

## XII.    The Allegations Do Not Require a More Definite Statement.

The GlobalOptions Defendants' motion for a more definite statement simply does not meet the requirements set by Rule 12(e) and by courts interpreting that rule.  A "party may move for a more definite statement of a pleading … which is so vague or ambiguous that the party cannot reasonably prepare a response."  FED. R. CIV. P. 12(e).  In light of the plain language of Rule 12(e), the GlobalOptions Defendants' filing of *two* motions in response to Plaintiffs' Complaint obviates the need for a more definite statement.

Moreover, because of the liberal federal pleading requirements, courts are reluctant to compel a more definite statement pursuant to Rule 12(e) out of fear that such action will become a substitute for discovery or have a dilatory effect on litigation.  *Fraternal Order of Police*

---

[152] *Nugent*, 2010 WL 4780847 at *11.  The Mirtchev Defendant's allusion to the investigative requirements of Rule 11 is not only disproven by the exhibits Plaintiffs submit with this Opposition, but is also an unnecessary veiled threat made in the vain hope that it will bolster a groundless request for relief.  *See* Krull MTStrike at 17 nn.11-12.

*Library of Cong. Labor Comm. v. Library of Cong.*, 692 F. Supp. 2d 9, 19 (D.D.C. 2010)

(Kennedy, J.); *Potts v. Howard University,* 269 F.R.D. 40, 44 (D.D.C. 2010) (Urbina, J.).

Despite their averments to the contrary, the GlobalOptions Defendants' motion makes clear that

they are attempting to gain discovery from Plaintiffs of the GlobalOptions briefing documents

prepared for President Nazarbayev.  GlobalOptions Mot. More Def. Stmt. at 2-3.  They spend

nearly a third of their argument discussing these documents.  Plaintiffs attach some of these

documents to this Opposition.  *See* Exs. 1, 33.  They spell out in great detail the GlobalOptions

Defendants' involvement in formulating the Superkhan plan that was eventually put into effect at

the expense of Plaintiffs' holdings and reputations.  Their inclusion as exhibits in this opposition

should preclude the need to provide a more definite statement in the Complaint.

Additionally, the GlobalOptions Defendants' allegations of deficiencies in the Complaint

are inaccurate.  That the Complaint often groups together GlobalOptions Defendants with the

Krull Corporation in references to "the Corporate Defendants" in no way obscures the actual acts

of which Plaintiffs accuse them.  Plaintiffs' Complaint specifically alleges, *inter alia*, that the

GlobalOptions Defendants: (1) prepared briefing documents for President Nazarbayev on dealing

with the Kazakhgate crises; (2) drafted the documents laying out the Superkhan plan; (3) worked

with the Kazakh Embassy on public relations, political strategy, and monetary transfer issues;

(4) funneled President Nazarbayev's financial assets—including assets once owned by

Plaintiffs—through international transactions and corporate shells to mask ownership; (5) aided

Nazarbayev in determining that Plaintiffs should be targeted for neutralization; (6) facilitating

the expropriation of Plaintiffs' various business interests; (7) worked with the Kazakh Embassy

to gather information for use in discrediting Plaintiffs; and (8) published or had others publish

numerous defamatory statements about Issam Hourani.  *See* Complaint ¶¶ 40, 46-55, 63, 78, 84,

87, 89, 108, 131-132, 143, 146-156.  Thus, Plaintiffs' Complaint "is neither so vague nor so ambiguous that the defendant cannot reasonably be required to answer" so this Court "should deny [Defendants] motion for a more definite statement and require [Defendants] to bring the case to issue by filing a response within the time provided by the rules."  *Potts*, 269 F.R.D. at 42.

## **Conclusion**

For the foregoing reasons, this Court should deny all of Defendants' motions.


Dated:  January 14, 2011                    Respectfully submitted,

                                            _____/s/_____
                                            Stuart H. Newberger, D.C. Bar #294793
                                            Michael L. Martinez, D.C. Bar #347310
                                            Timothy L. Foden, D.C. Bar #979947
                                            CROWELL & MORING LLP
                                            1001 Pennsylvania Avenue, N.W.
                                            Washington, DC 20004
                                            Phone:  202-624-2500
                                            Fax:  202-628-5116

                                            *Counsel for Plaintiffs*

103

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 14, 2011, I caused copies of the foregoing document to be filed electronically with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all parties of record at the e-mail addresses on file with the Clerk of the Court.

<u>Warren Anthony Fitch, Esq. (CM/ECF)</u>
Counsel for Defendants Alexander V. Mirtchev and Krull Corporation.

<u>Morton S. Taubman, Esq. (CM/ECF)</u>
Counsel for Defendants GlobalOptions, Inc., and GlobalOptions Management, Inc.

<u>Mark David Hunter, Esq. (CM/ECF)</u>
Counsel for Defendants GlobalOptions, Inc., and GlobalOptions Management, Inc.

  /s/
Stuart H. Newberger, D.C. Bar #294793
Michael L. Martinez, D.C. Bar #347310
Timothy L. Foden, D.C. Bar #979947
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone:  202-624-2500
Fax:  202-628-5116