# Exhibit 31

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DEVINCCI SALAH HOURANI et al. ) | |
| ) | |
| ) | |
| ) | |
| Plaintiffs ) | Civil Case No. 10-1618 (TFH) |
| ) | |
| v. ) | |
| ) | |
| ALEXANDER V. MIRTCHEV et al. ) | |
| ) | |
| ) | |
| Defendants ) | |

### Declaration of Scott Horton

I, Scott Horton, state as follows:

1.      I submit this Declaration at the request of Crowell & Moring LLP, attorneys for Plaintiffs, with respect to Defendants' motion to dismiss the case under the doctrine of *forum non conveniens*. I have been asked to sketch the political and legal system of Kazakhstan as they relate to the issues raised by the motion.

2.      I reside in Pelham Manor, Westchester County, New York, and maintain an office at 1251 Avenue of the Americas, New York, New York. I am a member of the bar of the State of New York, having been admitted to practice in 1982. I have also been admitted to practice in the United States District Courts for the Southern, Eastern and Northern Districts of New York and in the United States Court of Appeals for the Second Circuit.

3.      My native language is English, but I also have a reasonable mastery of the German, French and Russian languages as well and have occasionally handled commercial matters relying on those languages, usually in collaboration with local attorneys.

4.    I am currently of counsel to the firm of DLA Piper LLC and a lecturer in law at Columbia Law School. I am also a contributing editor for legal affairs at *Harper's Magazine*.

5.    I have served as a legal affairs writer and commentator for a number of publications and broadcasters, notably including the television networks CNN, NBC and CBS. In February 2008, I published *Private Security Contractors at War*, a study of legal accountability issues surrounding the use of private security contractors in wartime. I was invited four times to testify on this subject before the United States Congress (House Judiciary Committee and Senate Armed Services Committee) and to deliver three special Congressional briefings on related issues and worked closely with Congress on special legislation designed to extend the extraterritorial jurisdiction of U.S. courts to deal with questions relating to military contractors. I also serve as a witness and consultant for the House Committee on Oversight in connection with its pending investigation into certain contract irregularities involving the United States Department of Defense and several Central Asian nations.

6.    Since 1995, I have been a member of the faculty at Columbia Law School in New York, where I conduct courses dealing with comparative and international law, the laws of armed conflict, and commercial dealings with emerging markets, with a special focus on nations of the former Soviet Union, particularly including Kazakhstan. One of my courses, "Investment in Emerging Markets," deals with the legal environment of nations in transition of the former Soviet Union, and sections discussing the privatization process in Kazakhstan and recent disputes between the Kazakhstani Government and major oil and gas companies form a central part of the course.

7.    My relevant qualifications are as follows. I received a J.D. degree from The University of Texas School of Law in Austin in 1981. I previously studied civil law at the Universi-

ties of Munich and Mainz in Germany as a Fulbright Scholar. I worked as a commercial attorney from 1982 through 2007 with the law firms of Cleary, Gottlieb, Steen & Hamilton and Patterson, Belknap, Webb & Tyler in New York, serving as a partner with the latter firm from 1990. My work focused on representation of investors in nations in transition, particularly including Central Asia. I also provided advice and representation to international development banks and to foreign sovereigns.

8.      At Columbia University, I introduced a seminar dealing with legal problems relating to business and investment in the nations in transition in 1995. I also regularly supervise the work of graduate students at the Law School and the School of International and Public Affairs dealing with law and legal policy issues in Central Asia. I serve as a faculty supervisor to the *Journal of East European Law*, and regularly speak and write at functions dealing with Central Asian issues, significantly including Kazakhstan, and I speak widely on invitation at other universities, including, in the past two years, Princeton, Yale, Duke, Georgetown, New York University, Bard College, Michigan State University, Case Western Reserve University, Stanford, University of California at Los Angeles, Pomona College, Pace University and the University of Turin.

9.      I am associated with Columbia University's Harriman Institute, a center for Russian, Eurasian and Eastern European studies. I am a member of the Council on Foreign Relations, a former treasurer and member of the Executive Committee of the International Law Association's American Branch, and a member of the Board of Advisors of the National Institute of Military Justice. I serve as chair of the Advisory Board of the Eurasia Group, a thinktank that does market-related risk analysis for investment banks, commercial banks and companies doing business in emerging markets, with a special focus on the Central Eurasian region. I am also one

of the authors of the EurasiaGroup Political Risk Index, a process used to assess political risk particularly in developing nations, which is widely reproduced in publications such as *The Economist* and the *Financial Times*.

10.     Throughout my career I have also been involved as a human rights defender and monitor. I served as counsel to Andrei Sakharov and continue to serve as counsel to Elena Bonner and I am a director of the Moscow-based Andrei Sakharov Foundation. I have represented a number of political dissidents, journalists and lawyers in cases involving political repression and have served as an expert advisor on asylum applications for three governments.

11.     I travel regularly to Central Asia and spend a considerable part of my time there. In particular, I have studied and written on the transformation of the legal profession in each of the nations in the region. I organized a program of interaction between the New York City Bar Association ("NYCBA") and bar associations in Kazakhstan and Kyrgyzstan in 1993, and published a report on the status of the organized legal profession in Central Asia derived from this mission. I served as chair of the NYCBA's Committees on the Former Soviet Union, on International Human Rights and on International Law. I have maintained close ties with lawyers, judges and law scholars throughout the region since that time. I arranged an exchange program between NYCBA and the College of Advocates of Almaty in 1994, and have worked regularly with the Almaty bar since that time.

12.     I have participated in a large number of U.S.-funded exchange programs which have brought Kazakhstani lawyers, judges and prosecutors to the United States over the last fifteen years and I have visited with many of them in Kazakhstan, observing legal proceedings there with some frequency. At the request of the U.S. Department of State and Department of Justice, I teach an annual seminar entitled "An Introduction to the Legal Systems of Central

4

Asia" at the National Foreign Service Training Institute in Arlington, Virginia, every year, in-

cluding, most recently, on January 6, 2011. One aspect of this course is to prepare diplomats and

consular officers in dealing with the legal system, including monitoring and reporting on trials

and appeals as part of their official duties. I have also regularly organized special briefings for

the Department of State on legal and commercial issues coming out of Central Asia. I have also

been consulted on Kazakhstani legal issues by the United States Attorney for the Southern Dis-

trict of New York. I work closely with law students from throughout this region and have done

so consistently since 1995. Many of my former students and assistants now hold important posi-

tions throughout this region, including the President of Georgia and the Minister for Foreign

Economic Relations of Azerbaijan. Others serve as important government officials in four other

nations.

13.     I am a founding trustee of the American University of Central Asia, which was

established in 1995, and operates with the support of local governments and an endowment ap-

propriated by Congress, to provide an American-style liberal arts and sciences education to stu-

dents from throughout the Central Asian region. Within the board, I have oversight responsibil-

ity for the university's law program, which prepares and trains lawyers to practice throughout the

region. I have authored more than one hundred articles and notes on legal issues, most of which

addressed legal developments in the former Soviet Union and roughly a dozen addressed legal

investment issues in Kazakhstan with a focus on the regime governing foreign investment.

