**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DEVINCCI SALAH HOURANI**, *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**ALEXANDER V. MIRTCHEV**, *et al.*,<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)  **Case No. 10-cv-01618-TFH**<br>)  **(Hon. Thomas F. Hogan)**<br>)<br>)<br>)<br>) |

**DEFENDANTS' MOTION FOR RULE 11 SANCTIONS FOR**
**FILING IMPROPER AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure Rule 11, Defendants Alexander V. Mirtchev

and Krull Corporation, by and through undersigned counsel, respectfully move this Court to

sanction Plaintiffs and their counsel for filing an amended complaint designed to harass

Defendants and without reasonable investigation of factual allegations, which Plaintiffs know or

should know are false.  The grounds supporting Defendants' Rule 11 Motion are set forth in the

accompanying memorandum.

Date:  <u>November  6, 2012</u>                    Respectfully submitted,

  <u>/s/ Richard W. Beckler</u>
Richard W. Beckler (DC Bar #262246)
LaShon K. Kell  (DC Bar #483465)
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, DC  20006
Telephone:  (202) 828-5816
Facsimile:  (202) 857-4835
E-mail:  richard.beckler@bgllp.com
            lashon.kell@bgllp.com

***Counsel for Defendants***
***Alexander V. Mirtchev and Krull Corporation***

and

Stephen Sale  (DC Bar # 942243)
John D. Quinn (DC Bar # 267302)
Eugene P. Kopp (DC Bar # 239467)
SALE & QUINN, P.C.
910 16th Street, N.W., Fifth Floor
Washington, DC 20006
Telephone:  (202) 833-4170
Facsimile:  (202) 887-5137
E-mail:  sscsq@aol.com
            quinn.j@salequinn.com

***Counsel for Defendants***
***Alexander V. Mirtchev and Krull Corporation***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th day of November 2012, a true and complete copy of

the foregoing *Defendants' Motion for Rule 11 Sanctions for Filing Improper Amended Complaint,*

*Memorandum in Support thereof, and proposed Order* was served by the Court's electronic filing

system on the following registered electronic filing participants:

Stuart H. Newberger, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004

***Counsel for Plaintiffs***
***Devincci S. Hourani and Issam S. Hourani***


Timothy L. Foden, Esquire
ALLEN & OVERY
One Bishops Square
London E1 6AD
UNITED KINGDOM

***Counsel for Plaintiffs***
***Devincci S. Hourani and Issam S. Hourani***


Howard W. Foster, Esquire
Matthew A. Galin, Esquire
FOSTER PC
150 N. Wacker Drive
Suite 2150
Chicago, IL 60606

***Counsel for Plaintiffs***
***Devincci S. Hourani and Issam S. Hourani***


    */s/ Richard W. Beckler*
Richard W. Beckler  (DC Bar #262246)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DEVINCCI SALAH HOURANI**, *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**ALEXANDER V. MIRTCHEV**, *et al.*,<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Case No. 10-cv-01618-TFH**
**(Hon. Thomas F. Hogan)**

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR RULE 11 SANCTIONS
## FOR FILING IMPROPER AMENDED COMPLAINT

Richard W. Beckler (DC Bar #262246)
LaShon K. Kell  (DC Bar #483465)
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, DC  20006
Telephone:  (202) 828-5816
Facsimile:   (202) 857-4835
E-mail:  richard.beckler@bgllp.com
            lashon.kell@bgllp.com

and

Stephen Sale  (DC Bar # 942243)
John D. Quinn (DC Bar # 267302)
Eugene P. Kopp (DC Bar # 239467)
SALE & QUINN, P.C.
910 16th Street, N.W., Fifth Floor
Washington, DC 20006
Telephone:  (202) 833-4170
Facsimile:   (202) 887-5137
E-mail:  sscsq@aol.com
            quinn.j@salequinn.com

Dated:  November 6, 2012

*Counsel for Defendants*
*Alexander V. Mirtchev and Krull Corporation*

# TABLE OF CONTENTS

Page

I.  INTRODUCTION……………………………………………………….......1

II. PRELIMINARY STATEMENT………………………………………….......5

III. THE HOURANIS' OWN STATEMENTS DISPROVE THEIR AMENDED
COMPLAINT ………………………………………………………………….8

    A. The Houranis' Initial Complaint and Sworn Affidavits Fatally Contradict the
Unreasonable and Unfounded Allegations of Their First Amended
Complaint…………………………………………………………………11

    B. Plaintiffs' Witnesses Testified That All Hourani Assets Were Seized By The
State……………………………………………………………………….......16

        1. The Houranis Testified that All Their Assets Were Expropriated by
Kazakhstan, Not Extorted by Dariga Nazarbayeva or Defendants for
Personal Use …………………………………………………………16

        2. The Houranis Sponsored Extensive Aliyev and Abbas Testimony of the
Government of Kazakhstan's Universal Expropriation of the
Houranis' Assets …....………………………………………………...21

IV. STATEMENT OF LEGAL AUTHORITIES………………………….…..…..26

    A. Despite the Absence of Any Reasonable Basis in Fact for the Houranis' Amended
Complaint, the Houranis Violate Rule 11 By Refusing to Withdraw It……….…..26

    B. The Houranis and Their Counsel Must Be Sanctioned for Amended Complaint
Allegations Devoid of Any Reasonable Factual Basis………………….…....…28

    C. The Houranis' Amended Complaint Must Be Dismissed and Monetary
Sanctions Equal to Defense Fees and Costs Must Be Imposed on the Houranis
and Their Counsel ……………………………………………………....…33

V.  CONCLUSION …………………………………………………………….......35

## I.      INTRODUCTION

Defendants Alexander Mirtchev and Krull Corporation move for sanctions against Plaintiffs Issam Salah Hourani ("Issam") and Devincci Salah Hourani ("Devincci" and, collectively, "the Houranis") and their counsel under Rule 11 of the Federal Rules of Civil Procedure for filing an amended complaint to harass Defendants and without reasonable investigation into the factual allegations therein, which Plaintiffs know or should know are false.

Defendants do not file this Rule 11 motion lightly—Plaintiffs and their counsel, however, have left Defendants no other choice.  Counsel for Defendants provided counsel for Plaintiffs 21 days to review this Memorandum prior to filing this motion in accordance with Local Rule 7(m). Counsel also met and conferred in a good faith effort to attempt to avoid filing this motion.

For more than four years, Dr. Alexander Mirtchev, a US citizen living in Washington, DC, has been targeted in a smear campaign by former Kazakhstan KGB (now KNB) head Major General Rakhat Aliyev ("General Aliyev"), a convicted fugitive from justice intent on pursuing his own political agenda.[1]  General Aliyev created or supplied forged documents, false sworn testimony and other inaccurate and misleading information that form the basis of the instant action.[2]  As General Aliyev himself has testified, he is assisted by his loyal cadre from his days

---

[1] General Aliyev's criminal record and widely reported public reputation include the offenses of kidnapping, torture, murder, racketeering, and arms, human and drug trafficking.  General Aliyev's multi-faceted campaign seeks (a) to evade prosecution and law enforcement investigations in a number of jurisdictions in Europe and elsewhere, and extradition to Kazakhstan to serve his 40-year prison sentence and stand trial for murders; (b) to take over the Presidency of Kazakhstan; (c) to suppress well-established documentation of his notorious tenure as a powerful KGB figure in Kazakhstan;  (d) to "redefine" himself as a "reformer," "political dissident" and "opposition leader" even as longstanding opposition leaders have exposed General Aliyev himself as the primary tormentor of the actual political opposition; (e) to obtain witness immunity and asylum to be a prosecution witness against his targets and generate extensive large-market media coverage against his targets here and in Kazakhstan; (f) to seek revenge on his former wife and their children for not joining General Aliyev's conflict with his former father-in-law; and (g) to heap scorn upon those with favorable Kazakhstan relations to try to isolate the Government with lack of legitimacy claims.

[2] *See* Ex. 1, Addendum to Memorandum in Support of Defendants' Motion for Rule 11 Sanctions, filed under seal, November 6, 2012.

as head of Kazakhstan's KGB and police,[3] who could have been the origin of his forged documents.[4]

Dr. Mirtchev, President of Krull Corp., is a respected international macro-economic consultant who currently serves as a Member of the Board of Directors and the Executive Committee of the Atlantic Council of the United States; Executive Chairman of the Royal United Services Institute for Defense and Security Studies ("RUSI") International, and Vice President of RUSI (est. 1831), London, UK; Council Member of the Kissinger Institute on China and the US; and Member of the Wilson National Cabinet and Senior Scholar at the Woodrow Wilson International Center for Scholars, Washington, DC.[5]  In relation to Kazakhstan, Dr. Mirtchev is currently an independent, non-executive director of the sovereign wealth fund of the country "Samruk-Kazyna."[6]  Dr. Mirtchev has published several monographs and numerous articles in respected periodicals.

Prior to General Aliyev's campaign, he and Dr. Mirtchev met only a few times at official functions, but General Aliyev has nonetheless repeatedly demanded and threatened Dr. Mirtchev to join his political activities against the Government of Kazakhstan. Of course, Dr. Mirtchev

---

[3]  Besides running the KGB, General Aliyev also served as Kazakhstan's Chief of Tax Police, First Deputy Minister for state tax revenues, as well as Deputy Foreign Affairs Minister, Ambassador to Austria and the Kazakh Representative to the Organization for Security and Co-operation in Europe.

[4]  Witness Statement of Rakhat Aliyev, *In re Caratube Int'l Oil Co.*, Misc. No. 10-0285-JDB (Dkt. No. 32-1 Aug. 6, 2010) at 24 ¶ 56 ("A document that was ***provided to me by people still loyal to me in Kazakhstan*** [emphasis added], and which I have shared with legal counsel for Claimant, ***proves beyond doubt*** [emphasis in original] that the Government of Kazakhstan expropriated the Hourani family's assets as a way of attacking them and me together.").

[5]  Dr. Mirtchev is not General Aliyev's only target with perceived Kazakhstan ties in the West, as he has also attacked President Clinton, King Juan Carlos of Spain, Prime Minister Tony Blair and Prince Andrew of Great Britain, numerous Members of the U.S. Congress and a wide variety of other present and former officials of the United States and foreign countries, accusing them of all manner of alleged impropriety and misconduct with no supporting evidence.

[6]  Dr. Mirtchev also has served as senior economic advisor to the prime minister, member of the State Commission for the Modernization of the Economy of Kazakhstan and non-executive Chairman of the Board of Directors of the Kazakhstan Sustainable Development Fund, "Kazyna," comprised of the development institutions of the country.

refused to lend any support to General Aliyev's ongoing and planned activities, and thus General Aliyev's attack on Dr. Mirtchev began in earnest.

In his campaign against Dr. Mirtchev, General Aliyev's key proxies have included his in-laws, Palestinian brothers Issam and Devincci Hourani.[7]  Caratube, which Devincci claimed to own first brought a discovery petition in this Court in April 2010 against Dr. Mirtchev and entities with alleged ties to Kazakhstan, ostensibly in support of a now-dismissed Paris arbitration before a Tribunal in the International Centre for Settlement of Investment Disputes ("ICSID").[8]  When the Court likewise denied Caratube's discovery petition and reconsideration,[9] the Houranis brought this civil action for $2 billion against Dr. Mirtchev and other Washington, D.C. consultants.  Here, General Aliyev's proxies, the Houranis, have been forced to amend their complaint in an attempt to jettison the inherently unreasonable, implausible and frivolous allegations of their initial complaint.[10]  The Houranis thereby morphed their previous allegations of universal government expropriation into a claim that General Aliyev's former wife, Dariga Nazarbayeva, with the help of Dr. Mirtchev from Washington, DC, "extorted" the Houranis' Kazakhstan assets.

General Aliyev has also attacked Dr. Mirtchev in General Aliyev's self-published book The Godfather-in-Law (trafo verlag 2009),[11] which was distributed by Amazon.com, and posted on his personal blog RakhatAliyev@LiveJournal.com.  As General Aliyev's blogged slurs

---

[7]   Issam, whose wife is General Aliyev's sister Gulshat Aliyeva, has obtained UK citizenship.  Devincci obtained US citizenship through his former marriage to a US citizen.

[8]   On June 5, 2012, the World Bank's International Centre for the Settlement of Investment Disputes ("ICSID") Tribunal rejected Caratube's claims due to the Houranis' lack of credibility following the filing and withdrawing of forged documents, and failure to show that Devincci owned or controlled Caratube.  *See infra* note 19.

