UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEVINCCI SALAH HOURANI, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   **Civ. No. 10-1618 (TFH)** |
| | ) |
| | ) |
| ALEXANDER V. MIRTCHEV, *et al.*, | ) |
| | ) |
| Defendants. | ) |

# FILED

**MAY 0 8 2013**

Clerk, U.S. District and
Bankruptcy Courts

## MEMORANDUM OPINION

This case involves alleged violations of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C . § 1961 *et seq.*, and an alleged conspiracy to defame.

Plaintiffs contend that Defendants were instrumental in devising and coordinating a vast

racketeering and money laundering scheme, the goal of which was to strip Plaintiffs of their

assets in multi-million dollar media businesses located in the Republic of Kazakhstan

("Kazakhstan") and to defame Plaintiffs by publishing false statements on the website of the

Embassy of the Republic of Kazakhstan ("Kazakh Embassy") in Washington, D.C.  Pending

before the Court are Defendants' Motion to Dismiss the First Amended Complaint ("Am.

Compl." or "Amended Complaint") [Docket No. 70] and Motion for Rule 11 Sanctions for Filing

an Improper Amended Complaint [Docket No. 82].  The Court has considered thoroughly the

parties' arguments, submissions, and the entire record herein.  For the reasons below,

Defendants' motion to dismiss the Amended Complaint is **granted with prejudice** and motion

for Rule 11 sanctions is **denied.**

1

## I.     Background

Plaintiffs Devincci and Issam Hourani[1] (collectively, "the Houranis") are brothers and businessmen.  Defendant Alexander Mirtchev heads Defendant Krull Corporation, a "global strategic solutions provider" with its principal place of business in the District of Columbia.  Am. Compl. ¶ 13 [Docket No. 68].  According to the Amended Complaint,[2] which is the operative complaint for the purposes of assessing Defendants' Motion to Dismiss, the Houranis were, until 2007, very successful businessmen who operated "oil, broadcasting, and publishing companies" in the Republic of Kazakhstan.  *Id.* ¶ 11.  The specific companies at issue in Defendants' pending motions are KTK Television and Alma Media, two media companies in which the Houranis held shares.  *See id.* ¶ 17.  Plaintiffs allege that Dariga Nazarbayev,[3] the daughter of the Kazakh President, Nursultan Nazarbayev, "sought to amass ownership of the nation's major media outlets" as she contemplated a political career.  *Id.* ¶ 12.  Her goal was to "have the media portray her in the most favorable light" and to secure "the vast wealth and ownership [of] such large businesses."  *Id.* ¶ 12.  She therefore sought Defendants' assistance in actualizing her plan.  *Id.* ¶ 13.  Defendant Mirtchev allegedly agreed, from the District, to:

1) "assist [Dariga] with monetizing her control of the company,"

2) "deposit some of the proceeds of the seized businesses in western bank accounts where it would not be taxed or otherwise scrutinized,"

---

[1] Devincci is a U.S. Citizen and Issam is a citizen of the United Kingdom.

[2] The factual background of this case is based on the allegations of the First Amended Complaint, which are assumed to be true for the purposes of the discussion about Defendants' Motion to Dismiss.  The factual allegations of the Original Complaint [Docket No. 1] differ from those in the Amended Complaint and these discrepancies will be analyzed more fully in the Court's discussion about Defendants' Motion for Rule 11 Sanctions, *infra.*

[3] Dariga Nazarbayev is also known as Dariga Nazarbayeva.

3) "help Dariga use the money to acquire U.S. and European currencies [which] would raise

Kazakhstan's standing in the eyes of the western political establishment," and

4) "use his influence to falsely brand the Houranis as international criminals and terrorists

[to] neutralize the Houranis' ability to attack her or her father in response to the extortion

of their businesses."

*Id.* ¶ 16.  This conspiracy, according to Plaintiffs, is consistent with Defendant Mirtchev's

"Superkhan" memorandum[4] to the Kazakh President, in which Defendant Mirtchev advised the

President on how to consolidate his power "at the expense of business leaders." *Id.* ¶ 15.

Plaintiffs allege that their businesses were subsequently harassed by various government

entities. *Id.* ¶ 17.  Armed police raided their offices on June 27, 2007. *See id.* ¶ 18-19.  Plaintiff

Devincci Hourani was also under surveillance by the KNB (the Kazakh equivalent of the KGB),

who were allegedly "acting at the behest of Dariga and Mirtchev." *Id.* ¶ 20.  Under this pressure,

in July 2007, Devincci met with Dariga to try to address the situation. *Id.* ¶ 21.  She offered to

use her ties to the government to "protect" the Houranis if he would sign over his family's shares