14.     I am not an attorney qualified to practice in the courts of Kazakhstan, but I am a

legal comparativist with experience in commercial practice in Kazakhstan and a student of the

Kazakhstani legal and judicial system. I have served as counsel to Kazakhstan's Ministry of

Natural Resources and Environmental Protection in 1995-96 and have represented numerous

commercial interests on projects in Kazakhstan, with particular emphasis on the natural re-

sources sector. I have studied the Kazakh courts and legal system since 1992, and have repeat-

edly monitored proceedings in Kazakh courts, with particular attention to commercial matters

and criminal law proceedings raising human rights issues.

15.    I co-authored, together with Glenn S. Kolleeny (a partner at Salans LLC) and

Dmitri Pentsov (now a lawyer with the International Labor Organization in Geneva) a study of

the first major court-supervised corporate restructuring in Kazakhstan, involving Karaganda Me-

tallurgical Combinate ("Karmet") entitled *Bankruptcy, Kazakh Style*. This study subsequently

featured as a part of a BBC documentary on the rise of Lakshmi Mittal and his steel conglomer-

ate in which I appeared discussing the transaction.

16.    I previously served as an expert witness in one other case in which defendants

sought dismissal of a federal complaint suggesting that the claims should have been properly

brought in Kazakhstan. In the case of *Sokol Holdings, Inc. et al. v. BMB Munai, Inc.,* Judge

Kimba Wood denied the motion to dismiss in an order and opinion dated June 14, 2007.

**Opinion**

17.    I have examined the pleadings filed in this case and the materials submitted by

Defendants in support of their motion to have the case dismissed on grounds of *forum non con-

veniens*, and in particular the statement submitted by Joel Benjamin and Viktoria Simonova with

respect to Kazakh law and practice. Benjamin and Simonova opine on behalf of Defendants that

the claims asserted in the complaint rest on theories of conversion, interference with contract,

defamation, libel and invasion of privacy, and that a comparable footing exists for these claims

under the law of obligations (tort) of the Republic of Kazakhstan. However, Kazakhstani law

does not incorporate a system of tort law of the sort known to Anglo-American lawyers. Ka-

6

zakhstani lawyers would in my experience tend to attempt to resolve disputes of the sort alleged here on the basis of contracts. While it is true that the general law of obligations contains a series of concepts that resemble Anglo-American tort liabilities and that could provide a basis for such claims—as Benjamin and Simonova state—in practice such claims are brought far less frequently in Kazakhstan than in the United States.

18.    Benjamin and Simonova also state that "most of the acts alleged in this case to be tortious occurred in Kazakhstan," and state that Kazakhstani courts would have jurisdiction over the matter. The basis for this conclusion is not clear to me. It is clear that some of the conduct giving rise to these claims occurred in Kazakhstan, but an examination of both allegations and documentary evidence suggests that the focus of conduct of the Defendants occurred within the United States, and some of it occurred in third-countries as well. In any event, however, I believe that it would be contrary to the interests of justice for this matter to be dismissed in favor of an adjudication by a Kazakhstani court because Kazakhstan lacks a judiciary with sufficient independence to deal fairly with the matters presented in this complaint. That is particularly the case because the complaint puts in question conduct of Nursultan Nazarbayev, the president of Kazakhstan, and of certain of his key senior advisors, and under the laws of Kazakhstan and the current actual practice of Kazakhstani courts, no court would be permitted to critically examine the actions of the president.

**Legal System of the Republic of Kazakhstan**

A.    The Presidency

19.    The dominant position of the presidency is trumpeted in the Constitution. Contrary to the separation-of-powers approach popular in constitutions adopted in the era after World War II, the Kazakhstani Constitution adopted in 1995 establishes a nominally democratic

state with a "presidential system of government." KAZAKHSTAN CONST. art. 2.  No pretense is made of balancing executive, legislative and judicial functions.  Rather, the Constitution vests heavy overarching authority in the president, who has the power to appoint and dismiss governments, to dissolve parliament and call new elections, and to appoint and dismiss judges.  The descriptions of the President's role and authority are extravagant.  He is the "head of the state," "supreme official," the "symbol and guarantor of unity between the people and the state power," and the "symbol of the assurance of human rights and freedoms."[1]  These powers unite aspects of the executive, legislative (including the power to issue and implement laws by decree) and judicial power within the President, who appears to hover as a superstructure over all the institutions of government, with a right of direct intervention in each.

20.    The Kazakhstani Constitution provides that "[o]ne and the same person may not be elected as President of the Republic for more than two terms consecutively."  However, shortly after Nazarbayev's reelection as president in June 2007, this provision was modified by adding the words: "This limitation does not apply to the First President of the Republic of Kazakhstan—Leader of the Nation."  The modification is thus for the benefit of one person—Nursultan Nazarbayev—and it was included just as a powerful figure in Kazakhstan, and a member of Nazarbayev's own family, Rakhat Aliyev, announced his intention to contest the presidency.[2]  Especially when the formal allocations of power are compared with their actual exercise, the characterization of this system as a "presidential system" is clearly accurate because little effort is made to balance the powers granted the President with those exercised by the parliamentary and judicial authorities.  Rather, the powers of the President are absolutely preeminent.  The

---

[1] LAW ON THE PRESIDENT OF THE REPUBLIC OF KAZAKHSTAN, CONSTITUTIONAL LAW OF THE REPUBLIC OF KAZAKHSTAN, Dec. 26, 1995, chs. 1 & 2.

[2] LAW ON THE FIRST PRESIDENT OF THE REPUBLIC OF KAZAKHSTAN, CONSTITUTIONAL LAW OF THE REPUBLIC OF KAZAKHSTAN, Dec. 20, 2000.

claim that the system is a "democracy" is subject to challenge, however, because serious opposition political parties have not been permitted to compete in the elections for President or parliament. It would be more accurate to view Kazakhstan as a presidential dictatorship with some of the formal attributes of a democracy, but a lack of political will actually to realize those attributes.

21.     Indeed, as time passes, the centrifugal forces in Kazakhstani politics have led to a steady accretion of power in the President's hands and successive steps to lend legal formality to political fact. For instance, in June 2010, the Kazakhstan's parliament, the Majlis, added to Nazarbayev's powers and privileges by bestowing upon him the title "Leader of the Nation," which will remain his even if he ever gives up the presidency.[3] In particular, as Leader of the Nation, Nazarbayev is immune from all criminal and civil accountability for his acts since he assumed the mantle of government in Kazakhstan—including misappropriation of state assets, abuse of power and acts of violence against citizens. The legislation was pressed forward immediately after a popular uprising toppled the autocratic government of Kurmanbek Bakiyev in Kazakhstan's close neighbor, Kyrgyzstan. In fact, the immunities conferred upon Nazarbayev bear a remarkable similarity to the charges that the new revolutionary government in Kyrgyzstan was pursuing against Bakiyev and members of his family at the time. When this was noted to one of the legislation's sponsors, the legislator responded rather improbably that it was merely a "coincidence."[4]

22.     Under both the Leader of the Nation Law and the Law on Amendments and Additions to Some Legislative Acts of the Republic of Kazakhstan Concerning Protection of the

---

[3] *Happy Birthday, Mr. President*, THE ECONOMIST, July 8, 2010, *available at* http://www.economist.com/node/16542507?story_id=16542507&fsrc=rss.

[4] *Nazarbayev Appointed Leader of Nation*, LENTA.RU, June 15, 2010, http://www.lenta.ru/news/2010/06/15/nazarbaev. (Russian language article.)