[9]   *See In re Caratube Int'l Oil Co.*, Misc. No. 10-0285-JDB (D.D.C. Aug. 11, 2010) (Dkt. No. 35).

[10]   *Cf.* Order, April 12, 2012 (Dkt. No. 67).

[11]   *See* Ex. 2.

against Dr. Mirtchev became increasingly outrageous, LiveJournal.com, following receipt of notice of libel by Dr. Mirtchev's counsel in 2009, deleted General Aliyev's blog and barred him from any further postings.  In early 2010, after Dr. Mirtchev's counsel's protests about libels against Dr. Mirtchev in General Aliyev's book, Amazon.com followed suit by deleting the webpage and ceasing all sales of General Aliyev's book.[12]  In sum, four years later nothing has come of General Aliyev's smear campaign beyond the continued pendency of his Hourani in-laws' unreasonable and implausible amended complaint.

In this action alone, which began in September 2010, Plaintiffs have harassed Defendants by bombarding this Court with outlandish and unfounded claims "supported" not only by ever-changing legal theories, but also by totally contradictory "facts."  Plaintiffs were granted leave to amend only after assuring this Court that they intended to only change the legal theories supporting their claim.[13]  Instead, Plaintiffs fundamentally changed not only their legal theories, but also the basic factual allegations underlying their theories—factual changes that cannot be reconciled with their original allegations such that one, or the other, or both must be false.  The sensational allegations used to support Plaintiffs' expropriation theory in their initial complaint have now been replaced by even more sensational, but totally contradictory, allegations to support Plaintiffs' new pattern of extortion theory to support racketeering claims in the amended complaint.  Given that Plaintiffs' efforts to evade dismissal of this action have no limits and because Plaintiffs can have no proper basis for their ever-changing and contradictory "facts," Defendants request that the Court impose the sanctions requested herein.

---

[12] Both Amazon.com and LiveJournal.com took swift action after being fully informed of General Alivey's background and his numerous libelous allegations against Dr. Mirtchev and others.

[13] *See* Pl. Mem. in Support of Motion for Leave to Amend Compl. at 3, (Dkt. No. 60-1).

## II.    PRELIMINARY STATEMENT

Plaintiffs' improper purpose in filing their first amended complaint is amply demonstrated by their abject failure to provide any reasonable basis whatsoever for their amended complaint. Once Plaintiffs' Act of State expropriation theory failed, the Houranis assured the Court that their amended complaint would "narrow" and "simplify" their ***legal theories***.[14]   Plaintiffs' amended complaint, however, changes the fundamental ***factual allegations*** of their original complaint, and does so by alleging new facts that cannot be reconciled with the allegations of the original complaint.    The factual allegations in Plaintiffs' amended complaint are so flagrantly contradictory to their own extensive and repeated sworn testimony in this matter and in other fora that the amended complaint allegations must be false.

The amended complaint replaces the most basic factual allegations of the initial complaint—that the Government of Kazakhstan, aided by Defendants, expropriated ***all*** of the Houranis' Kazakhstan assets—with the allegation that Defendants (and others) took Plaintiffs' media assets for personal gain as individuals acting in their private capacities, and ***not*** on behalf of the Government of Kazakhstan.    Therefore, the Plaintiffs have intentionally propounded falsehoods to the Court: (a) by submitting false verified statements to this Court in support of their initial complaint swearing that the Government of Kazakhstan expropriated all of their assets and defamed the Plaintiffs,[15] or (b) by newly and falsely alleging in the amended complaint, that Defendants, acting privately and separately from the Government of Kazakhstan, defamed the Houranis and extorted their assets, or (c) by giving two sets of allegations that are equally false.

---

[14] *Id.*

[15] *See generally* Declaration of Issam Hourani (Dkt. No. 32-27 Jan. 14, 2011) and Declaration of Devincci Hourani (Dkt. No. 32-28 Jan. 14, 2011).

The Plaintiffs alleged in their initial complaint:  (1) that the Government of Kazakhstan expropriated ***all*** of the Houranis' Kazakhstan assets, including media assets, and defamed Issam on an embassy website; and (2) that Defendants aided and abetted the Government's actions. After Defendants moved to dismiss based on the Act of State Doctrine and numerous other bars to this action, Plaintiffs redoubled support for their initial complaint with sworn statements and documents that General Aliyev supplied.[16]   According to the Houranis' and General Aliyev's sworn factual statements, the allegations giving rise to Plaintiffs' claims emanate from their close family, social and business relations with Aliyev.  Plaintiffs, at the time, claimed they were "stripped" of their assets through expropriation because General Aliyev has a "dispute" with the Government of Kazakhstan.[17]   Indeed, the Houranis separately and repeatedly attested that the allegations in their initial complaint were truthful, but Defendants' motion to dismiss demonstrated that claims in the Houranis' initial complaint were both premised on false documents and legally barred.[18]  Plaintiffs then amended their complaint to allege facts fatally contradicted by the basic allegations of their initial complaint and multiple sworn statements.

In their amended complaint, Plaintiffs' new allegation is that Defendants privately conspired with Dariga to defame and to extort, for their personal benefit, the Houranis' Kazakh media assets.  Plaintiffs now claim no act of state was involved.  In their attempt to evade dismissal, Plaintiffs' new contradictory factual allegations are neither reconcilable with Plaintiffs' affidavits to the Court, nor with the Houranis' and General Aliyev's sworn statements before other tribunals.  In this Court and in arbitration, the Houranis and General Aliyev filed verified statements swearing that the Government of Kazakhstan expropriated all of Houranis'

---

[16] *See id.*  KGB General Rakhat Aliyev is not only the raison d'être, but also the ***sole source*** for all of Plaintiffs' allegations and "evidence," consisting of forged documents that they use to support their claims

[17] *See id.*

[18] *See* Dkt. No. 12, Sept. 22, 2010.

Kazakhstan businesses and defamed Issam on the embassy website.[19]   Therefore, the Houranis' first amended complaint contradicts the original complaint by alleging, without reasonable basis, that Defendants and Dariga privately extorted the Houranis' assets and defamed the Houranis with no act of state involved.

The contradiction between the facts first alleged in the original complaint and then supported by innumerable sworn affidavits, and the facts nakedly alleged in the amended complaint, is not only a deliberate and flagrant attempt to abuse process in this Court, but also confirms General Aliyev's harassment campaign.

This motion seeks redress for Plaintiffs' and their counsel's Rule 11 violations for filing a first amended complaint that directly contradicts the factual allegations of their initial complaint and supporting sworn statements for the purpose of continuing Plaintiffs' harassment campaign against Defendants.   Defendants requested that Plaintiffs withdraw their amended complaint as lacking any reasonable factual basis, but Plaintiffs refused.   In response to Defendant's "safe-harbor" service of this motion, more than 21 days before this filing, Plaintiffs' counsel argued that Plaintiffs continue to support their allegations in the amended complaint, that leave to amend effectively immunized their amended complaint from Rule 11 sanctions, and that Defendants are barred from filing, and therefore the Court is barred from reviewing related and relevant transcripts from Caratube's concluded arbitration before the International Centre for the Settlement of Investment Disputes ("ICSID") which illustrate how facilely Plaintiffs change their

---

[19]   In June 2008, the Houranis filed a request for arbitration against the Republic of Kazakhstan with ICSID for expropriation of their company, Caratube International Oil Company.   On June 5, 2012, the ICSID Tribunal (1) dismissed Caratube's claim for lack of jurisdiction because Caratube failed to show that Devincci owned or controlled Caratube in Kazakhstan and (2) assessed $3.2 million against Caratube for defense fees and costs paid by the Republic of Kazakhstan.   Ex. 3, *Caratube Int'l Oil Co. v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12 (June 5, 2012).   On October 2, 2012, Caratube applied for annulment of the ICSID award through new counsel Derain & Gharavi.

factual testimony in different fora.[20]   While Defendants understand why Plaintiffs wish to preclude the Court from access to their ICSID arbitration testimony that is highly damaging to their position here, the testimony of Plaintiffs' witnesses before ICSID, contradicting their amended complaint, is central to this motion and thus is filed in a sealed addendum.[21]  Sanctions are mandated by Rule 11 for filing the amended complaint without reasonable investigation, for an improper purpose, and for refusing to withdraw it.[22]  Plaintiffs and their counsel must be sanctioned by dismissal with prejudice and imposition of joint and several monetary sanctions in the amount of all of Defendants' defense fees and costs.

## III.   THE HOURANIS' OWN STATEMENTS DISPROVE THEIR AMENDED COMPLAINT

The initial and amended complaints have totally irreconcilable differences, demonstrating the unreasonableness and implausibility of the amended complaint.   From the start, Plaintiffs publicly asserted their allegations of expropriation in this case.   Upon filing this action, Plaintiffs' counsel's press release loudly proclaimed their universal expropriation allegations:

*Crowell & Moring* LLP has *filed a lawsuit* on behalf of a U.S. citizen and his British brother whose *multi-billion dollar business empire was seized by*

---

[20]  *See supra* note 2.   During the arbitration, the ICSID Tribunal decided to consider exceptions to confidentiality on a case-by-case basis.   On June 5, 2012, the Tribunal issued its final award, finding that ICSID had no jurisdiction over Caratube's claims against the Republic of Kazakhstan.  *See* ICSID Case No. ARB/08/12 (June 5, 2012), Exhibit 3.   Therefore, the Tribunal is no longer available to receive or to rule on a request for an exception from confidentiality, assuming that the Tribunal would have had any jurisdiction to enforce or grant exceptions from a confidentiality order.   Due to Plaintiffs' counsel's objection to Defendants' use of the relevant ICSID transcripts, Defendants are filing under seal those portions of this memorandum and supporting transcript testimony (Exhibit 1) so that the Court may have access to the highly relevant testimony of Plaintiffs' witnesses therein while the Court determines whether  Plaintiffs could have any lawful basis for their confidentiality claim.  *See* Motion for Leave to File Addendum Under Seal, filed same day as this motion.   The filing under seal is without prejudice to motion to remove the seal to allow electronic filing with the Court.

[21]  *Id.* When Defendants' counsel inquired whether Hourani counsel Crowell & Moring continues to represent Caratube before ICSID in order to ascertain whether Crowell & Moring has standing as counsel for Caratube to make a confidentiality claim as to the transcripts, Mr. Newberger responded that such information may be privileged and, in any event, was "none of the business" of Defendants' counsel.   Thus, Defendants have no idea whether the Hourani's counsel has any standing or authority to assert confidentiality on behalf of Caratube, which names, as counsel of record in its annulment application, Derain & Gharavi, but not Crowell & Moring.

[22]  *See* Fed. R. Civ. P. 11(c).

> *Kazakhstan*. The brothers filed suit in the U.S. District Court for the District of Columbia against Washington-based consultant <u>Alexander Mirtchev</u> and his corporate affiliates, <u>Krull Corporation</u>, <u>GlobalOptions, Inc.</u>, and GlobalOptions Management, Inc. The complaint alleges that Mirtchev and his affiliates supported and orchestrated ***Kazakh President Nursultan Nazarbayev in a politically-motivated campaign to expropriate the Hourani brothers' investments in Kazakhstan and destroy their reputations internationally.***
>
> * * *
>
> ***Crowell & Moring LLP partner Stuart H. Newberger, counsel for the Houranis***, said, "Washington-based consultants violated U.S. and international law to get paid tens of millions of dollars to orchestrate a ***dictator's seizure of assets*** owned by American and British businessmen and investors, and they will now face justice. ..."
>
> The lawsuit seeks several billion dollars in damages based on the actual value of the ***Houranis' businesses and assets seized beginning in 2007 and now personally owned and controlled by President Nazarbayev*** as part of the Superkhan project orchestrated by the Washington-based defendants. It also seeks damages for the false and ***defamatory information*** drafted and maintained by the defendants on the ***Kazakh Embassy website in Washington***.[23]

Thus, the Crowell & Moring press release left no doubt that the Houranis' action is based on alleged expropriation of assets now under the direct control of the President of Kazakhstan and defamation of Issam on the Kazakhstan embassy website.

Plaintiffs alleged in their original complaint, and attested to repeatedly and consistently, that the Government of Kazakhstan expropriated their media holdings by requiring them to "sign over [all] media holdings [KTK and Alma Media] to the Government." Compl. at ¶ 106. Now, in the amended complaint, Plaintiffs allege that they signed over all of "KTK and . . . Alma Media to Dariga for her use." Am. Compl. ¶¶ 5-6. Obviously, the self-same alleged Hourani media assets could not simultaneously be expropriated by the Government of Kazakhstan and extorted by Defendants. Defendants could not have aided and abetted Government defamation of Issam through the embassy website and independently and personally have defamed Issam by their private actions through the embassy website without any act of state.