---

[4] The "Superkhan" memorandum is the subject of significant criticism by Defendants, according
to whom it exists only as an alleged attachment to a memorandum from the Deputy Prosecutor
General of the Republic of Kazakhstan, Askhat K. Daulbaev, to Erlan A. Idrissov, Kazakhstan's
Ambassador to the United States. *See* Defs.' Mem. in Supp. of Mot. to Dismiss at ECF 11 n.4
[Docket No. 71].  Defendants argue that this memorandum from Daulbaev to Idrissov has been
shown to be forged. *See* Defs.' Reply in Supp. of Mot. to Dismiss and Mot. to Strike [Docket
No. 44] at ECF 6-11 (explaining forgery); Ex. 1 to Pls.' Mot. to Dismiss [Docket No. 71-2]
(January 2012 Expert Report of Gideon Epstein).  In Plaintiffs' First Amended Complaint and
reply brief, they do not mention the Daulbaev memo or address the forgery issue, but do refer to
the "Superkhan" document (albeit only to note that the "Superkhan" memorandum was
"consistent" with the scheme described in the Amended Complaint and allegedly authored by
Defendant Mirtchev). Am. Compl. ¶ 15; Pls.' Opp'n to Defs.' Mot. to Dismiss at 16 [Docket
No. 73].  Plaintiffs argue that the "Superkhan" memorandum itself has "never been alleged to be
a forgery." Tr. of Mot. Hr'g Before Hon. Judge Hogan at 63:1, Hourani v. Mirtchev, Civil
Action No. 10-1618 (Apr. 16, 2013).  The Court duly notes this disagreement between the parties
over the "Superkhan" memorandum, yet need not delve further into the merits of the forgery
issue at this stage.

in two mass media companies, KTK Television and Alma Media. *Id.* The following day,

Devincci, under duress, signed over to the First Presidential Fund the family's shares in these

two companies. *Id.* Dariga subsequently "siphoned the companies' assets." *Id.* ¶ 25. In the face

of continued harassment, the Houranis left Kazakhstan in 2008. *Id.* ¶ 28. Since then, Dariga has

allegedly compensated Defendant Mirtchev for his role in the extortion of Plaintiffs' assets by

wiring money (partially from revenues from Plaintiffs' businesses) to the bank accounts of

Defendant Krull Corporation, as well as to other bank accounts. *Id.* ¶¶ 29-31. Defendant

Mirtchev has allegedly concealed the money from the extortion to avoid incurring tax liability.

*Id.* ¶ 40.

Additionally, on December 18, 2008, Defendants Mirtchev and Krull Corporation

allegedly "published" or "caused" the Kazakh Embassy to publish defamatory statements about

Plaintiffs on the embassy website, mostly related to Plaintiffs' alleged terrorist ties.[5] *Id.* ¶ 58.

Defendants' involvement in the publication of these statements was "concealed" by the Kazakh

government and was only discovered by Plaintiffs in April 2010. *Id.* ¶ 62.

Plaintiffs' initial complaint in this action was filed on September 23, 2010. On April 12,

2012, this Court granted Plaintiffs' motion for leave to file an amended complaint. *See Hourani*

*v. Mirtchev*, 282 F.R.D. 278 (D.D.C. 2012) [Docket No. 67]. Plaintiffs' Amended Complaint

alleges that Defendants committed a pattern of racketeering activity, and conspired to do so, in

violation of RICO, 18 U.S.C. § 1962(c) (Count I); Defendants conspired with Dariga

Nazarbayev to extort Plaintiffs' businesses in violation of RICO, 18 U.S.C. § 1962(d) (Count II);

---

[5] The statements were that: "1) the Houranis were members of Hamas; 2) they were supporters of Hamas; 3) they imported workers into Kazakhstan that were trained in Islamic terrorist camps; 4) they assaulted an employee of Ruby Roz Agricol, a business owned by Kassem Omar; and 5) they owned an apartment in which an alleged mistress of Rakhat Aliyev was falsely imprisoned, drugged, and eventually murdered." Am. Compl. ¶ 58. The statements took the form of news stories, editorials, government memoranda, and other publications. *Id.* ¶ 59.

4

and Defendants conspired to defame Plaintiffs (Count III). *Id.* ¶¶ 42-65. The Amended

Complaint seeks damages and injunctive relief. *Id.* On May 17, 2012, Defendants moved to

dismiss Plaintiffs' first amended complaint. *See* Defs.' Mem. in Supp. of Mot. to Dismiss

[Docket No. 71]. On November 6, 2012, Defendants moved for Rule 11 sanctions for filing an

improper amended complaint. *See* Defs.' Mot. for Rule 11 Sanctions [Docket No. 82]. The

Court addresses these motions in turn.


**II.       Defendants' Motion to Dismiss**


    *A. Motion to Dismiss Standard*

A complaint must contain "enough facts to state a claim . . . that is plausible on its face,"

not merely one that is "conceivable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see*

*also Am. Fed'n of Gov't Emps., Local 2741 v. District of Columbia*, 689 F. Supp. 2d 30, 32-33

(D.D.C. 2009). That is, the plaintiffs must "plead[] factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). The Court must "accept as true all of the factual allegations

contained in the complaint," *Atherton v. District of Columbia*, 567 F.3d 672, 681 (D.C. Cir.