Rights of Citizens to Privacy, December 8, 2009, it is a criminal act to make false statements about the life and acts of President Nazarbayev.  In practice in Kazakhstan, this means that any-one disputing the president's official account of his life and acts as president is subject to prose-cution.  These provisions are further bolstered by article 318 of the Criminal Code of Kazakh-stan, which makes it a crime to "offend the honor and dignity of the president."  All of these pro-visions collectively would make it impossible for claimants to assert and prosecute claims of fact describing illegal or tortuous conduct by Nazarbayev in a Kazakhstani court.  Indeed, the Plain-tiffs subject themselves to prosecution simply by publishing their claims.

23.     The legislation drew sharp international criticism, particularly from observers who noted that Kazakhstan was currently Chairman-in-Office of the OSCE, and the "Leader of the Nation" law rested on principles of official immunity that could not be reconciled with the OSCE's Paris Charter of 1990.  President Nazarbayev responded to these criticisms by stating, when the law was sent to him for signature, it was "unnecessary."[5]  Nazarbayev did not veto the law, however.  Rather, he let the law take effect through his own inaction on the thirtieth day fol-lowing its enactment by parliament.[6]  That way, Nazarbayev could claim he had nothing to do with the law's enactment.

24.     On December 28, 2010, London's *Daily Telegraph* reported in a dispatch from Almaty that President Nazarbayev "is preparing to back a move to cancel elections in the oil-rich

---

[5] Aydar Yakubov, *Nazarbayev Finds a Way to Become "Leader of the Nation,"* RADIO FREE EUROPE/RADIO LIB-ERTY ("RFE/RL"), June 15, 2010,
http://rus.azattyq.org/content/Nazarbaev_leader_of_nation/2072014.html?page=1&x=1#relatedInfoContainer.
(Russian language article.)

[6] LAW ON THE PARLIAMENT OF THE REPUBLIC OF KAZAKHSTAN AND THE STATUS OF ITS REPRESENTATIVES, CONSTI-TUTIONAL LAW OF THE REPUBLIC OF KAZAKHSTAN, Oct. 16, 1995, art. 19(2) (providing that a law passed by parlia-ment and transmitted to the president becomes final and valid if not vetoed by the president within thirty days).

former Soviet Republic until 2020."[7]  It cited Yermukhamet Yertysbayev, a senior advisor to Nazarbayev, as its source for this conclusion.[8]  The U.S. embassy in Astana criticized the initiative, stating "We believe a national referendum that would replace the presidential elections guaranteed by Kazakhstan's constitution would be a setback for democracy in Kazakhstan. We think that it is important that Kazakhstan's government and citizens honour their international commitments and continue to strive for free and fair elections."[9]  On January 7, President Nazarbayev then rejected the initiative to extend his rule by referendum.  Some Kazakhstani political observers believe that a referendum approach could nevertheless go forward, much as Nazarbayev appeared to oppose the law granting him "Leader of the Nation" status but then allowed it to become law just the same.[10]

25.     The upshot of these developments is to make clear that Nazarbayev will continue to govern as president with extraordinary powers for the indefinite future, and whether the formalities of a contested election are permitted in 2012 or dropped in favor of a "Turkmen style" referendum extending his term is entirely in the discretion of Nazarbayev.

**A Legal System in Transition**

26.     Kazakhstan has a legal system in transition.  The nation was built off a Soviet legal legacy, and has undergone an extensive series of legal reforms, which in many respects serve as a model for the post-Soviet space.  Although the Constitution tilts decidedly towards the au-

---

[7] Richard Orange, *Kazakh president likely to back call to scrap election and stay in power*, DAILY TELEGRAPH, Dec. 28, 2010, *available at* http://www.telegraph.co.uk/news/worldnews/asia/kazakhstan/8228145/Kazakh-president-likely-to-back-call-to-scrap-election-and-stay-in-power.html.

[8] *Id.*

[9] U.S. Embassy Astana, "U. S. Government's Position on Kazakhstan's Proposed National Referendum to Extend President Nazarbayev's Term in Office," Jan. 4, 2011, archived at http://kazakhstan.usembassy.gov/pr-01-04-11.html.

[10] Richard Orange, "Kazakhstan president rejects 10 year extension to his rule," DAILY TELEGRAPH, Jan. 7, 2011, archived at http://www.telegraph.co.uk/news/worldnews/asia/kazakhstan/8245923/Kazakhstan-president-rejects-10-year-extension-to-his-rule.html.

thoritarian, most modern Kazakhstani legislation is strikingly progressive. The Kazakhstani legal system follows the pandectist civil-law tradition, and recently adopted legislation is generally in the mainstream of European civil law. The Civil Code is a good example of this process. Kazakhstan was among the earliest states to adopt a new civil code. Promulgated by presidential decree in 1995, the new civil code reflected the work of a substantial cohort of legal academics drawing on models from around the world, of which the Austrian, Dutch, German and Russian codes figure most prominently. In short order, Kazakhstan adopted a panoply of commercial laws sufficient to create a solid platform for intense foreign investment—sustaining a large number of natural resource exploration and development contracts concluded over the coming decade which helped vault Kazakhstan into a leading position as a producer of hydrocarbons. This legal regime has consistently won strong praise from international observers. The formal legal regime, however, must be weighed carefully against the nation's rule of law instincts and the legal institutions which should uphold it, but which often fall seriously short in that mission.

> B.   The Special Role of the Family

27.    Parallel to the understanding of roles of formal legal structures, sociologists, anthropologists and political scientists discussing the role of law and government in Kazakhstan frequently note that Kazakhs have an "informal" or "traditional" understanding of governance and law apart from the formal structures. Drawing on the nomadic roots of Kazakh society which reverberate to the present day, this stresses the role of extended clan groups and families. Kazakhstan has a well-established practice over centuries to seek resolution of disputes within these clan structures rather than through formal legal institutions that began to appear in the Tsarist era and which became much more entrenched following the Soviet consolidation of power in the Steppe region in the 1920s to 1930s. Leaders of the clan groups also have respon-

sibility to provide for the welfare of their clan. This leads to relationships which in the eyes of Westerners would be seen as nepotistic or corrupt, but in a Central Asian perspective reflect a long-established social order which exists under the surface and masked by the formal one.

28. Indeed, in modern political parlance in Kazakhstan, references to "the family" often have a more specific meaning: the family of President Nazarbayev and a handful of other individuals close to him who sit at the pinnacle of political and economic power in Kazakhstan. The membership in this golden inner circle focuses on, but is not limited to, the immediate family of Nursultan Nazarbayev. It extends beyond to key political allies who now exercise control over the regional-financial conglomerates that dominate the commercial sector. In a recently published study, Barbara Junisbai describes the relationship this way: "FPGs[11] closely associated with the President have gained control over the country's oil and gas sectors, as well as other highly sought-after natural resources. They comprise the President's inner circle, or the 'Nazarbaev clan,' as it is sometimes called. Membership in the inner circle is not limited to the President's extended family or to those sharing the same clan or tribal identity."[12] In another study, Anja Franke has charted in some detail how the Nazarbayev clan wields presidential power and influence to attain dominant positions in the business world—including Nazarbayev's wives, brothers, nephews, daughters and their husbands.[13]

29. A good example of the extent of the Nazarbayev family's economic interests can be found in recently disclosed information surrounding the Kazakh mining giant Kazakhmys plc. A member of the prestigious FTSE 100 share index and the tenth largest producer of copper in

---

[11] Financial-industrial groups (from the Russian: *Finansovo—Promyshlennye Gruppy*).