---

[23] Ex. 4, Crowell & Moring, "American and British Investors Sue Kazakhstan's Washington Consultants for Roles in Stealing Assets and Defaming Owners" (Press Release Sept. 23, 2010) (emphasis added), http://www.crowell.com/NewsEvents/PressReleasesAnnouncements/1352970.

Moreover, Plaintiffs' new allegation that Defendants privately conspired with Dariga Nazarbayeva, daughter of President Nursultan Nazarbayev and former spouse of General Aliyev, to extort, for their personal benefit, the Houranis' media assets is contradicted by Hourani testimony: "[S]ince the very public falling out in May 2007 between President Nazarbayev and General Aliyev, the President and his Government have commenced a concerted campaign to purge my family and me from Kazakhstan, expropriate our business investments in that country, and spread false and harmful disinformation about me in the world media."[24]   Plaintiffs' new allegations that Defendants personally conspired to defame Issam and Devincci without any act of state are contradicted by Issam's own testimony: "Kazakh Embassy in Washington, D.C. … published two defamatory articles about me."[25]   Because Plaintiffs' amended complaint must be false if their January 14, 2011 affidavits (Dkt. Nos. 32-27, 32-28) were true, Defendants requested that Plaintiffs withdraw their amended complaint, but they refuse.[26]

---

[24]   Decl. of Issam Hourani  (Dkt. No. 32-27 Jan. 14, 2011) at 3 ¶ 4.

[25]   *Id.* at 12 ¶ 33.

[26]   Defendants previously moved for sanctions for Plaintiffs' filing of false and forged documents with this Court.  *See* Dkt. Nos. 24, 26 (Jan. 6, 2011); *see also* Dkt. No. 31 (Jan 12, 2011).  The Court ordered that motion held in abeyance.  *See* Dkt. No. 53 (July 13, 2011).  The Court should also note that, while before ICSID in the Caratube arbitration and UNCITRAL in the Ruby Roz arbitration, counsel for Plaintiffs, Crowell & Moring introduced these same false and forged documents to the arbitration tribunal.  Counsel Crowell & Moring ultimately withdrew the forgeries completely, but not before they were fatal to the credibility of Caratube and its witnesses. Ex. 3, *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12 at 100 ¶ 405 (June 5, 2012)("And while the allegedly forged documents were withdrawn by Claimant during the hearing (C-162, C-175, C-238, C-239, C-240, Aliyev 25; see Tr, day 6, pp. 228–229), and therefore the Tribunal will not rely on them…, the Tribunal cannot overlook that their submission and later withdrawal throw a doubt on Claimant's credibility. This has a bearing on the Tribunal's evidentiary evaluation of the fact that Claimant did not provide any documents showing the exercise of effective control by Devincci Hourani.")  The Ruby Roz arbitration before UNCITRAL was likewise premised on a forgery by General Aliyev that was subsequently withdrawn by that claimant.  Ex.  5, The Republic of Kazakhstan's Response to RRA's Request for Interim Measures (Sept. 12, 2012) 14 n. 39, *Ruby Roz Agricol LLP v. Republic of* Kazakhstan.  Here, however, Plaintiffs and their counsel refuse to withdraw the  forged documents and instead they tell the Court that Plaintiffs do not *presently* rely on the documents identified as forgeries. Plaintiffs' Reply in Support of Their Motion for Leave to Amend (Dkt. No. 62 Nov. 23, 2011) at 2 n.4. Plaintiffs' representation to the Court that they are not relying on the forged documents is inaccurate, as the amended complaint relies on one of the proffered forgeries that is the so-called 'Superkhan' plan, without which Plaintiffs would have no factual support for any claim. Dkt. No. 32-2 at 3 ¶ 15 (Jan. 14, 2011) ("The plan was consistent with his recommendations made to the President in a memorandum informally known as the "Superkhan" document, in which Mirtchev had counseled the President of Kazakhstan on how he could consolidate power for himself and his

A.     The Houranis' Initial Complaint and Sworn Affidavits Fatally Contradict the
       Unreasonable and Unfounded Allegations of Their First Amended Complaint.

The original complaint made unequivocal, detailed allegations that the Government of

Kazakhstan expropriated all Hourani assets, including the Hourani media assets.  The Houranis

submitted their own and others' voluminous sworn testimony that "each and every one" of the

Hourani assets, including Plaintiffs' media assets, were seized by the Government of Kazakhstan

and transferred to the "First Presidential Fund."[27]   As demonstrated by Plaintiffs' own words

quoted below, their amended complaint, alleging for the first time that their assets were taken by

persons acting in their private capacities and not at the direction of and on behalf of the

Government of Kazakhstan, contains factual allegations that are irreconcilable with Plaintiffs'

extensive sworn statements of Government action supporting Plaintiffs' original complaint.

In Plaintiffs' Reply to Defendants' Opposition to Motion for Leave to File Amended

Complaint, Plaintiffs unabashedly, and quite falsely, represent that media claims were ***always***

premised on private, and not state, action:

> The FAC addresses the first of Defendants' broader objections by
> limiting the RICO claims in this civil action to actions and instances in which
> the particular business and properties of the Hourani family were taken not by the
> Government of Kazakhstan, but rather by private citizens, most specifically the
> President's daughter, Dariga Nazarbayeva.  To be sure, this is a subset of the larger
> group of actions and takings of Hourani businesses and property addressed in the
> Complaint.  It reflects the fact that with respect to these specific businesses, the
> particular assets at issue do not, in fact, appear to have ended up with the
> Government of Kazakhstan, but rather ended up in the hands of, or under the
> control of, Ms. Nazarbayeva.

 (Dkt. No. 62, Nov. 23, 2011, at 2.)  The Houranis assured the Court that Plaintiffs would only

plead narrowed and simplified legal theories, not new facts, and that the amended complaint

---

family at the expense of business leaders.").  General Aliyev also testified at ICSID that he retains loyal officials
in Kazakhstan.  *See supra* note 4.
       [27]  *See* Decl. of Rakhat Aliyev, Dkt. No. 32-14 at ¶ 49; Decl. Issam Hourani, Dkt. No. 32-28 at ¶ 9.

would be appropriate because "a plaintiff is not bound by the legal theory on which he or she originally relied."[28]

Rather than narrowing and simplifying their legal theories, Plaintiffs changed their **legal theories** and the very **facts** upon which they base their claims and to which they repeatedly swore under oath in witness statements filed with this Court.  The Houranis' attempted verbal sleight of hand is demonstrated by the following *verbatim* passages of Hourani allegations from their (A) original complaint, filed on September 23, 2010 ("then"), (B) sworn testimony, submitted on January 12, 2011 ("then") and (C) contradictory first amended complaint, filed on April 12, 2012 ("now"):

| THEN – Allegations | NOW – Allegations |
| --- | --- |
| **Government of Kazakhstan Expropriation of KTK and Other Hourani Assets**: | **Dariga Nazarbayeva's Extortion of Hourani Assets for Her Own Use**: |
| o (A) "Within a few months of the schism between President Nazarbayev and his son-in-law, Rakhat Aliyev, each and every one of these business interests owned by the Houranis and their family members was effectively expropriated or outright seized by the Kazakh Government." Compl. at 30-31 ¶¶ 107.<br><br>o (B) "… I discovered in early April 2010 that the Defendants in this case worked with the Republic of Kazakhstan and its ruler, Nursultan Nazarbayev, to divest me and my family members of our individual interests in each and every one of those businesses." Sworn Declaration of Devincci Hourani (ECF #32-24 Jan. 14, 2011) at 2 ¶¶ 5. | o (C) "Devincci Hourani believed that he had no choice but to capitulate to [Dariga Nazarbayeva's] demand. … [U]nder duress he signed documents [that] conveyed all his shares and Gulshat's shares in KTK and Issam Hourani's shares in Alma Media to Dariga for her use."  Am. Compl. at 5-6 ¶¶ 22-23. |
| **Government Action Against Houranis Due to Relationship to Rakhat Aliyev**: | **Extortion of Houranis to Support Dariga's Nazarbayeva's Own Political Career**: |
| o (A) "Kazakh Government then shut down KARAVAN newspaper, part of Issam Hourani's Alma Media holdings, and the KTK television channel … and replaced the senior management with government shills.  These actions were undertaken to ensure that Rakhat Aliyev was unable | o (C) "Until 2007, the Houranis were extremely successful businessmen, owning and operating oil, broadcasting, and publishing companies in the Republic of Kazakhstan. At that time, Dariga Nazarbayev [ ], daughter of President Nursultan Nazarbayev of Kazakhstan, sought to amass |

---

[28]  Pl.' Opp'n to Mot. to Dismiss First Am. Comp. (Dkt. No. 73 Jun. 13, 2012) at 17 (quoting *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999)).

| THEN – Allegations | NOW – Allegations |
|---|---|
| to find a way to connect with the Kazakh people through an independent media source.  During that two week media blackout, Issam Hourani was approached by representatives of the Kazakh Government who 'required' him to: (1) sign over Alma Media to the government."  Compl. at 32-33 ¶ 113-14.<br><br>o (B) "[A] collateral campaign to 'purge' Kazakhstan of any perceived political and financial supporters of Mr. Aliyev, which, in the eyes of the President, included my family and me."  Sworn Declaration of Issam Hourani (No. 32-27 Jan. 14, 2011) at 5 ¶¶ 12. | ownership of the nation's major media outlet.  She was contemplating a political career as a possible successor to her father and sought to have the media portray her in the most favorable light as well as the vast wealth and ownership such large businesses would confer.  Mirtchev agreed to help Dariga achieve her objectives in exchange for substantial fees.  She advised him of her plans to take control of the nation's largest media conglomerate, Alma Media. … She would then demand that [the Houranis] turn over their shares in Alma Media in exchange for her 'protection' from further intimidation." Am. Compl. at 2-3 ¶¶ 11-12, 14. |
| **Government Compelled Hourani Turnover<br>of Media Asset to Government Fund:**<br><br>o (A)  "KNB officials began to monitor Devincci Hourani's every move and monitor his phone calls" Compl. at 34 ¶124. "Under duress, Devincci Hourani signed the necessary documents, and with the stoke of a pen, the Government of Kazakhstan expropriated two of the country's remaining independent media outlets, which were worth hundreds of millions of dollars." Compl. at 36-37 ¶ 126.<br><br>o (B) "Throughout 2007 my family, my employees, and I were subjected to harassment, intimidation, monitoring, and unnecessary interrogations by Kazakh officials [as] part of a plan hatched by the Defendants to consolidate power in their patron, President Nazarbayev, through the elimination of individuals in Kazakhstan with financial power and societal influence and the enrichment of his regime at the expense of such individuals." Decl. of D. Hourani at 3 ¶ 8. | **Dariga Nazarbayeva Compelled Turnover<br>of All Hourani Assets to Her:**<br><br>o (C) "The Houranis had little choice but to turn over all of their businesses to Dariga… In 2008, the Houranis were forced to leave the country.  Thus, the Houranis lost ownership of large, profitable businesses worth hundreds of millions, perhaps billions, of dollars." Am. Compl. at 6 ¶¶ 27-28. |
| **Aiding and Abetting Government Expropriation<br>of Hourani Media Assets:**<br><br>o (A)  "Defendants intentionally aided and advised President Nazarbayev, Dariga Nazarbayeva, and the Government of Kazakhstan in forcing Devincci Hourani to sign over his interest in KTK Television to the First Presidential Fund as a means of retribution for the Houranis' relationship with Aliyev …" Compl. at 54 ¶ 194.<br><br>o (B) "[E]ach of my family's businesses were in fact raided and investigated, and individual members of my family were systematically interrogated, harassed, and intimidated on a regular basis in | **Dariga Nazarbayeva and Dr. Mirtchev Act<br>Privately in their Personal Capacities:**<br><br>o (C)  "Mirtchev agreed to undertake three crucial endeavors for Dariga if she obtained control of Alma Media and other business entities.  First, Mirtchev agreed to assist [Dariga] with monetizing her control of the company. Second, Mirtchev would deposit some of the proceeds of the seized businesses in western bank accounts [and] help Dariga use the money to acquire U.S. and European currencies… .   Finally, Mirtchev agreed to use his influence to falsely brand the Houranis as international criminals and terrorists [to] neutralize the Houranis' ability to |