2009), and allow the plaintiff "the benefit of all inferences that can be derived from the facts

alleged," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). However, the

Court may not "accept inferences drawn by plaintiffs if such inferences are unsupported by the

facts set out in the complaint." *Id.* A plaintiff must show "more than a sheer possibility that a

defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678, and therefore must provide "more than

labels and conclusions," *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements," will not suffice. *Iqbal*, 556 U.S. at 678.

    B.  *Analysis of RICO Claims*

    The Amended Complaint alleges two violations of RICO under 18 U.S.C. § 1962(c) and (d), which state:

> c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Count I alleges that Defendant Mirtchev[6] violated § 1962(c) by conducting the "enterprise," *i.e.*, Krull Corporation, through a "pattern of racketeering activity." Am. Compl. ¶ 44. This "pattern" refers to Defendant Mirtchev's conspiracy to extort Plaintiffs' businesses and his laundering of some of the proceeds of the extortion through various bank accounts. *Id.* ¶¶ 33-41. Plaintiffs asserts that these acts constitute "racketeering activity" under 18 U.S.C. § 1961(1)(A)-(B)[7] and § 1961(1)(A). *See id.* ¶¶ 29-33; Pls.' Opp'n to Defs.' Mot. to Dismiss at ECF 11

---

[6] Krull Corporation is not a defendant in the RICO claims. *See* Pls.' Opp'n to Mot. to Dismiss [Docket No.73] at ECF 15 n.12.

[7] 18 U.S.C. § 1961(1)(B) incorporates 18 U.S.C § 1951 and § 1956. 18 U.S.C § 1951(a) states:
    Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in

[Docket No. 73]. Count II is essentially the same as Count I, except that it is made pursuant to 18 U.S.C § 1962(d). Pls.' Opp'n to Mot. to Dismiss at ECF 11.

Plaintiffs frame their allegations as a unified conspiracy in which Defendant Mirtchev, while in the United States, "approved" of Dariga's extortion of Plaintiffs' media businesses, KTK Television and Alma Media, both of which were located in Kazakhstan. *Id.* at ECF 13. Dariga then "foster[ed] a campaign" in which Plaintiffs and their businesses suffered harassment and intimidation" at the hands of the Kazakh police. Am. Compl. ¶ 3. While in Kazakhstan, Dariga forced Plaintiffs to sign over their business shares. *Id.* ¶¶ 21-23. Dariga then paid Defendant Mirtchev for his assistance by wiring into Krull Corporation bank accounts payments that were, in part, derived from revenues of Plaintiffs' seized businesses. *Id.* ¶¶ 30-31. Accepting these allegations as true, the Court acknowledges Defendant Mirtchev's alleged involvement in a conspiracy that was, undoubtedly, multinational. This Court must therefore

---

> furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
>
> 18 U.S.C § 1956(a) states:
>
> > (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— (A) (i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or (B) knowing that the transaction is designed in whole or in part— (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.
>
> 18 U.S.C. § 1961(1)(A) makes violations of state extortion statutes racketeering activity. The relevant violation under D.C. Code states:
>
> > (a) A person commits the offense of extortion if: (1) That person obtains or attempts to obtain the property of another with the other's consent which was induced by wrongful use of actual or threatened force or violence or by wrongful threat of economic injury; or (2) That person obtains or attempts to obtain property of another with the other's consent which was obtained under color or pretense of official right.
>
> D.C. Code § 22-3251.

consider whether this conspiracy has sufficient contacts with the United States to fall under RICO's domestic ambit.  The Court finds that it does not.

   This Court's precedent has made clear – and the parties agree – that RICO does not apply extraterritorially.  *United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 28 (D.D.C. 2011) ("[T]here is no evidence that Congress intended to criminalize foreign racketeering activities under RICO.").  Other courts have uniformly concluded the same, applying the Supreme Court's guidance in *Morrison v. National Australia Bank Ltd.*, that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." 130 S. Ct. 2869, 2878 (2010).  *See, e.g., Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010); *United States v. Chao Fan Xu*, 706 F.3d 965, 975 (9th Cir. 2013); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 913 (C.D. Cal. 2011); *Sorota v. Sosa*, 842 F. Supp. 2d 1345, 1349 (S.D. Fla. 2012).  Yet while *Morrison* directed courts to examine extraterritoriality by looking at "the 'focus' of congressional concern," including the "objects of the statute's solicitude" and "transactions that the statute seeks to regulate," 127 S. Ct. at 2884, applying this framework to RICO is "far from clear-cut," *Chao Fan Xu*, 706 F.3d at 975.  Courts have disagreed somewhat on how to assess the extraterritoriality of a RICO claim, falling generally into two camps.  *See Chao Fan Xu*, 706 F.3d at 975-76 (discussing in detail these two camps).  While the first camp asserts that RICO's focus is on the enterprise, the other asserts that RICO's focus is on the pattern of racketeering activity.  *Compare Cedeño v. Intech Group, Inc.*, 733 F. Supp. 2d 471, 474 (S.D.N.Y. 2010) ("the focus of RICO is on the enterprise as the recipient of, or cover for, a

pattern of criminal activity")[8] *with Agency Holding v. Malley-Duff*, 483 U.S. 143, 154 (1987)

("[T]he heart of any RICO complaint is the allegation of a pattern of racketeering.").