[12] Junisbai, *A Tale of Two Kazakhstans: Sources of Political Cleavage and Conflict in the Post-Soviet Period*, 62 EUROPE-ASIA STUDIES 235, 236 (Mar. 2010).

[13] Franke, *Kazakhstan and Azerbaijan as Post-Soviet Rentier States: Resource Incomes and Autocracy as a Double 'Curse' in Post-Soviet Regimes*, 61 EUROPE-ASIA STUDIES 109 (Jan. 2009).

the world, Kazakhmys is a huge natural resources company allegedly controlled by individuals

closely related to President Nazarbayev.  In October 2005, Kazakhmys became the first company

from the territory of the former Soviet Union to be granted a listing on the main market of the

London Stock Exchange, which it used to raise over $491 million in capital.  Ironically, a Ka-

zakh observer argued credibly that the LSE listing led to *decreased* transparency surrounding the

actual equity ownership and de facto control of the company.[14]

      30.     Global Witness, a British-based NGO which investigates the role of natural re-

sources in funding conflict and corruption around the world, has recently produced a major in-

vestigative report that attempts to resolve some of the lingering ambiguities surrounding the se-

cretive ownership structure of Kazakhmys.  Because of the absence of transparency in the com-

pany's own filings and disclosures, Global Witness carried out interviews with a number of for-

mer government officials, opposition politicians and businessmen who claimed knowledge of

Kazakhmys.  Global Witness reports: "All of the sources who claim knowledge of Kazakhmys—

nine in total—voiced the same opinion, that the company's major shareholders and key managers

maintain a close relationship with the Kazakh president, Nursultan Nazarbayev, and that this re-

lationship could allow Nazarbayev to influence the way the company is run if he so chooses.

Some sources allege that Nazarbayev influences the company in actuality."[15]  The report goes on

to cite evidence that President Nazarbayev's £30,600 bill from a stay in London's posh Lanes-

borough Hotel in 2006 was sent to Kazakhmys for settlement and it quotes a series of former

---

[14] Tulegen Askarov, *Secrets of the Copper Lords, or, About the True Owners of Kazakhmys*, RESPUBLICA, Oct. 15, 2006 (arguing that "the presence of such influential persons in Kazakhmys, very close to the President of Kazakh-stan, became the main incentive for the reorganization of the company to decrease its transparency."). (Russian lan-guage article.)

[15] GLOBAL WITNESS, RISKY BUSINESS: KAZAKHSTAN, KAZAKHMYS PLC AND THE LONDON STOCK EXCHANGE (July 13, 2010), http://www.globalwitness.org/media_library_detail.php/1022/en/kazakh_company_on_ftse_100_a_risk_for_investors_sa.

Kazakh government officials describing incidents in which President Nazarbayev appears personally to direct Kazakhmys business matters.

31.     The Kazakhmys case demonstrates how Nazarbayev uses family members and longtime political associates as his proxies in this process. As of March 2010, three senior Kazakhstani managers of Kazakhmys owned 47.6 percent of the company, according to a 2009 Kazakhmys company report. The government of Kazakhstan itself owns a further 15 percent. Two of these three men have long-standing personal relationships with Nazarbayev going back to the Soviet era, and the third is a protégé of the first two. Vladimir Ni, the chair of Kazakhmys Corporation LLC, worked for twenty-eight years as a top government official in Kazakhstan both before and after the country gained its independence, including a thirteen year period in which he served as Nazarbayev's chief of staff. Vladimir Kim, who owns 38.9 percent of the company, had spent most of his early life working for Vladimir Ni, and from 2002 forward has been a senior member of President Nazarbayev's political party, Nur Otan. Global Witness states that the three men function as frontmen for Nazarbayev. None of them has prior executive or managerial experience in the business world, much less with the mining industry, and it is unclear how any of them could, while earning modest salaries as government functionaries, have amassed the capital necessary to acquire stakes worth hundreds of millions of dollars in a world-class mining company. Additionally, in 2004, shortly before Kazakhmys's initial London listing, President Nazarbayev's brother Bolat joined its board of directors.[16]

32.     Those within the inner circle of "the family" appear to operate in virtual detachment from the country's legal regime, including formal systems of regulation and accountability, while they enjoy the President's favor. Instead, they are often able to manipulate the levers of

---

[16] *Id.*

state power in an unseen or nearly unseen way to effect their business or personal objectives. Because of the intensity of emotion surrounding family relationships and the close association of money with political power, a divorce or the falling out of favor of a member of the family can have extraordinary legal, political and economic consequences.

      C.    <u>The Kazakhstan Judiciary</u>

    33.    In the nineteen years since it emerged on the international stage, Kazakhstan's lawmakers have done an on the whole admirable job in crafting legislation to support a market economy. In many respects their work can even be called state-of-the-art. Nevertheless, Kazakhstan's rule-of-law traditions are extremely weak, and even President Nazarbayev has acknowledged that judicial independence and integrity is a weak point for his country.[17] Because the ultimate test of commitment to the rule of law rests equally on the articulation of legal norms and the willingness fairly and forcefully to apply those norms, the question of judicial independence and integrity is essential, as is the relationship between the courts and the procuracy and other agencies of law enforcement.

    34.    The foundations for the Kazakhstani judiciary are contained in section VII of the Constitution, which is supplemented by Constitutional Law No. 132, usually called the Law on the Judicial System. These contain conventional guarantees of judicial independence ("a judge … shall be independent and subordinate only to the Constitution and the law," CONST. art. 77; "Courts shall consist of permanent judges whose independence shall be protected by the Constitution and law," CONST. art. 79; "Financing of courts, provision of judges with housing shall be

---

[17] Opening Address of President Nursultan Nazarbayev to the Conference "Struggle Against Corruption & Good Governance as a Condition for Economic and Social Development of East Europe and Central Asia," Sep. 16, 2009, p. 6.

performed from the republican budget and must ensure the possibility of complete and free exercise of justice," CONST. art. 80).

35.   If we review the standards contained in the Basic Principles,[18] the Kazakhstani judiciary falls short on many fronts. Of the factors identified, three are particularly significant to Kazakhstan: the process of judicial qualification and selection; the appointment process; and the process of removal or, more specifically in Kazakhstan's case, non-reappointment. I discuss each of these factors below.

36.   To attain qualification as a judge, an individual must be a citizen at least 25 years old with a higher legal education (usually the *diploma* of a law faculty or institute), must have two years of practical experience working as a lawyer, and must pass a judicial qualifying examination. CONST. art. 79(3). Appellate judges must have at least five years experience in legal practice, including at least two years service as a judge. CONST. art. 29(2).

37.   Judges are appointed by the President. With respect to Supreme Court judges, the nomination is on recommendation of the Supreme Judicial Council and confirmation by the senate; with respect to appeals courts, the recommendation of the Supreme Judicial Council, with respect to district courts, the Ministry of Justice. However, judges (other than those of Supreme Court) serve terms of five years, at the end of which they are subject to reappointment. This means judges must be conscious of how the President views their decisions at all times.