| THEN – Allegations | NOW – Allegations |
|---|---|
| Kazakhstan." Decl. of I. Hourani at 5 ¶ 16.<br><br>○ (B) [Dariga] warned me of what the Republic could do against me and my family if I did not cooperate. Thus, when I signed these papers, hundreds of millions of dollars of media interests were expropriated at the stroke of a pen." Decl. of D. Hourani at 3 ¶ 9. | attack her…" Am. Compl. at 3-4 ¶¶ 16. |
| **Defendants Support Government Expropriation**:<br><br>○ (A) "…Mirtchev worked in concert with the Kazakh Government to take unlawful ownership, dominion, or control over Devincci Hourani's interest in KTK … over Issam Hourani's interest in Alma Media when Dariga Nazarbayeva demanded [they] sign over [Houranis'] interest … to the Government of Kazakhstan's First Presidential Fund under threats of reprisal." Compl. at 49-50 ¶¶ 173-74.<br><br>○ (B) "In the wake of the expropriation of my family's various business interests in Kazakhstan and the publication of the various defamatory statements about me, I was, of course, certain that the Republic of Kazakhstan and President Nazarbayev had been responsible for these acts. I was not, however, aware that others outside of the Kazakh Government had aided them in their efforts. Devincci and I hired private investigators and asset-location specialists to investigate further the circumstances of the plot against our family." Decl. of I. Hourani at 10 ¶ 27. | **Dariga Nazarbayeva Extorts and Conspires with Defendants for Her Own Account**:<br><br>○ (C) "Mirtchev agreed to help Dariga … with her plans to take control of the nation's largest media conglomerate, Alma Media… . The plan was consistent with [Mirtchev's] recommendations made to the President in a memorandum informally known as the "Superkhan" document, … He thought it was best for her future career that the Hourani family be stripped of all its business interests and leave the country.<br><br>* * *<br><br>Dariga through threats of violence and threats of economic injury, obtained the Houranis' business assets…. Mirtchev conspired to extort the shares of Kassem Omar and Gulshat Hourani." Am. Compl. at 3, 7-8 ¶¶ 14-15, 29-31, 34, 36. |
| **Defendants Assist Government Agents in Divestiture of Hourani Assets**:<br><br>○ (A) "Mirtchev and the Corporate Defendants laundered monetary instruments unlawfully seized from the Houranis through the aforementioned transfer of those assets to the Samruk Kazyna sovereign wealth fund …" Compl. at 61 ¶ 223.<br><br>○ (B) "[T]he Government has not stopped its campaign against me and the Hourani family. … Kazakhstan has been zealously assisted by … President Nazarbayev's agents located in the United States, including Mirtchev, Krull Corporation … who have pursued me from May 2007 and work to divest the Houranis of their assets…" Witness Statement of Rakhat Aliyev (ECF # 32-14) at 21 ¶ | **Dariga Nazarbayeva and Defendants Personally Launder Hourani Funds**:<br><br>○ (C) "As compensation for his role in the extortion, Dariga has undertaken to have Mirtchev paid through Krull Corp.'s bank accounts from … revenues of the seized Hourani businesses [which] were wired continuously from 2007 to the present, and will continue into the future into the Krull accounts" Am. Compl. at 7 ¶¶ 29-31. |

| THEN – Allegations | NOW – Allegations |
|---|---|
| 53. | |
| **Defendants Aided Government's Defamation of Issam on Embassy Website**: | **Dariga Nazarbayeva and Defendants Personally Libel Houranis**: |
| o (A) "Mirtchev and the Corporate Defendants published or caused … two news stories on the website of the Kazakh Embassy in Washington, D.C., a Forbes.com editorial, internal Kazakh Government memoranda, the so-called Aliyev Dossier published by ETG…[29] The Defendants intentionally published or caused these false statement to be published as a means of discrediting Issam in the eyes of the Western authorities and media." Compl. at 55-56 ¶¶ 200-201.<br><br>o (B) "The Kazakh Embassy in Washington, D.C. … published two defamatory articles about me, was to be an integral part of the [Kazakh Government] task force's activities according to the memorandum … to spread negative and discreditable information…" Decl. of I. Hourani at 12 ¶ 33. | o (C) "Dariga used her influence with the Kazakh embassy in Washington, D.C. to make its website available for anti-Hourani content.  On December 18, 2008, Mirtchev, acting through Krull, and with the active support of the Kazakh ambassador, caused the embassy website to post statements that: 1) the Houranis were members of Hamas; 2) they were supporters of Hamas; 3) they imported workers into Kazakhstan that were trained in Islamic terrorist camps; 4) they assaulted an employee of Ruby Roz Agricol, a business owned by Kassem Omar; and 5) they owned an apartment in which an alleged mistress of Rakhat Aliyev was falsely imprisoned, drugged and eventually murdered."  Am. Compl. at 9-10 ¶¶ 57-58. |

As Plaintiffs' own above-referenced passages plainly show, by alleging now that Defendants acted privately, separate and apart from the Government of Kazakhstan, in extorting the Hourani media assets, the amended complaint cannot be reconciled with the factual allegations underlying the original complaint or Hourani testimony unequivocally attesting that all Hourani (and specifically all media) assets were seized by the Government of Kazakhstan. Now, then, or on both occasions, Plaintiffs have submitted false factual allegations to this Court. Because the naked factual allegations of the amended complaint are conclusively contradicted by the Houranis' repeated sworn testimony prepared and submitted by their counsel, the Houranis and counsel must be sanctioned for their amended complaint.

---

[29] Plaintiffs effectively admit that internal Government memoranda were illicitly obtained, but Plaintiffs fail to allege either how Defendants could conceivably be involved in publishing internal Government memoranda or how Plaintiffs could be libeled by internal government memoranda.

B.      Plaintiffs' Witnesses Testified That All Hourani Assets Were Seized
        By The State.

        1.      *The Houranis Testified that All Their Assets Were Expropriated by
                Kazakhstan, Not Extorted by Dariga Nazarbayeva or Defendants for
                Personal Use.*

The new amended complaint allegations are fatally contradicted by Plaintiffs' own sworn statements.  Plaintiffs consistently swore under oath in affidavits filed not only with this Court, but also in other fora, that all of the Hourani Kazakhstan assets, including their media assets, were expropriated by the Government of Kazakhstan.  In fact, even as the Houranis announced their intentions to file an amended complaint, they contradicted the facts alleged therein with written arbitration testimony in *Ruby Roz Agricol LLP v. Republic of Kazakhstan*, UNCITRAL.[30]

Within days of announcing their intention to file an amended complaint based on new, non-expropriation legal theories, the Plaintiffs' testified to the contrary in *Ruby Roz*.[31]  *See* Exhibit 7 and Exhibit 8 attached hereto.  Specifically, Issam Hourani testified to the following on September 24, 2011:

---

[30] On September 4 and 24, 2011, Issam and Devincci swore in their Ruby Roz arbitration testimony before United Nations Commission on International Trade Law (UNCITRAL) of universal Government expropriation of Hourani assets.  *See infra* notes 33-34.  On September 20, 2011, Plaintiffs announced their amended complaint by motion for scheduling conference ["Plaintiffs are … obtaining new/additional counsel … prosecuting … RICO claims… .  Accordingly, Plaintiffs intend to amend their RICO claims, *and add additional Plaintiffs... .* Plaintiffs intend to simplify and streamline their Complaint… ."].  Plaintiffs' Motion for a Scheduling Conference (Dkt. No. 54, Sept. 20, 2011) at 2.  Plaintiffs' amended complaint alleges RICO predicate offenses of extortion and money laundering by Dariga Nazarbayeva and Defendants in their personal capacities with no act of state. *See* First Am. Compl. (Dkt. No. 68 Apr. 12, 2012).

[31] The Houranis have supported their RICO  claims in this case with allegations that Defendants extorted the oil field supply, airline and sugar assets (called the "Sugar Centre") of alleged Ruby Roz owner Kassem Omar (Omar), who is married to the sister of Devincci and Issam.  Am. Compl. (Dkt. No. 68 Apr. 12, 2012) at 6 ¶¶ 24-26.  Conversely, Caratube introduced General Aliyev's resume in the Caratube arbitration wherein General Aliyev claims that he founded and owns the Sugar Centre.  Ex. 6, Resume of General Rakhat Aliyev (July 9, 2007) at 2.  Crowell & Moring drafted Hourani testimony before UNCITRAL that all assets of the Hourani family (which includes Omar) were expropriated by the Government of Kazakhstan.  Further, although Ruby Roz has presented a handwriting expert before UNCITRAL, Ruby Roz nonetheless has withdrawn the predicate Aliyev forgery that was also withdrawn before ICSID.  *See supra* note 26.  In arbitrations and litigation brought by the Hourani family directly or in the names of companies, the instant matter is the only case where General Aliyev's forgeries have not been withdrawn.

-16-

| ¶¶ | Issam Hourani UNCITRAL TESTIMONY |
|---|---|
| 2 | I can read and write English reasonably well, and each word in this statement is mine alone. However, since English is not my native language, I have been assisted in the administrative preparation of this statement by the legal counsel to Ruby Roz Agricol LLP ("Ruby Roz"), Crowell & Moring LLP.[32] |
| 5 | Kazakhstan Government, either directly or by other means of its agents has … expropriated billions of dollars worth of investments held by me and my family in Kazakhstan, … defamed me in Kazakhstan and abroad … . |
| 6 | [F]rom May 2007 forward, each one of my family's and my own businesses were effectively paralyzed by the Kazakh Government, via investigations, arbitrary audits, allegations of "violations" of various Kazakh company and environmental regulations, and accusations of purported "breaches" of contractual obligations. |
| 26 | The expropriation of all my family's businesses (including Kassem Omar's) in Kazakhstan within the space of about a year … and the harassment and intimidation that ensued, coincided exactly with the political falling out between Mr. Aliyev and President Nazarbayev. |
| 32 | Within days, three actions were taken by the Government in quick succession. First, Karavan newspaper part of my Alma Media holdings and KTK television channel, … were shut down by the Government … and senior management were replaced by Government for three months (in the end, the ban lasted two weeks) and senior management were replaced by Government shills. |
| 33 | I was approached again by Government representatives who "required" me to (i) sign over my media holdings to the Government; (ii) divorce my wife, Gulshat; and (iii) denounce Mr. Aliyev publicly. |
| 66 | Due to the ambition of my brother-in-law to be President, and the coordinated retaliation of a political regime where the rule of law is not respected, everything I and my family worked hard to build was wiped away within the space of less than a year. We have been the victim of Kazakh politics, where those in power risk no political threats—even if those threats are only apparent.[33] |

Devincci Hourani likewise testified to the following on September 4, 2011:

| ¶¶ | Devincci Hourani UNCITRAL TESTIMONY |
|---|---|
| 2 | I can read and write English reasonably well, and fully understand all the words used in this witness statement. However, since English is not my native language, I have been assisted in the administrative preparation of this statement by Crowell & Moring LLP, the legal counsel to Ruby Roz Agricol LLP ("Ruby Roz"). |

[32] The Houranis', General Aliyev's and Yasser Abbas' affidavits before this Court and in the Caratube/ICSID and Ruby Roz/UNCITRAL arbitrations routinely attest to preparation by Crowell & Moring. Defendants cite sworn Hourani, Aliyev and Abbas testimony *not* to afford it any credence, but because Plaintiffs are bound by their witness testimony exposing their contradictory amended complaint as unreasonable and implausible.