This Court's precedent does not fall cleanly into either camp. Our decision in *Philip Morris* used language consistent with both, quoting from *Cedeño* that "the focus of RICO is on the enterprise," 783 F. Supp. 2d at 28-29 (internal quotation marks omitted), while also referring to the lack of congressional intent to "criminalize foreign racketeering activities under RICO," *id*. at 29. Nevertheless, in accordance with the majority of other post-*Morrison* cases deciding this issue, this Court finds that "RICO's statutory language and legislative history support the notion that RICO's focus is on the pattern of racketeering activity." *Chao Fan Xu*, 706 F.3d at 977. Section 1962(c), which provides the basis for Plaintiffs' RICO claims, prohibits conduct "through a pattern of racketeering activity," while sections 1962(a)-(b) additionally prohibit the use of income derived from "a pattern of racketeering activity" to acquire an interest in an enterprise involved in interstate commerce. RICO's legislative history, furthermore, indicates that Congress's purpose in enacting RICO was explicitly to "seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful *activities* of those engaged in organized crime." Organized Crime Control Act of 1970, Congressional Statement of Findings and Purpose, Pub. L. No. 91-452, §1, 84 Stat. 922 (1970) *reprinted in* 1970 U.S. Code Cong. & Admin. News 1073 (emphasis added).

This Court therefore declines Plaintiffs' invitation to assess the extraterritoriality of Plaintiffs' RICO claim by examining the "location of the enterprise."[9] Pls.' Opp'n to Mot. to

---

[8] This Court notes that, on appeal, the Second Circuit expressly declined to adopt the "enterprise as focus" standard, or any standard for that matter. *See Cedeño v. Castillo*, 457 Fed. App'x 35, 37-38 (2d Cir. 2012).

Dismiss at ECF 12. Instead, looking to the pattern of racketeering activity in this case, this Court finds that "the slim contacts with the United States alleged by [Plaintiffs] are insufficient to support extraterritorial application of the RICO statute." *Norex*, 631 F.3d at 33. Numerous cases have come to similar conclusions. In *Philip Morris*, this Court found that "isolated domestic conduct does not permit RICO to apply to what is essentially foreign activity." *Philip Morris*, 783 F. Supp. 2d at 29. The domestic conduct there included communications between foreign and domestic actors, visits to the United States, and the use of an experimental farm in North Carolina to further the alleged scheme. *See id*.

Similarly, the Second Circuit dismissed a RICO claim with "slim" domestic contacts in *Norex*, 631 F.3d at 33 (2d Cir. 2010), in which Plaintiffs alleged a "racketeering and money laundering scheme with the goal of seizing control over most of the Russian oil industry through the use of Russian oil companies." *Id*. at 30. The *Norex* Plaintiffs alleged (1) "that Defendants used money transferred through United States wires to bribe Russian officials and commit various violations of U.S. laws and statutes," (2) "that Defendants traveled between the U.S. and Russia in aid of various aspects of the alleged Illegal Scheme," and (3) "that an extortion attempt

---

[9] Even if this Court did look to the location of the enterprise to determine whether the claim is sufficiently "domestic," this Court questions whether Defendant Mitchev's mere association with Krull Corporation is sufficient to make Krull Corporation the RICO "enterprise." *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (concluding that RICO liability "depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs.") (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). Plaintiffs fail to plead any facts showing that Defendant Mirtchev utilized Krull Corporation to advance the extortion. Krull Corportation's involvement was limited to the money laundering scheme, in which Dariga paid Defendant Mirtchev with money partially derived from Plaintiffs' businesses, through Krull (and other) bank accounts located both within and outside of the United States. Post-extortion money laundering between U.S. and foreign bank accounts is not sufficient to render a RICO scheme domestic, even under the enterprise-as-focus framework. *See Cedeño*, 733 F. Supp. 2d at 472 (applying enterprise-as-focus framework to find that "a wide-ranging money laundering scheme that utilized New York-based U.S. banks to hold, move, and conceal the fruits of fraud [and] extortion" was "too peripheral . . . to support a RICO lawsuit").

was made by [a] Defendant . . . while . . . in San Francisco." *Norex Petroleum Ltd. v. Access*

*Indus., Inc.*, 540 F. Supp. 2d 438, 443 (S.D.N.Y. 2007), *aff'd*, 631 F.3d 29 (2d Cir. 2010).  Such

conduct was found insufficient for RICO liability.  *Norex*, 631 F.3d at 33.