38.   The Law on the Judicial System, combined with the powers of the President as "protector" appear to authorize the removal or sanctioning of judges on factors which are at best ambiguous. Rapporteur Leandro Despouy's report on the independence of Kazakhstan's judiciary states: "they can facilitate the abusive removal or sanction of, more especially, any politically

---

[18] UNITED NATIONS BASIC PRINCIPLES ON THE INDEPENDENCE OF THE JUDICIARY, Dec. 15, 1985, *available at* http://www2.ohchr.org/english/law/indjudiciary.htm.

independent judge. Judges feel vulnerable about their position if they issue acquittals opening
the door for individuals to threaten the State financially, or if their sentences are reversed on ap-
peal. More especially, judges with a high record of sentences contrary to State interests may
have to prove that they were not bribed and be exposed to disciplinary measures or non-
reappointment by the President."[19]

39.    These factors point collectively to a judiciary under the effective control of the
executive in Kazakhstan. Moreover, the absence in fact of judicial independence can be gauged
on the basis of statistics from the criminal justice process. As the Despouy Report notes, for in-
stance, only 0.1 percent of all criminal cases going to trial (73 out of 62,602) resulted in acquittal
in 2003.[20] The introduction of a jury system has somewhat ameliorated this situation, since ju-
ries have proven far more likely to acquit than judges. In 2009, for instance, courts conducted 47
jury trials involving 69 defendants; jurors convicted 32 defendants and acquitted 14; for the same
period, judicial acquittals were described as "negligible." This only serves to highlight questions
about the fairness and independence of the Kazakhstani judiciary.[21]

40.    The United States Department of State accurately assesses the state of the Ka-
zakhstani judiciary in its current Human Rights Country Report: "The law does not provide for
an independent judiciary. The executive branch limited judicial independence. Prosecutors en-
joyed a quasijudicial role and had authority to suspend court decisions."[22]

41.    Far from handling cases with the requisite independence, Kazakhstani judges
have a strong reputation for handling cases either as proxies for the Executive or of accepting

---

[19] Special Rapporteur Leandro Despouy, *Report of the Special Rapporteur on the Independence of Judges and Law-
yers on a Mission to Kazakhstan*, ¶ 34, *delivered to the General Assembly*, U.N. Doc. E/CN.4/2005/60/Add.2 (Jan.
11, 2005) ("Despouy Report").

[20] Despouy Report ¶ 54.

[21] U.S. Dept. of State, *2009 Human Rights Report: Kazakhstan* ("2009 Report").

[22] *Id.*

bribes to resolve cases in favor of economically and politically well situated local powerbrokers. Again, as the United States Department of State notes: "Corruption was evident at every stage and level of the judicial process.  Although judges were among the most highly paid government employees, lawyers and human rights monitors alleged that judges, procurators, and other officials solicited bribes in exchange for favorable rulings in the majority of criminal cases."[23]

42.     The State Department's conclusions are echoed in a series of authoritative reports by Freedom House which pay close attention to the politicization of the Kazakhstani court process and raise questions about a lengthy list of cases in which political adversaries of the Nazarbayev government have been prosecuted.  Freedom House stated: "The concentration of powers in the presidency, the capture of the Parliament by powerful, regime-connected financial interests, and the prevalence of personal patronage over formal rules have contributed to the continuing subordination of the judiciary to political interests.  Kazakhstan's judicial system has lost much of its credibility by acting in full compliance with the regime's interests rather than stepping in to protect civil liberties.  The local courts have been accused of many procedural and politically motivated charges....."  Freedom House noted that the Kazakhstani judiciary had thus far failed to issue a single independent verdict protecting an individual against government abuse, in concluding that the Kazakhstani judiciary had shown year-on-year deterioration for five successive years, and was now among the least independent judiciaries of the Soviet Union's successor states.[24]

D.     Torture and Deaths in Detention

---

[23] *Id.*

[24] Freedom House, *Freedom in the World* (2006, 2007, 2010), *available at* http://www.freedomhouse.org/template.cfm?page=15.

43.     The pervasive presence of torture as a feature of the Kazakhstani criminal justice system further highlights weaknesses in the legal culture and a failure by the judiciary and the procuracy to play an essential role of oversight.  Kazakhstan's Constitution and Criminal Code proscribe the use of torture-induced evidence in the criminal justice process.  CONST. art. 77(9), CRIM. CODE art. 116(1)(1).  However, Prof. Manfred Nowak, in his report on Kazakhstan's adherence to the Convention Against Torture, prepared in his capacity as the United Nations special rapporteur on torture, finds evidence that torture-induced evidence has not been excluded: "since crimes need to be solved, previous convicts are often accused of having committed them, and their cases are simply fabricated, often with the use of physical violence to obtain a confession, to which false evidence is then added."[25]  The OSCE's own study of trial practice in Kazakhstan came to the same conclusion: "the exclusion of evidence elicited as a result of torture… does not appear to be sufficiently established in judicial practice in Kazakhstan."[26]  Moreover, Kazakhstan has one of the world's highest prison incarceration rates.  Prof. Nowak concludes that "the use of torture and ill-treatment certainly goes beyond isolated instances."[27]  Nowak also points to a failure to bring criminal charges against state agents even in cases where torture is well-documented through physical evidence.  He notes that this can largely be explained through the "paradox" that the procurators who have enforcement power also exercise a level of supervisory authority over the police forces who regularly use torture.  A charge would therefore in itself suggest that the procurator "has not fulfilled its monitoring role."[28]

---

[25] Manfred Nowack, *Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment: Mission to Kazakhstan, delivered to the General Assembly*, U.N. Doc. A/HRC/13/39/Add.3 (Dec. 16, 2009) ("Nowak Report").

[26] ODIHR/OSCE, *Report on Results of Trial Monitoring in the Republic of Kazakhstan* (2005-06), at 9, *available at* http://www.osce.org/astana/documents/24153.

[27] Nowak Report ¶ 22.

[28] *Id.* ¶ 55.

44.     Kazakhstan also has an exceptionally high rate of death in detention, particularly deaths of witnesses and suspects in investigatory detention. Many of these cases also implicate torture. There were 268 deaths in detention in 2006, for instance. These facts point to massive, systematic violations of the fundamental rights of those held in detention without accountability for prison authorities, procurators and without monitoring or oversight of the situation by the courts.[29] A recent striking example involves KNB Major General Zhomart Mazhrenov, who was arrested in July 2008 in connection with a corruption investigation and died in his cell one day later. The Nazarbayev Government claims that Mazhrenov committed suicide, the same explanation applied to most of the deaths in detention.[30] But following his death, it appeared that General Mazhrenov was critical of the Nazarbayev Government's human rights abuses and had established links to a number of political dissidents, including Rakhat Aliyev, the President's former son-in-law. General Mazhrenov also may have witnessed a major political assassination of an opposition political figure. His sudden death was therefore extremely convenient for the Nazarbayev Government, and the suggestion that he committed suicide has met with considerable skepticism.[31]

E.     The Procuracy

45.     Professors Nowak and Despouy each highlight the paramount role played by the procurator general in the Kazakhstani justice system and the general unwillingness of judges to contradict or obstruct the position taken by the procuracy. The office of procurator general is

---

[29] UNHCHR, *Concluding Observations of the Committee Against Torture: Kazakhstan*, at 9, *delivered to the Generaly Assembly*, U.N. Doc. CAT/C/KAZ/CO/2 (Nov. 21, 2008), *available at* http://www2.ohchr.org/english/bodies/cat/docs/co/CAT.C.KAZ.CO.2.doc.