[33] Ex. 7, Witness Statement of Issam Hourani, *Ruby Roz Agricol LLP v. Republic of Kazakhstan*, UNCITRAL (Sept. 24, 2011) at 2-3 ¶¶ 5-6, 8 ¶ 26, 10 ¶ 32, 11 ¶ 33, 23 ¶ 66.

| ¶¶ | Devincci Hourani UNCITRAL TESTIMONY |
|---|---|
| 19 | It was becoming clear that my family was being targeted by the Kazakh authorities, apparently because of the family connection with Mr. Aliyev through marriage. … I began to fear the lengths to which the authorities might go to retaliate against my family because of the dispute between President Nazarbayev and Mr. Aliyev. |
| 24 | As ordered, I went to the police station the next day, 28 June 2007, to be questioned by Colonel Kim. … There were very few questions about our businesses.  It was quite clear to me that the questioning was aimed at finding out information about the connection between Mr. Aliyev and Issam, … [T]here was extreme hostility on the part of the Kazakh officials towards me and my family. |
| 43 | Dariga also suggested that if the Hourani family signed away the shares it held in mass media companies, in particular the companies KTK and Alma Media, then the rest of our businesses might be left alone and the persecution of the family might stop. The next day, I went to see her again, and this time she was ready with contract papers and her lawyer on hand, demanding that I sign over my stake in KTK to the First President Fund, owned by the Government. … [S]he warned me of what the Republic could do against me and my family if I did not cooperate. Thus, when I signed these papers, hundreds of millions of dollars of media interests were taken away at the stroke of a pen. |
| 44 | [Dariga] told me that my family was already caught up in the turmoil, and that the President was now focused on seizing all my family's businesses and assets in Kazakhstan as soon as possible. … I and my family were seen by President Nazarbayev as aligned with his enemy, and that the consequences would be extremely serious for us, both personally and in terms of our many business interests in Kazakhstan. |
| 62 | [A]ll of our diverse business interests would around the same time be … confiscated. I firmly believe that these seizures, and the ongoing harassment and intimidation, are the direct result of my family's links to Mr. Aliyev and the falling out [with] Mr. Nazarbayev. The actions of the Kazakh authorities have been unjust, illegitimate, and have done irreparable harm to my family … .[34] |

As noted extensively above in Section III.B., Plaintiffs also testified <u>in this case</u> that the Government of Kazakhstan expropriated all Hourani assets.  In addition to the above-referenced testimony, Issam Hourani testified to the following on January 14, 2011:

| ¶¶ | Issam Hourani USDC DC DECLARATION |
|---|---|
| 4 | [S]ince the very public falling out in May 2007 between President Nazarbayev and Mr. Aliyev, the President and his Government have commenced a concerted campaign to purge my family and me from Kazakhstan, expropriate our business investments in that country, and spread false and harmful disinformation about me in the world media. |

---

[34]   Ex. 8, Witness Statement of Devincci Hourani, *Ruby Roz Agricol LLP v. Republic of Kazakhstan*, UNCITRAL (Sept. 4, 2011) at 2 ¶ 2; 9-11 ¶¶ 19, 24; 19-21 ¶¶ 43-44; 28-29 ¶ 62.

| ¶¶ | Issam Hourani USDC DC DECLARATION |
|---|---|
| 6 | [F]rom May 2007 forward, each of my family's and my own businesses were effectively paralyzed by the Kazakh Government… |
| 10 | The expropriation of all my family's businesses in Kazakhstan within the space of a few short months, including the harassment, intimidation, and defamation outlined in the Complaint in this litigation, coincided exactly with the political falling out between Mr. Aliyev and President Nazarbayev. |
| 27 | In the wake of the expropriation of my family's various business interests in Kazakhstan and the publication of the various defamatory statements about me, I was, of course, certain that the Republic of Kazakhstan and President Nazarbayev had been responsible for these acts. |
| 28 | At that time [in 2007], however, I did not know that the Defendants were in any way involved in the Kazakh Government's efforts against my family. |
| 29 | In early April 2010, we learned that Kazakhstan had *some* assistance in its scheme from outside consultants, the Defendants. |
| 32 | The [November 16, 2007] memorandum stated that this task force included not only Kazakh officials, but "A.Mirtchev" the "'President of GlobalOptions Management' and a staff advisor to the Government of Kazakhstan. It then outlines President Nazarbayev's personal orders that the task force gather "discreditable financial and bank information as well as submission of the KNB operations reports relevant both to Aliyev group and Hourani Brothers to US law enforcement bodies." |
| 33 | The Kazakh Embassy in Washington, D.C., which, as stated above, published two defamatory articles about me, was to be an integral part of the [Kazakh] task force's activities according to the memorandum. |
| 36 | Upon receiving the November 16, 2007, memorandum, and several others like it that Rakhat has been able to provide us, it became apparent that the Defendants conspired with and aided the Kazakh Government in stripping my brother and me of our business interests and publishing the above-mentioned defamatory remarks made about me. |
| 37 | Immediately upon obtaining this memorandum, my brother and I engaged investigators to ascertain the extent of the Defendants' activities on behalf of the Republic of Kazakhstan.[35]  I also asked Rakhat to provide us with any further documentation he was able to obtain showing the Defendants' activities on behalf of Kazakhstan.  Most |

---

[35]  One of the General Aliyev-supplied forged documents withdrawn before ICSID, but also introduced and not withdrawn here, attached a document that Aliyev calls a "Superkhan" plan to expropriate oligarch assets which the Houranis, alleged as the basis of their claims, to have been authored by Dr. Mirtchev.  Issam thereby testifies that this action is predicated on Aliyev-provided documents that Defendants have demonstrated are forged.  It is not reasonable or plausible, however, that the Houranis did not learn of these documents and their claim until August 2010 because Aliyev wrote extensively about the same documents and made the same allegations against Defendants in Aliyev's book published in the Spring of 2009. Ex. 2, R. Aliyev, The Godfather-in-Law (trafo verlag 2009) 396-401, 403-404.  Due to this implausibility, Issam no doubt testified at the Caratube arbitration hearing that he had not read his brother-in-law's book, but neither the Houranis nor General Aliyev stated any reasonable or plausible rationale as to why General Aliyev would have concealed this alleged evidence from the Houranis for another 18 months, allegedly revealing it only in late August 2010.

| ¶¶ | **Issam Hourani USDC DC DECLARATION** |
|---|---|
| | importantly, Devincci and I asked our legal counsel to institute proceedings immediately against Defendants for their role in our injuries.[36] |

As part of Plaintiffs' efforts to bolster their original complaint, Devincci Hourani

also testified to the following on January 14, 2011:

| ¶¶ | **Devincci Hourani USDC DC DECLARATION** |
|---|---|
| 5 | … Defendants in this case worked with the Republic of Kazakhstan and its ruler, Nursultan Nazarbayev, to divest me and my family members of our individual interests in each and every one of those businesses. The decision to strip me of my assets in these various businesses stems directly from my family's association with the President's former son-in-law Rakhat Aliyev. |
| 6 | … [A]s a result of its link by marriage to Mr. Aliyev's family, the media company was a key focus for President Nursultan Nazarbayev and his allies. Indeed, in May 2007, the President ordered the immediate shut down of KTK's broadcasting for three months (in the end, it was shut down for two weeks,  and later, was confiscated by the Government). Ultimately, my interest in KTK television was stripped from me through the coercive tactics of the Kazakh Government… .[37] |
| 19 | Further, the [November 16, 2007] memorandum lays out directives from President Nazarbayev, instructing … the task force… .  The memorandum then attached … GlobalOptions Management-drafted "Superkhan" memorandum laying out the contours of a plan for the consolidation of power in President Nazarbayev and the neutralization of political and economic rivals. |
| 20 | It is my understanding that Rakhat Aliyev obtained this memorandum and several others that we submit in this litigation through sources still loyal to him within Kazakhstan. |
| 21 | Immediately upon receiving this memorandum, my brother and I requested that our counsel pursue direct legal action against the Defendants in the United States.[38] |

Further undermining Plaintiffs' case is General Aliyev's following statement in his

resume that was introduced by Caratube before ICSID:

---

[36]  Decl. of Issam Hourani (Dkt. No. 32-27 Jan. 14, 2011) at 2-3 ¶¶ 4-6; 4-5 ¶¶ 10; 10-11 ¶¶ 27-29; 12-14 ¶¶ 32-37.  Any reasonable investigation by Plaintiffs' counsel would have included inquiry into Aliyev's book, revealing his claims of possessing so-called "evidence" long before September 2010.

[37]   General Aliyev stated in his book that he owned KTK and Alma Media and was pressured by the President of Kazakhstan to surrender those media holdings:  "I told the President in no uncertain terms that I was not willing to give up my holding, Alma Media KTK." Ex. 2, R. Aliyev, The Godfather-in-Law (trafo verlag 2009) 27, 34, 39, 395 (at 395).

[38]  Decl. of Devincci Hourani (Dkt. No. 32-28 Jan. 14, 2011) at 2 ¶¶ 5-6; 5-6 ¶¶ 19-21.  Devincci thus testifies that this action is predicated on forged documents provided by General Aliyev.

> Dr. Aliyev's business interests include a powerful media holding group incorporating several printed and television news channels in Kazakhstan. The media group is highly profitable and generates approximately US $30 million per annum, principally from advertising revenue.[39]

General Aliyev is no doubt referring to Alma Media and KTK television, which the Houranis claim were extorted from them in this case.[40] The factual allegations of Plaintiffs' amended complaint are thus dispositively disproven by the statements of the Houranis and General Aliyev.

2. *The Houranis Sponsored Extensive Aliyev and Abbas Testimony of the Government of Kazakhstan's Universal Expropriation of the Houranis' Assets.*

The Houranis presented testimony of their in-law, General Aliyev, and of their blood relative and business partner Yasser Mahmoud Abbas to support their claims of expropriation of all of their businesses and assets by the Government of Kazakhstan. General Aliyev gave the following written testimony in July 2010, filed first with the ICSID three-member Tribunal in *Caratube Int'l Oil Co. v. Republic of Kazakhstan* and then with this Court in the *Caratube* discovery case in August 2010:

| ¶¶ | **Rakhat Aliyev ICSID TESTIMONY** |
|---|---|
| 4 | Since 2007, … I have been living in exile and all my businesses in Kazakhstan and those of my family and allies, have been expropriated by the Government of Kazakhstan at the direction of President Nazarbayev. |
| 8 | As a result, there can be no doubt that the driving force behind the Government's actions in relation to … multi-billion dollar investments by the Hourani family in Kazakhstan and expropriated by the Government was wholly political. |

---

[39] Ex. 6, Resume of Rakhat Aliyev (July 9, 2007) at 2.

[40] *Cf.* The Godfather-in-Law, Ex.2 at 395 (Aliyev claims holdings in Alma Media KTK). The Houranis' contradictory evidence in various cases as to ownership applies likewise to the sugar assets referred to as the Sugar Centre that the Houranis alleged in their amended complaint to have been owned by Omar and extorted by Defendants as a RICO predicate offense. Am. Compl. (Dkt. No. 68 Apr. 12, 2012) at 6 ¶ 26. General Aliyev's ICSID Witness Statement filed with this Court in the *Caratube* case included a reference to his Curriculum Vitae (CV) as attached Exhibit I to the Witness Statement. *Caratube,* Dkt. No. 32-1, Case No. 1:10-mc-00285-JDB (Aug. 6, 2010). The Aliyev resume was not attached, however, to the Witness Statement as filed here, but is attached hereto as Ex. 6. General Aliyev's resume shows that he claims ownership of the Sugar Centre, again demonstrating that the Houranis and their counsel have no reasonable basis for their amended complaint.

| ¶¶ | Rakhat Aliyev ICSID TESTIMONY |
|---|---|
| 51-52 | Altogether, the Hourani family has had over two billion dollars worth of assets expropriated. … [T]he Hourani family had *all* their interests in Kazakhstan expropriated … In the span of a few months, the Hourani family was essentially nullified as a financial presence in Kazakhstan. |
| 53-54 | [O]nce the President had decided to eliminate me, expropriation of the Hourani family's financial wealth in Kazakhstan was an inevitable and consequential corollary. … to ensure that I was not able to get my message out of the country, while allowing the President at the same time to consolidate his position and strategy." |
| 55-56 | [I]n relation to the Houranis, the plan was simple:  nullify them by confiscating their property. …Devincci Hourani's shares in the television channel, KTK, were also forcibly signed over to the President's own fund, the First Presidential Fund.  Issam Hourani's massive media interests, alone worth hundreds of millions of dollars, were signed over to the President's own fund through a fabricated power of attorney forging his signature. … [A]ctions by the Government were part of a careful campaign orchestrated by it against the Hourani family and me.  A document that was provided to me by people still loyal to me in Kazakhstan, and which I have shared with legal counsel for Claimant, proves beyond doubt that the Government of Kazakhstan expropriated the Hourani family's assets as a way of attacking them and me together.[41] |

---

[41]  Witness Statement of Rakhat Aliyev, *In re Caratube Int'l Oil Co.*, Misc. No. 10-0285-JDB (Dkt. No. 32-1 Aug. 6, 2010) at 3 ¶ 4; 4 ¶ 8; 22-24 ¶¶ 51-56.  In the *Caratube* arbitration, one ICSID Tribunal member was appointed by each party, and those two appointees were then expected to appoint a third member.  The Caratube appointee to the Tribunal would not agree to the consensus appointment of a third member (who ultimately had to be appointed by ICSID), but the Caratube appointee nonetheless joined in the Tribunal's resounding 117-page consensus decision against Caratube.  Following assessment of credibility of Caratube's witnesses (including, most prominently, Devincci, Issam and Aliyev), the ICSID Tribunal unanimously (a) dismissed Caratube's claims for failure to meet its burden to show that Devinccci owned and controlled Caratube's Kazakhstan operations and (b) assessed legal fees and costs against Caratube in the amount of $3.2 million as follows:

> Indeed, the nominal price, if any, paid for the acquisition of the shares raises doubts about the existence of an investment in which at least USD 9.4 million had already been sunk, especially if it is the only element of the transaction. In such situation the Tribunal is required to review closely the circumstances of the transaction [page 104 ¶ 433].
>
> *   *   *
>
> There is also no evidence that Devincci Hourani's contribution constituted of his know-how or managerial skills.  Devincci Hourani admitted himself that: '*Other than when I was the Director of CIOC I have not been actively involved in the day to day running of CIOC.*'  CIOC was not an ordinary business venture.  It was set up to operate an oil concession the value of which CIOC now claims to be over USD 1 billion.  Yet CIOC's nominal share capital is … about USD 7,000 (C-174)… . CIOC's shares were always held by individuals.  Nothing is known about any substantial contribution by any of those individuals, neither in terms of money, nor assets or know-how.  Fadi Hussein's total contribution to CIOC was USD 11,000.  Both Fadi Hussein and Waheeb Antakly sold their shares for their nominal value… [Page 108 ¶¶ 450-52].
>
> [N]o plausible economic motive was given to explain the negligible purchase price he paid for the shares and any other kind of interest and to explain his investment in CIOC. No evidence was presented of a contribution of any kind or any risk undertaken by Devincci Hourani. There was no capital flow between him and CIOC that contributed anything to the business venture operated by CIOC. [Page 109 ¶ 455].
>
> *   *   *
>
> Claimant's evidence does not support a conclusion that CIOC was an investment of Devincci

The Houranis also filed the following Aliyev testimony in this matter, on January 14, 2011, that claimed Hourani media assets (which Plaintiffs now allege were extorted by Defendants) were in fact expropriated when they were "signed over to the President's own fund":

| ¶¶ | Rakhat Aliyev USDC DC DECLARATION |
|---|---|
| 6 | In 2007, I challenged my father-in-law's ability to remain as President …. As a result I have had to live in exile, and all my businesses in Kazakhstan, and those of my family and allies, have been expropriated by the Government of Kazakhstan at the direction of President Nazarbayev. |
| 16 | Of course, as my brother-in-law, Issam Hourani was a close friend… . Inevitably as a result of our close family relationship, my fate, and that of the Hourani family, was intertwined in the eyes of the President Nazarbayev and  the Defendants in this matter. |
| 32 | This is the Kazakh Government's *modus operandi*.  …[M]embers of my family, including the Hourani family have suffered as collateral damage to President Nazarbayev's campaign to hurt me through those whom he believes to be "Aliyev people." |
| 45 | Altogether, the Hourani family has had over two billion dollars worth of assets expropriated. |
| 46 | In the same time period as my falling out with the President, the Hourani family has had all its interests in Kazakhstan expropriated, from the Caratube oil concession to their interests in sugar, from poultry production and distribution to land and real estate, from a percentage of the country's media to millions of dollars in Kazakh bank accounts. In the span of a few months, the Hourani family was essentially nullified as a financial presence in Kazakhstan. |
| 47 | The Government's move against the Hourani family was in some sense inevitable. As I have stated, they were a prominent and wealthy family with significant financial power at their disposal. They were known to the President through me.  [T]he Hourani family thus represented an important financial resource available to fund me and my activities in opposition to the President.  [O]nce the President decided to eliminate me, expropriation of the Hourani family's financial wealth in Kazakhstan was an |

Hourani. …
                                        *    *    *
… Claimant was first required to show the existence of an at least plausible economic motivation in Devincci Hourani's alleged investment in CIOC. Since no plausible economic motivation has been shown by Claimant, and in view of Claimant's burden of proof, the Tribunal is not obliged to enquire what the real motivation behind Devincci Hourani's purchase of the shares in CIOC was. [Page 111 ¶¶ 463, 466].
                                        *    *    *
Resulting from the above considerations, the Tribunal concludes that the facts presented and proved by Claimant do not satisfy Claimant's burden of proof to establish jurisdiction of this Tribunal. Accordingly, the Tribunal finds that it does not have jurisdiction over the claims raised in this case [Page 112 ¶¶ 468-69].

Ex. 3, *Caratube Int'l Oil Co. v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12 (June 5, 2012).   This decision is publicly available for review and download at http://italaw.com/sites/default/files/case-documents/italaw1100.pdf

| ¶¶ | Rakhat Aliyev USDC DC DECLARATION |
|---|---|
|  | inevitable and consequential collorary. |
| 48 | Worse still, KTK and Karavan belonging to Gulshat and Devincci Hourani, was entirely shut down nationwide for two weeks and eventually transferred into the hands of the Government. |
| 49 | [I]n relation to the Houranis, the simple plan, as conceived by the Defendants in this action, was to nullify them by confiscating their property and discrediting them as Islamic terror threats. |
| 50 | I know for a fact that the above actions by the Government were part of a careful campaign orchestrated by it and the Defendants against the Hourani family and me.  A document that was provided to me by sources still loyal to me in Kazakhstan, and which I have shared with legal counsel for Plaintiffs, proves beyond doubt that the Government of Kazakhstan, in conjunction with the Defendants, expropriated the Hourani family's assets as a way of attacking them and me together. In fact, this document, a November 16, 2007, memorandum from Colonel A. Daulbaev to Kazakh Ambassador to the United States E. Idrissov, confirms that a special taskforce was created at the orders of the President (likely through his Chief of Staff, Aslan Musin), and under the leadership of Askhat Daulbaev of the General Prosecutor's Office (he is also with the KNB), simply to eradicate the economic power of Issam and Devincci Hourani.[42] |

Plaintiffs filed with the ICSID Tribunal and then with this Court General Aliyev's 26-page *Caratube* witness statement with only a single shoe-horned reference to Defendants as assisting the Government.[43]   Plaintiffs also filed their *Caratube* ICSID reply memorial expounding Yasser Abbas' testimony that Kazakhstan expropriated all Hourani assets as political retaliation against General Aliyev:

> President Nazarbayev told Mr. Yasser Abbas, Special Envoy of the Palestinian Authority President during a formal visit to Astana in October 2008, that expropriation of the Hourani family businesses was because Issam Hourani was "related to a person" (*i.e.,* Mr. Aliyev).  The President further confirmed that if Issam Hourani "collaborated" with the Kazakh Government against that "person," all the Hourani family businesses, including CIOC, would be returned.   Mr. Abbas, who has no personal interest in the outcome of this dispute and provides his sworn testimony as a formal representative of his own President, attests in his witness statement in this arbitration that:

---

[42] *See* Decl. of Rakhat Aliyev (Dkt. No. 32-14 Jan. 14, 2011) at 2 ¶ 6; 6 ¶ 16; 12 ¶ 32; 18-20 ¶¶ 45-50.  The only "evidence" cited in General Aliyev's Declaration is a Nov. 16, 2007 forgery transmitting his equally bogus "Superkhan" plan.

[43] Witness Statement of Rakhat Aliyev, *In re Caratube Int'l Oil Co.*, Misc. No. 10-0285-JDB (Dkt. No. 32-1 Aug. 6, 2010) at 25 ¶ 57 ("Government has not stopped its campaign against me and the Hourani family. … Kazakhstan has been zealously assisted by … President Nazarbayev's 'agents' located in the United States, including Mr. Mirtchev, who have pursued me since May 2007.").

> [m]y meeting with President Nazarbayev confirms that the only reason that CIOC (and the other expropriated businesses of the Hourani family in Kazakhstan) were targeted by the Kazakh Government was because the Hourani family was affiliated, in the eyes of the President, with Mr. Aliyev.  As such, there can be no question that the only motivation behind the Government's actions against the Hourani family and CIOC was political retaliation against Mr. Aliyev.[44]

Indeed, Mr. Abbas, while testifying for his business partners and relatives, Devincci and Issam, that the Government of Kazakhstan expropriated all Hourani businesses due to their relationship with General Aliyev, gave a disclaimer of common interest with the Houranis.   Recent Congressional testimony before the House Foreign Affairs Committees provides evidence disproves Mr. Abbas's self-interest disclaimer.[45]

---

[44]   Ex. 9, Witness Statement of Yasser Abbas, *In re Caratube Int'l Oil Co.*, Misc. No. 10-0285-JDB (April 27, 2010) at ¶¶ 6-8, 21 ("Devincci was concerned about the treatment … at the hands of the Kazakh Government. … President had simply set his sights on clearing out anyone connected with Mr. Aliyev, including CIOC and any other investments held by the Hourani family.  I now know this to be true.  As I came to learn from President Nazarbayev himself, … the driving force behind the Government's action in relation to … investments held by the Hourani family in Kazakhstan was … personal retaliation against them solely because of Mr. Issam Hourani's familial connection to Mr. Aliyev. … [T]he only motivation behind the Government's actions against the Hourani family and CIOC was political retaliation against Mr. Aliyev.").  Before ICSID, Mr. Abbas made not a single mention of Defendants.

[45]   Contrary to the Caratube/Hourani representation in the filings to this Court and ICSID that "Mr. Abbas … has no personal interest in the outcome" in relation to the Houranis, a prominent witness recently testified before Congress that Mr. Abbas and the Houranis are business partners in Sudan oil and other projects.  Ex. 10, J. Schanzer, "Chronic Kleptocracy:  Corruption within the Palestinian Political Establishment," House Foreign Affairs Committee, Middle East and South Asia Subcommittee (Foundation for Defense of Democracies July 10, 2012), http://foreignaffairs.house.gov/112/HHRG-112-FA13-WState-SchanzerJ-20120710.pdf ("I have also had conversations with a current foreign intelligence official and two former US intelligence officials with additional information about the Abbas brothers' international operations. According to information supplied and confirmed by these officials, the Palestinian Authority granted diplomatic passports in 2009 to two business partners of the Abbas brothers:  Issam and Devincci (Assem) Hourani. The passports, according to these officials, 'entitle them to travel internationally with immunity' normally afforded to Palestinian diplomats. The Israeli press covered aspects of this story in 2011. According to the intelligence officials, Yasser Abbas worked with Devincci Hourani to pursue an oil business in Sudan called Caratube [that] appears to have an office in Kazakhstan. … Devincci Hourani and Yasser Abbas, according to these officials, received 'help from the Palestinian Authority ambassador to Sudan [Sayed al-Masri] to win three oil blocks on behalf of CIOC.'  The US and foreign officials suggest that the operation in Sudan may be a violation of US sanctions laws because Devincci is believed to be an American citizen. The intelligence officials also note that Devincci Hourani has 'partnered with Yasser Abbas to initiate other business projects in Sudan, including construction of a ... hotel and other real estate projects.'  The officials further add that the 'sons of Mahmoud Abbas have also been in continuing contact with the Hourani brothers about business opportunities in Kazakhstan, the Ukraine, and Montenegro.'").

## IV.  STATEMENT OF LEGAL AUTHORITIES

A.  <u>Despite the Absence of Any Reasonable Basis in Fact for the Houranis' Amended Complaint, the Houranis Violate Rule 11 By Refusing to Withdraw It</u>.

Where "the operative complaint contains allegations that are false or in conflict with the documents submitted in another tribunal in a separate proceeding," that plaintiff may be subject to sanctions "if plaintiff fails to rectify the alleged inconsistencies."[46]  In accordance with the "safe harbor" provision of Fed. R. Civ. P. 11(c)(2), Defendants served this motion on Plaintiffs more than 21 days before filing with the Court.  The Rule 11 safe harbor provision affords no protection whatsoever, however, to a party who "refuses to withdraw the unsupported allegation."[47]

Directly and through Caratube, Plaintiffs filed two lawsuits in this Court as fishing expeditions for discovery.  After the Court's dismissal, followed by denial of reconsideration, of Plaintiffs' Caratube gambit, the Houranis filed their fanciful 64-page, 231-paragraph complaint initiating this action the very next day.  After Defendants raised *Iqbal/Twombly* implausibility, Act of State Doctrine, statute of limitations, lack of RICO extraterritoriality effect and other bars to the Houranis' totally unreasonable and implausible complaint, the Houranis "upped the ante" by filing a flood of documents that include the Hourani and Aliyev declarations and forged documents.