     In *Cedeño*, the Second Circuit affirmed the dismissal of the plaintiff's RICO claim,

finding that the alleged enterprise was "almost exclusively Venezuelan"[10] and that the plaintiff

"fail[ed] to allege that the domestic predicate acts proximately caused his injuries." *Cedeño v.*

*Castillo*, 457 Fed. App'x 35, 38 (2d Cir. 2012).  There, the plaintiff alleged that the defendants,

many of whom were associated with the Venezuelan government, schemed to imprison him,

damaged his businesses, and laundered money from the extortion through U.S. bank accounts

(only the last of these acts had a domestic connection).  *Cedeño v. Intech Group, Inc.*, 733 F.

Supp. 2d 471, 472 (S.D.N.Y. 2010).  Finally, in *Chao Fan Xu*, the Ninth Circuit affirmed the

defendants' convictions under § 1962(d) when the "pattern of racketeering activity . . . was

executed and perpetuated in the United States" even though it was "conceived of and planned

overseas." 706 F.3d at 979.

     The facts pled in the instant case do not establish a connection between the United States

and the alleged racketeering activity that is sufficient to support a RICO claim.  As in *Philip*

*Morris*, *Norex*, and *Cedeño*, this case certainly has some domestic contact.  Defendant Mirtchev

and Plaintiff Devincci Hourani are U.S. citizens and Krull Corporation is located in the District.

Pls.' Opp'n to Mot. to Dismiss at ECF 13-15.  "Mirtchev approved of the extortion scheme from

Washington, D.C," Am. Compl. ¶ 15, and received some money from Dariga in Krull

---

[10] The Second Circuit looked to both the enterprise and the pattern of racketeering activity in affirming the district court's dismissal of the complaint, but did not explicitly adopt either framework. *Cedeño*, 457 F. App'x at 37-38.

Corporation's bank accounts located partially in the U.S.[11] *Id.* ¶¶ 29-30. But this domestic

conduct is too "isolated," *Philip Morris*, 783 F. Supp. 2d at 29, and "peripheral," *Norex*, 540 F.

Supp. 2d at 472, to support a RICO claim. As the Supreme Court has stated, "it is a rare case of

prohibited extraterritorial application that lacks *all* contact with the territory of the United

States," and "the presumption against extraterritorial application would be a craven watchdog

indeed if it retreated to its kennel whenever some domestic activity is involved in the case."

*Morrison*, 130 S. Ct. at 2884 (emphasis added). U.S. citizenship, the location of the enterprise,

and laundering money through accounts in the United States cannot change the "essentially

foreign" nature of the racketeering activity in this case. *Philip Morris*, 783 F. Supp. 2d at 29.

Dariga's campaign of "harassment and intimidation" against the Plaintiffs took place entirely in

Kazakhstan, as did her extortion of Plaintiffs' assets. Am. Compl. ¶¶ 3, 21-23. Moreover,

Defendant Mirtchev's post-extortion money laundering[12] through domestic and foreign bank

accounts is not substantial enough to constitute a domestic predicate act. *See Cedeño*, 733 F.

Supp. 2d at 472-73 (finding that predicate acts of money laundering involving transfers in and

out of United States accounts "too peripheral" to bring domestic RICO claim).

    Furthermore, as in *Cedeño*, Plaintiffs fail to allege that the domestic predicate act of post-

extortion money laundering proximately caused their injuries. *See Cedeño*, 457 Fed. App'x at

38; *see also Hemi Grp. LLC v. N.Y.C.*, 130 S. Ct. 983, 991 (2010) ("[T]he compensable injury

flowing from a [RICO] violation . . . necessarily is the harm caused by [the] predicate acts.")

---

[11] The predicate acts of extortion, conspiracy to extort, and money laundering are in violation of 18 U.S.C. § 1951, D.C. Code § 22-3251, and 18 U.S.C. § 1956. *See* Am. Compl. ¶¶ 33-41.
[12] The Amended Complaint describes Defendant Mirtchev's "money laundering" as receiving payments through Krull bank accounts that were partly derived from revenues of the Plaintiffs' seized businesses. *See* Am. Compl. ¶¶ 29-30. This act alone is not sufficient to constitute money laundering. However, Defendant Mirtchev's "monetizing" Dariga's control of the companies, "deposit[ing] some of the proceeds of the seized businesses in western bank accounts" to avoid taxes, and acquiring currencies could constitute money laundering. *Id.* ¶ 16.

(emphasis removed) (internal quotation marks omitted).  Indeed, Plaintiffs' injuries – *e.g.*, the loss of their assets in Kazakhstan, harassment by Kazakh government officials, government police raids, and expulsion from Kazakhstan – were the "direct and proximate" result of the extortion, not the post-extortion money laundering.  *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768 (9th Cir. 2002) (affirming dismissal of RICO claims after finding, in part, that theft, not money laundering of theft proceeds, was proximate cause of plaintiff's injury).  Thus, Plaintiffs' money laundering claim cannot constitute a predicate act under RICO.