[30] *Detained General of Kazakh Special Services Commits Suicide in Astana*, JOHNS HOPKINS UNIVERSITY CENTRAL ASIA-CAUCASUS INSTITUTE ANALYST, July 9, 2008, *available at* http://www.cacianalyst.org/?q=node/4915.

[31] Bruce Pannier, *Convenient "Suicide" Removes Key Witness in Kazakh Scandal*, RFE/RL, July 11, 2008, http://www.rferl.org/content/Key_Witness_In_Kazakh_Scandal_Dies/1183098.html.

placed on equal footing with that of justices of the Supreme Court in terms of immunities and

protections granted it by the constitution, but its powers are extraordinary.  In sum, the office

combines two major functions: (1) the power to enforce the law through prosecution and civil

action brought in the name of the state; and (2) as the "eyes of the tsar," the powers of an inspec-

tor general on behalf of the state, with extraordinary authority to enter into premises, demand the

physical presence of persons and documents and conduct investigations without formal legal

cause.  The office dates back to the time of Peter the Great and it has been used—much as de-

scribed by Nikolai Gogol in his celebrated play, *The Inspector General (Revizor)*—to combat

corruption and inefficiency.  Historically, the office has therefore carried substantial political

weight and the procurator general has had a close connection with those who wield power at the

highest level, serving as a whip to assure discipline and fidelity down the line.  Since Kazakhstan

gained its independence, the procurator general has been an important weapon used by Nazar-

bayev and his government to suppress political opposition. Potential opposition political figures

are criminalized, and thereby disqualified from participation in the political process.  Their assets

are seized and persons close to them are also harassed, prosecuted and dispossessed.  I review

below a number of cases that demonstrate this pattern of conduct.

46.    The powers of the procurator general are extremely broad.  For instance, under

the Law on National Security of 1998, the procurator general has the right to suspend the activi-

ties of any publisher or broadcaster when he deems it necessary to the national security.[32]  His

decisions on this point are not subject to review or appeal.  These powers have been used repeat-

edly to block the broadcast or publication of news reports which might damage the reputation of

President Nazarbayev.  For example, the powers were used in 1999, when foreign press reports

---

[32] MARTHA BRILL OLCOTT, KAZAKHSTAN: UNFULFILLED PROMISE 106 (2002) (discussing use of this power by the procurator to terminate publications and broadcasters).

about "Kazakhgate" (discussed in more detail below) were placed under ban, and in 2009, when the reading or reproduction of Rakhat Aliyev's book *The Godfather-in-Law* was banned on the pretext that the book revealed state secrets, particularly in discussions of Nazarbayev's family life.[33]   Although it is undeniable that the procurator general plays a normal criminal justice function in a great many criminal investigations and prosecutions he undertakes, the experience of the last seventeen years suggests that his function often deteriorates into a simple political one when dealing with figures that President Nazarbayev views as enemies.   In such cases, the procurator general's job is to attack and wear down these figures by criminalizing them.   The criminal justice system is thus transformed into a political tool to protect the President from political embarrassment or compromise.

47.   Kazakhstan's political system has been variously described as an advanced kleptocracy or a 21st-century dictatorship.[34]   Freedom House's authoritative assessment of *Freedom in the World* for 2010 concluded that "President Nursultan Nazarbayev and his Nur Otan party maintained almost complete control over the political sphere in 2009, using tactics including arbitrary arrests, restrictive new laws, and politically motivated prosecutions to muzzle critical media outlets and individuals."[35]   These tactics necessarily involve the complicity of police forces, the procuracy, the court system and individual judges.   In sum, they reveal a judicial system that is tightly controlled by the executive and which rarely demonstrates any meaningful independence.

---

[33] *The Prohibited Book of Rakhat Aliyev Does Not Pose Much Danger*, FERGHANA.RU, May 26, 2005, http://enews.ferghana.ru/article.php?id=2537.

[34] *Accountability and Transparency: Country Studies – Kazakhstan*, DEMOCRACY WEB (2010), http://www.democracyweb.org/accountability/kazakhstan.php.

[35] Freedom House, *Freedom in the World – Kazakhstan*, May 3, 2010, http://www.unhcr.org/refworld/country,,FREEHOU,,KAZ,,4c0ceae928,0.html.

48.    The procuracy, courts, state-security apparatus and financial police often act in tandem to work the will of President Nazarbayev—frequently this is to dispossess persons he has identified as enemies, though on other occasions it is to bolster the positions of those he has decided to favor, particularly the members of his family and inner circle. The Freedom House *Nations in Transit* 2009 report states that "[a] narrow circle of kin, clients, and powerful financial groups and a limited stratum of government officials, technocrats, and entrepreneurs have benefited the most from Kazakhstan's resource wealth and economic growth."[36]  In this strong executive system created by President Nazarbayev, where much depends on presidential patronage, "the judiciary, like the legislative branch, has remained loyal to the regime and protected the interests of the state and its functionaries rather than those of individuals, minorities, and the weaker strata of society."[37]

49.    Although most studies have focused on the criminal justice system, the United Nations Special Rapporteur, Prof. Leandro Despouy, also examined patterns of government meddling with civil litigation in the Kazakhstani courts, even when it is not a party to the case. The Procurator General is the principal vehicle for the Kazakhstani Government's manipulation of civil cases.  The Despouy Report concludes, "In civil cases, the Procuracy has the right to intervene at any stages of the trial, even where the State does not have a clear and legitimate interest. This situation reportedly occurs with some regularity, especially where there exists an economic interest: it forms part of a frustrating power relationship between judges and prosecutors and it was alleged that, sometimes, this leads individuals who have the political or financial

---

[36] Freedom House, *Nations in Transit 2009 – Kazakhstan* (2010), http://www.freedomhouse.eu/images/nit2009/kazakhstan.pdf.
[37] *Id.*

24

means of soliciting the Procuracy (possibly by offering a bribe) to intervene and appeal a decision that runs against their interest." Despouy Report ¶ 44.

50.      Although instances of state manipulation in high profile human rights trials are documented far more extensively than are those in commercial litigation, this does not mean that those are rare occurrences and do not have a systemic nature.  There are two likely reasons why these might be underreported, according to the U.S. State Department's 2008 *Investment Climate Statement — Kazakhstan*: "Most investors prefer to handle investment disputes privately, rather than makes cases public. [...] Senior government officials have a large say in minor and major transactions, and decisions are often made behind closed doors."

F.      Corruption in Kazakhstan

51.      In 2007, the U.S. Department of State, in delivering a report about Kazakhstan, observed that corruption was "pervasive" especially "in law enforcement and the judicial system."[38]  A report issued by the U.S. Embassy in Kazakhstan for 2009 mirrored that sentiment, noting that historically corruption was fairly rampant throughout the various branches and agencies of Kazakh government.  Human rights groups and NGOs have consistently been accusing the government of overlooking corruption within their own ranks.[39]

52.      In 2009, the Kazakh government "intensified its campaign to address corruption, and several highly placed government officials were investigated for embezzlement and abuses of office."  The government reported that during the first ten months in 2009, "1,693 corruption crimes were disclosed, including 625 bribery cases, 332 cases of abuses of power, 60 cases of

---

[38] U.S. Dept. of State, Bureau of Democracy, Human Rights and Labor, *Human Rights Country Reports: Kazakhstan*, Mar. 6, 2007, at 1 ("2007 Report").