When Defendants presented sworn declarations of both purported Government of Kazakhstan authors of the General Aliyev documents and pre-eminent experts testifying that General Aliyev's documents are forgeries, Plaintiffs filed an amended complaint that is fatally contradicted by the Houranis' own sworn written testimony in four cases before the Court and

---

[46]  *Day v. Corner Bank (Overseas) Ltd.*, 789 F. Supp. 2d 136, 148 (D.D.C. 2011).
[47]  *Brown v. Ameriprise Fin. Servs., Inc.*, 276 F.R.D. 599, 605 n. 4 (D. Minn. 2011).

arbitral tribunals.  Plaintiffs' obstinate refusal to withdraw their abusive amended complaint violates the most basic tenet that, under Rule 11, "[p]laintiffs are not permitted to assert first, without basis, and discover later."[48]   Thus, "a plaintiff cannot avoid sanctions through the fortuity that some of her unsupported factual allegations later turn out to be accurate."[49]   Instead, in carefully delineated circumstances, "Rule 11 leaves open the door for plaintiffs to allege claims '*likely* to have evidentiary support after a reasonable opportunity for further investigation or discovery,' but such claims must be 'specifically so identified' in a complaint.'"[50]   Plaintiffs not only have failed to identify claims in their amended complaint that are "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," but also have totally contradicted the allegations of the amended complaint by their sworn statements and by their own original complaint.[51]   Because the plaintiffs have contradicted the allegations of the amended complaint in two cases before this Court and two more arbitral tribunals, Plaintiffs' amended complaint is based neither upon reasonable investigation nor an indication of which allegations are likely to have evidentiary support following discovery.   Rule 11 requires

---

[48]   *Id.* at 605 (citing *Micro Motion, Inc. v. Kane Steel Co.,* 894 F.2d 1318, 1327 (Fed. Cir. 1990) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery,* not to find out if it has any basis for a claim [emphasis in original].")); *see also Bryant v. Brooklyn Barbeque Corp.,* 130 F.R.D. 665, 669 (W.D. Mo. 1990) ("Since [Rule 11] requires ... a reasonable [pre-filing] inquiry, a party filing a complaint hoping that discovery will reveal facts supporting the allegations may be sanctioned.").

[49]   *Brown,* 276 F.R.D. at 605-06 ("A shot in the dark is a sanctionable event, even if it somehow hits the mark." (citing *Vista Mfg., Inc. v. Trac–4, Inc.,* 131 F.R.D. 134, 138 (N.D. Ind. 1990))).

[50]   *Brown,* 276 F.R.D. at 606 n.5 (citing Fed. R. Civ. P. 11(b)(3) (emphasis added)).

[51]   Plaintiffs argue that Defendants have no recourse for the Houranis' abusive amended complaint that blatantly contradicts their own sworn written testimony supporting the original complaint because, as to "any inconsistency between the allegations of the original complaint and FAC, such inconsistencies are more appropriately addressed at summary judgment and/or trial."  Pls.' Opp'n to Defs.' Mot. to Dismiss the First Am. Compl. Dkt. No. 73 (June 13, 2012) at 17.  No provision of Rule 11 empowers a party to make false filings with impunity or precludes the afflicted party from any remedy before summary judgment or trial.  To the contrary, Rule 11 imposes on Plaintiffs a continuing obligation to withdraw their contradictory and abusive amended complaint. While Plaintiffs' argument furthers their ploy to seek unwarranted "fishing expedition" discovery for the Houranis' abusive amended complaint, Defendants may challenge the amended complaint by Rule 11 motion without further egregious waste of resources of the Court and Defendants by needlessly awaiting summary judgment and trial.

sanctions against Plaintiffs for their abusive, unfounded amended complaint and associated filings.

B.    The Houranis and Their Counsel Must Be Sanctioned for Amended Complaint Allegations Devoid of Any Reasonable Factual Basis.

Counsel for the Houranis here likewise represented Plaintiffs and assisted the Houranis and General Aliyev in preparation of written testimony, filed in two cases before this Court and two more arbitrations before ICSID and UNCITRAL, that unequivocally attests that the Government of Kazakhstan expropriated all of the Houranis' businesses and defamed Issam. Indeed, the Houranis and General Aliyev testified here that Hourani interests in media assets KTK and Alma Media were expropriated by the Government of Kazakhstan when Devincci was forced to sign over those media interests to the Government's First Presidential Fund. *See supra* Sections III.A and III.B. Plaintiffs' original complaint alleged, in excruciating detail, (1) that the Government of Kazakhstan expropriated all of the Houranis' Kazakhstan assets and defamed Issam and (2) that Defendants aided and abetted the Government action. Plaintiffs subsequently supported their initial complaint with Hourani and Aliyev testimony prepared by Plaintiffs' counsel and Aliyev-supplied documents that were declared forgeries and frauds both by purported Government of Kazakhstan authors and pre-eminent experts.[52]

In another case where plaintiffs "persisted in alleging claims without any reasonable factual or legal basis," this Court held that the "the conduct of the plaintiff and his counsel . . . in pursuing vexatious and dilatory litigation warrants sanctions."[53]  By amending their complaint,

---

[52]  *See supra* note 26.  If Plaintiffs were true to their word in disclaiming reliance on Aliyev's forgeries, then Plaintiffs would have no evidence whatsoever purporting to support their amended complaint.

[53]  *See Reynolds v. U.S. Capitol Police Bd.*, 357 F. Supp. 2d 19, 26 (D.D.C. 2004) ("The D.C. Circuit has held that 'once the district court finds that a pleading is not well grounded on fact, not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or is interposed for any improper purpose,' Rule 11 *requires* that sanctions of some sort be imposed."'  *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 852 (D.C. Cir. 1995) (citing *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174–75 (D.C. Cir. 1985) (emphasis in the

Plaintiffs foreclosed the earlier opportunity for dismissal of this case based on *Iqbal/Twombly* implausibility, Act of State Doctrine, statute of limitations, lack of RICO extraterritoriality effect and other bars raised by Defendants.  Plaintiffs nonetheless continue to pursue their "vexatious and dilatory litigation" and that conduct "requires … sanctions."[54]  Indeed, in four separate cases, Plaintiffs' counsel filed Hourani and Aliyev testimony attesting that the Government of Kazakhstan expropriated all Hourani businesses and defamed Issam at the embassy website.[55] Here, counsel for the Houranis presented testimony by them and General Aliyev supporting the initial complaint allegations that Defendants aided and abetted as agents of the Government of Kazakhstan in the ***expropriation*** of all Hourani businesses and defaming Issam at the embassy website.   Plaintiffs then made a sea change in their amended complaint to allege, as totally unsubstantiated "facts," that Defendants took ***private*** actions against Plaintiffs involving no act of state.  The court sanctions as follows a party making "sensational allegations" lacking "any factual basis whatsoever":

> But where, as here, a plaintiff makes sensational allegations with respect to a defendant without any factual basis whatsoever, and then tries to rescue his claims against that defendant from dismissal by introducing an entirely different theory of liability in his legal memoranda, the failure of the plaintiff and his counsel "to make sure the original complaint was well grounded in fact is clearly a violation of Rule 11."[56]

In *Carswell v. Air Line Pilots Ass'n, Int'l*, Carswell tried to rescue his sensational claims by presenting new legal theories in his memoranda on motions to dismiss, but here, the Houranis'

---

original").").

[54] *Id.*

[55] The Court should properly consider that in four separate cases Plaintiffs submitted the testimony disproving their amended complaint.  *See Atkins v. Fischer*, 232 F.R.D. 116, 129 (D.D.C. 2005) ("It has long been held that in considering the implementation of sanctions against a party or a counsel to a litigation, a district court may consider all the circumstances surrounding the alleged violation. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 635, 82 S.Ct. 1386. 'The totality of circumstances can include events which did not occur in the case proper but occurred in other cases and are, by their nature, relevant to the pending controversy.' citing *Thibeault v. Square D Co.*, 960 F.2d 239, 246 (1st Cir. 1992).

[56] *Carswell v. Air Line Pilots Ass'n, Int'l*, 248 F.R.D. 325, 330 (D.D.C. 2008)(quoting *Barlow v. McLeod*, 666 F. Supp. 222, 229 (D.D.C. 1986)).

actions are much more egregious as they present new facts by the expedient of an amended complaint desperately seeking to moot the sensational contradictory allegations of their original complaint and declarations verifying that complaint.  Thus, the Houranis, in an attempt to rescue their action, make sensational allegations in the amended complaint contradicted by the original complaint, declarations and memoranda opposing the motions to dismiss.  In a futile effort to supplant Plaintiffs' own sworn statements and original complaint allegations that Defendants served as agents to the *Government* of Kazakhstan to aid and abet its *expropriation* of Hourani Kazakhstan business and its libel of Issam on the embassy website, the Houranis filed the amended complaint making unreasonable and implausible sensational allegations that Defendants acted privately to *extort* Kazakhstan media businesses, to racketeer and to defame both Houranis from Washington, D.C.

Consistent with the Court's *Carswell* holding, *Colliton v. Cravath, Swain & Moore LLP* (a) rejected the plaintiff's motion for leave to file an amended complaint because the proposed amended complaint contradicted the original complaint and was "a transparent attempt" to evade legal defenses the defendant had presented, and (b) found that the plaintiff's "self-contradictory assertions" in the proposed amended complaint violated Rule 11 where  the new allegations "clearly lack reasonable evidentiary support."[57]  By definition, Plaintiffs' amended complaint "clearly lack[s] reasonable evidentiary support" because their only evidence in the case is theirs and General Aliyev's sworn statements that attest that the Government of Kazakhstan expropriated all of the Houranis' business assets, thereby rendering impossible Plaintiffs' novel claim that Defendants successfully extorted those very same assets from Plaintiffs.  The *Colliton* Court appropriately rejected that plaintiff's expedient effort to salvage his action by propounding

---

[57]  No. 08 Civ. 0400, 2008 WL 4386764, at *13-14 (S.D.N.Y. Sept. 24, 2008); *accord Dozier v. Deutsche Bank Trust Co.*, No. 09 Civ. 9865, 2011 WL 4058100, at *4 (S.D.N.Y. Sept. 1, 2011) (court rejects new allegations that contradicted allegations plaintiff made in original pleading).

an amended complaint replete with "self-contradictory assertions."  Here, the amended complaint is contradicted by testimony that Plaintiffs themselves have repeatedly attested to under oath.

In sum, in accordance with the Court's *Carswell* ruling, *Colliton* and apposite precedent, the Houranis must be subject to Rule 11 sanctions that include, but are not limited to, dismissal with prejudice of this federal court proceeding.[58]

Just as the *Carswell* Court ruled that a plaintiff could not use legal memoranda to change his pleading, this Court likewise ruled that "[w]here a party emphatically and willingly swears to facts, it bears a heavy burden—even in the summary judgment context—when it seeks to jettison its sworn statement."[59]  Indeed, it is hornbook law that a party is bound by the testimony of that party's own witnesses.[60]  A court will credit a party's sworn testimony over later "corrections" because where a "plaintiff has failed to 'offer persuasive reasons for believing the supposed correction,' the court must credit the plaintiff's deposition testimony."[61]  Here the Houranis and General Aliyev repeatedly testified in lengthy sworn statements prepared by counsel.  The Houranis fail even to acknowledge any attempt to "correct" their sworn testimony that

---

[58]   In addition to monetary sanctions reimbursing Defendants' legal fees and costs, the ultimate sanction of dismissal with prejudice is especially appropriate here for Plaintiffs' filing an amended complaint that is contradicted by their own and Aliyev's voluminous testimony and for filing forged documents.  *See Garcia v. Berkshire Life Ins. Co. of America*, 569 F.3d 1174, 1182 (10th Cir. 2009) (affirming dismissal as sanction for falsifying documents in discovery; "submission of false evidence is … a fraud on the court"); *Amadasu v. Gen. Revenue Corp.*, No. 1:04-cv-772, 2008 WL 207936, at *4-6 (S.D. Ohio Jan. 24, 2008) (dismissing action as sanction for submitting forged documents to court); *Greenburg v. Roberts Props., Ltd.*, No. 06-16323, 2007 WL 2493323, at *1-2 (9th Cir. June 4, 2007) (affirming dismissal and awarding attorneys' fees as sanction for attaching forged documents to complaint); *Jimenez v. Madison Area Tech. College*, 321 F.3d 652, 657 (7th Cir. 2003) (affirming dismissal as a sanction for abusive conduct in falsifying evidence); *Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488 (9th Cir. 1991) ("[Plaintiff] attempted to deceive the district court on material matters before it.  Falsifying evidence is grounds for the imposition of the sanction of dismissal").