To be sure, this Court recognizes that a defendant need not personally commit the extortion alleged to be liable for conspiracy to commit a RICO violation under 18 U.S.C. § 1962(d).  *See RSM Prod. Corp. v. Freshfields Bruckhaus Deringer US LLP*, 682 F.3d 1043, 1047-1048 (D.C. Cir. 2012) ("A defendant need not agree to be the one to commit the predicate acts . . . . 'it suffices that [the defendant] adopt the goal of furthering or facilitating the criminal endeavor.') (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).  Yet Defendant Mirtchev's "mere[] agree[ment] with Dariga that she would [commit the extortion]," Pls.' Opp'n to Mot. to Dismiss at ECF 11-12, made while Defendant Mirtchev was in the United States, is insufficient to transform Plaintiffs' RICO conspiracy claim from foreign to domestic.  As the Ninth Circuit stated in *Chao Fan Xu*, "we look 'not upon the place where the deception originated' but instead upon the connection of the challenged conduct to the proscription in the statute."  706 F.3d 965 at 979 (quoting *Morrison*, 130 S. Ct at 2884).  Here the "challenged conduct" took place entirely abroad.  Defendant Mirtchev's assent is thus insufficient to bring the conspiracy within RICO's domestic ambit.

In sum, the predicate acts that proximately caused Plaintiffs' injury – namely, the extortion *in Kazakhstan by a Kazakh actor* of Plaintiffs' *Kazakhstan-based* assets – were

squarely extraterritorial and therefore outside of RICO's reach.  Defendant Mirtchev's mere

agreement from the United States cannot paint over this foreign scheme with a domestic brush.

This Court therefore dismisses the Plaintiffs' RICO claims.


      *C.  Analysis of Conspiracy to Defame Claim*

      Plaintiffs also assert that Defendant Mirtchev acted "through Krull" and that Defendants

"published or caused" the Kazakh Embassy to publish defamatory articles on the embassy's

website. *See* Am. Compl. ¶¶ 58-59.  These articles included news stories, editorials, internal

government memoranda, and other internet publications. *Id.* ¶ 59.  Because Plaintiffs fail to plead

sufficient facts to support their conspiracy to defame claim, this claim must be dismissed.

      Under District of Columbia law, a plaintiff claiming defamation must show: "(1) that the

defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant

published the statement without privilege to a third party; (3) that the defendant's fault in

publishing the statement amounted to at least negligence; and (4) either that the statement was

actionable as a matter of law irrespective of special harm or that its publication caused the

plaintiff special harm." *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1088 (D.C. Cir. 2007).

      Defendants argue that Plaintiffs' claim must be dismissed because the claim does not

identify the "the time, place, content, speaker, and listener of the allegedly defamatory matter."

Defs.' Reply at ECF 19 [Docket No. 75].  However, contrary to Defendants' argument, District

of Columbia law does not apply a heightened pleading standard requiring such detail. *See*

*Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (refusing to adopt a heightened standard that

would require the plaintiff to "plead the time, place, content, speaker and listener of the allegedly

defamatory matter"); *see also Intelsat United States Sales Corp. v. Juch-Tech, Inc.*, 2013 U.S.

Dist. LEXIS 43258 (D.D.C. Mar. 27, 2013) (concluding that because the defendants'

counterclaim "alleged the speaker, recipient, subject matter, and defamatory nature of the

statements," its claims were sufficiently particular to survive a motion to dismiss).

District of Columbia law does require, however, that Plaintiffs' factual allegations of

defamation be specific enough to allow Defendants to "form responsive pleadings." *Solers, Inc.*

*v. Doe*, 977 A.2d 941, 948 (D.C. 2009). Plaintiffs fail to meet this standard. The Amended

Complaint alleges only that Defendant Mirtchev "use[d] his influence to falsely brand the

Houranis as international criminals and terrorists," Am. Compl. ¶ 16, and that he acted "through

Krull, and with the active support of the Kazakh ambassador" to "cause" the Kazakh Embassy to

post defamatory statements, *id.* ¶ 58. Plaintiffs allege no facts describing the "influence"

Defendant Mirtchev had with the embassy, Forbes.com, the "Eurasian Transition Group," or the

publishers of "various other Internet publications" – or even simply what relationship

Defendants' "influence" had to the publishing of these statements. *Id.* ¶ 59. Plaintiffs also do

not describe how Defendant Mirtchev purportedly "caused" the embassy to publish these

statements or in what manner he himself or Krull Corporation did so.[13] Without alleging if or