[39] U.S. Dept. of State, Bureau of Democracy, Human Rights and Labor, *Human Rights Country Reports: Kazakhstan*, Mar. 11, 2010, at 18 ("2010 Report").

excessive use of power, 365 cases of embezzlement and five cases of money laundering, and two cases of economic smuggling."[40]

53.     Despite this increased enforcement, Kazakhstan remains low in the Corruption Perceptions Index published by Transparency International.  In 2010, it was ranked 105 out of 180 countries with a CPI score of 2.9, which was an improvement from a CPI score of 2.7 in 2009.[41]  The World Bank, on the other hand, has ranked Kazakhstan 63rd out of 181 countries in 2010 (up from 70th place in 2009) on ease of doing business.[42]

G.     Human Rights in Kazakhstan

54.     In 2010, Freedom House, ranking Kazakhstan as "not free," gave it a political rights score of 6 and a civil rights score of 5 applying a seven-point scale in which 7 represents a perfect totalitarian system without freedom and 1 represents a model democracy.  Moreover, Freedom House gave Kazakhstan a "downward trend arrow" due to a "spate of politically moti-vated libel suits against critical media outlets, a restrictive new internet law, arbitrary arrests of officials and businesspeople and the grossly deficient judicial proceedings against human rights activist Yevgeny Zhovtis."[43]  Furthermore, Freedom House has strongly criticized Kazakhstan, and President Nazarbayev, in particular, for the stronghold he has maintained over key govern-ment positions through his Nur Otan party.  U.S. Government reports have further discussed al-legations that those individuals who seek to enter into government service are required to join

---

[40] 2010 Report, at 18.
[41] Transparency International, *2009 Corruption Perception Index*, http://www.transparency.org/policy_research/surveys_indices/cpi/2009.
[42] The World Bank, *Kazakhstan – Country Brief 2010* (last accessed May 11, 2010), at 3.
[43] Freedom House, *Freedom In The World – Kazakhstan* (2010), http://www.freedomhouse.org/inc/content/pubs/fiw/inc_country_detail.cfm?country=7850&year=2010&page=0&view=mof&pf.

Nur Otan.[44] Rights and freedoms of assembly and association are also significantly abridged through licensing and registration requirements.[45]

55.     The concentration of power in the executive branch has worried many observers of Kazakh politics. Control of the judiciary branch by the executive is discussed widely in various reports as a cause for concern as well. More recent developments in Kazakhstan, particularly since the country assumed chairmanship of the OSCE, have given fodder to Kazakh critics as well. The U.S. Helsinki Commission Chairman Senator Benjamin Cardin expressed disappointment of President Nazarbayev's desire to "aggrandize" his own power after the announcement that Nazarbayev had been given "Leader of the Nation" status.[46]

56.     A number of specific court cases in Kazakhstan involving figures known as political adversaries to President Nazarbayev can be examined to demonstrate the executive's manipulation of legal proceedings in Kazakhstani courts. Prominent among them would be proceedings against former Prime Minister Akezhan Kazhegeldin, former Governor Galymzhan Zhakiyanov, former minister Mukhtar Ablyazov, human rights advocate Evgeniy Zhovtis and the banished former presidential son-in-law Rakhat Aliyev. One example, in particular, involving the prominent exposé journalist Sergei Duvanov, demonstrates well the reach of the president and his inner circle in the management of pending legal cases.

57.     Mr. Duvanov had provoked the ire of the Kazakhstani Government by authoring a series of detailed reports in the course of 2002, drawn heavily from publications in the West such as *The New York Times* and *The Wall Street Journal,* about the bribery case of *United States v. Giffen*, involving corruption allegations against a senior aide to President Nazarbayev, com-

---

[44] 2009 Report, at 17.

[45] *Id.*

[46] Stan Rogers, *Nazarbayev's 'leader of nation' status criticised*, CENTRAL ASIA ONLINE, June 25, 2010, http://centralasiaonline.com/cocoon/caii/xhtml/en_GB/newsbriefs/caii/newsbriefs/2010/06/25/newsbrief-08.

monly referred to as "Kazakhgate."[47]  The particulars of the Kazakhgate scandal are set forth be-

low.[48]

58.     In the *Giffen* case, the United States criminally charged two American business-

men with corrupt dealings with individuals in the Kazakhstani government.  Defendant James

Giffen is the CEO of Mercator Corp., a New York-based merchant bank, and simultaneously a

senior advisor to President Nazarbayev who has been issued a Kazakh diplomatic passport.  He

was charged with at least $78 million in bribes, allegedly on behalf of major oil companies, to

the President and a former Kazakh prime minister (the actual total of the alleged bribes is un-

known, but has been quoted as being over a billion dollars).  The original indictment included 13

counts of violating the U.S. Foreign Corrupt Practices Act (FCPA) and 33 counts of money

laundering.

59.     Indicted with Giffen was J. Bryan Williams III, a former senior executive who

was in charge of Mobil's overseas crude-oil transactions in Kazakhstan on a charge of evading

taxes over an alleged $2 million kickback in connection with Mobil's oil business in Kazakhstan.

Mr. Williams subsequently accepted a guilty plea, while Mr. Giffen maintained his innocence,

pursuing a classic "graymail" defense in which he argues that he worked as an agent of the

American Central Intelligence Agency (CIA) gathering intelligence about the operations of the

Kazakhstani government, and arguing that his dealings were known to and acquiesced in by the

United States Government.[49]  The case was tied up in years of litigation over the declassification

and production of U.S. Government documents, and most recently was put on hold again when

---

[47] *Kazakhstan: Mobil, CIA secrets may come out*, BLOOMBERG, Aug. 25, 2005,
http://www.corpwatch.org/article.php?id=12586.

[48] Comprehensive treatments of the genesis of Kazakhgate can be found in: STEVE LEVINE, THE OIL AND THE
GLORY: THE PURSUIT OF EMPIRE AND FORTUNE ON THE CASPIAN SEA (2007), and Seymour Hersh, *The Price of Oil:
What Was Mobil Up to in Kazakhstan and Russia?*, NEW YORKER, July 9, 2001.

[49] Steve LeVine, *The CIA, Secretiveness and Jim Giffen's Gamble*, BUSINESSWEEK, Sep. 18, 2008, *available at*
http://www.businessweek.com/blogs/russia_oil_politics/archives/2008/09/the_cia_secreti.html.

the CIA, which acknowledged the existence of a "relationship" between itself and Giffen, disclosed that it still had not turned over all the relevant documentation.[50]

60.     Ironically, it appears that the criminal investigation that produced these indictments was triggered by action of the Nazarbayev government itself, when it shared with European law-enforcement authorities information concerning its suspicions that former prime minister turned government critic Akezhan Kazhegeldin had benefited from suspicious foreign payments.  That investigation led prosecutors in Geneva, Switzerland, to the discovery of bank account information concerning the suspect payments which they then shared with the U.S. Justice Department.[51]

61.     Battling back against the prosecutors' allegations, Giffen interposed a "graymail" defense in which he argued that his dealings with the Kazakhstani government and its key officers were known to the American intelligence community and were undertaken with their consent and, in at least some cases, for their benefit.  He pressed for discovery of documents which he suggested would prove this knowledge.  This tactic had its desired effect of provoking opposition to the suit within the United States government, particularly within the Central Intelligence Agency, which apparently feared disclosure of sensitive information concerning its operations in the Central Asian region.  The District Court nevertheless directed disclosure of information showing dealings between the intelligence services and Giffen.  Although some materials were disclosed, as the trial date approached, prosecutors were forced to concede that a substantial volume of materials had never been put forward, in apparent violation of the court's discovery rulings.  Facing the possible dismissal of their case for noncompliance with the court's orders, the

---

[50] Human Rights Watch, *World Report 2001 – Kazakhstan* (2002), http://www.hrw.org/wr2k1/download/business.rtf.