[59]   *Hopkins v. Women's Div., Gen. Bd. of Global Ministries,* 284 F. Supp. 2d 15, 21 (D.D.C. 2003) (quoting *Pyramid Sec., Ltd. v. IB Resolution*, 924 F.2d 1114, 1123 (D.C. Cir. 1991)).

[60]   *See Wiget v. Becker*, 84 F.2d 706, 710 (8th Cir. 1936) ("a party is bound by the testimony of his own witnesses"); *Yellow Cab Co. v. Rodgers*, 61 F.2d 729, 731 (3d Cir. 1932) ("defendant as bound by the testimony of its own witness"), *overruled on other grounds, Abraham v. Nat'l Biscuit Co.*, 89 F.2d 266 (3d Cir. 1937); *see also Lyon v. Bursey,* 36 App. D.C. 235 (1911) ("it does not lie in his mouth either to impeach his own evidence, or assert that the record does not import verity.").

[61]   *Hopkins*, F. Supp. 2d 284 at 21 (quoting *Pyramid Securities, Ltd. v. IB Resolution*, 924 F.2d 1114, 1123 (D.C. Cir. 1991)).

Defendants aided and abetted the Government of Kazakhstan's expropriation of the Houranis' media businesses and the defamation of Issam on the embassy website.  Instead, the Houranis support their amended complaint by arguing that they had ***always*** claimed that Defendants acted in their private capacities to extort the Houranis' media business and to defame Issam.[62]   A party's very failure to admit to its "correction" mandates the imposition of sanctions.[63]

The Houranis' novel factual allegations of Defendants' "private action" are totally belied by Plaintiffs' repeated sworn testimony that all of their businesses were expropriated by the Government of Kazakhstan and, specifically, that their media assets were confiscated by the Government's First Presidential Fund.  As a matter of physics and logic, it simply was not possible (let alone reasonably or plausibly alleged) for Defendants to extort assets from the Houranis that the Houranis had repeatedly sworn to have been previously expropriated from them by the Government of Kazakhstan.

If a pleading is not well grounded in fact, the pleader is subject to sanctions.[64]   Once the absence of a factual basis for their amended complaint was shown, the Houranis and their counsel were required to re-evaluate their Rule 11 certification.[65]   Because the Hourani and Aliyev testimony disproved the allegations of the amended complaint, Plaintiffs were required to withdraw that amended complaint, along with other filings supporting it.

---

[62] *See* Dkt. No. 64 at 2.

[63] *First Central Savings Bank v. Meridian Residential Capital*, No. 09-CV-3444-DLI-LB, 2011 WL 1240100 at *2 (E.D.N.Y. Mar 30, 2011) ("Therefore, it appears that Plaintiff is attempting to modify its allegations without admitting that the allegations as originally stated in the complaint were incorrect. Such conduct runs afoul of Rule 11.").

[64] *Levine v. F.D.I.C.*, 2 F.3d 476, 479 (2d Cir. 1993) ("the creativity of an attorney may not transcend the facts of a given case; counsel in his attempts at creativity concocted 'facts' that were not well grounded, and therefore exceeded the bounds of conduct ... incorporated in Fed. R. Civ. P. 11.").

[65] *See Sherman Treaters Ltd. v. Ahlbrandt,* 115 F.R.D. 519 (D.D.C. 1987) ("If during the course of litigation 'an attorney subsequently becomes aware of information or evidence which reasonably leads him to believe that there is no factual or legal basis for his position, ... then that attorney is under an obligation to re-evaluate the earlier certification of the cause under Rule 11.'") (quoting *Woodfork By and Through Houston v. Gavin,* 105 F.R.D. 100, 104 (N.D. Miss. 1985)).

It remains the law in this Court that "once the district court finds that a pleading is not well grounded in fact ..., Rule 11 *requires* that sanctions of some sort be imposed."[66]   By definition, the Houranis' contradictory amended complaint could not be well grounded in fact because it is totally contradicted both by sworn testimony prepared by counsel and signed and sworn to by the Houranis and by the original complaint signed by their counsel.  In *Bender,* this Court stated that "blatant denial of facts known to … Defendants violated Rule 11(b) as there was no reasonable factual basis for them."[67]  Defendants' conduct is much more egregious than that in *Bender*.  The Houranis made sensational allegations, supported by their own and General Aliyev's sworn statements and forged documents, that the Defendants aided and abetted the Government of Kazakhstan to expropriate all of Defendants' assets and to aid and abet defamation of Issam on the embassy website.  Then Plaintiffs' amended complaint, continuing to rely on General Aliyev's forged documents, contradicted their own sworn testimony, initial complaint and other filings by alleging that Defendants acted ***privately*** to extort the Houranis' media business and to defame Issam.  Plaintiffs and counsel must be sanctioned for improperly maintaining their amended complaint.

C.      The Houranis' Amended Complaint Must Be Dismissed and Monetary Sanctions Equal to Defense Fees and Costs Must Be Imposed on the Houranis and Their Counsel.

Besides imposition of monetary sanctions in the amount of Defendants' fees and costs of defending this case, Plaintiffs' conduct "is sufficiently egregious to warrant the 'ultimate sanction' of dismissal" with prejudice.[68]   This action, which now consists of Plaintiffs' many sworn

---

[66]  *Bender v. Jordan*, 679 F. Supp. 2d 85, 88 (D.D.C. 2010) (quoting *Rafferty v. NYNEX Corp.,* 60 F.3d 844, 852 (D.C. Cir. 1995) (emphasis in original; internal quotation marks and citations omitted)).

[67]  *Id.* (citing *Crawford  v. Deutsche Bank AG,*  60 F. Supp. 2d 829, 834 (E.D. Va. 2003)).

[68]  *Brown*, 276 F.R.D. at 608 ("Here, by pressing claims lacking in factual support, the Court is left with the impression 'that [Plaintiff's] strategy [was] to strong-arm a settlement by *in terrorem* claims, rather than to vindicate her legal entitlements.' Dismissal is appropriate for this reason, and to protect the integrity of the juridical process")

statements disproving the amended complaint that relies solely on the forged documents, must be dismissed with prejudice.   Monetary sanctions likewise must be imposed.

In a case where a party gave multiple false answers to a complaint, "[a]s a sanction for their violations of Rule 11(b), the Court will award one-half of their fees and all of their costs to [plaintiffs]."[69]   Because Plaintiffs demonstrate by their own and Aliyev's sworn testimony that they have no reasonable basis for *any* of the allegations of their amended complaint, Defendants are entitled to *all* fees and costs of defense of this action.[70]

For violation of Rule 11, a court "'imposes financial sanctions upon both the unsuccessful litigant[ ] and [its] lawyers, but more important, in the case of lawyers it carries with it a condemnation of [their] professional conduct.'"[71]   Rule 11 obligations apply equally to original and newly added counsel:  "An attorney substituting into a case after its commencement is no less obligated than the attorney who filed it to reasonably ensure that the complaint's contentions rest on a proper factual foundation."[72]   Therefore, original counsel and co-counsel are equally liable for Rule 11 sanctions.[73]   In this case, the Houranis' new co-counsel was introduced with

---

(*quoting Westfield Ins. Co. v. Sheehan Constr. Co.,* 564 F.3d 817, 820 (7th Cir. 2009), and citing *Pope v. Federal Express Corp.,* 974 F.2d 982, 984 (8th Cir. 1992), for the proposition that "dismissal [is] warranted where plaintiff knowingly used manufactured document to support her claim.")

[69] *Bender,* 679 F. Supp. 2d at 88.

[70] *See Sherman Treaters*, 115 F.R.D. at 525 ("Here, plaintiff's Rule 11 violation spawned a whole series of foundationless complaints, motions, and other papers to which defendant was required to respond. Accordingly, the Court grants defendant's motion for attorneys' fees as to those claims for reimbursement which are linked to plaintiff's Rule 11 violation.  Specifically, the Court finds that this reimbursement includes all fees and expenses incurred between October 30, 1984, the date plaintiff's first factually deficient complaint was filed, through March 7, 1985, the day this Court granted defendant's motion for summary judgment and dismissed this action with prejudice.").

[71] *Id.* at 527-28 (quoting *Tedeschi v. Smith Barney, Harris Upham & Co., Inc.,* 579 F. Supp. 657, 661 (S.D.N.Y. 1984), *aff'd* 757 F.2d 465 (2d Cir.), *cert. denied,* 474 U.S. 850 (1985)).

[72] *Brown,* 276 F.R.D. at 608 n. 7 (citing *Carswell v. Air Line Pilots Ass'n, Int'l,* 248 F.R.D. 325, 329 n. 4 (D.D.C. 2008); Fed. R. Civ. P. 11(b)(3)).

[73] *Carswell* , 248 F.R.D. at 329 n. 4 ("[P]laintiff's counsel, while not a signatory to the plaintiff's original complaint, essentially 'affirmed to the [C]ourt that the … case had arguable merit' when she entered her notice of appearance. . . .  The plaintiff's attorney is therefore equally responsible for any unfounded factual assertions made in the plaintiff's original complaint." (quoting *Turner v. Sungard Bus. Sys., Inc.,* 91 F.3d 1418, 1421 (11th Cir. 1996))).

considerable fanfare as specialized RICO counsel for the Plaintiffs,[74] and new co-counsel likely was involved in drafting their amended complaint.  In any event, both sets of counsel for the Houranis are equally responsible under Rule 11 (a) for amended complaint allegations that are disproven by the Hourani, General Aliyev and Abbas sworn testimony, demonstrating the absence of a reasonable investigation and total lack of plausibility and (b) for their refusal to withdraw the amended complaint and other filings making those allegations.

## V.  CONCLUSION

Because Plaintiffs filed their amended complaint to harass Defendants, because the amended complaint and supporting filings irreconcilably contradict Plaintiffs' own sworn statements and original complaint, and because Plaintiffs will not withdraw the offending amended complaint as required by Fed. R. Civ. P. 11, Defendants respectfully request that the Court sanction Plaintiffs' Rule 11 violations by order (a) dismissing the amended complaint with prejudice; and (b) directing Plaintiffs and their counsel, jointly and severally, to reimburse all of Defendants' legal fees and costs for defense of this action.

---

[74] *See* Pl.'s Mot. for Scheduling Conference, Dkt. No. 54, at 2 (Sept. 20, 2011).

Date: <u>November 6, 2012</u>  Respectfully submitted,


  <u>/s/ Richard W. Beckler</u>
Richard W. Beckler (DC Bar #262246)
LaShon K. Kell  (DC Bar #483465)
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, DC  20006
Telephone:  (202) 828-5816
Facsimile:  (202) 857-4835
E-mail:  <u>richard.beckler@bgllp.com</u>
        <u>lashon.kell@bgllp.com</u>

        and

Stephen Sale  (DC Bar # 942243)
John D. Quinn (DC Bar # 267302)
Eugene P. Kopp (DC Bar # 239467)
SALE & QUINN, P.C.
910 16th Street, N.W., Fifth Floor
Washington, DC 20006
Telephone:  (202) 833-4170
Facsimile:  (202) 887-5137
E-mail:  <u>sscsq@aol.com</u>
        <u>quinn.j@salequinn.com</u>

*Counsel for Defendants*
*Alexander V. Mirtchev and Krull Corporation*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DEVINCCI SALAH HOURANI,** *et al.*,  ) | |
| ) | |
| **Plaintiffs,**  ) | |
| ) | |
| **v.**  ) | **Case No. 10-cv-01618-TFH** |
| ) | **(Hon. Thomas F. Hogan)** |
| **ALEXANDER V. MIRTCHEV,** *et al.*,  ) | |
| ) | |
| **Defendants.**  ) | |

## PROPOSED ORDER

The Court has considered Defendants Alexander V. Mirtchev's and Krull Corporation's ("Defendants") Motion for Rule 11 Sanctions for Filing Improper Amended Complaint, dated November 6, 2012, and for good cause shown, it is hereby

**ORDERED** that Defendants' Motion is GRANTED; and it is

**FURTHER ORDERED** that Plaintiffs' amended complaint is hereby dismissed, with prejudice; and it is

**FURTHER ORDERED** that Plaintiffs and their counsel, jointly and severally, are to reimburse all of Defendants' legal fees and costs for defense of this action.

**IT IS SO ORDERED**, this _____ day of _____ 2012.


_____
THOMAS F. HOGAN
United States District Court Judge