---

[13] Plaintiffs argue that they discovered Defendants' involvement in the alleged defamation in April 2010, prior to which they believed only the Government of Kazakhstan to be behind the publications. Pls.' Opp'n to Defs.' Mot. to Dismiss at ECF 25-26. However, the Amended Complaint provides no further details about how Plaintiffs made this discovery of Defendants' involvement. Indeed, examining Plaintiffs' own declarations, to which Plaintiffs direct this court to find support for their defamation claim, Hr'g Tr. at 49:24-50:7 (Apr. 16 2013), the court finds that the critical (if not sole) piece of evidence substantiating Defendants' involvement with the scheme outlined in the Amended Complaint is the Daulbaev memorandum, which Defendants challenge as a forgery and upon which Plaintiffs claim to no longer rely. *See* I. Hourani Decl. ¶ 30 [Docket No. 32-27] ("[M]y brother-in-law, Rakhat Aliyev, obtained a memorandum providing definitive evidence that the Defendants had played integral roles in the Republic of Kazakhstan's campaign against my family. On the basis of that evidence, we decided to file a civil suit against the Defendants in this Court."); *see also* Hr'g Tr. at 61:20-21 ("We [*i.e.*, Plaintiffs] do not rely on those allegedly forged documents to put forward this case."). Without further addressing the forgery issue, this Court notes that the conclusory nature of Plaintiffs'

how Defendant Mirtchev had contact with or control over the media or government publishers in

question, Plaintiffs' statement that Defendant Mirtchev somehow "caused" these sources to

defame Plaintiffs is precisely the kind of "mere conclusion[]" that is not "entitled to the

assumption of truth" under *Iqbal*. 556 U.S. at 664.


### III.    Defendants' Motion for Sanctions


Defendants move this Court to dismiss Plaintiffs' claims with prejudice and to impose

sanctions against Plaintiffs and their counsel under Fed. R. Civ. P. 11(b), under which a party

presenting the court with a pleading certifies that:

> (1) it is not being presented for any improper purpose, such as to harass, cause
>
> unnecessary delay, or needlessly increase the cost of litigation;

---

defamation claim may be due in part to Plaintiffs' decision to withdraw from their Amended Complaint all mention of the allegedly forged Daulbaev memorandum that mentions Defendants' involvement in the conspiracy to extort and defame Plaintiffs.

The Court also notes that Plaintiffs rely on their "discovery" of Defendants' involvement in the defamation (by way of the Daulbaev memorandum) when countering Defendants' argument that the defamation claim is procedurally barred under the applicable one year statute of limitations. *See* D.C. Code § 12-301(4) (noting that the statute of limitations for libel or defamation in the District of Columbia is one year from publication). Plaintiffs seek to apply the "discovery rule," under which the one year period does not begin to run until a plaintiff knows (or by the exercise of reasonable diligence should know) (1) of the injury, (2) its cause in fact and (3) of some evidence of wrongdoing. *Bussineau v. Georgetown College*, 518 A.2d 423, 425 (D.C. 1986). Although the allegedly defamatory statements were first published in 2008 and Plaintiffs did not file their complaint until September 2010, Plaintiffs argue that they did not discover Defendants' involvement in the publication until April 2010. *See* Pls.' Opp'n to Defs.' Mot. to Dismiss at ECF 25. Until then, Plaintiffs believed that only the Republic of Kazakhstan was publishing defamatory statements, and that they were thus statutorily foreclosed from pursuing any legal remedies for their defamation injuries under the Foreign Sovereign Immunities Act. *Id.* at ECF 26-27; *see* 28 U.S.C. § 1605(a)(5)(B) (providing no waiver of a foreign state's immunity for "any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights"). This Court need not decide whether the statute of limitations bars Plaintiffs' defamation claim, choosing instead to dismiss this claim for other reasons set forth herein.

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a

nonfrivolous argument for extending, modifying, or reversing existing law or for

establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will

likely have evidentiary support after a reasonable opportunity for further investigation or

discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so

identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b)(1-3).[14]  To determine whether a party has engaged in conduct violating

these requirements, the court must apply an objective standard of reasonableness. *See Bus.*

*Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 550-51 (1991). Under Rule 11,

a court retains broad discretion to impose appropriate sanctions if a violation is found. *See*

*Clinton v. Jones*, 520 U.S. 681, 709 n.42, 117 S. Ct. 1636 (1997) ("Sanctions may be appropriate

where a claim is presented for any improper purpose, such as to harass, including any claim

based on allegations and other factual contentions [lacking] evidentiary support or unlikely to

prove well-grounded after reasonable investigation." (internal citations omitted)).

The Court notes that Defendants' motion has some merit, as Plaintiffs have alleged facts

in their First Amended Complaint that contradict facts outlined in their original complaint and

Plaintiffs' own sworn statements.[15]  Specifically, the First Amended Complaint alleges that

---

[14] The Court notes that both parties are represented by experienced and skilled counsel well-known to this Court.

[15] The Court may consider the original Complaint and Plaintiffs' other filings, including sworn statements, in evaluating the Amended Complaint. *See W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) (holding that on a Rule 12(b)(6) motion "it is appropriate for the court to look beyond the amended complaint to the record, which includes the original complaint" and compare the complaints).