[51] Rozlana Taukina, *The Swiss Won't Return Money to Nazarbayev*, INSTITUTE FOR WAR & PEACE REPORTING, Sep. 11, 2001 (interview with Geneva Procurator Bernard Bertossa), *available at* http://ftp.eurasia.org.ru/archive/2001/gate_en/09_11_Bertossainterview_eng.htm.

prosecutors ultimately entered into a plea-bargain agreement[52] on August 6, 2010 under which

the most serious charges against Giffen were dropped.  He pleaded guilty to an income tax viola-

tion relating to nondisclosure of a Swiss bank account, and Mercator Corporation, an investment

bank which he controls, pleaded guilty to a single count of violation of the Foreign Corrupt Prac-

tices Act—relating to the supply to Kazakh officials of some snowmobiles.[53]  Most observers

consider the outcome to be an astonishing failure for the prosecutors, and an exceptionally adroit

series of maneuvers by defense counsel, who successfully played U.S. Government agencies

against one another to bring the case to near-complete collapse.

62.     The Kazakh Government took extraordinary steps to block wide dissemination of

reports about the *Giffen* case in Kazakhstan as the information provided was considered unusu-

ally threatening to President Nazarbayev and other senior leaders.  Television broadcasts from

Russia were disrupted, for instance, when reports about the case were carried, and copies of ma-

jor newspapers carrying stories about the case were generally unavailable within the country.[54]

Duvanov's dissemination of information about the case, in Russian language and to a broader

public, was therefore apparently viewed by President Nazarbayev and his key aides as particu-

larly troubling.

63.     After Duvanov's pieces summarizing the Western press reporting were published,

he was physically threatened.[55]  Following an incident that occurred in October 2002 while Du-

vanov was visiting his dacha in the town of Kainar outside of Almaty, he was charged by prose-

---

[52] The plea bargain agreement can be viewed here: http://www.mainjustice.com/2010/08/06/james-giffen-plea-agreement-and-criminal-information.

[53] David Glovin, *Seven-Year Kazakh Bribery Case Ends With "Sputtering" Misdemeanor Plea*, BLOOMBERG, Aug. 6, 2010, http://www.bloomberg.com/news/2010-08-06/oil-consultant-giffen-to-plead-guilty-to-misdemeanor-after-bribery-charges.html.

[54] *Eurasia Media Forum: Central Asia's Masters of Spin*, EURASIANET, Apr. 21, 2004, http://www.eurasianet.org/departments/insight/articles/eav042204a.shtml.

[55] Ibragim Alibekov, *Appeal Date Set for Jailed Journalist in Kazakhstan*, EURASIANET, Feb. 23, 2003, http://www.eurasianet.org/departments/civilsociety/articles/eav022403.shtml.

cutors with having had unlawful sexual intercourse with a minor.  The accusations stirred considerable controversy, with many observers noting the rapid tracking of the criminal prosecution, the evidence of a high-level of attention paid to it by the President's office and the suspicion that the crime had been staged to eliminate a journalist who had exposed threatening facts about the President.[56]  The OSCE's Chairman-in-Office appointed two expert outside observers, Ferdinand J.M. Feldbrugge and William B. Simons, both law professors at the University of Leiden, to study the case and report back to him.[57]

64.     I subsequently obtained a copy of their confidential evaluation of the case, which I tracked myself during visits in this period to Kazakhstan.  The prosecution claims that Duvanov violently forced himself upon a young female, having sexual intercourse with her against her will.  The defense argues, as Professors Feldbrugge and Simons note, that "Duvanov has been the victim of an elaborate plot to remove him, as a person who proved to be a thorn in the side of certain government officials and agencies, from the public arena, both physically—by locking him up for a considerable period—and by permanently destroying his public image—by parading him as a rapist and a child molester.  The defense story is obviously not subject to the strict rules of evidence that govern the case for the prosecution.  If the defense succeeds in telling a story that is internally consistent, possesses a certain degree of credibility, and has not been convincingly refuted by the prosecution, the prosecution's story will have to be weighed against it and the judge might easily reach the conclusion that the prosecution, even if they have a good story, has not succeeded in dispelling all doubt about its truthfulness."  Feldbrugge and Simons considered the defense account far more credible and better established by the available evidence

---

[56] OSCE, *The Duvanov Case: A Report to the Chairman-in-Office by Professors Ferdinand Feldbrugge and William Simons*, Mar. 28, 2003 ("Feldbrugge-Simons Report").
[57] *Id.*

than that put forward by the prosecution: *"In this matter, it is our provisional conclusion that this is indeed the case."*[58] Professors Feldbrugge and Simons have not subsequently altered their view of the case.

65.     The Leiden professors also concluded that there was ample evidence to support a conclusion that the case had been manipulated, start to finish, by the Kazakhstani Executive. In addition to their monitoring of the judicial treatment of the case, which was suggestive of such manipulation, they identified physical evidence of this in the form of a fax from the Presidential Administration to local police providing detailed guidance on the management of the case and suggesting both that it was a matter of the utmost importance to the president and that his interest actually antedated the alleged crime.[59]

66.     The Duvanov case is not a single, isolated instance of executive abuse of the criminal justice system in political interests.  Rather it is exemplary of a category of cases, un-usual perhaps only in the fact that it was meticulously studied by highly qualified and impartial foreign experts whose independent queries also stumbled upon physical evidence of the fact.  It demonstrates the ability and willingness of the Kazakhstani President's office to "frame" a po-litical adversary and then micromanage his prosecution when it chooses to do so—in the process deploying procurators, KNB officers and police.  It also shows the sort of cases that may attract close attention of the President's office.

67.     Duvanov was sentenced to a 3½ year jail term, which he served in a penal colony near Almaty until being paroled to a house-arrest regime in January 2004,[60] following an interna-tional outcry over his conviction.

---

[58] *Id.* at 27 (emphasis in original).

[59] *Id.*

[60] Reporters Sans Frontières, *Sergei Duvanov released early for "good conduct,"* Aug. 18, 2004, http://arabia.reporters-sans-frontieres.org/print.php3?id_article=9060.

**<u>Conclusion</u>**

Based on the foregoing analysis, I believe, to a reasonable degree of legal certainty, that the claims which form the basis of the Plaintiffs' complaint would, if asserted in a court in Kazakhstan, not receive a fair hearing, and that it would therefore serve the interests of justice for them to be heard and resolved in this court.

I, Scott Horton, declare under penalty of perjury that the foregoing is true and correct.

Name: ___Scott Horton___ (print)

Signed: ___Scott Horton___ (sign)

**Scott Horton**

Dated:      January 12, 2011

New York, NY