*Dariga*, acting as a private party, "siphoned [Plaintiffs' media] companies' assets" en route to a political career. Am Compl. ¶¶ 12, 25. In contrast, in their Original Complaint and in other sworn testimony, Plaintiffs consistently claim that the *Government of Kazakhstan expropriated* their assets because of Plaintiffs' ties to General Rakhat Aliyev. *See, e.g.*, Compl. ¶ 110 [Docket No. 1] ("The theft of the Houranis' assets stems directly from a meeting between Rakhat Aliyev and President Nazarbayev . . . ."); *id.* ¶ 126 ("with the stroke of a pen, the Government of Kazakhstan expropriated two of the country's remaining independent media outlets [i.e. KTK Television and Alma Media]"); *id.* ¶ 106 (alleging that all Hourani businesses were "expropriated by the Kazakh Government"); *id.* ¶ 126 ("the Kazakh Government expropriated each and every one of the Hourani family businesses"); *see also* I. Hourani Decl. ¶ 5 [Docket No. 32-27] ("the Government of Kazakhstan . . . expropriated billions of dollars worth of investments"); *id.* ¶ 27 ("[T]he Republic of Kazakhstan and President Nazarbayev" were responsible for the expropriation of Plaintiffs' assets); D. Hourani Decl. ¶ 5 [Docket No. 32-28] (alleging Defendants worked with the "Republic of Kazakhstan" and its President to divest the Houranis of their businesses because of their ties to Rakhat Aliyev); *id.* ¶ 6 (asserting that Devincci's interest KTK Television "was stripped . . . through the coercive tactics of the Kazakh Government as supported by the Defendants").

In addition, while Dariga seems to be a government agent with a supporting role in the Original Complaint – advising Devincci Hourani to sign over his family's assets to the First Presidential Fund, warning him "that the government would take more drastic actions against his family" if he failed to do so, Compl. ¶ 126, and "allow[ing] government entities to expropriate all of the companies' assets," *id.* ¶ 127 – she takes center stage in the Amended Complaint as a non-governmental party, *see* Pls.' Opp. to Mot. to Dismiss. at ECF 34 ("[T]he [First Amended

Complaint] focuses on instances in which . . . Dariga . . . acted for her own personal reasons with no official government imprimatur, to steal certain businesses of the Hourani family."). Furthermore, while both complaints allege that Dariga instructed the Houranis to sign the assets over to the "First Presidential Fund," the Original Complaint describes this fund as being "set up by President Nazabayev to develop his image domestically and abroad." Compl. ¶ 126; *see also* Am. Compl. ¶ 21 ("[Dariga] demand[ed] that Devincci Hourani sign over to the First Presidential Fund [his and Issam's] shares in Alma Media [and KTK Television]").[16]

Plaintiffs allege that they do not plead new factual allegations, only new legal theories. *See* Pls.' Opp'n to Defs.' Rule 11 Mot. at 2-3 [Docket No. 89]. They also argue that the allegations in the Amended Complaint simply refocus and narrow the original claims, "adding another fact in the chain of events." Hr'g Tr. 65:10 (Apr. 16, 2013). A plaintiff, however, may not plead facts in their amended complaint that contradict those in their original complaint. While reconcilable "small variations" between the complaints are acceptable, *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192 (D.C. Cir. 2004), "[w]here a plaintiff blatantly changes his statement of the facts in order to respond to the defendants['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint a court is authorized to accept the facts described in the original complaint as true." *Colliton v. Cravath, Swaine & Moore LLP,* No. 08-0400, 2008 U.S. Dist. LEXIS 74388, at *19 (S.D.N.Y. Sept. 24, 2008) (internal quotation marks and citations omitted). Given the number and nature of the inconsistencies between the complaints, the Court finds Plaintiffs' explanations difficult to

---

[16] Perhaps in an attempt to diminish the role of the Kazakh government in their amended pleadings, Plaintiffs have claimed in their Opposition Brief that they need discovery to determine whether the First Presidential Fund is actually a "government" fund. *See* Pls.' Opp'n at ECF 35 n.33.

accept.  Other courts have found a Rule 11 violation to provide alternative grounds for the

dismissal of a complaint.  *See, e.g.*, *id.* at *42-43.  This Court, however, chooses not to impute

bad faith on the part of the Plaintiffs, finding ample grounds for dismissing the complaint on the

substantive grounds previously discussed.  Instead, this Court denies Defendants' Rule 11

Motion and, finding that Plaintiffs have already had two bites at the proverbial apple, dismisses

the Amended Complaint with prejudice.


**IV.     Conclusion**


This Court has considered Plaintiffs' remaining arguments and has found them without

merit.  Thus, for the foregoing reasons, Defendants' motion to dismiss the complaint is

GRANTED WITH PREJUDICE and Defendants' motion for Rule 11 sanctions is DENIED.  An

appropriate order accompanies this memorandum opinion.


May 7, 2013

Thomas F. Hogan
UNITED STATES DISTRICT JUDGE